**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,**

**Plaintiff,**

v.

**ELISABETH DeVOS, Secretary, U.S. Department of Education,** *et al.***,**

**Defendants.**

Civil Action No. 17-999 (RDM)

---

## CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff California Association of Private Postsecondary Schools ("CAPPS") hereby moves for a preliminary injunction restraining the Department of Education ("Department"), its officers, employees, and agents from effectuating, implementing, applying, or taking any action to enforce the ban on arbitration and class-action-waiver provisions ("Arbitration and Class Action Waiver Ban") during the pendency of this litigation. The Arbitration and Class Action Waiver Ban constitutes a portion of the Final Rule challenged in this action. *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule").

As detailed in the attached memorandum of law, the Arbitration and Class Action Waiver Ban contravenes the Federal Arbitration Act, exceeds the Department's statutory authority, runs afoul of the Administrative Procedure Act, and violates the Constitution. CAPPS is thus likely to succeed on the merits; its members will be irreparably harmed in the absence of injunctive relief; the balance of equities tips in its favor; and an injunction would be in the public interest.

WHEREFORE, CAPPS respectfully requests that the Court grant CAPPS's Motion for a

Preliminary Injunction and enjoin the Department from enforcing the Arbitration and Class

Action Waiver Ban.


Dated: June 2, 2017                              Respectfully submitted,

                                                 /s/ Clifford M. Sloan
                                                 CLIFFORD M. SLOAN, DC Bar No. 417339
BORIS BERSHTEYN                                  CAROLINE S. VAN ZILE, DC Bar No. 1017942
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
4 Times Square                                   LLP
New York, NY 10036                               1440 New York Avenue, NW
T: 212/735-3834                                  Washington, DC 20005
                                                 T: 202/371-7000
GREGORY BAILEY                                    F: 202/661-8340
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP         Email: cliff.sloan@skadden.com
155 N Upper Wacker Dr. #2700                      Email: caroline.vanzile@skadden.com
Chicago, IL 60606
T: 312/407-0739
F: 312/407-8604

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
T:  202/776-7867
F:  202/330-5290

*Attorneys for CAPPS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Motion for a Preliminary Injunction, Memorandum in Support, and the relevant Declarations and Attachments, were sent via Federal Express to the following parties:

Elisabeth DeVos, in her official capacity as Secretary of Education
United States Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Jefferson B. Sessions III
United States Office of the Attorney General
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Channing D. Phillips
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, DC 20530

The Motion, Memorandum, Declarations, and Attachments were also sent via email to Sheila Lieber (Sheila.Lieber@usdoj.gov) and Thomas Zimpleman (Thomas.D.Zimpleman@usdoj.gov) at the Department of Justice, who have indicated that they will be acting as counsel for Defendants Elisabeth DeVos and the Department of Education.

Dated: June 2, 2017                        Respectfully submitted,


                                           /s/ Clifford M. Sloan
                                           CLIFFORD M. SLOAN, DC Bar No. 417339
                                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                           LLP
                                           1440 New York Avenue, NW
                                           Washington, DC 20005
                                           T: 202/371-7000
                                           F: 202/661-8340
                                           Email: cliff.sloan@skadden.com

                                           *Attorney for CAPPS*

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**CALIFORNIA ASSOCIATION OF PRIVATE
POSTSECONDARY SCHOOLS,**

        **Plaintiff,**

**v.**

**ELISABETH DeVOS, Secretary, U.S.
Department of Education, *et al.*,**

        **Defendants.**

**Civil Action No. 17-999 (RDM)**

---

## CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND .....................................................................................................4

STANDARD OF REVIEW .........................................................................................................5

ARGUMENT ..............................................................................................................................6

I.      CAPPS IS LIKELY TO SUCCEED ON THE MERITS ...................................................6

      A.      The Arbitration and Class Action Waiver Ban Contravenes the Federal
Arbitration Act.......................................................................................................6

      B.      The Department Lacks the Authority to Promulgate the Ban Under the HEA........10

      C.      The Arbitration and Class Action Waiver Ban Is Arbitrary and Capricious ...........13

      D.      The Arbitration and Class Action Waiver Ban Violates the Constitution ...............19

II.     SCHOOLS WILL SUFFER IRREPARABLE HARM ABSENT AN
INJUNCTION ..................................................................................................................19

III.    THE BALANCE OF EQUITIES TILTS IN CAPPS'S FAVOR.....................................23

IV.    AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST ..................................24

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

*American Financial Services Association v. Burke,*
　　169 F. Supp. 2d 62 (D. Conn. 2001) ...................................................... 20, 21

*American Health Care Association v. Burwell,*
　　No. 16-233, 2016 WL 6585295 (N.D. Miss. Nov. 7, 2016) ........................... 8, 10, 18, 19

*AT&T Mobility LLC v. Concepcion,*
　　563 U.S. 333 (2011) ...................................................................... 7, 8, 14

*Bayou Lawn & Landscape Services v. Secretary of Labor,*
　　713 F.3d 1080 (11th Cir. 2013) ...................................................... 23

*Buckeye Check Cashing, Inc. v. Cardegna,*
　　546 U.S. 440 (2006) ...................................................................... 6

*Burlington Truck Lines v. United States,*
　　371 U.S. 156 (1962) ...................................................................... 13

*Carey v. Federal Election Commission,*
　　791 F. Supp. 2d 121 (D.D.C. 2011) .................................................. 23

*Circuit City Stores, Inc. v. Adams,*
　　532 U.S. 105 (2001) ...................................................................... 11

*Comcast Corp. v. FCC,*
　　600 F.3d 642 (D.C. Cir. 2010) ...................................................... 12

*CompuCredit Corp. v. Greenwood,*
　　565 U.S. 95 (2012) ...................................................................... 8

*Davis v. District of Columbia,*
　　158 F.3d 1342 (D.C. Cir. 1998) ...................................................... 22

*DIRECTV, Inc. v. Imburgia,*
　　136 S. Ct. 463 (2015)................................................................... 7, 9

*Eastern Enterprises v. Apfel,*
　　524 U.S. 498 (1998) ...................................................................... 19

*Encino Motorcars, LLC v. Navarro,*
　　No. 15-415, 579 U.S. ___, slip op. (June 20, 2016)............................... 18

*Enterprise International, Inc. v. Corporation Estatal Petrolera Ecuatoriana,*
　　762 F.2d 464 (5th Cir. 1985)........................................................ 21

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................................... 12, 13

*George Washington University v. District of Columbia*,
    148 F. Supp. 2d 15 (D.D.C. 2001) ..................................................................23

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) .......................................................................22

