**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS**, Plaintiff, <br><br> v. <br><br> **ELISABETH DEVOS**, in her official capacity as Secretary of the Department of Education, and the **U.S. DEPARTMENT OF EDUCATION**, <br><br> Defendants, <br> and <br><br> **COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, PEOPLE OF THE STATE OF ILLINOIS, STATE OF IOWA, THE ATTORNEY GENERAL OF MARYLAND, STATE OF NEW YORK, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF WASHINGTON** and **DISTRICT OF COLUMBIA** <br><br> [Proposed] Defendant-Intervenors | Civil Action No. 17-999 (RDM) |

**STATE MOVANTS' REPLY IN SUPPORT**
**OF THEIR MOTION TO INTERVENE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.   The State Movants Satisfy Article III Standing ...................................................... 3

    A.   Vacating the Borrower Defense Rule Would Injure the State Movants by
        Stripping the State Movants of Enhancements to Their Enforcement Systems ............. 5

        1.   The Borrower Defense Regulations Directly Benefit the State Movants'
            Enforcement Systems .................................................................................................. 6

        2.   CAPPS and the Defendants Mischaracterize the Benefits of the Borrower Defense
            Regulations to the State Movants ........................................................................... 11

    B.   Vacating the Borrower Defense Rule Would Harm the State Movants' Interests
        in the Economic Health and Well-Being of State Residents ........................................ 13

    C.   Setting Aside the Borrower Defense Regulations Would Result in Injury to the
        State Movants that Would Be Prevented if the Agency Action Were Upheld ............. 17

II.  The State Movants Satisfy Rule 24(a)'s Interest and Impairment Prongs ............................ 19

III. The Defendants Have Made Clear that They Will Not Adequately Defend the
    Borrower Defense Rule and Will Not Represent the State Movants' Interests .................... 20

IV. The Court Should Exercise Its Discretion to Grant State Movants Permissive
    Intervention to Participate Fully in this Litigation .............................................................. 22

CONCLUSION ....................................................................................................................... 24

## TABLE OF AUTHORITIES

### CASES

*100Reporters LLC v. United States Dep't of Justice,*
    307 F.R.D. 269 (D.D.C. 2014) .......................................................................................... 3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ........................................................................................ 5, 13, 15, 16

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ......................................................................................... 12

*Aziz v. Trump,*
    No. 1:17-CV-116(LMB/TCB), 2017 WL 465918 (E.D. Va. Feb. 3, 2017) ..................... 16

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n,*
    788 F.3d 312 (D.C. Cir. 2015) ..................................................................................... 4, 17

*Defs. of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013) ...................................................................................... 22

*Deutsche Bank Nat'l. Trust Co. v. FDIC,*
    717 F.3d 189 (D.C. Cir. 2013) ........................................................................................ 22

*E.E.O.C. v. Nat'l Children's Ctr., Inc.,*
    146 F.3d 1042 (D.C. Cir. 1998) ................................................................................ 22, 23

*Forest Cty. Potawatomi Cmty. v. United States,*
    317 F.R.D. 6 (D.D.C. 2016) .......................................................................... 17, 19, 20, 21

*Fund For Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ........................................................................... 18, 19, 21

*Grayson v. AT&T,*
    15 A. 3d 219 (D.C. App. 2010) ...................................................................................... 10

*In re Idaho Conservation League,*
    811 F.3d 502 (D.C. Cir. 2016) ........................................................................................ 22

*Karlin v. IVF Am., Inc.,*
    93 N.Y.2d 282 (N.Y. App. 1999) ................................................................................... 10

*Karsner v. Lothian,*
    532 F.3d 876 (D.C. Cir. 2008) ........................................................................................ 19

*Kraus v. Trinity Management Services, Inc.*,
    23 Cal. 4th 116 (Sup. Ct. 2000) ........................................... 10

*Maryland People's Counsel v. FERC*,
    760 F.2d 318 (D.C. Cir. 1985) (Scalia, J.) ............................ 16, 17

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ........................................... 13, 15, 16

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ........................................... 15

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ........................................... 3

*Nuesse v. Camp*,
    385 F.2d 694 (D.C. Cir. 1967) ........................................... 21

*Scott v. Cingular Wireless*,
    160 Wash.2d 843, 161 P.3d 1000 (2007) ........................................... 10

*Simon v. E. Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................... 18

*Skehan v. State Sys. of Higher Educ.*,
    815 F.2d 244 (3d Cir. 1987) ........................................... 13

*Slaney v. Westwood Auto, Inc.*,
    366 Mass. 68 (1975) ........................................... 10

*Sweet Home Chapter of Communities for a Great Oregon vs. Lujan*,
    No. CIV. A. 91-1468, 1991 WL 277331, (D.D.C. Dec. 10, 1991) ........................................... 21

*United States v. Lopez*,
    514 U.S. 549 (1995) ........................................... 13

*United States v. Windsor*,
    133 S.Ct. 2675, 2687 (2013) ........................................... 23

*Wildearth Guardians v. Salazar*,
    272 F.R.D. 4 (D.D.C. 2010) ........................................... 4, 22

*WildEarth Guardians v. Jewell*,
    No. CV 16-1724 (RC), 2017 WL 598477, (D.D.C. Feb. 14, 2017) ........................................... 6, 21

## STATUTES

815 ILCS 505/2 ..................................................................................................... 3

Cal. Bus. & Prof. Code § 17200 *et seq* ............................................................... 3

Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.................... 3

Iowa Consumer Fraud Act, Iowa Code § 714.16 ................................................... 3

Massachusetts Consumer Protection Act, M.G.L. c. 93A ...................................... 3

Md. Code Ann., Com. Law §§ 13-101 *et seq.* ...................................................... 3

New York Executive Law § 63(12) ........................................................................ 3

New York General Business Law §§ 349 and 350 ................................................. 3

Oregon Unlawful Trade Practices Act, Oregon Revised Statutes 646.605 *et seq*. ......................... 3

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* ...... 3

Washington Consumer Protection Act, RCW 19.86.010, et seq. ............................ 3

## RULES AND REGULATIONS

34 C.F.R § 685.222(b) ........................................................................................... 7

34 C.F.R. § 668.171(c).......................................................................................... 7

34 C.F.R. § 685.222(e)(7)(iii)(C)........................................................................... 7

34 C.F.R. § 685.222(h)(5)(iii)(C) .......................................................................... 7

34 C.F.R. § 685.300 ............................................................................................... 9

34 F.C.R. § 685.206(c)(4)(iii) ............................................................................... 7

81 Fed. Reg. 75,926 (Nov. 1, 2016)............................................................. passim

81 Fed. Reg. 92,232 (Dec. 19, 2016) .................................................................. 14

Fed. R. Civ. P. 24(a) ............................................................................................ 19