*Hall Street Associates, L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008) ........................................................................................6

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) ...................................................... 13, 15, 16, 18

*Kindred Nursing Centers, L. P. v. Clark*,
    No. 16-32, slip op. (May 15, 2017) .............................................................7, 10

*Marmet Health Care Center, Inc. v. Brown*,
    132 S. Ct. 1201 (2012) ............................................................... 6, 7, 15, 24

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
    460 U.S. 1 (1983) ...........................................................................................6

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile
    Insurance Co.*,
    463 U.S. 29 (1983) ..................................................................... 13, 15, 18

*National Federal of Independent Business v. Sebelius*,
    132 S. Ct. 2566 (2012) ....................................................................................9

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984) ......................................................................................19

*Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools
    and Colleges*,
    951 F. Supp. 2d 851 (E.D. Va. 2012) ......................................................23, 24

*Saturn Distribution Corp. v. Williams*,
    905 F.2d 719 (4th Cir. 1990)...........................................................................7

*Securities Industry Association v. Connolly*,
    703 F. Supp. 146 (D. Mass. 1988) *aff'd*, 883 F.2d 1114 (1st Cir. 1989)..........................20

*Securities Industry Association v. Connolly*,
    883 F.2d 1114 (1st Cir. 1989) .........................................................................7

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir. 1970) ...................................................................21

*Shearson/American Express, Inc. v. McMahon*,
    482 U.S. 220 (1987) .............................................................................9

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) .............................................................................9

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .............................................................................9

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) .........................................................................8, 14

*TD International, LLC v. Fleischmann*,
    639 F. Supp. 2d 46 (D.D.C. 2009) ..........................................................21

*Texas Children's Hospital v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ..........................................................21

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014) .......................................................................13

*Volt Information Services, Inc. v. Board of Trustees of Leland Stanford Jr. University*,
    489 U.S. 468 (1989) .............................................................................8

*Whitman v. American Trucking Associations, Inc.*
    531 U.S. 457 (2001) ...........................................................................12

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................6

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...............................................................21

## STATUTES

9 U.S.C. § 2 .............................................................................................6

10 U.S.C. § 987 ......................................................................................11

12 U.S.C. § 5518 ....................................................................................11

15 U.S.C. 78o(o) .....................................................................................11

20 U.S.C. § 1087d .............................................................................10, 12

Cal. Educ. Code § 94902(a) ..................................................................................19

## REGULATIONS

34 C.F.R. § 600.4(c) ...........................................................................................15

34 C.F.R. § 600.5(d) ...........................................................................................15

34 C.F.R. § 685.300 ........................................................................................5, 19

81 Fed. Reg. 32,830 (May 24, 2016) ..................................................................17

81 Fed. Reg. 75,926 (Nov. 1, 2016)..............................................................*passim*

## OTHER AUTHORITIES

Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010),
       http://www.wsj.com/ articles/
       SB10001424052748703724104575378933954267308 ...................................4

Consumer Financial Protection Bureau, *What Are the Main Differences Between Federal
       Student Loans and Private Student Loans?*,
       http://www.consumerfinance.gov/askcfpb/545/what-are-main-differences-
       between-federal-student-loans-and-private-student-loans.html (last visited May
       30, 2017) ................................................................................................17

Deborah Platt Majoras, Chairwoman, FTC, Comments at the FTC Workshop: Protecting
       Consumer Interests in Class Actions (Sept. 13, 2004), 18 Geo. J. Legal Ethics
       1161 (2005) ............................................................................................15

Jill E. Fisch, *Class Action Reform, Qui Tam, and the Role of the Plaintiff*, 60 Law &
       Contemp. Probs. 167 (1997) ......................................................................16

H.R. Rep. No. 68-96, , 68th Cong., 1st Sess. (1924) ...................................................6

H.R. Rep. No. 97-542, 97th Cong. 2d Sess. (1982)....................................................14

Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 Va. L. Rev. 1051
       (1996)....................................................................................................16

National Center For Education Statistics, Digest of Education Statistics, Table 331.20
       (Nov. 2016), https://nces.ed.gov/ programs/digest/d16/tables/dt16_331.20.asp ...............2

S. Rep. No. 536, 68th Cong., 1st Sess. (1924)..........................................................14

2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)....................12

Michael Stratford, *DeVos Says She'll Process Already-Approved Student Debt Relief Claims*, PoliticoPro.com (May 24, 2017, 2:16 PM), https://www.politicopro.com/education/whiteboard/ 2017/05/devos-says-shell-process-already-approved-student-debt-relief-claims-088261 ........................................22

U.S. Chamber Institute for Legal Reform, *Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions* 1-2 (Dec. 11, 2013), http://www.instituteforlegalreform.com/ uploads/sites/1/Class-Action-Study.pdf...........16

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2013).......................................21

**INTRODUCTION**

On November 1, 2016, the Department of Education ("Department") published a Final Rule adopting a series of far-reaching and unprecedented changes in its approach to student borrower defenses under the Higher Education Act.  *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule" or "Borrower Defense Regulations").  It provided that these changes would go into effect on July 1, 2017, the earliest possible date they could be imposed under the governing statute.  The Secretary of Education has publicly stated that she is reviewing the new regulatory regime set forth in the Borrower Defense Regulations.  The Department, however, has not yet modified the rules or their effective date.  Accordingly, with the July 1 effective date approaching, plaintiff California Association of Private Postsecondary Schools ("CAPPS") filed suit on May 24, 2017, challenging the new rules as exceeding the Department's statutory authority, violating the Administrative Procedure Act, and flouting the Constitution.

Although CAPPS plans to ask for a briefing schedule that would expeditiously resolve the legal issues with the broader regulations, one aspect of the Final Rule will lead to immediate chaos and disruption if it goes into effect on July 1, 2017.  The Final Rule bars the enforcement of arbitration provisions and class action waivers in existing agreements with students, and it further prohibits schools from entering into new agreements with arbitration provisions and class action waivers.  This ban on arbitration and class-action-waiver provisions ("Arbitration and Class Action Waiver Ban") will immediately and irreparably harm CAPPS schools.  Accordingly, CAPPS respectfully moves for the entry of a preliminary injunction to preserve the status quo and prevent the implementation of the Arbitration and Class Action Waiver Ban while the Court considers the merits of the challenge to the Final Rule.