Fed. R. Civ. P. 24(b) ............................................................................................ 22

Fed. R. Civ. P. 24(c) .............................................................................................. 3

## FILINGS

Complaint, Commonwealth of Pennsylvania v. Education Management Corp.,
Case No. 545 M.D. 2015 (Pa. Commw. Ct., Nov. 16, 2015) ............................................ 5

Complaint, Massachusetts v. Corinthian Colleges, Inc. *et al.*
No. 14-1093 (Mass. Super. Ct. Apr. 3, 2014) .................................................... 5

Complaint, People of the State of Illinois v. Education Management Corporation *et al.*,
No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015) ............................................ 5

Complaint, State of New York v. Education Management Corp., *et al.*,
No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015) .................................................... 5

Complaint, State of Washington v. Education Management Corp., *et al.*,
Case No. 15-2-27623-9 SEA (King County Sup. Ct. Nov. 16, 2015) ................................ 5

Consent Judgment, People of the State of Illinois v. Education Management Corporation *et al.*, No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015) ........................................ 5

Consumer Protection Division v. Education Management Corporation, *et al.*
Case No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015) .................................................. 5

District of Columbia v. Education Management Corporation, *et al.*
Case No. 2015 CA 8875 B (D.C. Sup. Ct.) .......................................................... 5

People of the State of California v. Corinthian Colleges, Inc., *et al.*,
No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016) ........................................................ 5

United States ex rel. Washington v. Education Management Corp., *et al.*,
No. 07-00461 (W.D. Pa., Nov. 13, 2015) .......................................................... 5

## OTHER AUTHORITIES

Announcement, Federal Student Aid, *Information About Debt Relief for Corinthian College Students, available at* https://studentaid.ed.gov/sa/about/announcements/corinthian ........ 8

*For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, United States Senate, Health, Education, Labor and Pensions Committee, at 8 (July 30, 2012) *available at* https://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf. ........................ 14

Kevin Lang & Russell Weinstein, National Bureau of Economic Research, *Evaluating Student Outcomes at For-Profit Colleges* at 10 (June 2012) *available at* http://www.nber.org/papers/w18201.pdf .......................................................... 15

Press Release, Department of Education, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, (June 14, 2017) *available at* https://www.ed.gov/news/press-release/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions............................................................... 20

Robyn Smith, National Consumer Law Center, *Ensuring Educational Integrity* at 9 (June 2014) *available at* https://www.nclc.org/images/pdf/pr-reports/for-profit-report.pdf ..... 15

Stacy Cowley, *18 States Sue Betsy DeVos Over Student Loan Protections*, N.Y. Times, July 6, 2017 *available at* https://www.nytimes.com/2017/07/06/business/dealbook/ massachusetts-betsy-devos-lawsuit.html?mcubz=2. ......................................................... 20

United States Government Accountability Office, Higher Education: Education Should Strengthen Oversight of Schools and Accreditors; Table 1: Oversight Roles and Responsibilities of the "Triad," Dec. 2014, *available at* http://www.gao.gov/assets/670/667690.pdf...................................................................... 13

## INTRODUCTION

The Commonwealth of Massachusetts, the States of California, Iowa, New York, Oregon, and Washington, the Commonwealth of Pennsylvania, the People of the State of Illinois, the Attorney General of Maryland, and the District of Columbia, by and through their Attorneys General, (the "State Movants") hereby submit this reply memorandum in support of their motion to intervene as defendants in this litigation.

The State Movants have longstanding interests in the effective enforcement of their state laws and in the oversight of higher education within their respective states. For years, the State Movants have worked to combat the misconduct of predatory schools and to prevent the harms that such schools cause to the economic health and well-being of state residents. The challenged regulations (the "Borrower Defense Regulations" or the "Regulations"), which were promulgated following considerable involvement by the State Movants, further the State Movants' interests by facilitating state enforcement efforts, creating meaningful and necessary remedies for violations of state law, deterring violations of state consumer protection statutes, and protecting state residents from economic harm. These benefits would be lost if California Association of Private Postsecondary Schools ("CAPPS") prevails in this litigation. The State Movants' legally protected sovereign and quasi-sovereign interests more than satisfy the requirements of Article III standing and justify the State Movants' intervention in this case.

CAPPS and the Defendants do not deny that the State Movants have an interest in the strength of their enforcement efforts and compliance with state law. Instead, CAPPS and the Defendants mischaracterize the benefits that the State Movants would receive from the implementation of the Borrower Defense Regulations. By their terms, the Regulations create a role and legal status for state agency enforcement actions in the Department of Education's (the

"Department") borrower defense framework. The Regulations provide that successful state enforcement actions are sufficient to establish the basis for borrower defense discharges. Moreover, enforcement actions by state agencies expose schools to collection actions by the Department, and imperil a school's continued participation in programs administered under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.* The Borrower Defense Regulations thereby incorporate actions by state agencies into the mechanisms by which the Regulations promote their key goals of: providing remedies for borrowers who are harmed by their schools' unfair practices, deterring fraud and abuse by schools, and ensuring that schools bear the costs of their misconduct. The severe consequences to schools that commit misconduct directly promote increased compliance with state consumer protection laws, thereby protecting state residents from abuse.

The State Movants' interests are not adequately represented by the Defendants. Notably, the Defendants do not even contend that they share, let alone adequately represent, the State Movants' interests. Throughout the pendency of this litigation, the Department and Secretary DeVos have explicitly disavowed the Borrower Defense Regulations. The Defendants have described CAPPS's claims as "serious and credible," and stated that "[t]he borrower-defense regulations suffer from substantive and procedural flaws." In so doing, the Defendants have already failed to adequately represent the interests of the State Movants in this litigation and have made clear that they will not adequately defend the regulations at issue. The intervention of the State Movants, either as of right or permissively, is therefore essential to the just and equitable adjudication of the questions presented in this lawsuit.

For the reasons discussed below and in the State Movants' Memorandum in Support of their Motion to Intervene, the State Movants have satisfied the requirements for intervention.