Many CAPPS schools have arbitration clauses and class action waivers in their existing enrollment agreements with students to promote cost-effective and swift dispute resolution for

both the school and its students.  *See* Declaration of Robert Johnson ("Johnson Decl.") ¶ 9 (June 1, 2017).  In the Federal Arbitration Act ("FAA"), Congress recognized the many benefits of arbitration and enacted a broad federal pro-arbitration policy – a principle that the Supreme Court has repeatedly emphasized and upheld.  Without relief from this Court, however, beginning on July 1, those well-established benefits will be unavailable to CAPPS schools: their current arbitration provisions and class action waivers will immediately become unenforceable.  CAPPS schools, moreover, will immediately be prohibited from entering into such agreements with any future students.

Attempting to justify this wholesale rejection of the arbitration and class-action-waiver benefits recognized by Congress and the Supreme Court, the Department stated that it is merely making its ban a condition of receiving Title IV funding, not enacting a flat prohibition.  But the elimination of Title IV funds would be the death knell for CAPPS institutions, as it would be for nearly all postsecondary institutions.  Fully 80% of postsecondary students rely on Title IV funds to pay their tuition; thus, the loss of such funds would cripple any school.  *See* Nat'l Ctr. For Educ. Statistics, Digest of Educ. Statistics, Table 331.20 (Nov. 2016), https://nces.ed.gov/ programs/digest/d16/tables/dt16_331.20.asp (outlining financial aid statistics for 2014-15 school year).  As a result, the ban is an impermissibly coercive *de facto* mandate – as other courts have recognized in similar circumstances.

The four-part test for obtaining a preliminary injunction is met here:

- **First**, CAPPS is likely to succeed on the merits with regard to the Department's regulatory overreach in enacting the Arbitration and Class Action Waiver Ban.  The Department's new Arbitration and Class Action Waiver Ban conflicts with the Federal Arbitration Act; exceeds the Department's authority under the Higher

2

Education Act ("HEA"); violates the Administrative Procedure Act ("APA"); and contravenes the Constitution.

- **<u>Second</u>**, CAPPS schools will be irreparably harmed in the absence of an injunction.  Schools will immediately be stripped of the benefits of arbitration and class-action waivers in their enrollment agreements for all new enrollments; chaos will ensue as schools, arbitrators, and courts debate how existing arbitrations may proceed, assuming they may proceed at all; schools that lose Title IV funding will quickly collapse; and funds lost will not be recoverable due to the Department's sovereign immunity.

- **<u>Third</u>**, the balance of the equities tips in CAPPS's favor.  There will be no harm to the Department or students if this aspect of the Final Rule's implementation is delayed pending full consideration of the merits; in contrast, severe harm to CAPPS schools and students will flow from allowing the ban to remain in place. That is particularly true given that the Secretary is currently reconsidering the Final Rule in any event, and its fate in the long term remains uncertain.

- **<u>Finally</u>**, an injunction is in the public interest.  In the absence of an injunction, the sound and orderly continuation of existing arbitration proceedings will be unnecessarily disrupted.  Moreover, resources will be needlessly diverted away from classes and students, particularly students from underserved populations that enroll in proprietary schools like many CAPPS constituents.

For all of these reasons, CAPPS respectfully requests that this Court enter a preliminary injunction enjoining enforcement of the Arbitration and Class Action Waiver Ban by July 1, 2017.

# FACTUAL BACKGROUND

*CAPPS*

CAPPS is a California state association of schools representing a diverse range of private postsecondary institutions in California. *See* Johnson Decl. ¶ 2. It has a membership of approximately 150 institutions, which includes proprietary (for-profit) and non-profit schools. *Id.* ¶ 4. Many CAPPS schools are technical or vocational colleges that prepare workers for occupations necessary to a thriving economy. *Id.* ¶ 7. CAPPS schools train future nurses, dialysis technicians, ultrasound technicians, home health aides, emergency medical technicians, information technology specialists, cyber-security specialists, HVAC and refrigeration technicians, electricians, paralegals, chefs, line cooks, and cosmetologists. *Id.* ¶ 8. The economy would not function without workers in these fields. Local hospitals, labs, repair companies, and restaurants depend on a reliable stream of well-trained workers. And students rely on CAPPS schools for access to skilled jobs and upward mobility.

Most CAPPS members are proprietary institutions, which serve a student population that has a high percentage of low-income and minority individuals who are otherwise not well served by traditional institutions. *See* Comments of CAPPS, ED-2015-OPE-0103, Attach. 1, Declaration of Jonathan Guryan, Ph.D. (Aug. 1, 2016). Students at proprietary schools are likely to be the first in their family to graduate from college. *Id.* ¶ 14. They are also more likely to be single parents, financially independent, and over the age of 25. *Id.* ¶¶ 7, 12. These students are often drawn to proprietary schools based on the schools' flexible schedules and career-focused instruction. Johnson Decl. ¶ 5-6. Proprietary schools have established a record of successful efforts to help these students, whom other schools might label "at risk," actually graduate. *See*, *e.g.*, Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010), http://www.wsj.com/articles/SB10001424052748703724104575378933954267308. As the

Department itself acknowledged, "there are many proprietary career schools and colleges that play a vital role in the country's higher education system." 81 Fed. Reg. at 75,934.

*Final Rule*

The Final Rule is a sprawling mass of loosely related regulations. One of those regulatory interventions is central here: the Arbitration and Class Action Waiver Ban. Under the Final Rule, institutions that participate in the Direct Loan Program are prohibited from using or obtaining pre-dispute agreements to arbitrate borrower defense claims and from using or obtaining a waiver of a borrower's right to initiate or participate in a class action lawsuit related to those claims. *See* 81 Fed. Reg. at 76,087-88; 34 C.F.R. §§ 685.300(e)-(f). The borrower defense claims encompassed by the Final Rule include actions related to student loans, the provision of educational services, or a school's marketing – in other words, a wide variety of lawsuits a student might initiate against a school.

The Final Rule explicitly bars institutions from enforcing existing arbitration provisions or class action waivers. 81 Fed. Reg. at 76,087-88; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii). The ban takes effect immediately on July 1, 2017. Schools must either notify borrowers of this change or amend their agreements. 81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii). The Department imposed this ban despite Congress's explicit pro-arbitration stance in the Federal Arbitration Act, despite Supreme Court decisions emphasizing the benefits of arbitration and class-action-waiver provisions in contractual agreements, and despite data in the record demonstrating the benefits of bilateral arbitration.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must establish that (i) it is "likely to succeed on the merits," (ii) "it is likely to suffer irreparable harm in the absence of preliminary

relief," (iii) "the balance of equities tips in [its] favor," and (iv) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.   CAPPS IS LIKELY TO SUCCEED ON THE MERITS

CAPPS is likely to succeed on the merits because the Rule's Arbitration and Class Action Waiver Ban contravenes the FAA, exceeds the Department's statutory authority, runs afoul of the APA, and violates the Constitution.