Accordingly, the State Movants request that the Court grant their intervention in this litigation, either as of right or permissively.[1]

## ARGUMENT

### I.      The State Movants Satisfy Article III Standing

The State Movants have substantial, legally protected interests in this lawsuit. The State Movants are charged with enforcing consumer protection laws in their respective states.[2] In that role, the State Movants are responsible for investigating and bringing enforcement actions against predatory for-profit schools and providing assistance to student borrowers who have been harmed by the abusive actions of such schools. The Borrower Defense Regulations incorporate state enforcement actions and investigations into the borrower defense framework that they

---

[1] CAPPS argues that the Court should deny the State Movants' Motion to Intervene because the State Movants have not filed a pleading pursuant to Fed. R. Civ. P. 24(c). *See* CAPPS Opp'n to Mot. to Intervene ("CAPPS Opp."), ECF No. 39 at 3. This argument is inconsistent with this Court's precedent and the purpose of Rule 24. Courts have rejected parties' "attempt[s] to construe Rule 24(c) as imposing some form of draconian use-it-or-lose-it pleading standard on prospective intervenors before they even formally join the litigation." *100Reporters LLC v. United States Dep't of Justice*, 307 F.R.D. 269, 285 (D.D.C. 2014). Rather, "[i]n this circuit . . . an intervenor participates on equal footing with the original parties to a suit." *Id.* Here, the State Movants filed their Motion to Intervene early in this litigation, before the Defendants were required to file any responsive pleadings. The Court should reject a hypertechnical reading of Rule 24(c) requiring a putative intervenor to file a pleading before Defendants were required to file a pleading. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236 n.19 (D.C. Cir. 2004) (rejecting the parties' claim that the putative intervenors "may not intervene because they did not include with their motion to intervene 'a pleading setting forth the claim or defense for which intervention is sought'" and citing with approval the government's concession that "this Court and other courts have not be[en] hypertechnical" when applying Rule 24(c)).

[2] *See, e.g.*, Cal. Bus. & Prof. Code § 17200 *et seq.*; 815 ILCS 505/2; Iowa Consumer Fraud Act, Iowa Code § 714.16; Md. Code Ann., Com. Law §§ 13-101 *et seq.*; Massachusetts Consumer Protection Act, M.G.L. c. 93A; New York General Business Law §§ 349 and 350; New York Executive Law § 63(12); Oregon Unlawful Trade Practices Act, Oregon Revised Statutes 646.605 *et seq.*; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*; Washington Consumer Protection Act, RCW 19.86.010, et seq.; Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

establish. These Regulations were designed to deter institutional misconduct, hold abusive

schools accountable for their actions, and provide loan forgiveness to students who are harmed

by their schools. 81 Fed. Reg. 75,926 (Nov. 1, 2016). If implemented, the Regulations would: (1)

enhance the effectiveness of the State Movants' enforcement efforts; (2) further the State

Movants' interests in the oversight of post-secondary institutions within their respective states;

(3) promote greater compliance with the State Movants' respective consumer protection laws; (4)

facilitate an appropriate remedy for violations of state law; and (5) protect state residents from

abuse, thereby helping to ensure their economic well-being. The loss of benefits that the State

Movants would sustain if CAPPS were successful in its challenge of the Borrower Defense

Regulations readily establishes the State Movants' Article III standing.

Where a litigant seeks to intervene as a defendant for the purpose of defending an agency

action, Article III requires the litigant to demonstrate:

> (a) that it would suffer a concrete injury-in-fact if the action were to be set aside,
> (b) that the injury would be fairly traceable to the setting aside of the agency action,
> and (c) that the alleged injury would be prevented if the agency action were to be
> upheld.

*Wildearth Guardians* v. *Salazar*, 272 F.R.D. 4, 13 (D.D.C. 2010).

As CAPPS concedes, in the context of a litigant's motion to intervene as a defendant, the

D.C. Circuit has "generally found a sufficient injury in fact where a party benefits from agency

action, the action is then challenged in court, and an unfavorable decision would remove the

party's benefit." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d

312, 317 (D.C. Cir. 2015). The State Movants face this exact situation: the Borrower Defense

Regulations benefit the State Movants, and, if CAPPS is successful in this litigation, the State

Movants will lose the benefits they worked hard to attain.

4

### A.  Vacating the Borrower Defense Rule Would Injure the State Movants by Stripping the State Movants of Enhancements to Their Enforcement Systems

The State Movants have longstanding interests in the oversight of education within their borders and in the enforcement of their respective consumer protection laws. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 601 (1982) (explaining that States have a "sovereign interest" in "the power to create and enforce a legal code"). To that end, the State Movants have actively combatted the damage wrought by predatory schools, initiating numerous costly and time-intensive investigations and enforcement actions against proprietary and for-profit schools for violations of state consumer protection statutes.[3]

The rulemaking at issue in this litigation was commenced in the wake of investigations—including those undertaken by the State Movants—that revealed widespread misconduct by for-profit schools. The State Movants are not incidental beneficiaries of the Borrower Defense Regulations—they participated at every stage of the rulemaking that resulted in these regulations and worked to achieve their benefits. State Movants served on the negotiating committee,

---

[3] *See, e.g.*, Complaint, Massachusetts v. Corinthian Colleges, Inc. *et al*. No. 14-1093 (Mass. Super. Ct. Apr. 3, 2014); People of the State of California v. Corinthian Colleges, Inc., *et al*., No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016) ($1.1 billion judgment); Complaint, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consent Judgment, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consumer Protection Division v. Education Management Corporation, *et al*. Case No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015); Complaint, State of New York v. Education Management Corp., *et al*., No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Consent Order and Judgment (N.Y. Sup. Ct. Jan. 14, 2016); Complaint, State of Washington v. Education Management Corp., *et al*., Case No. 15-2-27623-9 SEA (King County Sup. Ct. Nov. 16, 2015); Consent Decree (King County Sup. Ct. Nov. 16, 2015); District of Columbia v. Education Management Corporation, et al. Case No. 2015 CA 8875 B (D.C. Sup. Ct.) (Consent Order entered on January 20, 2016); Complaint, Commonwealth of Pennsylvania v. Education Management Corp., Case No. 545 M.D. 2015 (Pa. Commw. Ct., Nov. 16, 2015); $95.5 million global settlement, intervention by States of California, Illinois, and others, United States ex rel. Washington v. Education Management Corp., *et al*., No. 07-00461 (W.D. Pa., Nov. 13, 2015).

provided feedback on the Department's draft regulations, and submitted comments to the Department throughout the rulemaking process. *See WildEarth Guardians v. Jewell*, No. CV 16-1724 (RC), 2017 WL 598477 at *3 (D.D.C. Feb. 14, 2017) (finding that Wyoming had standing to intervene as a defendant on behalf of a federal agency and explaining that Wyoming had "worked with the [agency] in developing the regulatory framework under which" the State received benefits). The result of the State Movants' efforts is a rule that incorporates state enforcement actions and investigations into the borrower defense framework in a manner that strengthens the effectiveness of the State Movants' enforcement activities and provides important assistance to the State Movants' efforts to combat unlawful conduct within their respective states. These benefits are neither "attenuated" nor "speculative" as CAPPS suggests, nor are the State Movants' interests in maintaining these benefits "philosophical." CAPPS Opp. at 5, 6, 12. The benefits arise directly from the incorporation of the State Movants' enforcement efforts into the Borrower Defense Regulations, and would be lost if the Regulations were vacated.