### A.   The Arbitration and Class Action Waiver Ban Contravenes the Federal Arbitration Act

The Department's Final Rule would retroactively invalidate arbitration clauses in thousands of contracts and prohibit arbitration clauses in thousands of prospective contracts. That is exactly what Congress sought to prevent in the FAA.  *See* H.R. Rep. No. 68-96, 68th Cong., 1st Sess., at 1 (1924) ("The purpose of this bill is to make valid and enforc[ea]ble agreements for arbitration contained in contracts involving interstate commerce or within the jurisdiction of admiralty, or which may be the subject of litigation in the Federal courts.").

The FAA forbids such agency action.  The Federal Arbitration Act provides that arbitration agreements in contracts "*shall be* valid, irrevocable, and enforceable."  9 U.S.C. § 2 (emphasis added).  Congress intended the Act to replace "indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'"  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  As the Supreme Court has observed, the FAA embodies a "liberal federal policy favoring arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also Marmet Health Care*

*Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (per curiam) (The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution.").

In a wide-ranging series of cases enforcing the FAA, the Supreme Court has invalidated state laws and policies that abridge the right to enforce arbitration provisions in contracts. *See, e.g.*, *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) (holding that "California['s] . . . interpretation does not place arbitration contracts 'on equal footing with all other contracts'" and "does not give 'due regard . . . to the federal policy favoring arbitration.'" (internal citations omitted)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011) ("When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA."); *see also Marmet Health Care Ctr., Inc.*, 132 S. Ct. at 1203.

As the Supreme Court emphasized only weeks ago, the FAA "establishes an equal-treatment principle" and invalidates "any state rule discriminating on its face against arbitration." *Kindred Nursing Ctrs., L. P. v. Clark*, No. 16-32, slip op. at 4 (May 15, 2017).

In addition, the Supreme Court has made clear that the FAA protects the formation of contracts providing for arbitration just as it does the enforcement of arbitration provisions in existing contracts. *Id.* at 7-9 (rejecting the contention that the FAA is inapplicable to rules that "address only formation" of contracts); *see also, e.g.*, *Saturn Distrib. Corp. v. Williams*, 905 F.2d 719, 723 (4th Cir. 1990) ("To restrict the FAA to existing agreements would be to allow states to 'wholly eviscerate Congressional intent to place arbitration agreements upon the same footing as other contracts.'" (citing *Sec. Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1123-24 (1st Cir. 1989))).

The Supreme Court has also held that the FAA's protection of arbitration provisions fully applies to class action waivers that are part of arbitration provisions. *See AT&T Mobility LLC,*

563 U.S. 333.  A prohibition against contractual provisions that specify bilateral arbitration, like the Department's class-action-waiver ban here, "sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 348.  The "principal purpose" of the FAA is not only to ensure that arbitration agreements are treated equally, but to "ensur[e] that private arbitration agreements are enforced *according to their terms.*"  *Volt Info. Servs., Inc. v. Board of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989) (emphasis added).  Those terms, as the Supreme Court has recognized, certainly may include a preference for bilateral over class-wide arbitration.  *AT&T Mobility LLC*, 563 U.S. at 344-52; *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681-87 (2010).

The FAA likewise prohibits federal agencies from invalidating or otherwise discriminating against arbitration agreements or class action waivers.  A federal court recently held that plaintiffs were likely to prevail in a suit against the Department of Health and Human Services, which sought to bar arbitration agreements between nursing homes and their patients. *See Am. Health Care Ass'n. v. Burwell*, No. 16-233, 2016 WL 6585295 (N.D. Miss. Nov. 7, 2016) (to be published at 217 F. Supp. 3d 921).  The court noted the vast array of Supreme Court decisions striking down state laws "that stand as an obstacle to the accomplishment of the FAA's objectives."  *Id.* at *6 (quoting *AT&T Mobility LLC*, 563 U.S. at 343).  The court also deferred to the Supreme Court's holding that the FAA's preference for arbitration can be displaced only by a "contrary *congressional command.*"  *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 99 (2012) (emphasis added).  As the court recognized, "Congress did not enact the Rule in this case; a federal agency did, and therein lies the rub."  *Am. Health Care Ass'n.*, 2016 WL 6585295, at *19.  Because of the FAA, the "burden is on the party opposing arbitration" – here, the

8

Department – "to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987). In the present case, the Department of Education has not suggested that Congress intended to preclude arbitration agreements in the higher education context; therefore, the Department's rule barring arbitration agreements between schools and students is unlawful.

The Department's principal argument as to why the Arbitration and Class Action Waiver Ban does not violate the FAA is an assertion that "the HEA gives the Department the authority to impose conditions on schools that wish to participate in a Federal benefit program." 81 Fed. Reg. at 76,022. In other words, the Department contends that it is not imposing an impermissible ban on arbitration or class-action waivers because schools can always choose not to accept Title IV funds. That argument fails for two reasons. First, an agency may not use its spending power to engage in "economic dragooning" that leaves parties with "no real option but to acquiesce" to otherwise unlawful requirements. *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2605 (2012). A threat to withdraw all Title IV funding, which 80% or more of students rely on, is a "gun to the head" that goes well beyond "the point at which pressure turns into compulsion." *Id.* at 2604 (citing *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).[1] Second, pursuant to the FAA the Supreme Court has frequently vacated provisions that merely have a disproportionate impact on arbitration clauses without imposing a flat ban. *See, e.g.*, *DIRECTV, Inc.*, 136 S. Ct. at 471. The Department's Final Rule certainly constitutes such unequal treatment of arbitration

---

[1]   At the very least, this Court should reject the Department's interpretation of its statutory authority as encompassing the authority to impose such a coercive condition (which would raise deeply problematic issues under the Spending Clause) to avoid having to confront a constitutional question. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).

contracts, which is in and of itself prohibited by the FAA.  *See Kindred Nursing Centers, L. P.*, No. 16-32, slip op. at 4.[2]

Based on the text of the statute and Supreme Court precedent, the FAA bars the Department from prohibiting and rendering unenforceable arbitration agreements and class action waivers.

  B.  <u>The Department Lacks the Authority to Promulgate the Ban Under the HEA</u>

CAPPS is also likely to succeed on the merits because the Secretary lacks the authority to promulgate the Arbitration and Class Action Waiver Ban under the HEA.  The Department purports to find authority for the ban in Section 454(a)(6) of the HEA, a catch-all provision codified at 20 U.S.C. § 1087d(a)(6).  Under Section 454(a)(6), the Secretary may "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program in program participation agreements with educational institutions.  20 U.S.C. § 1087d(a)(6).  This vague catch-all provision is too thin a reed on which to hang a regulation that conflicts with the express statutory mandate of the FAA.