**1. The Borrower Defense Regulations Directly Benefit the State Movants' Enforcement Systems**

Prior to the promulgation of the Borrower Defense Regulations, there was no specific mechanism in place for the Department to forgive federal loan debt or hold schools accountable for misconduct on the basis of state enforcement actions. For the first time, the Regulations created a process and mechanism that formalizes the role of state enforcement actions in the borrower defense framework.

Notably, the Regulations incorporate state enforcement actions in a manner that enhances the Regulations' deterrent effects. The Regulations provide that a successful state enforcement action against a school entitles borrowers to obtain loan forgiveness and entitles the Department

6

to seek repayment of amounts forgiven from the school. *See* 81 Fed. Reg. at 76,083, 76,085; 34 C.F.R §§ 685.222(b), 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C), and 685.206(c)(4)(iii). Additionally, the Borrower Defense Regulations establish that a lawsuit brought against a school by a state agency for borrower defense-related claims will negatively impact a school's financial responsibility composite score. *See* 81 Fed. Reg. at 76,073; 34 C.F.R. § 668.171(c). This score is used by the Department to determine whether a school is sufficiently financially responsible to participate in the Department's Title IV programs. A low score imperils a school's access to Title IV funding, which is a major, if not the primary, source of revenue for many schools. The increased risks of losing Title IV funding and being subjected to Departmental collection as a result of state enforcement actions are direct deterrents to violations of state law.

In seeking to minimize the benefits of the Regulations to the State Movants, CAPPS and the Defendants incorrectly claim that the Borrower Defense Regulations do not result in any additional deterrent effects beyond those achieved through the State Movants' existing enforcement activities. CAPPS Opp. at 8. This claim is belied by the very structure of the Borrower Defense Regulations. By providing that state enforcement actions can result in Departmental collection actions and loss of Title IV eligibility, the Borrower Defense Regulations create meaningful deterrence mechanisms beyond those available through the State Movants' existing enforcement efforts. CAPPS has explicitly acknowledged the force of these mechanisms, claiming that "empowering state Attorneys General . . . to trigger important federal regulatory consequences unilaterally . . . increase[s] the risks institutions face to their financial stability from the mere filing of a lawsuit." CAPPS Complaint, ECF No. 1, at ¶ 158.

Moreover, by formalizing the process by which state enforcement actions may result in loan forgiveness, the Borrower Defense Regulations facilitate what is, in many instances, the

only effective remedy for schools' violation of state law. Schools often lack sufficient resources to pay full restitution, leaving students without relief in the absence of loan forgiveness. In effect, federal loan discharges—which can only be approved by the Department—are the *exclusive* remedy for such institutional misconduct. The integration of state enforcement actions into the process by which students obtain relief establishes a critical remedy for the violations of state law that underlie the state enforcement actions.

The State Movants also benefit from the Borrower Defense Regulations' establishment of a group discharge process for borrowers with common facts and claims. 81 Fed. Reg. at 76,083-86; 34 C.F.R. § 685.222. Under the Regulations, if the State Movants bring a successful enforcement action against a school in which eligibility for discharge is established, the group discharge provisions would relieve the State of the burden and expense of having to contact each borrower to help them individually apply for a borrower defense. The invalidation of these provisions would cause the State to make expenditures to undertake these steps whenever a school's borrowers are eligible for discharge.

For example, the collapse of Corinthian Colleges ("Corinthian"), which the Department specifically cited as an impetus for the new regulations, caused the State Movants to take such steps in response to the flood of borrower defense claims. The Department appointed a Special Master to analyze claims, and ultimately found that Corinthian systematically misrepresented its job placement rates in widely distributed promotional and recruiting materials at over 100 campuses, as well as for online programs in which students enrolled nationwide. *See generally* Announcement, Federal Student Aid, *Information About Debt Relief for Corinthian College Students,* https://studentaid.ed.gov/sa/about/announcements/corinthian. In light of Corinthian's systematic fraud—and in the absence of a group discharge process—the Department created an

ad hoc application to address the borrower defense claims of former Corinthian students affected by Corinthian's systematic fraud (i.e., those who enrolled in the identified programs at identified campuses during times at which the misrepresentations were commonplace). However, this process still required affected students to apply individually for discharge, as there was then no process for providing a group discharge to all students in the affected cohorts.

Although the Department conducted its own outreach to former Corinthian students, few students responded by seeking discharge through the Department's process, and many students remained unaware of their right to apply for a borrower defense discharge. The Department therefore asked state attorneys general to conduct their own outreach campaigns to inform borrowers in their States of their rights to obtain loan discharges. Forty-seven state attorneys general agreed to conduct outreach to affected students. As part of that effort, the state attorneys general used a common fund administered by the National Association of Attorneys General to retain a settlement administrator to conduct outreach to over 100,000 affected students at an estimated total cost of $255,919, with over $100,000 invoiced to date. This effort is ongoing, as affected borrowers contact states with questions about the application process. The invalidation of the group discharge provisions in the Borrower Defense Regulations would require the State Movants to incur such expenses to address schools' misconduct in the future.