To begin with, in the rare circumstances in which Congress has given an agency the authority to abrogate arbitration provisions, it has done so clearly and unambiguously.  For

---

[2] The federal court considering a similar ban in the Medicare/Medicaid context agreed:

> [N]ursing homes are so dependent upon Medicare and Medicaid funding that the Rule in this case effectively amounts to a ban on pre-dispute nursing home arbitration contracts.  This court believes that the Rule should, and likely will be, treated as what it effectively is (*i.e.*, a de facto ban), in determining whether it conflicts with the FAA.  Moreover, it should be noted that, even if the Rule in this case is interpreted as a mere "incentive" against arbitration, this does not necessarily mean that singling out a form of arbitration for such disincentives allows it to survive FAA scrutiny.

*Am. Health Care Ass'n*, 2016 WL 6585295, at *5.

example, the Consumer Financial Protection Bureau ("CFPB") was given explicit authority by

Congress to study the issue of mandatory arbitration and then to promulgate a rule regarding

mandatory arbitration *if* the CFPB believed such a rule to be necessary.[3]  Without such explicit

congressional authorization, the FAA prohibits an agency from altering arbitration agreements.

The fact that Congress plainly thought it necessary to give such explicit authority to the CFPB,

and even then only after a careful study of the issue, supports the conclusion that the Department

does not have the authority, under a vague catch-all provision of the HEA, to abrogate arbitration

or class-action-waiver agreements.[4]

     In addition, the text and structure of the HEA establish that Section 454(a)(6) does not

authorize such aggressive interference with private contracts or such a massive expansion of

agency authority.  Section 454(a)(6) is a catch-all phrase that comes at the end of a series of

---

[3]    In sharp contrast to the catch-all in the HEA, the CFPB statute provides that:

       (a) The Bureau shall conduct a study of, and shall provide a report
to Congress concerning, the use of agreements providing for arbitration of any
future dispute between covered persons and consumers in connection with the
offering or providing of consumer financial products or services.

       (b) The Bureau, by regulation, ***may prohibit or impose conditions
or limitations on the use of an agreement between a covered person and a
consumer for a consumer financial product or service providing for
arbitration of any future dispute between the parties***, if the Bureau finds that
such a prohibition or imposition of conditions or limitations is in the public
interest and for the protection of consumers. The findings in such rule shall be
consistent with the study conducted under subsection (a).

12 U.S.C. § 5518 (emphasis added).

[4]    Indeed, as the Department acknowledged (81 Fed. Reg. at 76,023), other agencies in addition
to the CFPB have also been given specific, limited statutory authority to regulate arbitration
provisions – unlike the Department.  *See, e.g.*, 10 U.S.C. 987(f)(4), (h) (concerning the
Department of Defense and regulation of the use of mandatory arbitration in extensions of
credit to service members); 15 U.S.C. 78o (authorizing the SEC to regulate the use of
mandatory arbitration in certain investment relationships).

ministerial requirements for loan administration under program participation agreements.  And when general provisions "'follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'"  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)).  For example, under Subsections (1)-(5) of Section 454(a), an institution must agree to "provide a statement that certifies the eligibility of any student to receive a loan."  20 U.S.C. § 1087d(a)(1)(C).  The institution must also "set forth a schedule for disbursement of the proceeds of the loan in installments."  *Id.* § 1087d(a)(1)(D).  And the school may "not charge any fees of any kind, however described, to student or parent borrowers for origination activities."  *Id.* § 1087d(a)(5).  Under the precept of *ejusdem generis*, any provision promulgated under Section 454(a)(6) – the catch-all provision at the end of this long list – should likewise deal with the calculating, tracking, and disbursement of loan funds, or at least a similar ministerial function.

The Department seeks to use this limited catch-all requirement to override the FAA and to give the Department unbounded authority to regulate agreements between students and their schools.  But as the Supreme Court has held, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-161 (2000) (refusing to approve the FDA's assertion of authority to regulate tobacco based on generic statutory language); *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010) (refusing to allow the FCC to use its ancillary authority to enact massive new regulations otherwise outside its statutory reach).

12

Put simply, Section 454(a)(6) is not a blank check for the Department to enact any policy it sees fit, no matter how attenuated the connection might be to loan administration.  Section 454(a) does not deal with arbitration provisions or class action waivers – and neither, for that matter, does *any* provision of the HEA.  The Department cannot read into 454(a)(6) authority that Congress clearly did not intend to confer.[5]

C.      The Arbitration and Class Action Waiver Ban Is Arbitrary and Capricious

The Department's Arbitration and Class Action Waiver Ban is also arbitrary and capricious under the tenets of reasoned decision-making.  Section 706 of the APA requires an agency to:

> examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." . . . Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  When engaging in notice-and-comment rulemaking, the agency also has the obligation to respond to significant comments on the record.  The D.C. Circuit has held that "the opportunity

---

[5]     Further, the Department's foray into arbitration and class action waivers is novel and unprecedented.  This, too, supports the conclusion that the Arbitration and Class Action Waiver Ban exceeds the agency's authority.  *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) (refusing to approve the EPA's assertion of "newfound authority" to regulate energy sources that it had not attempted to regulate previously); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159-161 (refusing to approve the FDA's assertion of authority to regulate tobacco, a product that it had not attempted to regulate previously).

to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) (citation omitted).

**First**, the Department violated the APA because the agency failed to adequately consider extensive data in the record demonstrating the benefits of arbitration.  As discussed in the legislative history compiled to support the FAA and in Supreme Court case law interpreting the Act, the benefits of arbitration are substantial to *all* parties involved.  The Supreme Court has emphasized the significant "benefits [to] private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."  *Stolt-Nielsen S.A.*, 559 U.S. at 685.  CAPPS cited not only those court opinions in its comments – opinions that themselves contain references to numerous studies on arbitration – but also several published studies confirming the advantages of arbitration.  *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103, at 64 ("The average time from filing to final award for the consumer arbitrations studied was 6.9 months[,] . . . [i]n cases with claims seeking less than $10,000, consumer claimants paid an average of $96[,] and . . .[c]onsumers won some relief in 53.3% of the cases they filed and recovered an average of $19,255[.]" (citing Searle Civil Justice Institute, Consumer Arbitration Before the American Arbitration Association, Preliminary Report xiii (Mar. 2009), http://www.masonlec.org/site/rte_uploads/files/Consumer %20Arbitration%20 Before%20the%20AAA%20-%20Preliminary%20Rpt.pdf)); *id.* ("In 2005, Harris Interactive surveyed 609 adults who had participated in some type of arbitration, finding that they reported several advantages of arbitration over litigation: 74% said it was faster, 63% said it was simpler, and 51% said it was cheaper than litigation." (citing Brief of the Ctr. for Class Action Fairness as Amicus Curiae in Supp. of Pet'r at 25, *AT&T Mobility LLC. v. Concepcion*, 563 U.S. 333 (2011) (No. 09-893))); *see also* S. Rep. No. 536, 68th Cong., 1st