Additionally, the State Movants' consumer protection enforcement efforts directly benefit from provisions of the Borrower Defense Regulations that prohibit schools participating in the Federal Direct Loan Program from using mandatory arbitration agreements and class action waivers. *See* 81 Fed. Reg. at 76,087; 34 C.F.R. §§ 685.300(e)-(f). CAPPS seeks to characterize these provisions as offering a benefit solely to borrowers, but this characterization fails to acknowledge the critical role that private lawsuits play in the State Movants' consumer

9

protection enforcement frameworks. As the Supreme Court of Washington has explained, "[p]rivate citizens act as private attorneys general in protecting the public's interest against unfair and deceptive acts and practices in trade and commerce. Consumers bringing actions under the [Consumer Protection Act] do not merely vindicate their own rights; they represent the public interest . . . ." *Scott v. Cingular Wireless*, 160 Wash.2d 843, 853 (2007) (internal quotation mark omitted). Thus, state consumer protection statutes incorporate private rights of action not only to facilitate the resolution of private disputes, but also to supplement government efforts and lead to greater enforcement of state laws. In fact, States historically enacted private rights of action under their consumer protection statutes specifically because public enforcement efforts could not address each and every consumer abuse. Private actions are integral components of state consumer protection enforcement systems, combatting and deterring unfair and deceptive conduct.[4] Mandatory arbitration agreements, which forbid citizens from acting as private attorneys general and relegate consumer protection enforcement to opaque private dispute resolution, undercut state consumer protection statutes, impeding state agencies' ability to obtain information about potential misconduct on the part of schools and to address problematic practices. The State Movants benefit directly from the provisions of the Borrower Defense Regulations that restore this important component of state consumer protection enforcement.

---

[4] *See, e.g.*, *Slaney v. Westwood Auto, Inc*., 366 Mass. 688, 698–99 (1975) ("Chapter 93A contained no private remedy provisions when it was originally [enacted] . . . . Because of the inability of the [Consumer Protection] Division to handle all the complaints it was receiving, it became clear that private remedies were needed under c. 93A."); *Karlin v. IVF Am., Inc*., 93 N.Y.2d 282, 291 (N.Y. App. 1999) ("When section 349 was enacted in 1970, only the Attorney General was empowered to enforce it . . . . It soon became clear, however, that the broad scope of section 349, combined with the limited resources of the Attorney General, made it virtually impossible for the Attorney General to provide more than minimal enforcement." (internal quotation marks omitted)); *see also Grayson v. AT&T*, 15 A. 3d 219, 240 (D.C. App. 2011); *Kraus v. Trinity Management Services, Inc*., 23 Cal. 4th 116, 126 (Sup. Ct. 2000).

### 2. CAPPS and the Defendants Mischaracterize the Benefits of the Borrower Defense Regulations to the State Movants

CAPPS and the Defendants seek to minimize the importance of the Regulations' incorporation of state enforcement actions by citing to specific roles the Regulations did not vest on states—such as creating a formal mechanism for state attorneys general to apply for group borrower defense discharges. Both Opposition briefs emphasize that the Regulations did not *directly* incorporate state consumer protections laws as stand-alone bases for borrower defense claims. CAPPS Opp. at 6; Defs. Opp. at 3. However, the Department's rationale for this regulatory design actually supports the intervention of the State Movants in this case. The Department chose not to directly incorporate state consumer protection laws out of a concern for the "burden" that interpreting such state laws would cause to federal agencies. 81 Fed. Reg. at 75,940. Rather, the Department avoided this burden by incorporating into the borrower defense framework enforcement actions brought by the States themselves, thereby leaving to the state agencies the role of interpreting their respective laws. CAPPS and the Defendants actually demonstrate the importance of the role assigned to state agencies in the federal framework.

CAPPS and the Defendants argue that the State Movants have no interest in this litigation because the State Movants would be able to bring enforcement actions against schools even if the Borrower Defense Rule were vacated. CAPPS Opp. at 11; Defs. Opp. at 3. This argument is a straw man—the State Movants of course do not suggest that invalidation of the Regulations would eliminate their authority to file civil enforcement actions. In reality, CAPPS fails to address that the Borrower Defense Regulations would *increase* compliance with state law and *strengthen* state enforcement efforts. In so doing, the Borrower Defense Regulations benefit the State Movants. These benefits are neither attenuated nor speculative, but are directly connected to the mechanisms by which the Borrower Defense Regulations are designed to achieve their

deterrence and loan relief goals. Eliminating the Borrower Defense Regulations would strip the State Movants of potent enforcement and compliance tools, leaving the State Movants in a markedly worse position than they would be in if the Regulations were implemented.

In arguing that the State Movants do not satisfy Article III, the Defendants cite to a series of inapposite cases that stand for the proposition that an organization cannot "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." Defs. Opp. at 4. (quoting *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc*., 659 F.3d 13, 25 (D.C. Cir. 2011)). The Defendants' reliance on these organizational standing cases misses the mark. The State Movants do not contend that their expenses in connection with this litigation constitute an injury. Furthermore, in relying on this line of cases, the Defendants mischaracterize the State Movants' expenditures on their consumer protection enforcement actions as "self-inflicted budgetary choices." This characterization highlights the Defendants' fundamental misunderstanding of the State Movants' consumer protection enforcement responsibilities and exposes the Defendants' callous view of the importance of these consumer protection functions in the lives of students.[5]

The State Movants' interests in this litigation are far from "philosophical." The Borrower Defense Regulations created substantial benefits to the State Movants, enhancing the effectiveness of the State Movants' enforcement systems, providing remedies for institutional

---

[5] The Defendants suggest that the State Movants are seeking to "directly regulate" the federal government or "compel" the government to promulgate regulations that would benefit the State Movants. Defs. Opp. at 3-4. The State Movants do not seek to *compel* the Department to promulgate regulations. To the contrary, the State Movants seek to intervene in this lawsuit to *defend* final regulations that the federal government itself chose to promulgate, and which benefit the State Movants and their residents.

misconduct, and creating incentives for increased compliance with state law. The State Movants

will lose the benefits they gained from the agency action if CAPPS prevails in this litigation.

### B. Vacating the Borrower Defense Rule Would Harm the State Movants' Interests in the Economic Health and Well-Being of State Residents

The State Movants have an interest in the economic health and well-being of their

residents that would be harmed if the Borrower Defense Regulations were vacated. A State

establishes standing as *parens patriae* where it can assert an injury to a quasi-sovereign interest.

In particular, "a State has a quasi-sovereign interest in the health and well-being—both physical

*and economic*—of its residents in general." *Snapp*, 458 U.S. at 601 (emphasis added). The State

Movants' "stake in protecting [their] quasi-sovereign interests" entitle the State Movants to

"special solicitude" in the court's standing analysis. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520-

21 (2007).