Sess., at 3 (1924) (the Act, by avoiding "the delay and expense of litigation," will appeal "to big business and little business alike, . . . corporate interests [and] . . . individuals"); H.R. Rep. No. 97-542, 97th Cong. 2d Sess., at 13 (1982) ("The advantages of arbitration are many: it is usually cheaper and faster than litigation; it can have simpler procedural and evidentiary rules; it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties; it is often more flexible in regard to scheduling of times and places of hearings and discovery devices . . ."). The Department, however, failed to address the substance of these submissions.[6] Because the Department failed to meaningfully consider the benefits of arbitration, it violated cardinal principles of the APA by "entirely fail[ing] to consider an important aspect of the problem"; failing to address substantial comments in the record; and "offer[ing] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43; *see also Home Box Office, Inc.*, 567 F.2d at 35-36.[7]

**Second**, in adopting the class action waiver ban, the Department likewise failed to adequately consider the serious drawbacks of class actions for students. It is well documented that class actions are often an ineffective means of obtaining relief for consumers, as CAPPS

---

[6] The Department purports to be remedying "widespread abuse" by schools "aggressively us[ing] waivers and arbitration agreements to thwart" student actions over the years. 81 Fed. Reg. at 76,025. However, the Department does not acknowledge that students already have a means to combat this alleged abuse. Arbitration provisions that do not comport with the evenhanded legal principles that apply to all contracts may be voided by courts, even under the FAA. *See Marmet*, 132 S. Ct. at 1203-04. Banning arbitration agreements altogether only prevents students and institutions from being able to contract freely. Moreover, if the Department is worried about private arbitration being used to avoid publicity, the Department already proposed a separate solution: Under the Final Rule, schools must notify the Department when an arbitration or lawsuit is initiated.

[7] These benefits are confirmed by the Department, which itself requires arbitration with institutions disputing accreditation decisions. See 34 C.F.R. §§ 600.4(c), 600.5(d) (requiring an institution to "agree[] to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration before initiating any other legal action.").

noted in its comments.  As practitioners and scholars have found, the incentive to litigate a class

action – including compensation – is higher for attorneys than it is for individual consumers.

*See, e.g.*, Deborah Platt Majoras, Chairwoman, FTC, Comments at the FTC Workshop:

Protecting Consumer Interests in Class Actions (Sept. 13, 2004), 18 Geo. J. Legal Ethics 1161,

1162-63 (2005) (cited by CAPPS in the record, Comments of CAPPS, ED-2015-OPE-0103, at

66); *see also* Jill E. Fisch, *Class Action Reform, Qui Tam, and the Role of the Plaintiff*, 60 Law &

Contemp. Probs. 167, 168 (1997) (discussing situation in which class members receive little or

nothing but counsel are compensated generously) (cited by CAPPS in the record, Comments of

CAPPS, ED-2015-OPE-0103, at 66 n.15); Susan P. Koniak & George M. Cohen, *Under Cloak of*

*Settlement*, 82 Va. L. Rev. 1051, 1053-54 (1996) (discussing class action settlements in which

class lawyers negotiated or requested multimillion dollar fees while class members received

minimal in-kind compensation) (cited by CAPPS in the record, Comments of CAPPS, ED-2015-

OPE-0103, at 66 n.15).  For example, as CAPPS noted in its comments, even where students can

overcome the high hurdle of class certification, it is statistically unlikely they will prevail.  *See*

Comments of CAPPS, ED-2015-OPE-0103, at 66-67.  One study of consumer and employee

class actions filed or removed in 2009 found that not a single class action ended in a final

judgment on the merits for plaintiff: 14% remained pending four years after filing; of those

resolved, 35% were voluntarily dismissed; 31% were dismissed on the merits; and 33% achieved

a classwide settlement – half the settlement rate of general federal court litigation.  *See* U.S.

Chamber Institute for Legal Reform, *Do Class Actions Benefit Class Members? An Empirical*

*Analysis of Class Actions* 1-2 (Dec. 11, 2013), http://www.instituteforlegalreform.com/

uploads/sites/1/Class-Action-Study.pdf.  Given the well-documented drawbacks of class

litigation, the Department should have, at the very least, considered and addressed whether class

action waivers might ultimately hold benefits for borrowers. *See Home Box Office, Inc.*, 567

F.2d at 35-36.  Once again, however, the Department failed to adequately address this important

aspect of the problem.

**Third**, the Department relies heavily on a CFPB study on arbitration agreements and

class action provisions. But that study is plainly inapposite to the public student loan context at

issue in the Final Rule.  The CFPB study concerned six financial products including credit cards,

checking accounts, general purpose reloadable prepaid cards, payday loans, private student

loans, and mobile wireless contracts governing third-party billing services.  *See* 81 Fed. Reg.

32,830, 32,840 (May 24, 2016).  The CFPB *itself*, however, acknowledges that federal loans

fundamentally differ from private loans (let alone mobile wireless contracts): The CFPB points

out that the "interest rate for a federal student loan is generally fixed"; "[f]ederal student loans

allow [students] to limit the amount [they] must repay each month based on [their] income"; and

there are "[o]ptions to delay or temporarily forgo payments (like deferment and forbearance)[.]"

*See* Consumer Financial Protection Bureau, *What Are the Main Differences Between Federal

Student Loans and Private Student Loans?*, http://www.consumerfinance.gov/askcfpb/545/what-

are-main-differences-between-federal-student-loans-and-private-student-loans.html (last visited

May 30, 2017).  The Department may not, consistent with the mandates of reasoned decision-

making, simply cut and paste findings from an entirely separate legal and factual setting, made

by a separate agency with an entirely distinct statutory charter and mission.[8]  Given the massive

---

[8]  In responding to comments raising the issue of the dissimilarity between the loans in the
CFPB study and federal student loans, the Department stated that the study looked at the
prevalence of arbitration agreements for private student loans, which may "share
characteristics" with Direct Loan borrowers.  However, the Final Rule applies to educational
institutions, not private student loan lenders.  If the Department was concerned with
arbitration and class actions provisions offered by private student loan lenders, that concern

*(cont'd)*

and disruptive nature of the Final Rule, the Department's failure to undertake its own consideration of relevant data is fatal.[9]  The CFPB's study is an obviously insufficient basis to sustain the Arbitration and Class Action Waiver Ban, and the Department's failure to even *consider* these differences demonstrates a failure of reasoned decision-making.  *See State Farm*, 463 U.S. at 43; *see also Home Box Office, Inc.*, 567 F.2d at 35-36.  It also emphasizes the fact that the agency's decision runs counter to the evidence in the record.  *See State Farm*, 463 U.S. at 43.