As in *Massachusetts v. E.P.A.*, this litigation involves well-established and longstanding

interests of state governments. States have historically had a central role and interest in the

oversight and regulation of higher education and in the strength of educational institutions within

their borders. As courts have consistently recognized, education is an area "where States

historically have been sovereign." *United States v. Lopez*, 514 U.S. 549, 564 (1995); *see also*

*Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 248 (3d Cir. 1987) (noting that the provision

of education, in the context of higher education, "has long been recognized as a function of state

government"); *see also* United States Government Accountability Office, Higher Education:

Education Should Strengthen Oversight of Schools and Accreditors; Table 1: Oversight Roles

and Responsibilities of the "Triad," Dec. 2014, *available at* http://www.gao.gov/assets/670/

667690.pdf (noting that States' role in the system of higher education oversight includes

addressing students' concerns about their schools). In fact, the Department has recognized that

"States have a vital and unique role in the oversight of higher education" and has acknowledged "the interest that States have in protecting their residents" in the context of regulating postsecondary schools. 81 Fed. Reg. 92,232 (Dec. 19, 2016) at 92,253.

Here, as in *Massachusetts v. E.P.A.*, what is at stake is the promulgation of agency regulations that will protect the States' interests. CAPPS is seeking to invalidate agency regulations that would curb and remedy the misconduct of predatory schools that wreak financial harm on state residents while providing valueless education. The loss of these protections would directly undercut the State Movants' interests in the economic health and well-being of state residents and in the quality of higher education within each state.

The problems that the Borrower Defense Regulations were designed to address are far-reaching and serious. Numerous investigations conducted by the State Movants have uncovered pervasive predatory practices employed by for-profit schools, including making false and misleading representations to lure prospective students to enroll; exaggerating graduates' job placement and salary prospects; using unfair and harassing recruitment tactics; and recruiting and enrolling students unable to benefit from the education sought. Students who fall victim to such abuse often face serious economic consequences—including high default rates on their loans and high unemployment rates after leaving school. *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, United States Senate, Health, Education, Labor and Pensions Committee, at 8 (July 30, 2012) ("Senate Report") *available at* https://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf. Moreover, for-profit schools disproportionately recruit and enroll students from certain vulnerable groups, including low-income individuals and women of color. *See* Robyn Smith, National Consumer Law Center, *Ensuring Educational Integrity* at 9 (June 2014) *available at* https://www.nclc.org/images/pdf/

pr-reports/for-profit-report.pdf; Kevin Lang & Russell Weinstein, National Bureau of Economic

Research, *Evaluating Student Outcomes at For-Profit Colleges* at 10 (June 2012) *available at*

http://www.nber.org/papers/w18201.pdf. The Borrower Defense Regulations aim to deter

misconduct and provide critical relief to students affected by predatory schools, thereby

protecting state residents.

Longstanding Supreme Court precedent recognizes States' quasi-sovereign interests in

preventing precisely these kinds of consequences. In *Snapp*, for instance, the Court held that

avoiding unemployment among Puerto Rico's residents was a quasi-sovereign interest sufficient

for standing, since "[u]nemployment among Puerto Rican residents is surely a legitimate object

of the Commonwealth's concern." *Snapp*, 458 U.S. at 609. *Snapp* also "recognize[d] a similar

state interest in securing residents from the harmful effects of discrimination." *Id.* As explained

*supra*, predatory for-profit schools have committed massive fraud against students residing in the

movant states, creating a more-than-adequate predicate for states to assert their quasi-sovereign

interests in defending regulations that help to avert serious financial consequences like

unemployment and loan default, particularly among vulnerable groups.

Relying on an overbroad reading of *Snapp* and *Massachusetts v. Mellon*, 262 U.S. 447

(1923), CAPPS argues that "standing based on [] 'quasi-sovereign' interests is very limited,

particularly where states seek to challenge action by the federal government." CAPPS Opp. at 9.

This reading was squarely rejected by *Massachusetts v. E.P.A.*, which held that, at least in cases

brought under the Administrative Procedures Act ("APA"), States may have standing to sue the

federal government. 549 U.S. at 520 n.17 (rejecting the dissent's claim that *Mellon* and *Snapp*

"cast significant doubt on a State's standing to assert a quasi-sovereign interest . . . against the

Federal Government"); *Maryland People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985)

(Scalia, J.) (holding that *Mellon* restricted state *parens patriae* standing with respect to the federal government only as a matter of prudential standing, which is subject to congressional revision, not as a matter of Article III standing; and holding that Congress did in fact abrogate that principle by enacting a statute comparable to the APA that confers standing on any party that is "aggrieved" by a FERC order); *Aziz v. Trump,* No. 1:17-CV-116(LMB/TCB), 2017 WL 465918, at *4 (E.D. Va. Feb. 3, 2017) (noting that *Mellon* specifically addressed the ability of States to challenge congressional action, and that courts have since drawn a "distinction between congressional and executive action" for the purposes of a State's *parens patriae* standing).

CAPPS further argues that the State Movants do not have a sufficiently concrete quasi-sovereign interest in the current case by claiming that there are only two categories of such interests: "the states do not allege widespread environmental harm as is typically required to act as a quasi-sovereign, nor do they allege economic discrimination." CAPPS Opp. at 11. *Snapp* expressly held that a State's interest in protecting its citizens against discrimination is in addition to a State's interest in the economic health and well-being of its citizens. 458 U.S. at 609 ("Just as we have long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests, we recognize a similar state interest in securing residents from the harmful effects of discrimination."). And any argument that the harm at issue here is not sufficiently "widespread" would fail: *Snapp* itself found that Puerto Rico had standing as *parens patriae* even though only 787 jobs in a population of nearly 3 million were affected. See *Snapp*, 458 U.S. at 599, 609 (holding that focusing on the "small number of individuals directly involved" was "too narrow a view of the interests at stake here."). Finally, nothing in *Massachusetts v. E.P.A.* limits the principles announced in that case

to environmental harms. They are simply one example of the circumstances in which states may assert quasi-sovereign interests to establish Article III standing.

As the D.C. Circuit has explained, "[a] state's interest in those aspects of the welfare of its citizens secured and furthered by government . . . is unquestionably sufficient to confer standing upon the state as *parens patriae*." *Maryland People's Counsel*, 760 F.2d at 320. The State Movants' interests in the economic health and well-being of their citizens are implicated in this litigation and are sufficient to confer standing on the State Movants as *parens patriae*.