**<u>Finally</u>**, the Department failed to consider the extent to which institutions have relied on the current regulatory framework.  Recently, the Supreme Court acknowledged that "an agency must . . . be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Encino Motorcars, LLC v. Navarro, No*. 15-415, 579 U.S. ___, slip op. at 9 (June 20, 2016) (citations omitted).  Here, institutions have relied on arbitration provisions and class action waivers, at least in part, in determining the cost of tuition, obtaining insurance, and otherwise ordering their affairs.  To upend those relationships without even considering reliance interests is textbook arbitrary and capricious decision-making.  *See Home Box Office, Inc.*, 567 F.2d at 35-36.  As a result, CAPPS is likely to prevail on the independent ground that the Final Rule violates the APA.

---

*(cont'd from previous page)*
    did not provide justification for banning provisions by separate, unrelated educational institutions.  81 Fed. Reg. at 76,025.

[9]   "[T]his court believes that CMS would be required to actually prove that [a] negative impact is occurring, with proof considerably more reliable than comments received from the public.  Empirical evidence, rather than anecdotes, may (or may not) establish that a greater good is served by arbitration in most cases.  The record established by CMS in this case may well be sufficient for ordinary agency business, but the agency is seeking to engage in a rather unprecedented exercise of agency power in this case.  This court believes that more is required to justify the Rule in this case."  *Am. Health Care Ass'n*, 2016 WL 6585295, at *12.

D.     The Arbitration and Class Action Waiver Ban Violates the Constitution

The Final Rule also violates the Constitution because the Arbitration and Class Action Waiver Ban will be applied to contracts that currently exist between students and former students and institutions.  To the extent that the provisions are applied to contracts already in existence, or retroactively, the provisions contravene the Due Process Clause.  *See generally, e.g., Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984) (discussing Due Process Clause problems with retroactive changes to economic contracts); *E. Enters. v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J. concurring) (citing cases).  For that independent reason, CAPPS is likely to prevail on the merits.

## II.     SCHOOLS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

When the Arbitration and Class Action Waiver Ban goes into effect on July 1, CAPPS schools – and their students – will suffer immediate and irreparable harm.

Schools that comply with the Final Rule will be faced with irreparable harm.  As of July 1, schools can no longer include arbitration or class action provisions in their enrollment agreements, and schools will be immediately unable to enforce existing arbitration or class action waiver provisions.  Schools will also have to send notices to borrowers indicating that they will not enforce existing agreements.  81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).  This will lead to considerable turmoil that cannot be undone even if the ban is later invalidated.

Once a school sends notices to students as required by the rule, the added confusion caused by rescinding them when the rule is invalidated would be severe.  Also, for CAPPS members, the enrollment agreement is the basis of the relationship between a school and its students.  In fact, under California law, an enrollment agreement is the sole means by which a student can enroll at a school approved by the California Bureau of Private Postsecondary

Education.  *See* Cal. Educ. Code § 94902(a).  Once students have signed the agreement, it will be

virtually impossible to retroactively adopt pre-dispute arbitration and class-action-waiver

provisions.  *See* Johnson Decl. ¶ 13; Declaration of Stanbridge University ("Stanbridge Decl.") ¶

11 (June 1, 2017); Declaration of Gurnick Academy of Medical Arts ("AMA Decl.") ¶ 11 (June

1, 2017); Declaration of Institute of Technology ("IT Decl.") ¶ 11 (June 2, 2017); Declaration of

West Coast University ("West Coast Decl.") ¶ 12 (June 2, 2017); Declaration of American

Career College ("ACA Decl.") ¶ 12 (June 2, 2017).  In similar circumstances, courts have held

that the harm to institutions was irreparable.  *See Am. Health Care Assn.* 2016 WL 6585295, at

*15 (Irreparable harm would take place where "nursing homes will lose signatures on arbitration

contracts which they will likely never regain. Moreover, this court agrees with plaintiffs that

'provider Plaintiffs and other SNFs/NFs would incur immediate, substantial administrative

expenses. Admission agreements would need to be revised, and staff would require retraining on

admissions and dispute-resolution procedures.'"); *Am. Fin. Servs. Ass'n. v. Burke*, 169 F. Supp.

2d 62, 70-71 (D. Conn. 2001) ("No later relief can reform the contracts that AFSA members

entered into without mandatory arbitration clauses or restore to AFSA members the negotiating

position they would have occupied had section 5(7) not been in effect.").

        Temporary implementation of the Final Rule also will cause chaos for schools and their

students.  Cases that are currently proceeding in arbitration and may be near final disposition

could be halted in their tracks, as the Final Rule creates deep uncertainty for schools surrounding

what actions (if any) they may undertake in ongoing proceedings without losing their Title IV

funding.  West Coast Decl. ¶ 11; ACA Declaration ¶ 11.  The Final Rule will also cause disarray

and disorder for courts and schools faced with new cases: A school will not be able to request

removal to arbitration without risking its funding, although it would later be able to do so –

potentially upending a court case that has been proceeding – if the Final Rule were invalidated. In the interim, schools will need to amend their agreements; retrain their admissions staffs; and actually litigate cases, including class actions, in federal and state court.  *See* Johnson Decl. ¶ 12; Stanbridge Decl. ¶¶ 12-13; AMA Decl. ¶¶ 12-13; IT Decl. ¶¶ 13-14; West Coast Decl. ¶¶ 13-14; ACA Decl. ¶¶ 13-14; *see generally Sec. Indus. Ass'n v. Connolly*, 703 F. Supp. 146, 157-58 (D. Mass. 1988), *aff'd*, 883 F.2d 1114 (1st Cir. 1989) ("The harm to the plaintiffs is irreparable if enforcement of the regulations is not enjoined. The patterns and practices of contract formation regarding securities arbitration will, of course, need costly revision during the pendency of the litigation in the absence of an injunction.").