### C. Setting Aside the Borrower Defense Regulations Would Result in Injury to the State Movants that Would Be Prevented if the Agency Action Were Upheld

As described above, the Borrower Defense Regulations would confer substantial benefits on the State Movants, enhancing the effectiveness of the State Movants' civil enforcement systems, facilitating increased compliance with state law, and protecting state residents from abuse and economic injury. If CAPPS prevails in this litigation, the Borrower Defense Regulations would be vacated and the State Movants would lose these benefits, resulting in a concrete injury to the State Movants that would be avoided if the Court upholds the Borrower Defense Regulations. The State Movants have therefore satisfied the requirements of establishing standing as a defendant-intervenor. *See Crossroads Grassroots Policy Strategies*, 788 F.3d at 317 (in the context of a defendant-intervenor the court typically finds an "injury in fact where the party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit."); *see also Forest Cty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 11 (D.D.C. 2016) (a defendant-intervenor satisfies Article III standing where "it would suffer a concrete injury-in-fact if the action were to be set aside, [] the injury

would be fairly traceable to the setting aside of the agency action, and [] the alleged injury would be prevented if the agency action were to be upheld.").

CAPPS argues that any causal link between the State Movant's injury and the invalidation of the Borrower Defense Rule is "attenuated" because it depends on the "unfettered" choices of third parties. This argument is undercut by both the stated purpose of the Borrower Defense Regulations and CAPPS's own claims in this litigation. The Regulations were expressly designed *for the purpose* of deterring misconduct by schools and providing relief where such misconduct occurs. See 81 Fed. Reg. at 75,927 (describing a primary benefit of the Borrower Defense Regulations as: "improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools"). By design, the Regulations incorporate state enforcement actions in the mechanism by which these goals are achieved. There is nothing attenuated or speculative about the benefit of a regulation explicitly designed to deter misconduct. *See Fund For Animals, Inc. v. Norton,* 322 F.3d 728, 733 (D.C. Cir. 2003) (holding that a Mongolian government ministry had standing to intervene as a defendant on behalf of the federal government because the reversal of a U.S. agency's designation of argali sheep as threatened (rather than endangered) would deter some hunters from traveling to Mongolia and would thus cause a reduction in tourism).[6]

In fact, CAPPS has conceded that the Borrower Defense Regulations would affect the behavior of for-profit schools, claiming that the Regulations "expose[] schools to massive new liability" and that the increased costs and threats of litigation will "threaten the existence of

---

[6] Unlike the case at hand where the challenged regulations were specifically designed in a manner that creates benefits for the State Movants, the cases CAPPS seeks to rely on address situations in which there was "little more than the remote possibility . . . that [the plaintiffs'] situation might have been better had (defendants) acted [differently]." *Simon v. E. Kentucky Welfare Rights Org*., 426 U.S. 26, 44 (1976).

many CAPPS member institutions." CAPPS Complaint, ECF No. 1, at ¶¶ 5, 6. In particular, CAPPS has explicitly claimed that "empowering state Attorneys General . . . to trigger important federal regulatory consequences unilaterally . . . increase[s] the risks institutions face to their financial stability from the mere filing of a lawsuit." *Id.* at 158. CAPPS cannot now credibly argue that the connection between the invalidation of the Regulations and the State Movants' loss of benefits to their enforcement systems is merely attenuated.

## II.     The State Movants Satisfy Rule 24(a)'s Interest and Impairment Prongs

The State Movants satisfy the interest and impairment requirements of Rule 24(a). A movant seeking to intervene in an action under Rule 24(a) must demonstrate a legally protected interest in the action. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008). The intervenor must be "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest" in the litigation. *Karsner*, 532 F.3d at 885.

The relevant analysis of the State Movants' interests in this litigation parallels the standing analysis discussed *supra* in Section I. *Forest Cty. Potawatomi Cmty.*, 317 F.R.D. at 11 n. 4 ("[W]hen a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*."). As such, for the same reasons that the State Movants have established Article III standing, the State Movants have also established an interest in this litigation for the purposes of Rule 24(a)(2).

Additionally, for the reasons discussed in this Brief and in the State Movants' Memorandum in Support of their Motion to Intervene, the State Movants have also satisfied the Rule 24(a) impairment prong. Courts read the impairment prong as "looking to the practical consequences of denying intervention." *Fund For Animals, Inc.*, 322 F.3d at 735. This inquiry "is not a rigid one." *Forest Cty. Potawatomi Cmty.*, 317 F.R.D. at 10. As discussed at length

*supra*, the Borrower Defense Regulations enhance the effectiveness of the State Movants' enforcement efforts, increase deterrence of misconduct by schools, and provide protections and remedies for state residents. These benefits will be lost in the event that CAPPS is successful in this litigation. Accordingly, the State Movants satisfy the "impairment of interest" requirements for intervention as of right.

### III.   The Defendants Have Made Clear that They Will Not Adequately Defend the Borrower Defense Rule and Will Not Represent the State Movants' Interests

The State Movants' interests cannot be adequately represented by the Defendants. During the pendency of this litigation, the Defendants have repeatedly endorsed CAPPS's arguments and disavowed the Borrower Defense Regulations they purport to defend. In so doing, the Defendants have made abundantly clear that they cannot adequately defend the Borrower Defense Regulations. On June 14, 2017, in an official press statement, Secretary DeVos referred to the Borrower Defense Regulations as "a muddled process" necessitating a "regulatory reset." Press Release, Department of Education, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, (June 14, 2017) *available at* https://www.ed.gov/news/press-release/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions. Subsequently, on July 6, 2017, the Department's spokesperson described CAPPS's claims in this litigation as "serious and credible" and stated that "[t]he borrower-defense regulations suffer from substantive and procedural flaws." Stacy Cowley, *18 States Sue Betsy DeVos Over Student Loan Protections*, N.Y. Times, July 6, 2017 *available at* https://www.nytimes.com/2017/07/06/business/dealbook/massachusetts-betsy-devos-lawsuit.html?mcubz=2.

Despite the Department's explicit and unequivocal rejection of the Borrower Defense Regulations, CAPPS now argues that the Department will adequately defend the Regulations and

represent the State Movants' interests in this litigation. This assertion strains credulity. The Defendants have *already* failed to adequately represent the interests of the State Movants and their respective residents by endorsing CAPPS's arguments and disavowing the Regulations.[7]

A putative intervenor's burden to demonstrate inadequacy of representation is "*de minimis*, and extends only to showing that there is a possibility that its interests may not be adequately represented absent intervention." *Forest Cty. Potawatomi Cmty.*, 317 F.R.D. at 11. Despite CAPPS's suggestion to the contrary, in the D.C. Circuit, this *de minimis* burden applies even where a federal agency is a party to the litigation. *See Sweet Home Chapter of Communities for a Great Oregon v. Lujan*, No. CIV. A. 91-1468, 1991 WL 277331, at *3 (D.D.C. Dec. 10, 1991) ("This Circuit continues to apply the 'minimal burden' test . . . even to situations involving government parties."); *see also Fund For Animals, Inc.*, 322 F.3d at 735 (permitting intervention where a federal agency was a party and explaining that a petitioner "ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee"). The State Movants have met their *de minimis* burden.