The Department's only response – that a school could completely forego Title IV funding if it would like to continue using its arbitration and class-action-waiver provisions – severely exacerbates the prospect of irreparable injury.  Cutting off a school from Title IV funding based on its adherence to contractual arbitration and class-action provisions would bankrupt any school and leave its students stranded.  *See* Johnson Decl. ¶¶ 15-16; Stanbridge Decl. ¶¶ 3-4; AMA Decl. ¶¶ 3-4; IT Decl. ¶¶ 3-4; West Coast Decl. ¶¶ 3-4; ACA Decl. ¶¶ 3-4.  Although monetary harm is not typically irreparable, economic harm is irreparable where "the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see*, *e.g.*, *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (Friendly, J.) ("[T]he right to continue a business . . . is not measurable entirely in monetary terms."); *TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 48 (D.D.C. 2009); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2013) ("[W]hen the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable.").

Even if the Final Rule were eventually vacated, moreover, and even if the disruption caused by the ban could be ameliorated, schools *cannot recover funds from the Department* because of sovereign immunity.  Their losses would be permanent.  Losses that cannot be recovered due to sovereign immunity constitute irreparable harm.  *See, e.g.*, *Enter. Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages" can constitute "irreparable injury"); *Texas Children's Hospital v. Burwell*, 76 F. Supp. 3d 224, 241-45 (D.D.C. 2014) (finding irreparable harm where the states did not have a procedure for recovering supplemental payments once they had been recouped, and the loss of funds would mean reducing the hospitals' service); *Am. Fin. Servs. Assn.*, 169 F. Supp. 2d at 70-71 ("Where pecuniary losses cannot later be recovered because the defendant enjoys Eleventh Amendment immunity (as the State of Connecticut does here), such losses are irreparable for purposes of preliminary injunctive relief.").

Since the Final Rule violates the Due Process Clause, that harm is irreparable as well.  Deprivation of such a fundamental constitutional right is *de facto* irreparable.  "[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  Thus, "a prospective violation of a constitutional right constitutes irreparable injury for [preliminary injunction] purposes." *Id.* (internal citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (finding irreparable harm in the context of a Due Process Clause violation).

CAPPS is filing this request for a preliminary injunction approximately one month before the Final Rule takes effect.  The federal government has indicated that the Rule may be

significantly modified at some indeterminate date. The Secretary of Education, for example, recently testified to Congress that changes may be forthcoming in the next few weeks. *See*, *e.g.*, Michael Stratford, *DeVos Says She'll Process Already-Approved Student Debt Relief Claims*, PoliticoPro.com (May 24, 2017, 2:16 PM), https://www.politicopro.com/education/whiteboard/ 2017/05/devos-says-shell-process-already-approved-student-debt-relief-claims-088261 (Secretary DeVos testimony: The Borrower Defense Regulations are "something that we are studying carefully and looking at and we will have something further to say on that within the next few weeks."). But the implementation of the Final Rule is imminent, and CAPPS schools cannot wait any longer. The harm that will be imposed on July 1 will be impossible to repair. For the reasons set forth, CAPPS has demonstrated that its schools will suffer irreparably if the Final Rule goes into effect.

## III.    THE BALANCE OF EQUITIES TILTS IN CAPPS'S FAVOR

The balance of equities tips in CAPPS's favor. An injunction would merely maintain the status quo, which has been satisfactory to the Department and schools for decades. *See George Wash. Univ. v. Dist. of Columbia*, 148 F. Supp. 2d 15, 19 (D.D.C. 2001) (injunction warranted where it merely preserved the status quo and the only harm to the district would be delay); *Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 134-35 (D.D.C. 2011) (harm to individual rights outweighed agency's interest in enforcing its regulation). The only harm the Department would suffer if it ultimately prevails would be delayed implementation of its regulations. Courts often grant equitable relief in similar circumstances. *See*, *e.g.*, *Professional Massage Training Ctr, Inc. v. Accreditation All. of Career Sch. and Colls.*, 951 F. Supp. 2d 851, 854 (E.D. Va. 2012) (harm caused by delay was outweighed by damage to school); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013) ("DOL argues that it is harmed by having 'its entire regulatory program called into question.' This is not an appealing

argument. If the 'entire regulatory program' is *ultra vires*, then it should be called into question."). In fact, because the Secretary has already announced her intention to revisit and perhaps revise the Borrower Defense Regulations, the Department has little interest in temporarily implementing the Final Rule, creating chaos for schools, and ultimately repealing the Rule in any event. By contrast, implementation of the Arbitration and Class Action Waiver Provisions would seriously and irreparably injure schools.

## IV. AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST

A preliminary injunction is in the public interest. *See, e.g.*, *George Washington Univ.*, 148 F. Supp. 2d at 19; *Prof'l Massage Training Ctr., Inc.*, 951 F. Supp. 2d at 854-55. Creating chaos and disruption in arbitral tribunals and courts is contrary to the public interest. It is in the public interest, meanwhile, for schools to be able to focus on their educational mission and devote their resources to serving their students without suffering from the disorder that will follow the imposition of the Final Rule. When, for example, the arbitration and class action provisions go into effect, massive litigation costs (and insurance premiums) will be imposed on schools with no corresponding benefit to students. *See* Johnson Decl. ¶ 12; Stanbridge Decl. ¶¶ 12-14; AMA Decl. ¶¶ 12-14; IT Decl. ¶¶ 12-14; West Coast Decl. ¶¶ 13-15; ACA Decl. ¶¶ 13-15. This would cause tuition to rise or services to decline. *Id*; Because proprietary schools disproportionately serve underserved populations, the negative impact of the rules would also disproportionately harm those groups. Preventing that harm is in the public interest. This is particularly true here because individuals always retain the right to challenge particular arbitration agreements on a case-by-case basis on well-established grounds. *See Marmet*, 132 S. Ct. at 1203.

## CONCLUSION

For the foregoing reasons, the Court should grant CAPPS's Motion for a Preliminary

Injunction and enjoin the Department from enforcing the Arbitration and Class Action Waiver

Ban.

Dated: June 2, 2017                                 Respectfully submitted,

                                                       /s/ Clifford M. Sloan

BORIS BERSHTEYN                                     CLIFFORD M. SLOAN, DC Bar No. 417339
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP            CAROLINE S. VAN ZILE, DC Bar No. 1017942
4 Times Square                                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM
New York, NY 10036                                  LLP
T: 212/735-3834                                     1440 New York Avenue, NW
                                                    Washington, DC 20005
GREGORY BAILEY                                       T: 202/371-7000
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP            F: 202/661-8340
155 N Upper Wacker Dr. #2700                         Email: cliff.sloan@skadden.com
Chicago, IL 60606                                    Email: caroline.vanzile@skadden.com
T: 312/407-0739
F: 312/407-8604

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
T:  202/776-7867
F:  202/330-5290

*Attorneys for CAPPS*