Furthermore, the Defendants do not share the State Movants' particular interests in the strength of the State Movants' enforcement systems and compliance with state law. *See WildEarth Guardians*, 2017 WL 598477, at *4 (observing that "[s]everal previous cases have permitted intervention by states when the federal government was already a party"); *see also Wildearth Guardians*, 272 F.R.D. at 19-20 (permitting the State of Wyoming to intervene in litigation brought against a number of federal agencies because, "although there are certainly

---

[7] CAPPS further contends that the State Movants' concerns will be adequately protected by their participation as *amici*. However, as the D.C. Circuit has explained in the context of intervention, participation in litigation as *amicus curiae* is "not an adequate substitute for participation as a party." *Nuesse v. Camp*, 385 F.2d 694, 704 n.10 (D.C. Cir. 1967).

shared concerns . . . , [t]he mere fact that other defendants might hypothetically take [the State's] interests into account when shaping their arguments does not mean that they would afford the same primacy to [the State's] interests . . ." (internal citations and quotation marks omitted)). Consequently, the State Movants' interests cannot be adequately represented by the Defendants.

## IV. The Court Should Exercise Its Discretion to Grant State Movants Permissive Intervention to Participate Fully in this Litigation

In the alternative, the State Movants respectfully request that the Court grant them permission to participate fully in this litigation. District Courts are afforded "wide latitude" in determining whether to grant a motion for permissive intervention under Rule 24(b) of the Federal Rules of Civil Procedure. *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). The D.C. Circuit has long recognized that, "[a]s its name would suggest, permissive intervention is an inherently discretionary enterprise." *Id.*

Citing to a non-controlling concurrence in *Deutsche Bank Nat'l. Trust Co. v. FDIC*, 717 F.3d 189 (D.C. Cir. 2013), CAPPS and the Defendants contend that intervenors must establish Article III standing in order to be granted permissive intervention. To the contrary, "[i]t remains . . . an open question in [the D.C. Circuit] whether Article III standing is required for permissive intervention." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013). Nonetheless, even if this Court determines that Article III standing is a prerequisite for permissive intervention, the State Movants have satisfied this requirement, as discussed *supra* in Section I.[8]

_____

[8] The Defendants cite to the D.C. Circuit's one sentence denial of permissive intervention in *In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016) for the proposition that the State Movants lack a sufficient interest in this litigation to intervene permissively. There, the Court determined, in its discretion, that the proposed intervenors could not intervene permissively because they lacked a claim or defense that shared with the main action a common question of law or fact. 811 F.3d at 514-15. Here, as described *supra* in Sections I and II, the

The circumstances of this case warrant permissive intervention. The State Movants have concrete and important interests in the Borrower Defense Regulations. *See supra* Secs. I and II. During the pendency of this litigation, the Defendants have disavowed the Borrower Defense Regulations and adopted CAPPS's claims and arguments. *See supra* Sec. III. The Defendants have made clear that they cannot adequately defend the Borrower Defense Regulations or represent the State Movants' interests in this lawsuit. As such, the participation of the State Movants will aid in the just and equitable adjudication of this lawsuit by ensuring that the Court is presented with a true defense of the challenged regulations. *Cf. United States v. Windsor*, 133 S.Ct. 2675, 2687 (2013) (where government refuses to defend legislation, participation of others prepared to defend it with vigor ensures the sharp presentation of issues that courts rely upon in deciding difficult questions).

CAPPS's opposition to permissive intervention is premised primarily on its contention that permitting the intervention of ten State Movants would require excessive coordination and cause delay. CAPPS Opp. at 21. There is no merit to this claim. If permitted to intervene, the State Movants intend to submit any filings jointly and advance a united position in this litigation. Indeed, the State Movants have an interest in the speedy and efficient resolution of this litigation to ensure that the State Movants and state residents will be able to benefit from the Borrower Defense Regulations, which have yet to be implemented.

---

State Movants have concrete interests in the outcome of this litigation. Furthermore, courts in the D.C. Circuit may "allow[] intervention even in 'situations where the existence of any nominate claim or defense is difficult to find.'" *Nat'l Children's Ctr., Inc.*, 146 F.3d at 1046.

## CONCLUSION

For the reasons discussed *supra* and in the State Movants' Memorandum in Support of their Motion to Intervene, the State Movants respectfully request that the Court grant their motion to intervene as of right. In the alternative, the State Movants respectfully request that the Court grant them permissive intervention to participate fully in this litigation.

SUBMITTED this 26th day of July, 2017.

<div style="margin-left:40%">

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By: */s/ Yael Shavit*
Yael Shavit
Max Weinstein
Assistant Attorneys General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197 (Shavit)
(617) 963-2499 (Weinstein)
Yael.Shavit@state.ma.us
Max.Weinstein@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL
Bernard A. Eskandari
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS
Joseph Sanders
Assistant Attorney General
Illinois Attorney General's Office

</div>

24

100 W. Randolph St., 12th Fl.
Chicago, IL 60601
(312) 814-6796
jsanders@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
Tel: (515) 281-8772
Jessica.Whitney@iowa.gov

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585
Cmadaio@oag.state.md.us

FOR THE STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF NEW YORK
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
120 Broadway, 3rd floor
New York, NY 10271
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM, ATTORNEY
GENERAL
Andrew Shull
Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301

25

Tel: 503-934-4400
Andrew.shull@doj.state.or.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL
Jesse Harvey
Senior Deputy Attorney General
Office of the Pennsylvania Attorney General
Bureau of Consumer Protection
6th Floor Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
(412)565-2883
jharvey@attorneygeneral.gov

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL
Darwin P. Roberts
Deputy Attorney General
Jeffrey T. Sprung (D.C. Bar No.: 384880)
Benjamin J. Roesch
Cynthia Alexander
Assistant Attorneys General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
darwinr@atg.wa.gov
jeff.sprung@atg.wa.gov
benjaminr@atg.wa.gov
cynthiaa@atg.wa.gov

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
Philip Ziperman
Office of Consumer Protection
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 442-9886
Philip.Ziperman@DC.gov

26

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2017, I caused a copy of this Reply to be filed electronically and that this document is available for viewing and downloading from the ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/Yael Shavit*

YAEL SHAVIT