**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 17-999 (RDM)** |
| **ELISABETH DeVOS, Secretary, U.S. Department of Education,** *et al.***,** | |
| **Defendants.** | |

<u>**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS'
RENEWED MOTION FOR A PRELIMINARY INJUNCTION**</u>

Plaintiff California Association of Private Postsecondary Schools ("CAPPS") hereby moves for a preliminary injunction restraining the Department of Education ("Department") and its officers, employees, and agents from effectuating, implementing, applying, or taking any action to enforce the ban on arbitration and class-action-waiver provisions ("Arbitration and Class Action Waiver Ban"), the imposition of mandates and "triggers" purportedly based on an institution's "financial responsibility" ("Financial Responsibility Provisions"), the requirement of government-compelled speech in schools' promotional materials ("Repayment Rate Provisions"), and the invention of fundamentally new liabilities for schools ("Borrower Defense Provisions").  The Arbitration and Class Action Waiver Ban, the Financial Responsibility Provisions, the Repayment Rate Provisions, and the Borrower Defense Provisions are part of a rule adopted on November 1, 2016.  *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("2016 Rule").

As detailed in the attached memorandum of law, the Arbitration and Class Action Waiver Ban contravenes the Federal Arbitration Act, exceeds the Department's statutory authority, runs afoul of the Administrative Procedure Act ("APA"), and violates the Constitution.  Similarly, the

Financial Responsibility Provisions, the Repayment Rate Provisions, and the Borrower Defense Provisions exceed the Department's statutory authority, violate the APA, and contravene the Constitution.  CAPPS thus is likely to succeed on the merits; its members will be irreparably harmed in the absence of injunctive relief; the balance of equities tips in its favor; and an injunction would be in the public interest.

WHEREFORE, CAPPS respectfully requests that the Court grant CAPPS's Renewed Motion for a Preliminary Injunction and enjoin the Department from enforcing the Arbitration and Class Action Waiver Ban, the Financial Responsibility Provisions, the Repayment Rate Provisions, and the Borrower Defense Provisions.

Dated:  September 22, 2018

Respectfully submitted,

/s/ Clifford M. Sloan
CLIFFORD M. SLOAN, DC Bar No. 417339
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
4 Times Square
New York, NY 10036
T: 212/735-3834

GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
155 N Upper Wacker Dr. #2700
Chicago, IL 60606
T: 312/407-0739
F: 312/407-8604

ROBERT L. SHAPIRO, DC Bar No. 415854
DUANE MORRIS LLP
505 Ninth Street, NW
Washington, DC 20004
T: 202/776-7867
F: 202/330-5290

*Attorneys for CAPPS*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CALIFORNIA ASSOCIATION OF PRIVATE
POSTSECONDARY SCHOOLS,**

        **Plaintiff,**

**v.**

**ELISABETH DeVOS, Secretary, U.S.
Department of Education,** *et al.*,

        **Defendants.**

**Civil Action No. 17-999 (RDM)**

<u>**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS'
MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION
FOR A PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

    A.    CAPPS ...............................................................................................................2

    B.    2016 Rule .........................................................................................................3

        1.    Arbitration and Class Action Waiver Ban ....................................5

        2.    Financial Responsibility Provisions..............................................5

        3.    Repayment Rate Provisions ..........................................................7

        4.    Borrower Defense Provisions .......................................................8

ARGUMENT ........................................................................................................................9

I.    THE COURT SHOULD ENJOIN THE ARBITRATION AND CLASS ACTION WAIVER BAN ...........................................................................................11

    A.    CAPPS Is Likely to Succeed on the Merits Because the Arbitration and Class Action Waiver Ban Is Unlawful....................................................11

        1.    The Arbitration and Class Action Waiver Ban Conflicts with the FAA.......................................................................................11

        2.    The Arbitration and Class Action Waiver Ban Exceeds the Department's Statutory Authority...............................................14

        3.    The Arbitration and Class Action Waiver Ban Is Arbitrary and Capricious .............................................................................16

        4.    The Arbitration and Class Action Waiver Ban Violates the Constitution................................................................................20

    B.    The Arbitration and Class Action Waiver Ban Will Cause CAPPS Schools Irreparable Harm ...............................................................................20

    C.    The Balance of the Equities Favors an Injunction of the Arbitration and Class Action Waiver Ban......................................................................24

    D.    An Injunction of the Arbitration and Class Action Waiver Ban Is in the Public Interest ................................................................................24

II.  THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING
     THE FINANCIAL RESPONSIBILITY PROVISIONS ..................................................25

     A.  CAPPS Is Likely to Succeed on the Merits Because the Financial
         Responsibility Provisions Are Unlawful ...............................................................25

         1.  The Financial Responsibility Provisions Exceed the Department's
             Statutory Authority ....................................................................................25

         2.  The Financial Responsibility Provisions Violate the APA.......................27

         3.  The Financial Responsibility Provisions Violate the Constitution............28

     B.  CAPPS Schools Will Suffer Irreparable Harm if the Financial
         Responsibility Provisions Take Effect..................................................................29

     C.  The Balance of Equities Favors Enjoining Enforcement of the Financial
         Responsibility Provisions......................................................................................30

     D.  An Injunction of the Financial Responsibility Provisions Is in the Public
         Interest...................................................................................................................31

III. THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING
     THE FORCED-SPEECH REPAYMENT RATE PROVISIONS ....................................31

     A.  CAPPS Is Likely to Succeed on the Merits Because the Repayment Rate
         Provisions Are Unlawful........................................................................................31

         1.  The Repayment Rate Provisions Exceed the Department's
             Statutory Authority ....................................................................................31

         2.  The Repayment Rate Provisions Violate the APA ....................................32

         3.  The Repayment Rate Provisions Violate the Constitution ........................34

     B.  CAPPS Schools Will Suffer Irreparable Harm if the Forced-Speech
         Repayment Rate Provisions Take Effect ...............................................................35

     C.  The Balance of Equities Favors Enjoining Enforcement of the Repayment
         Rate Provisions .....................................................................................................37

     D.  An Injunction of the Repayment Rate Provisions Is in the Public Interest ..........37

IV. THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING
     THE BORROWER DEFENSE PROVISIONS .............................................................38

     A.  CAPPS Is Likely to Succeed on the Merits Because the Borrower Defense
         Provisions Are Unlawful........................................................................................38

1.      The Borrower Defense Provisions Exceed the Department's
        Statutory Authority ...................................................................................38

2.      The Borrower Defense Provisions Violate the APA ................................40

3.      The Borrower Defense Provisions Contravene the Constitution...............43

B.      CAPPS Schools Will Suffer Irreparable Harm if the Borrower Defense
        Provisions Take Effect ..........................................................................................43

C.      The Balance of Equities Favors an Injunction of the Borrower Defense
        Provisions...............................................................................................................44

D.      An Injunction of the Borrower Defense Provisions Is in the Public Interest.........44

CONCLUSION.........................................................................................................................45

## TABLE OF AUTHORITIES

### CASES

*Aishat v. U.S. Department of Homeland Security*,
    288 F. Supp. 3d 261 (D.C. Cir. 2018) ...............................................................................39

*American Financial Services Association v. Burke*,
    169 F. Supp. 2d 62 (D. Conn. 2001) .........................................................................21, 23

*American Health Care Association v. Burwell*,
    217 F. Supp. 3d 921 (N.D. Miss. 2016) ......................................................... 13, 14, 19, 21

*Archdiocese of Washington v. Washington Metropolitan Area Transit Authority*,
    897 F.3d 314, 334 (D.C. Cir. 2018) ...................................................................................9

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) .........................................................................................................12

*Atlas Air, Inc. v. International Brotherhood of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) ...................................................................................36

*Bauer v. DeVos*,
    Civil Action No. 17-1330 (RDM), 2018 WL 4353656 (D.D.C. Sept. 12, 2018) ...............4

*Bauer v. DeVos*,
    Civil Action No. 17-1330 (RDM), 2018 WL 4483783 (D.D.C. Sept. 17, 2018) ...............4

*Bayou Lawn & Landscape Services v. Secretary of Labor*,
    713 F.3d 1080 (11th Cir. 2013) .......................................................................................24

*Carey v. Federal Election Commission*,
    791 F. Supp. 2d 121 (D.D.C. 2011) .................................................................................24

*Cigar Association of America v. FDA*,
    317 F. Supp. 3d 555 (D.D.C. 2018) .................................................................................37

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) .....................................................................................................16, 40

*Comcast Corp. v. FCC*,
    600 F.3d 642 (D.C. Cir. 2010) .........................................................................................16

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) .........................................................................23, 30, 36

*DIRECTV, Inc. v. Imburgia*,
    136 S. Ct. 463 (2015) .................................................................................................12, 14

*Eastern Enterprises v. Apfel*,
    524 U.S. 498 (1998) ...................................................................................20

*Ellipso, Inc. v. Mann*,
    480 F.3d 1153, 1157 (D.C. Cir. 2007) ........................................................9, 44

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...........................................................................20, 27

*Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ........................................................................23

*Epic Systems Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) .............................................................................11, 12

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................................42

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ...................................................................................16

*Fuentes v. Shevin*,
    407 U.S. 67, 81 (1972) ................................................................................28

*Full Value Advisors, LLC v. SEC*,
    633 F.3d 1101 (D.C. Cir. 2011) ...................................................................35

*George Washington University v. District of Columbia*,
    148 F. Supp. 2d 15 (D.D.C. 2001) ..............................................................24

*Gomez v. United States*,
    490 U.S. 858 (1989) ...................................................................................39

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...............................................................23, 30

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) .....................................................................................43

*Hedgeye Risk Management, LLC v. Heldman*,
    196 F. Supp. 3d 40 (D.D.C. 2016) ...............................................................9

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) ............................................................... *passim*

*Honeywell, Inc. v. Consumer Product Safety Commission*,
    582 F. Supp. 1072 (D.D.C. 1984) ...............................................................36

*Kimberly-Clark Corp. v. District of Columbia*,
    286 F. Supp. 3d 128 (D.D.C. 2017) ................................................................37

*Kindred Nursing Centers, L. P. v. Clark*,
    137 S. Ct. 1421 (2017) ......................................................................12, 14

*Marmet Health Care Center, Inc. v. Brown*,
    565 U.S. 530 (2012) ..................................................................11, 18, 25

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................................28

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile*
    *Insurance Co.*,
    463 U.S. 29 (1983) ................................................................... *passim*

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................14

*NLRB v. SW General, Inc.*,
    137 S. Ct. 929 (2017) ..............................................................................32

*Patriot, Inc. v. HUD*,
    963 F. Supp. 1 (D.D.C. 1997) ................................................................36

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984) ................................................................................20

*Perry Education Association v. Perry Local Educators Association*,
    460 U.S. 37 (1983) ..................................................................................35

*Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools*
    *and Colleges*,
    951 F. Supp. 2d 851 (E.D. Va. 2012) ....................................................24

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ..........................................................36, 37

*Resolute Forest Products, Inc. v. USDA*,
    187 F. Supp. 3d 100 (D.D.C. 2016) ......................................................33

*Rodriguez v. McKinney*,
    156 F.R.D. 112 (E.D. Pa. 1994) .............................................................42

*Securities Industry Association v. Connolly*,
    703 F. Supp. 146 (D. Mass. 1988) ........................................................22

*Shearson/American Express, Inc. v. McMahon*,
    482 U.S. 220 (1987) ............................................................................... 13

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) ............................................................................... 14

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) .......................................................................... 12, 17

*TD International, LLC v. Fleischmann*,
    639 F. Supp. 2d 46 (D.D.C. 2009) ....................................................... 23

*Texas Children's Hospital v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ....................................................... 23

*True the Vote, Inc. v. IRS*,
    831 F.3d 551 (D.C. Cir. 2016) ............................................................. 35

*UDC Chairs Chapter, American Ass'n of University Professors v. Board of Trustees of University of D.C.*,
    56 F.3d 1469 (D.C. Cir. 1995) ............................................................. 43

*Universal Health Services, Inc. v. United States*,
    136 S. Ct. 1989 (2016) ......................................................................... 41

*Whitman v. American Trucking Associations, Inc.*
    531 U.S. 457 (2001) ............................................................................. 16

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 9

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ......................................................... 22, 30

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of, Oh.*, 471 U.S. 626 (1985) ........................................................................ 35

## STATUTES

5 U.S.C. § 553 .......................................................................................... 40

5 U.S.C. § 706 ............................................................................... 16, 27, 32

9 U.S.C. § 2 .............................................................................................. 11

10 U.S.C. § 987 ........................................................................................ 15

12 U.S.C. § 5518 ...................................................................................... 15

15 U.S.C. § 78o .................................................................................................15

20 U.S.C. § 1070 ..................................................................................................1

20 U.S.C. § 1087 ................................................................................................39

20 U.S.C. § 1087d ............................................................................14, 16, 39

20 U.S.C. § 1087e ..................................................................................38, 39

20 U.S.C. § 1092 ................................................................................................32

20 U.S.C. § 1094 ................................................................................................39

20 U.S.C. § 1099c ..........................................................................................25, 26

20 U.S.C. § 1221e-3 ........................................................................................40

20 U.S.C. § 3474 ................................................................................................40

Cal. Educ. Code § 94902 ..................................................................................21

## REGULATIONS

Cal. Code Regs. tit. 5 § 71745 ......................................................28, 30

34 C.F.R. § 668.41 ..............................................................................................7

34 C.F.R. § 668.171 ..........................................................................................28

34 C.F.R. § 685.206 ........................................................................................8, 9

34 C.F.R. § 685.300 ........................................................................................5, 21

81 Fed. Reg. 32,830 ..................................................................................19, 41

81 Fed. Reg. 75,926 ............................................................................. *passim*

82 Fed. Reg. 27,621 ............................................................................................4

82 Fed. Reg. 49,114 ............................................................................................4

83 Fed. Reg. 6458 ..............................................................................................4

83 Fed. Reg. 37,242 ............................................................................. *passim*

83 Fed. Reg. 40,167 ..........................................................................................4

# OTHER AUTHORITIES

Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010), http://www.wsj.com/ articles/SB10001424052748703724104575378933954267308 ...........................................3

California Grant Programs, https://www.csac.ca.gov/cal-grants (last visited Sept. 21, 2018) ..............................................................................................................................30

Consumer Financial Protection Bureau, *What Are the Different Ways to Pay for College or Graduate School?*, http://www.consumerfinance.gov/askcfpb/545/what-are-main-differences-between-federal-student-loans-and-private-student-loans.html (last visited May 30, 2017) .............................................................................................19

Dep't of Educ., *Updated Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13, 2017), https://ifap.ed.gov/eannouncements/ 011317UpdatedDataForCollegeScorecardFinaidShop Sheet.html...............................8, 33

Federal Student Aid, U.S. Department of Education, *Income-Driven Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven ......................33

*FFEL Program Lender and Guaranty Agency Reports*, Federal Student Aid, https://studentaid.ed.gov/sa/about/data-center/lender-guaranty (last visited Sept. 22, 2018) .....................................................................................................................7

Jill E. Fisch, *Class Action Reform, Qui Tam, and the Role of the Plaintiff*, 60 Law & Contemp. Probs. 167 (1997) ..........................................................................................18

Glossary Entry for "William D. Ford Federal Direct Loan (Direct Loan) Program," Federal Student Aid, https://studentaid.ed.gov/sa/glossary#William_D._Ford _Federal_Direct_Loan_Direct_Loan_Program (last visited Sept. 22, 2018) .....................5

H.R. Rep. No. 97-542, 97th Cong. 2d Sess. (1982).......................................................17

Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 Va. L. Rev. 1051 (1996)...........................................................................................................................18

National Council for State Authorization Reciprocity Agreements Manual, http://nc-sara.org/content/sara-manual ..................................................................................28

Deborah Platt Majoras, Chairwoman, FTC, Comments at the FTC Workshop: Protecting Consumer Interests in Class Actions (Sept. 13, 2004), 18 Geo. J. Legal Ethics 1161 (2005)................................................................................................................18

S. Rep. No. 536, 68th Cong., 1st Sess. (1924)..............................................................17

Michael Stratford, *DeVos Says She'll Process Already-Approved Student Debt Relief Claims*, PoliticoPro.com (May 24, 2017, 2:16 PM), https://www.politicopro.com/education/whiteboard/ 2017/05/devos-says-shell-process-already-approved-student-debt-relief-claims-088261 ..........................................3

## INTRODUCTION

On November 1, 2016, the Department of Education ("Department") published a final rule adopting a series of far-reaching and unprecedented changes to its regulatory regime under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq*.  *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("2016 Rule").  The Court should enjoin the enforcement of four aspects of the 2016 Rule that will lead to immediate chaos and cause irreparable harm if the Rule goes into effect:  the ban on arbitration and class-action-waiver provisions ("Arbitration and Class Action Waiver Ban"); the imposition of mandates and "triggers" based on an institution's "financial responsibility" ("Financial Responsibility Provisions"); the order to include government-compelled speech in schools' promotional materials ("Repayment Rate Provisions"); and the creation of fundamentally new liabilities for schools ("Borrower Defense Provisions").

The four-part standard for entering a preliminary injunction is amply justified on this record.  **First**, plaintiff California Association of Private Postsecondary Schools ("CAPPS") is likely to succeed on the merits of its challenge because all four provisions exceed the Department's statutory authority (and, in the case of the Arbitration and Class Action Waiver Ban, conflict with the Federal Arbitration Act ("FAA")), violate the rulemaking requirements of the Administrative Procedure Act ("APA"), and contravene the Constitution.  **Second**, CAPPS schools will be irreparably harmed in the absence of an injunction.  Among other injuries, enforcement of the 2016 Rule could cause schools to suffer severe financial crises and shut down, require schools to provide misleading government-compelled speech, upend schools' pre-existing and prospective contractual arrangements and arbitration proceedings, and force schools to expend substantial resources to defend themselves against new claims governed by unspecified ad hoc legal standards in proceedings lacking core procedural protections.  **Third**,

the balance of equities tips in CAPPS's favor because while CAPPS schools and students will suffer severe harm if the challenged provisions go into effect, the Department will not be harmed by a preliminary injunction.   **Fourth**, a preliminary injunction is in the public interest, particularly in light of the Department's intent to issue a new rule to replace the 2016 Rule as soon as November 1, 2018.   In the absence of an injunction, CAPPS schools and their students will face substantial, unnecessary harm through the temporary implementation of a rule that will be rescinded in short order.

For the reasons that follow, the Court should grant a preliminary injunction preserving the status quo and preventing the implementation of all four provisions.

## FACTUAL BACKGROUND

A.   <u>CAPPS</u>

CAPPS is a California state association of schools representing a diverse range of private postsecondary institutions in California.   *See* Declaration of Robert Johnson ("Johnson Decl.") ¶ 2 (Sept. 21, 2018).   It has a membership of approximately 150 institutions, including both proprietary (for-profit) and non-profit schools.   *Id.* ¶ 4.   Many CAPPS schools are technical or vocational colleges that prepare workers for occupations necessary to a thriving economy.   *Id.* ¶ 7.   CAPPS schools train future nurses, dialysis technicians, ultrasound technicians, home health aides, emergency medical technicians, information technology specialists, cyber-security specialists, HVAC and refrigeration technicians, electricians, paralegals, chefs, line cooks, and cosmetologists.   *Id.* ¶ 8.   The economy would not function without workers in these fields.   Local hospitals, labs, repair companies, and restaurants depend on a reliable stream of well-trained workers.   And students rely on CAPPS schools for access to skilled jobs and upward mobility.

Most CAPPS members are proprietary schools, serving a student population that includes a high percentage of low-income and minority individuals—students otherwise not well served

by traditional institutions of higher education.  *See* Comments of CAPPS, ED-2015-OPE-0103,

Attach. 1, Declaration of Jonathan Guryan, Ph.D. (Aug. 1, 2016).  Students at proprietary schools

are likely to be the first in their family to graduate from college.  *Id.* ¶ 14.  They are also more

likely to be single parents, financially independent, and over the age of 25.  *Id.* ¶ 7, 12.  These

students are often drawn to proprietary schools based on the schools' flexible schedules and

career-focused instruction.  Johnson Decl. ¶ 5-6.  Proprietary schools have established a record

of successful efforts to help these students, whom other schools might label "at risk."  *See, e.g.*,

Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010),

http://www.wsj.com/articles/SB10001424052748703724104575378933954267308.[1]   As the

Department itself recognized in the 2016 Rule, "there are many proprietary career schools and

colleges that play a vital role in the country's higher education system."  81 Fed. Reg. at 75,934.

B.    2016 Rule

On November 1, 2016, the Department published the 2016 Rule, which was scheduled to

go into effect on July 1, 2017, the earliest possible date under the governing statute.  Although

the Secretary of Education stated that she was undertaking a review of the new regulatory regime

announced in the 2016 Rule, the Department had not modified the Rule or its effective date as of

May 2017.[2]  Accordingly, with the July 1 effective date approaching, CAPPS filed this suit on

May 24, 2017, challenging the new rules as exceeding the Department's statutory authority,

violating the APA, and flouting the Constitution.

---

[1]   All internal citations and quotation marks are omitted unless otherwise indicated.

[2]   *See, e.g.*, Michael Stratford, *DeVos says she'll process already-approved student debt claims*, PoliticoPro.com (May 24, 2017, 2:16 p.m.), http://www.politicopro.com/education/whiteboard/2017/05/devos-says-shell-process-already-approved-student-debt-relief-claims-088261.

The Department then postponed the effective date of the 2016 Rule in light of this litigation ("Section 705 Stay"); issued an interim final rule delaying the effective date until July 1, 2018 ("IFR"); and later promulgated a rule delaying it until July 1, 2019 ("2018 Rule").  *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 82 Fed. Reg. 27,621 (June 16, 2017) ("Section 705 Stay"); 82 Fed. Reg. 49,114 (Oct. 24, 2017) ("IFR"); 83 Fed. Reg. 6458 (Feb. 14, 2018) ("2018 Rule") (collectively, "Delay Rules").

On July 31, 2018, the Department issued a Notice of Proposed Rulemaking ("NPRM") setting forth proposals to revise the 2016 Rule.  *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 83 Fed. Reg. 37,242 (July 31, 2018); *see also*, 83 Fed. Reg. 40,167 (Aug. 14, 2018).  For a new final rule to be effective on July 1, 2019, it would need to be issued by November 1, 2018.

On September 12, 2018, the Court issued an opinion and order concluding that the Section 705 Stay lacked adequate explanation, the 2018 Rule lacked the negotiated rulemaking process required by the HEA, and the IFR was largely moot.  *Bauer v. DeVos*, No. 17-1330, 2018 WL 4353656 (D.D.C. Sept. 12, 2018).  The Court vacated the Section 705 Stay and the 2018 Rule, but it stayed vacatur of the Section 705 Stay until October 12, 2018 to give the Department an opportunity "to remedy the deficiencies" in the Stay.  Mem. Op. & Order, *Bauer v. DeVos*, No. 17-1330, 2018 WL 4483783, at *3 (D.D.C. Sept. 17, 2018).

The 2016 Rule is a sprawling mass of loosely related mandates.  Four of those regulatory initiatives are central here: the Arbitration and Class Action Waiver Ban; the mandate-and-trigger Financial Responsibility Provisions; the forced-speech Repayment Rate Provisions; and the Borrower Defense Provisions.

*1.      Arbitration and Class Action Waiver Ban*

Under the 2016 Rule, institutions that participate in the Direct Loan Program[3] may not use or obtain pre-dispute agreements to arbitrate borrower defense claims or waivers of a borrower's right to initiate or participate in a class action lawsuit related to those claims.  *See* 81 Fed. Reg. at 76,087-88; 34 C.F.R. §§ 685.300(e)-(f).  The borrower defense claims encompassed by the 2016 Rule include actions related to student loans, the provision of educational services, or a school's marketing—a wide range of lawsuits a student might initiate against a school.

Many CAPPS schools have arbitration clauses and class action waivers in their existing enrollment agreements that potentially would be subject to the Arbitration and Class Action Waiver Ban.  *See* Johnson Decl. ¶ 9.  That ban would take effect immediately, causing schools to either notify borrowers of this change or amend their agreements.  81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).

*2.      Financial Responsibility Provisions*

The Financial Responsibility provisions of the 2016 Rule require schools to provide irrevocable letters of credit (or other unspecified financial protections)  amounting to 10 percent of their Title IV revenues for the most recently completed fiscal year when one or more "triggering events" occur.[4]

**First**, the 2016 Rule contains some mandatory triggers that automatically require a school to provide letters of credit.  These include instances when the institution did not receive

---

[3]   The William D. Ford Federal Direct Loan ("Direct Loan") Program is a federal student loan program under which eligible students and parents borrow directly from the Department at participating schools.  https://studentaid.ed.gov/sa/glossary#William_D._Ford_Federal_ Direct_Loan_Direct_Loan_ Program (last visited Sept. 22, 2018)..

[4]   Title IV Revenue refers to the revenue an institution receives from Title IV, HEA program funds.

more than 10 percent of its revenue from non–Title IV funds; when a publicly traded school fails to timely file a quarterly or annual report with the SEC; when the SEC warns an institution that it may suspend trading of its publicly traded stock; when an exchange on which a school's stock is traded notifies the school that it is not in compliance with exchange requirements or its stock is delisted; or when the school has a "cohort default rate" (measuring the extent to which its students default on their student loans) of greater than 30%.  81 Fed. Reg. at 76,073-74.

**Second**, the 2016 Rule contains automatic triggers that require the Department to recalculate a school's "composite score."  If the resulting composite score is less than 1.0, the school must provide letters of credit.  *See* 81 Fed. Reg. at 76,073.  The composite score is a composite of three ratios derived from an institution's financial statements.  Each time a specified triggering event occurs, the Department must recalculate the school's composite score based on the maximum impact stemming from those events (unless the school demonstrates to the Secretary's satisfaction that the event will have no effect on the assets and liabilities of the institution).  *Id.*  Triggering events include the imposition of *any* liability arising from a final judgment from a judicial or administrative proceeding or settlement; the existence of a suit pending for at least 120 days and brought by a federal or state authority for financial relief on claims related to the making of a Direct Loan for enrollment at the school or the provision of educational services; the existence of a suit by any private party that has not been quickly dismissed or resolved on summary judgment; an accrediting agency's imposition of a requirement to submit a "teach-out plan" that covers the closing of the school or any of its branches or additional locations; or "*any*" withdrawal of owner's equity by any means (including declaring a dividend) from a proprietary school if that institution has a composite score of less

than 1.5.  *Id.* (emphasis added).  Composite scores are used for a variety of purposes, including accreditation.  *See infra* pp. 30-31.

**Third**, the 2016 Rule contains certain "discretionary" triggers that require a school to provide letters of credit when the "Secretary demonstrates that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution."  81 Fed. Reg. at 76,074 (providing a non-exhaustive list of examples, such as failure of a yet-to-be-announced financial stress test and high annual dropout rates).  The Department explicitly declined to explain what would make an event "material" so as to qualify as a discretionary trigger.

*3.    Repayment Rate Provisions*

Under the 2016 Rule, a proprietary institution is required in certain circumstances to include in all promotional materials a loan repayment rate warning.  The warning is required if the institution's median borrower has neither fully repaid all FFEL[5] or Direct Loans nor made loan payments sufficient to reduce the outstanding balance of each loan by at least one dollar after three years.  *See* 81 Fed. Reg. at 76,071.  This warning is required even if students are repaying their loans gradually using Department-approved (and encouraged) income-based repayment plans.  The Department mandates the form, place, and manner of the warning, including the language that must be used  ("U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans").  *See* 81 Fed. Reg. at 76,072; 34 C.F.R. § 668.41(h)(3)(i)(A).

---

[5]   Under the Federal Family Education Loan ("FFEL") Program, private lenders made federal loans to students, and guaranty agencies insured these funds, which were, in turn, reinsured by the federal government.  The program was discontinued, and no new FFEL loans have been issued since July 1, 2010.  *See FFEL Program Lender and Guaranty Agency Reports*, https://studentaid.ed.gov/sa/about/data-center/lender-guaranty (last visited Sept. 22, 2018).

Public and non-profit schools with similar repayment rates, however, are not required to furnish their students with any warnings.  The decision to apply this provision only to proprietary schools was made based on data that the Department now acknowledges was inaccurate.[6]

### 4.     *Borrower Defense Provisions*

The 2016 Rule dramatically expanded the liabilities of schools in three fundamental ways.  First, the 2016 Rule transformed what once was a *defense* for borrowers into a new *affirmative claim*.  While the prior regulations limited the assertion of borrower defenses to "any proceeding to collect on a Direct Loan" that already had been instituted against a borrower, 34 C.F.R. § 685.206(c) (2012), the 2016 Rule expanded this right to allow a borrower to initiate an action for affirmative debt relief in front of a Department official at any time.  *See* 81 Fed. Reg. at 75,956.  Second, for loans first disbursed on or after the effective date, the 2016 Rule drastically changed the standard for establishing a borrower defense—including as an affirmative claim.  The 2016 Rule provided that a borrower defense is available when, among other things, the borrower demonstrates a breach of contract by the school or the borrower establishes a substantial misrepresentation by the school on which the borrower reasonably relied to his or her detriment.  *Id.* at 76,083.   In defining those claims, however, the 2016 Rule replaced the Department's prior reliance on state law with an entirely new jurisprudence encompassing a "Federal standard for breach of contract" and a "Federal standard" for substantial misrepresentation—standards that the Department planned to explicate "on a case-by-case

---

[6]   *See* Dep't of Educ., *Updated Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13, 2017), https://ifap.ed.gov/eannouncements/ 011317UpdatedDataForCollegeScorecardFinaidShopSheet.html.

basis."[7]  Third, the 2016 Rule created a new "group borrower defense" process—akin to a class action—in which the Department both prosecutes and adjudicates claims as to groups of students.  *See, e.g.*, 81 Fed. Reg. at 75,964-65.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish that (i) it is "likely to succeed on the merits," (ii) "[it] is likely to suffer irreparable harm in the absence of preliminary relief," (iii) "the balance of equities tips in [its] favor," and (iv) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Applying this standard, the Court should enjoin enforcement of the Arbitration and Class Action Waiver Ban, the Financial Responsibility Provisions, the Repayment Rate Provisions, and the Borrower Defense Provisions.[8]

**First**, CAPPS is likely to succeed on the merits in its challenge to all four provisions.  The Arbitration and Class Action Waiver Ban, the Financial Responsibility Provisions, the

---

[7]  For loans disbursed before the effective date, the 2016 Rule maintained the pre-existing definition of a "borrower defense," which required a borrower to show that some "act or omission of the school attended by the student . . . would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

[8]  The D.C. Circuit traditionally has held that "[a] court must balance these factors, and '[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'"  *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007).  The D.C. Circuit has not yet decided whether the Supreme Court's decision in *Winter* "is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned."  *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018); *see also, e.g.*, *Hedgeye Risk Mgmt., LLC v. Heldman*, 196 F. Supp. 3d 40, 46 (D.D.C. 2016) (Moss, J.).  CAPPS respectfully submits that the sliding-scale approach remains valid, as at least the Ninth Circuit has concluded.  *See All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) ("[I]f a plaintiff can only show that there are serious questions going to the merits . . . then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied.").  Under either standard, however, the Court should enter a preliminary injunction in this case.

Repayment Rate Provisions, and the Borrower and Defense Provisions exceed the Department's statutory authority, violate the APA's rulemaking requirements, and contravene the Constitution. The Arbitration and Class Action Waiver Ban also conflicts with the FAA.

**Second**, CAPPS schools will be irreparably harmed in the absence of an injunction. If the Arbitration and Class Actions Waiver Ban goes into effect, schools' current arbitration provisions and class action waivers immediately will become unenforceable and the schools will be prohibited from entering into such agreements with any new students. Later judicial invalidation of the rule could not redress the harm caused by the ensuing turmoil, including the confusion among schools and students regarding whether existing and new disputes are arbitrable, the virtual impossibility of retroactively adopting arbitration and class-action-waiver provisions, and the disruption of pending arbitration proceedings. Similarly, enforcement of the Financial Responsibility Provisions will require a number of schools to provide expensive and difficult-to-obtain letters of credit for reasons unrelated to financial responsibility, unnecessarily forcing smaller institutions to close. Allowing the forced-speech Repayment Rate Provisions to go into effect will cause serious reputational harm to schools, who will be required to provide a government-mandated message divorced from all relevant context throughout their promotional materials, and who will suffer deprivation of First Amendment rights. Finally, enforcement of the Borrower Defense Provisions will force schools to expend substantial resources to defend themselves against fundamentally new claims with unspecified ad hoc legal standards only to see those claims extinguished when the Department finalizes its revisions to the 2016 Rule.

**Third**, the balance of equities tips in CAPPS's favor. Neither the Department nor students will be harmed—let alone irreparably harmed—if these four aspects of the 2016 Rule's implementation are delayed pending full consideration of the merits. In stark contrast, CAPPS

schools and students will suffer severe harm if the challenged provisions go into effect.  Further

tipping the equities, the Secretary is actively reconsidering the 2016 Rule and has issued an

NPRM seeking to revise it, and the new rule may be finalized by November 1, 2018.  Springing

the 2016 Rule into brief existence thus will assuredly cause harm and disruption for reasons that

are, at best, uncertain and short-lived.

**Fourth**, a preliminary injunction is in the public interest.  In the absence of an injunction,

resources will be needlessly diverted away from classes and students, particularly students from

underserved populations being educated by many CAPPS schools; many smaller institutions

serving those populations might be forced to close if required to provide a letter of credit; the

sound and orderly continuation of existing arbitration proceedings will be unnecessarily

disrupted; and prospective students will be misled by government-compelled messages.

Declining to grant an injunction, moreover, will cause regulatory whiplash.  Schools, the public,

and the Department will be lurching among multiple regulatory regimes within a brief window.

## I.      THE COURT SHOULD ENJOIN THE ARBITRATION AND CLASS ACTION WAIVER BAN

### A.      CAPPS Is Likely to Succeed on the Merits Because the Arbitration and Class Action Waiver Ban Is Unlawful

#### 1.      *The Arbitration and Class Action Waiver Ban Conflicts with the FAA*

By retroactively invalidating arbitration clauses in existing and prospective contracts, the

2016 Rule plainly violates the FAA.  *See* 9 U.S.C. § 2 (providing that arbitration agreements in

contracts "*shall* be valid, irrevocable, and enforceable") (emphasis added).  Congress through the

FAA "directed courts to abandon their hostility [to arbitration] and instead treat arbitration

agreements as 'valid, irrevocable, and enforceable.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612,

1621 (2018).  To that end, as the Supreme Court has emphasized, the FAA "establishes 'a liberal

federal policy favoring arbitration agreements.'"  *Id.*; *see also Marmet Health Care Ctr., Inc. v.*

*Brown*, 565 U.S. 530, 533 (2012) (The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution."). Under this "liberal federal policy," moreover, bilateral, one-on-one arbitration is the norm. *See, e.g.*, *Epic Sys.*, 138 S. Ct. at 1622 (the "individualized nature of arbitration proceedings" is "one of arbitration's fundamental attributes"); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011) (rejecting California's ban on class action waivers and holding that a "manufactured" requirement of class arbitration "is inconsistent with the FAA"); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681-87 (2010) (the default rule is that an arbitration agreement provides for bilateral arbitration because "class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator").

As part of this pro-arbitration federal policy, the FAA establishes an "'equal treatment' rule for arbitration contracts." *Epic Sys.*, 138 S. Ct. at 1622. This equal-treatment mandate operates as a "congressional command requiring [courts] to enforce, not override, the terms of the arbitration agreements before [them]" and compels the invalidation of federal and state laws and policies that abridge the right to enforce arbitration provisions in contracts. *See, e.g.*, *id.* at 1623; *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) (invalidating law that "does not place arbitration contracts 'on equal footing with all other contracts'" and "does not give 'due regard . . . to the federal policy favoring arbitration'"); *Concepcion*, 563 U.S. at 341 (holding that laws that "prohibit[] outright the arbitration of a particular type of claim" are "displaced by the FAA"). These principles apply fully to the formation of arbitration agreements, in addition to their enforcement. *See, e.g.*, *Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 137 S. Ct. 1421, 1428 (2017) (rejecting contention that the FAA is inapplicable to rules that "address only formation" of contracts).

Consistent with these bedrock rules, federal agencies may not invalidate or otherwise discriminate against arbitration agreements in the absence of congressional authorization. *See, e.g.*, *Epic Sys.*, 138 S. Ct. at 1632 (rejecting the National Labor Relations Board's attempt to invalidate bilateral arbitration agreements); *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 931, 946 (N.D. Miss. 2016) (holding that plaintiffs were likely to prevail in a suit challenging a Department of Health and Human Services rule that sought to bar arbitration agreements between nursing homes and their patients and explaining that a federal agency lacks authority to displace the FAA's presumption in favor of arbitration).[9]   Indeed, the FAA places the burden on "the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).   In this case, the Department has not suggested—much less proven—that Congress intended to preclude arbitration agreements in the higher education context; therefore, the Department's rule barring arbitration agreements between schools and students is unlawful.

Conceding that no congressional enactment permits it to enact the Arbitration and Class Action Waiver Ban, the Department principally argued in 2016 that "the HEA gives the Department the authority to impose *conditions* on schools that wish to participate in a Federal benefit program."   81 Fed. Reg. at 76,022 (emphasis added).   In other words, the Department contended that it was not imposing an impermissible ban on arbitration or class-action waivers because schools can always choose not to accept Title IV funds.   That argument fails for two

---

[9]   Because the agency subsequently issued an NPRM that proposed changing the arbitration ban challenged in *American Health*, the parties ultimately agreed to a stay of further litigation—which the court entered—until the completion of the agency's rulemaking process.  *See*  Joint Mot. to Continue Stay of Proceeding, *Am. Health Care Ass'n v. Price*, No. 3:16-cv-00233 (N.D. Miss. June 8, 2017), ECF No. 68.  The case is still pending.

reasons.  First, an agency may not use its spending power to engage in "economic dragooning" that leaves parties with "no real option but to acquiesce" to otherwise unlawful requirements. *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012).  A threat to withdraw all Title IV funding, which 80 percent or more of students rely on, is a "gun to the head" that goes well beyond "the point at which pressure turns into compulsion."  *Id.* at 581.  The federal court considering a similar ban in the Medicare/Medicaid context agreed:

> [N]ursing homes are so dependent upon Medicare and Medicaid funding that the Rule in this case effectively amounts to a ban on pre-dispute nursing home arbitration contracts.  This court believes that the Rule should, and likely will be, treated as what it effectively is (*i.e.*, a de facto ban), in determining whether it conflicts with the FAA.  Moreover, it should be noted that, even if the Rule in this case is interpreted as a mere "incentive" against arbitration, this does not necessarily mean that singling out a form of arbitration for such disincentives allows it to survive FAA scrutiny.

*Am. Health Care Ass'n*, 217 F. Supp. 3d at 929-30.[10]  Second, pursuant to the FAA, the Supreme Court has frequently vacated rules that have a disproportionate impact on arbitration clauses even when they do not impose a flat ban.  *See, e.g.*, *DIRECTV, Inc.*, 136 S. Ct. at 471.  The Department's 2016 Rule indisputably constitutes such unequal treatment of arbitration contracts, which is prohibited by the FAA.  *See Kindred Nursing Centers*, 137 S. Ct. at 1426.

> 2.     *The Arbitration and Class Action Waiver Ban Exceeds the Department's Statutory Authority*

CAPPS is also likely to succeed on the merits because the Secretary lacks the authority to promulgate the Arbitration and Class Action Waiver Ban under the HEA.  The Department purported to find authority for the ban in Section 454(a)(6) of the HEA, 20 U.S.C. § 1087d(a)(6),

---

[10]   At the very least, this Court should reject the Department's interpretation of its statutory authority as encompassing the authority to impose such a coercive condition (which would raise deeply problematic issues under the Spending Clause) to avoid having to confront a constitutional question.  *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).

a catch-all provision allowing the Secretary to "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program in program participation agreements with educational institutions. 81 Fed. Reg. at 76,022. This vague catch-all provision is too thin a reed on which to hang a regulation that conflicts with the express statutory mandate of the FAA.

To begin with, in the rare circumstances when Congress grants an agency the authority to abrogate arbitration provisions, it does so clearly and unambiguously. For example, the Consumer Financial Protection Bureau ("CFPB") was given explicit authority by Congress to study the issue of mandatory arbitration and then to promulgate a rule regarding mandatory arbitration *if* the CFPB believed such a rule to be necessary. *See* 12 U.S.C. 5518 (authorizing the CFPB to "prohibit or impose conditions or limitations on the use" of certain agreements "providing for arbitration of any future dispute between the parties").[11] Without such explicit congressional authorization, the FAA prohibits an agency from altering arbitration agreements. That Congress plainly thought it necessary to give such explicit authority to the CFPB supports the conclusion that the Department lacks the authority, under a vague catch-all provision of the HEA, to abrogate arbitration or class-action-waiver agreements.[12]

---

[11]   In the CFPB context, Congress ultimately passed, and the President signed, a joint resolution disapproving the CFPB's rule that would have banned class action waivers in pre-dispute arbitration agreements. 82 Fed. Reg. 55,500 (Nov. 22, 2017).

[12]   Indeed, as the Department acknowledged, 81 Fed. Reg. at 76,023, other agencies in addition to the CFPB have been given specific, limited statutory authority to regulate arbitration provisions—unlike the Department. *See, e.g.*, 10 U.S.C. § 987(f)(4), (h) (concerning the Department of Defense and regulation of the use of mandatory arbitration in extensions of credit to service members); 15 U.S.C. § 78o (authorizing the SEC to regulate the use of mandatory arbitration in certain investment relationships).

In addition, the text and structure of the HEA establish that Section 454(a)(6) does not authorize such interference with private contracts or massive expansion of agency authority. Section 454(a)(6) is a catch-all clause at the end of a series of ministerial requirements for loan administration under program participation agreements. *See, e.g.*, 20 U.S.C. § 1087d(a)(1)(C), (D); *id.* § 1087d(a)(5)   And when general provisions "follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001).

The Department may not invoke this limited catch-all clause to override the FAA and to give the Department unbounded authority to regulate agreements between students and their schools.  Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-161 (2000) (FDA may not assert authority to regulate tobacco based on generic statutory text); *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010) (FCC may not use ancillary authority to enact massive regulations otherwise outside its statutory reach).

Put simply, Section 454(a)(6) is not a blank check for the Department to enact any policy it sees fit, no matter how attenuated the connection might be to loan administration.  Section 454(a) does not deal with arbitration or class action waivers—and neither, for that matter, does any provision of the HEA.  The Department cannot read into 454(a)(6) authority that Congress clearly did not intend to confer—and that conflicts with Congress's directives in the FAA.

   3.  *The Arbitration and Class Action Waiver Ban Is Arbitrary and Capricious*

The Department's Arbitration and Class Action Waiver Ban also is arbitrary and capricious.  Section 706 of the APA requires an agency to "examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").   When engaging in notice-and-comment rulemaking, the agency also has the obligation to respond to significant comments on the record. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

**First**, the Department violated the APA because the agency failed to adequately consider extensive data in the record demonstrating the benefits of arbitration.   As discussed in the Supreme Court case law interpreting the Act, the benefits of arbitration are substantial to *all* parties involved.   The Supreme Court has emphasized the significant "benefits [to] private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Stolt-Nielsen S.A.*, 559 U.S. at 685.   CAPPS' comments cited not only those court opinions—opinions that themselves contain references to numerous studies on arbitration—but also several published studies confirming the advantages of arbitration.[13]   The Department, however, failed to address the substance of these submissions,

---

[13]   *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103, at 64 ("The average time from filing to final award for the consumer arbitrations studied was 6.9 months[,] . . . [i]n cases with claims seeking less than $10,000, consumer claimants paid an average of $96[,] and . . .[c]onsumers won some relief in 53.3% of the cases they filed and recovered an average of $19,255[.]"); *id.* at 64-65 ("In 2005, Harris Interactive surveyed 609 adults who had participated in some type of arbitration, finding that they reported several advantages of arbitration over litigation: 74% said it was faster, 63% said it was simpler, and 51% said it was cheaper than litigation."); *see also* S. Rep. No. 536, 68th Cong., 1st Sess., at 3 (1924) (the Act, by avoiding "the delay and expense of litigation," will appeal "to big business and little business alike, . . . corporate interests [and] . . . individuals"); H.R. Rep. No. 97-542, 97th Cong. 2d Sess., at 13 (1982) ("The advantages of arbitration are many: it is usually cheaper and faster than litigation; it can have simpler procedural and evidentiary rules; it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties; it is often more flexible in regard to scheduling of times and places of hearings and discovery devices . . .").

contrary to cardinal principles of the APA.  *See, e.g.*, *State Farm*, 463 U.S. at 43; *Home Box Office*, 567 F.2d at 35-36.[14]  Not only that, the Department now acknowledges that it "should take a position more in line with the benefits of arbitration and the strong Federal policy favoring it" and lists "[s]everal potential benefits of arbitration" that are "relevant."  83 Fed. Reg. 37,245.

**Second**, in adopting the class action waiver ban, the Department likewise failed to adequately consider the serious drawbacks of class actions for students.  It is well documented that class actions are often an ineffective means of obtaining relief for consumers, as CAPPS noted in its comments.  As practitioners and scholars have found, the incentive to litigate a class action—including compensation—is higher for attorneys than it is for individual consumers.[15]  For example, as CAPPS noted in its comments, even where students can overcome the high hurdle of class certification, it is statistically unlikely they will prevail.  *See* Comments of CAPPS, ED-2015-OPE-0103, at 66-67.  Given the well-documented drawbacks of class litigation, the Department should have, at the very least, considered and addressed whether class

---

[14]  The Department purported to be remedying "widespread abuse" by schools "aggressively us[ing] waivers and arbitration agreements to thwart" student actions over the years. 81 Fed. Reg. at 76,025.  However, the Department did not acknowledge that students already have a means to combat this alleged abuse.  Arbitration provisions that do not comport with the well-established legal principles that apply to all contracts may be voided by courts, even under the FAA.  *See Marmet*, 565 U.S. at 532-34.

[15]  *See, e.g.*, Deborah Platt Majoras, Chairwoman, FTC, Comments at the FTC Workshop: Protecting Consumer Interests in Class Actions (Sept. 13-14, 2004), 18 Geo. J. Legal Ethics 1161, 1162-63 (2005) (cited by CAPPS in the record, Comments of CAPPS, ED-2015-OPE-0103, at 66); *see also* Jill E. Fisch, *Class Action Reform, Qui Tam, and the Role of the Plaintiff*, 60 Law & Contemp. Probs. 167, 168 (1997) (discussing situation in which class members receive little or nothing but counsel are compensated generously) (cited by CAPPS in the record, Comments of CAPPS, ED-2015-OPE-0103, at 66 n.15); Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 Va. L. Rev. 1051, 1053-54 (1996) (discussing class action settlements in which class lawyers negotiated or requested multimillion dollar fees while class members received minimal in-kind compensation) (cited by CAPPS in the record, Comments of CAPPS, ED-2015-OPE-0103, at 66 n.15).

action waivers might ultimately hold benefits for borrowers.  *See Home Box Office, Inc.*, 567 F.2d at 35-36.  Once again, however, the Department failed to adequately address this important aspect of the problem.

**Third**, the Department relies heavily on a CFPB study on arbitration agreements and class action provisions.  But that study is plainly inapposite to the public student loan context at issue in the 2016 Rule.  The CFPB study concerned six financial products including credit cards, checking accounts, general purpose reloadable prepaid cards, payday loans, private student loans, and mobile wireless contracts governing third-party billing services.  *See* 81 Fed. Reg. 32,830, 32,840 (May 24, 2016).  The CFPB *itself* acknowledges that federal loans fundamentally differ from private loans:  The CFPB points out that the "interest rate for a federal student loan is generally fixed"; "[f]ederal student loans allow [students] to enroll in a repayment plan based on [their] income" which "limits the amount [they] must repay each month based on [their] income"; and "[private] loans do not offer the flexible repayment terms or protections provided by federal student loans."  *See* Consumer Financial Protection Bureau, *What Are the Different Ways to Pay for College or Graduate School?*, http://www.consumerfinance.gov/ askcfpb/545/what-are-main-differences-between-federal-student-loans-and-private-student-loans.html.  The Department may not, consistent with the mandates of reasoned decision making, simply cut and paste findings from an entirely separate legal and factual setting, made by a separate agency with an entirely distinct statutory authority and mission.  Given the massive and disruptive nature of the 2016 Rule, the Department's failure to undertake its own consideration of relevant data is fatal.  *See, e.g.*, *Am. Health Care Ass'n*, 217 F. Supp. 3d at 939.  The CFPB's study—which Congress ultimately rejected, *see supra* p. 15 n.11— is an obviously insufficient basis to sustain the Arbitration and Class Action Waiver Ban, and the Department's failure to

even consider these differences demonstrates a failure to conduct reasoned decision making on the basis of evidence in the administrative record.  *See State Farm*, 463 U.S. at 43; *see also Home Box Office, Inc.*, 567 F.2d at 35-36.

**Finally**, the Department failed to consider the extent to which institutions have relied on the pre-existing regulatory framework.  Recently, the Supreme Court acknowledged that "an agency must . . . be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  Here, institutions have relied on arbitration provisions, class action waivers, and the strong congressional policy favoring their permissibility, at least in part, in determining the cost of tuition, obtaining insurance, and otherwise ordering their affairs.  To upend those relationships without even considering reliance interests is textbook arbitrary and capricious decision-making.  *See Home Box Office, Inc.*, 567 F.2d at 35-36.

> 4.    *The Arbitration and Class Action Waiver Ban Violates the Constitution*

The 2016 Rule also violates the Constitution because the Arbitration and Class Action Waiver Ban will be applied to existing contracts between students and former students and institutions.  To that extent, the provisions violate the Due Process Clause.  *See generally, e.g.*, *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984) (discussing Due Process Clause problems with retroactive changes to economic contracts); *Eastern Enters. v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J. concurring) (citing cases).

> B.    The Arbitration and Class Action Waiver Ban Will Cause CAPPS Schools Irreparable Harm

If the Arbitration and Class Action Waiver Ban goes into effect, CAPPS schools—and their students—will suffer immediate and irreparable harm

Schools will have to send notices to borrowers indicating that they will not enforce existing agreements (or renegotiate to amend the agreements). 81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii). The confusion prompted by those notices will only be exacerbated by rescission of those notices if and when the rule is invalidated. *See* 83 Fed. Reg. at 37,245 (Notice of Proposed Rulemaking rejecting the Arbitration and Class Action Waiver Provisions). Also, for CAPPS members, the enrollment agreement is the basis of the relationship between a school and its students. In fact, under California law, an enrollment agreement is the sole means by which a student can enroll at a school approved by the California Bureau of Private Postsecondary Education. *See* Cal. Educ. Code § 94902(a). Once students have signed the agreement, it will be virtually impossible to retroactively adopt pre-dispute arbitration and class-action-waiver provisions. *See* Johnson Decl. ¶ 13; Declaration of Stanbridge University ("Stanbridge Decl.") ¶ 11 (Sept. 20, 2018); Declaration of Gurnick Academy of Medical Arts ("AMA Decl.") ¶ 11 (Sept. 20, 2018); Declaration of Institute of Technology ("IT Decl.") ¶ 11 (Sept. 20, 2018); Declaration of West Coast University ("West Coast Decl.") ¶ 12 (Sept. 20, 2018); Declaration of American Career College ("ACC Decl.") ¶ 12 (Sept. 20, 2018). In similar circumstances, courts have held that the harm to institutions was irreparable. *See, e.g.*, *Am. Health Care Ass'n*, 217 F. Supp. 3d at 942 (finding irreparable harm where "nursing homes will lose signatures on arbitration contracts which they will likely never regain" and "[a]dmission agreements would need to be revised, and staff would require retraining on admissions and dispute-resolution procedures"); *Am. Fin. Servs. Ass'n. v. Burke*, 169 F. Supp. 2d 62, 70-71 (D. Conn. 2001) ("No later relief can reform the contracts that AFSA members entered into without mandatory arbitration clauses or restore to AFSA members the negotiating position they would have occupied had section 5(7) not been in effect.").

21

Temporary implementation of the 2016 Rule also will cause chaos for schools and their students.  Cases that are currently proceeding in arbitration and may be near final disposition could be halted in their tracks, as the 2016 Rule creates deep uncertainty for schools surrounding what actions (if any) they may undertake in ongoing proceedings without losing their Title IV funding.  West Coast Decl. ¶ 11; ACC Decl. ¶ 11.  The 2016 Rule will also cause disarray and disorder for courts and schools faced with new cases: a school will not be able to request removal to arbitration without risking its funding, although it would later be able to do so— potentially upending a pending court case—if the 2016 Rule were invalidated.  In the interim, schools will need to amend their agreements; retrain their admissions staffs; and litigate cases, including class actions, in federal and state court.  *See* Johnson Decl. ¶ 12; Stanbridge Decl. ¶¶ 12-13; AMA Decl. ¶¶ 12-13; IT Decl. ¶¶ 13-14; West Coast Decl. ¶¶ 13-14; ACC Decl. ¶¶ 13-14; *see generally Sec. Indus. Ass'n v. Connolly*, 703 F. Supp. 146, 157-58 (D. Mass. 1988) (finding irreparable harm because "[t]he patterns and practices of contract formation regarding securities arbitration will, of course, need costly revision during the pendency of the litigation in the absence of an injunction."), *aff'd*, 883 F.2d 1114 (1st Cir. 1989).

The Department's only response—that a school could completely forgo Title IV funding if it would like to continue using its arbitration and class-action-waiver provisions—severely exacerbates the prospect of irreparable injury.  Cutting off a school from Title IV funding based on its adherence to contractual arbitration and class-action provisions would bankrupt any school and leave its students stranded.  See Johnson Decl. ¶¶ 15-16; Stanbridge Decl. ¶¶ 3-4; AMA Decl. ¶¶ 3-4; IT Decl. ¶¶ 3-4; West Coast Decl. ¶¶ 3-4; ACC Decl. ¶¶ 3-4.  And monetary harm is irreparable where "the loss threatens the very existence of the movant's business."  *Wis. Gas*

*Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 48 (D.D.C. 2009).

Even if the 2016 Rule were eventually vacated, and even if the disruption caused by the ban could be ameliorated, schools *may not be able to recover improperly denied funds from the Department* because of sovereign immunity.  Losses that cannot be recovered due to sovereign immunity are permanent and constitute irreparable harm.  *See, e.g.*, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages" can constitute "irreparable injury"); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241-45 (D.D.C. 2014) (finding irreparable harm where the states did not have a procedure for recovering supplemental payments once they had been recouped, and the loss of funds would mean reducing the hospitals' service); *Am. Fin. Servs. Assn.*, 169 F. Supp. 2d at 70-71 ("Where pecuniary losses cannot later be recovered because the defendant enjoys Eleventh Amendment immunity . . . , such losses are irreparable for purposes of preliminary injunctive relief.").

Harm caused by the Arbitration and Class Action Waiver Ban also is per se irreparable because that provision violates the Due Process Clause through its retroactive application to current contracts currently in existence.  "[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  Thus, "a prospective violation of a constitutional right constitutes irreparable injury for [preliminary injunction] purposes."  *Id.*; *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (finding irreparable harm in the context of a due process violation).

C.     The Balance of the Equities Favors an Injunction of the Arbitration and Class
        Action Waiver Ban

The balance of equities tips in CAPPS's favor.  An injunction would merely maintain the

status quo, which has been the settled regime for the Department and schools for decades.  *See*

*George Wash. Univ. v. Dist. of Columbia*, 148 F. Supp. 2d 15, 19 (D.D.C. 2001) (injunction

warranted where it merely preserved the status quo and the only harm to the district would be

delay); *Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 134-35 (D.D.C. 2011) (harm to

individual rights outweighed agency's interest in enforcing its regulation).  The only harm the

Department would suffer if it were to ultimately prevail would be delayed implementation of its

regulations.   Courts often grant equitable relief in similar circumstances.   *See, e.g.*, *Prof'l*

*Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. and Colls.*, 951 F. Supp. 2d 851,

854 (E.D. Va. 2012) (harm caused by delay was outweighed by damage to school); *see also*

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013) ("DOL

argues that it is harmed by having 'its entire regulatory program called into question.' This is not

an appealing argument. If the 'entire regulatory program' is *ultra vires*, then it should be called

into question.").  In fact, because the Department already has issued an NPRM seeking to revise

the 2016 Rule and abandon the prohibition on arbitration and class action waivers, the

Department has little interest in temporarily implementing the provisions, creating chaos for

schools, and ultimately repealing the provisions in any event.  By contrast, implementation of the

Arbitration and Class Action Waiver Ban would seriously and irreparably injure schools.

D.     An Injunction of the Arbitration and Class Action Waiver Ban Is in the Public
        Interest

A preliminary injunction in these circumstances is in the public interest.  *See, e.g.*, *Prof'l*

*Massage Training Ctr., Inc.*, 951 F. Supp. 2d at 854-55 (public interest favored a preliminary

injunction where, among other things, "the public has an interest in keeping schools like

24

[plaintiff] in operation" because "[t]he school teaches students skills that enable them to find gainful and productive employment").  First, creating chaos and disruption in arbitral tribunals and courts is contrary to the public interest.  It is in the public interest, meanwhile, for schools to be able to focus on their educational mission and devote their resources to serving their students rather than coping with the disruption that will arise from temporary imposition of the 2016 Rule.  For example, massive litigation costs will be imposed on schools with no corresponding benefit to students.  *See* Johnson Decl. ¶ 12; Stanbridge Decl. ¶¶ 12-14; AMA Decl. ¶¶ 12-14; IT Decl. ¶¶ 12-14; West Coast Decl. ¶¶ 13-15; ACC Decl. ¶¶ 13-15. This would cause tuition to rise or services to decline.  *Id.*  Because proprietary schools disproportionately serve underserved populations, the baleful impact of the rules would also disproportionately harm those groups. Preventing that harm is in the public interest.  This is particularly true here because individuals always retain the right to challenge particular arbitration agreements on a case-by-case basis on well-established grounds.  *See Marmet*, 132 565 U.S. at 532-34.  Finally, as the Department has already indicated that it plans to rescind the Arbitration and Class Action Waiver Ban, it is in the public interest to avoid the regulatory whiplash that would result from implementing such a disruptive policy only to reverse course shortly thereafter.

## II.     THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE FINANCIAL RESPONSIBILITY PROVISIONS

### A.     CAPPS Is Likely to Succeed on the Merits Because the Financial Responsibility Provisions Are Unlawful

#### 1.     *The Financial Responsibility Provisions Exceed the Department's Statutory Authority*

The Department claimed that its authority to promulgate the Financial Responsibility Provisions derives from section 498(c) of the HEA, 20 U.S.C. § 1099c(c).  *See* 81 Fed. Reg. at 75,957, 75,980.  But the Provisions exceed the Department's authority under that statute.

**First**, the HEA provides that "*[t]he Secretary* shall determine whether an institution has the financial responsibility required" based on whether it is able to "provide the services described in its official publications and statements; provide the administrative resources necessary to comply with [the Act]; and meet all of its financial obligations." 20 U.S.C. § 1099c(c)(1) (emphasis added). In contrast to that express delegation of authority to the Secretary and only the Secretary, the Financial Responsibility Provisions incorporate triggers that rely exclusively on the acts of third parties, such as a state Attorney General, federal regulator, or private claimant. *See* 81 Fed. Reg. at 76,073.

**Second**, the HEA specifically states that "[t]he Secretary shall take into account an institution's *total financial circumstances* in making a determination of its ability to meet the standards herein required." *Id.* § 1099c(c)(2) (emphasis added). The triggers in the Financial Responsibility Provisions, however, are based on incomplete and narrow criteria that provide an inadequate and incomplete picture of a school's "total financial circumstances." Some triggers incorporate events (such as withdrawal of any equity or the payment of any judgment) that have narrow impacts on a school's finances (at most). Other triggers (such as the mere pendency of law suits or cohort default rates) have no effect on a school's financial circumstances.

**Third**, the HEA provides that "[t]he determination as to whether an institution has met the standards of financial responsibility . . . shall be based on an audited and certified financial statement of the institution," which "shall be conducted by a qualified independent organization or person in accordance with standards established by the American Institute of Certified Public Accountants." *Id.* § 1099c(c)(5). But the Financial Responsibility Provisions mandate triggers that rely on metrics other than a school's audited and certified financial statements. Indeed, few of the mandatory triggers have any relationship to a school's audited financial statements.

26

2.      *The Financial Responsibility Provisions Violate the APA*

The Financial Responsibility Provisions also are arbitrary and capricious under the APA because they are not the product of reasoned decision-making and fail to respond to significant comments in the record.  *See* 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43; *Home Box Office*, 567 F.2d at 35-36.

**First**, the Department violated the APA because it failed adequately to address concerns regarding its decision to base significant regulatory consequences on factors that are speculative or not directly relevant to an institution's financial well-being.  And, indeed, the Department recently recognized as much.  *See* 83 Fed. Reg. at 37,273 (the 2016 Rule "included as mandatory triggering events (1) events whose consequences were speculative . . . , (2) events more suited to accreditor action or increased oversight by the Department . . . , and (3) results of a test . . . whose future development and application was unspecified"); *id.* at 37,286-87 ("recogniz[ing] that many [state-law] violations do not threaten the financial stability or existence of the institution and therefore should not trigger mandatory surety requirements").  To take one example, the Department failed to consider that the mere pending status of lawsuits, without any consideration of the merits of those suits, bears no relation to an institution's financial responsibility.  By refusing to provide institutions an opportunity to be heard regarding the merits (or lack thereof) of any underlying claims, *see* 81 Fed. Reg. at 76,006, the Financial Responsibility Provisions effectively deprive schools of their day in court by imposing extremely punitive sanctions on them before a final judgment and no matter how frivolous the claims.

**Second**, the Department failed to consider the extent to which institutions relied on the pre-existing regulatory framework.  *See Encino Motorcars, LLC*, 136 S. Ct. at 2126 ("[An] agency must . . . be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account").  For years, the Department has evaluated *annually*

whether a school is financially responsible for purposes of participation in FSA programs. Under that regulatory regime, the Department considers an institution financially responsible if the school has a composite score of at least 1.5, has sufficient cash reserves, is current in its debt payments, and is meeting all of its financial obligations.   *See* 34 C.F.R. 668.171(b).   The Financial Responsibility Provisions upend this long-standing framework—which provides for annual determinations—by requiring the Secretary to recalculate an institution's composite score "regularly after associated actions or events are reported to the Secretary."   81 Fed. Reg. at 76,073.   This off-cycle and disjointed calculation and recalculation of a school's composite score will force schools to react to changes in their composite score *every time* a triggering event occurs, rather than once a year.   The Department fails to consider that such a sudden change in the timing and frequency of such a critical calculation as the composite score—which, among other things, affects a number of state approvals and the National Council for State Authorization Reciprocity Agreements ("NC-SARA") approval, *see, e.g.*, Cal. Code Regs. tit. § 71745; NC-SARA Manual, 12-13 (May 11, 2018) http://nc-sara.org/content/sara-manual—fundamentally disrupts institutions that have relied on the pre-existing framework and structure.

3.     *The Financial Responsibility Provisions Violate the Constitution*

The Financial Responsibility Provisions violate the Process Clause because they impose significant financial consequences automatically based on "triggering events."   The 2016 Rule does not allow an opportunity to contest the requirement to provide a letter of credit for many of the triggering events.   These "triggers" thus violate schools' due process rights.   *See Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976); *see also Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (right to a hearing "must be granted at a time when the deprivation can still be prevented").   Given the absence of the opportunity to contest or refute the financial implications of the "triggers," there is no meaningful ability to prevent arbitrary enforcement and deprivations.

28

B.    <u>CAPPS Schools Will Suffer Irreparable Harm if the Financial Responsibility Provisions Take Effect</u>

If the Financial Responsibility Provisions go into effect, CAPPS schools—and their students—will suffer immediate and irreparable harm.

**First**, enforcement of the Financial Responsibility Provisions will force many CAPPS schools to confront existential financial crises at best and will force their closure at worst.  The 2016 Rule requires institutions to automatically provide a letter of credit amounting to at least 10 percent of the school's Title IV receipts for the most recent fiscal year when one of the mandatory triggering events occurs.  81 Fed. Reg. at 76,073-74.  After three years, moreover, the amount of the letter of credit soars to 50 percent of its Title IV funds.   *See id.* at 76,075-76.  As CAPPS and others explained during the comment period, each letter of credit generally must be backed by cash collateral.  *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103, at 50 (Aug. 1, 2016); Comments of Education Affiliates Inc., ED-2015-OPE-0103, at 3 (Aug. 1, 2016).  Often, an institution will need to provide a cash deposit sufficient to cover the entire letter of credit and pay additional fees.  *See* Johnson Decl. at ¶ 25.  Letters of credit, moreover, are difficult to obtain in the current credit environment.  *Id.*  For many schools, the pending status of a lawsuit against it, no matter how meritless, might cost it millions of dollars as a result of the Department's new regulations.  *See* Declaration of Steve Gunderson ("Gunderson Decl.") ¶ 15 (Sept. 21, 2018).

Requiring schools—particularly smaller schools—to come up with such a massive amount of cash would imperil their very existence, as the Department belatedly has recognized. See 83 Fed. Reg. at 37,273 (concluding that "[u]pon further review, we believe these triggering events are inappropriate and would have unnecessarily required institutions to provide a letter of credit or other financial protection"); 81 Fed. Reg. at 76,007 (acknowledging that "the costs associated with a letter of credit have increased over time and that some institutions may not be

able to secure, or may have difficulty securing, a letter of credit"); *see also* Gunderson Decl. at ¶ 17-19; Johnson Decl. at ¶¶ 25-28; Comments of San Joaquin Valley College, ED-2015-OPE-0103 (Aug. 1, 2016) (noting that the Financial Responsibility Provisions could "forc[e] closure"); Comments of CECU, ED-2015-OPE-0103, at 1 (Aug. 1, 2016) ("The rule would impose potentially fatal financial and operational penalties on institutions."). Because this harm, although economic, "threatens the very existence of the movant's business," it is irreparable. *See, e.g.*, *Wis. Gas Co.*, 758 F.2d at 674; *see also* Gunderson Decl. ¶ 19; Johnson Decl. ¶¶ 27-28.

**Second**, the Financial Responsibility Provisions might cause schools to lose indispensable agency approvals. For example, the California Bureau of Private Postsecondary Education, which governs CAPPS schools, relies on a school's composite score as a measure for state approval. *See, e.g.*, Cal. Code Regs. tit. 5 § 71745. By upending the method for determining a school's composite score, the Financial Responsibility Provisions could lower the composite score such that the school would be deemed out of compliance with the state authorizing requirements. Such a determination could affect the eligibility of an institution and its students to participate in the state grant program. *See* Cal. Grant Programs, https://www.csac.ca.gov/cal-grants (last visited Sept. 21, 2018).

**Third**, by depriving institutions of a constitutional right (due process), enforcement of the Financial Responsibility Provisions is per se irreparable. *See, e.g.*, *Davis*, 158 F.3d at 1346; *Gordon*, 721 F.3d at 653.

C.    The Balance of Equities Favors Enjoining Enforcement of the Financial Responsibility Provisions

The balance of equities tips in CAPPS' favor. As with the Arbitration and Class Action Waiver Provisions, an injunction would merely maintain the status quo; the Department would not suffer significant harm if it prevails; and the Department currently is considering comments

on an NPRM that would rescind the Financial Responsibility Provisions.  Schools, however, would be irreparably injured if the Financial Responsibility Provisions were enforced.  And their staffs and students would not be spared, given that enforcement of the Provisions likely would force the closure of many schools.

      D.    <u>An Injunction of the Financial Responsibility Provisions Is in the Public Interest</u>

Finally, a preliminary injunction is in the public interest.  Enforcement of the Financial Responsibility Provisions would precipitate financial ruin for many schools, contrary to the public interest.  Enjoining enforcement of the regulations, by contrast, would promote the public interest by allowing schools to focus on their educational mission and to devote their resources to serving their students without suffering from the disorder that will follow imposition of the 2016 Rule.  When the Financial Responsibility Provisions go into effect, costly and burdensome letters of credit will be imposed on schools with no corresponding benefit to students.  To the contrary, students and schools alike would face severe harm due to the mass closures and financial crises that likely will befall the schools should the Financial Responsibility Provisions take effect.  *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103 (Aug. 1, 2016); Comments of CECU, ED-2015-OPE-0103 (Aug. 1, 2016); Comments of San Joaquin Valley College, ED-2015-OPE-0103 (Aug. 1, 2016); Comments of Success Education Colleges, ED-2015-OPE-0103 (Aug. 1, 2016).

**III.    THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE FORCED-SPEECH REPAYMENT RATE PROVISIONS**

      A.    <u>CAPPS Is Likely to Succeed on the Merits Because the Repayment Rate Provisions Are Unlawful</u>

          *1.    The Repayment Rate Provisions Exceed the Department's Statutory Authority*

The Repayment Rate provisions exceed the Department's statutory authority.  Nothing in the HEA suggests that the Department may compel institutions to provide information on

repayment rates on all of their promotional materials.  To the contrary, the HEA includes an express list of topics for which a school must provide information to students and prospective students—a list that conspicuously omits information on repayment rates.  *See* 20 U.S.C. § 1092(a)(1).  Congress's silence on repayment rates is dispositive.  *See, e.g.*, *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (explaining traditional mode of statutory interpretation under which "expressing one item of [an] associated group or series excludes another left unmentioned").  If Congress wanted students to have access to repayment rate information from institutions, it would have included it on the extensive statutory list.  Nor, moreover, does the HEA provide any basis for differentiating between proprietary schools and non-profit schools when it comes to providing information to students and prospective students, underscoring the lack of any statutory mooring for the Repayment Rate Provisions.

2.   *The Repayment Rate Provisions Violate the APA*

The Repayment Rate Provisions also are arbitrary and capricious because they are not the product of reasoned decision-making.  *See* 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43; *see also* 83 Fed. Reg. at 40,176 (Department admitting that "these disclosures will not provide meaningful or clear information to students").

**First**, the Department violated the APA because it failed to consider the effect that income-based repayment plans have on a student's rate of repayment.  Income-based repayment plans provide valuable flexibility for borrowers—particularly those from low-income backgrounds and those who choose to pursue careers in public service or in low-income communities—by allowing them to pay off their loans at a rate that is proportionate to their income.  And, indeed, the Department has recognized the benefits of such plans by expressing its strong support.  Precisely because of the flexibility inherent in income-based repayment plans, some borrowers will maintain an outstanding loan balance that is higher than their original loan

balance in the first few years after graduating.  *See* Federal Student Aid, U.S. Dep't of Educ., *Income-Driven Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven. Despite acknowledging that several commenters expressed concern that the 2016 Rule would conflict with the Administration's support of income-based repayment plans, the Department failed to adequately consider that its method for calculating loan repayment rates effectively would punish institutions enrolling students who later benefit from income-based repayment plans—and, in the process, would frustrate its objective in encouraging the development and implementation of these plans.  *See* 81 Fed. Reg. at 76,018.

**Second**, the Department's apparent decision to impose the Repayment Rate Provisions retroactively—by using data from students who graduated prior to the announcement of the 2016 Rule—is arbitrary and capricious.  Institutions that previously offered flexible repayment options to students, consistent with the Department's recommendations, would be sanctioned for doing so.  Penalizing schools for actions taken based on a prior regulatory regime and in furtherance of objectives previously promoted by the Department is manifestly unreasonable.

**Third**, the Repayment Rate Provisions are arbitrary and capricious because they apply only to proprietary institutions.  As an initial matter, the Department now concedes that the decision to target only proprietary schools was based on inaccurate data.[16]  The Department's reliance on admittedly flawed data as the basis for this regulatory distinction alone renders the Repayment Rate Provisions arbitrary and capricious.  *See, e.g.*, *Resolute Forest Prods., Inc. v. USDA*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency has relied on incorrect or inaccurate data . . . , its decision is arbitrary and capricious and should be overturned.").

---

[16] *See Updated Data for College Scorecard and Financial Aid Shopping Sheet*, https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecardFinaidShopShe et.html (last visited Sept. 21, 2018).

In any event, the Department failed to explain why traditional (i.e., non-proprietary) institutions are not also subject to the Repayment Rate Provisions.  The Department noted that non-proprietary institutions "are not typically comprised solely of [gainful employment or vocational] programs and the repayment rate warning may not be representative of all borrowers at the school," 81 Fed. Reg. at 76,017, but failed to explain why it did not then simply limit the requirement, for example, to those institutions with a significant proportion of students in gainful employment programs rather than to proprietary institutions, *id.* at 76,018.[17]  To the extent the Department's decision to limit the requirement to proprietary institutions is based on the "risk of excessive and unnecessary burden" to non-proprietary schools, *id.* at 76,017, that rationale likewise is unfair, arbitrary, and capricious.  The solution to an overly burdensome regulatory approach is not to impose the onerous burden only on some disfavored groups.  The Department's rationale for singling out proprietary schools falls far below the level "sufficient to enable [a court] to conclude that [it] was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.  It also conflicts with the Department's current view.  *See* 83 Fed. Reg. at 40,176 (agreeing with comments stating that the 2016 Rule "unfairly targeted proprietary institutions").

### 3. The Repayment Rate Provisions Violate the Constitution

The Repayment Rate Provisions also violate the First Amendment.  The proposed regulations compel proprietary institutions to speak a government-mandated message in a comprehensive array of their materials, including on their websites and in all promotional materials and advertisements.  In forcing speech, the Repayment Rate Provisions infringe on the "right to speak freely and the right to refrain from speaking at all," both of which are part of the

---

[17]  This is not to concede that such an approach necessarily would reflect reasoned decision-making, but it serves to highlight the glaring flaws in the Department's 2016 explanations.

"freedom of thought protected by the First Amendment." *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011).

The Repayment Rate Provisions cannot be defended as disclosures of "purely factual and uncontroversial information" that are "reasonably related to the [government's] interest in preventing deception of consumers." *See Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Oh.*, 471 U.S. 626, 651 (1985). For one thing, the Department has admitted that the Repayment Rate Provisions will not prevent deception. *See* 83 Fed. Reg. at 40,176 ("[T]he Department believes that these disclosures will not provide meaningful or clear information to students, and will increase cost and burden to institutions that would have to disclose this information."). In any event, the provisions constitute "broad prophylactic rules" that require careful scrutiny because they compel speech. *See Zauderer*, 471 U.S. at 649. And, indeed, the Repayment Rate Provisions raise particularly troubling First Amendment concerns because they are both over-inclusive and under-inclusive in that they target proprietary schools whose borrowers are using authorized income-based repayment plans and excuse non-profit and public institutions with similarly low (or lower) repayment rates. *See Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 55 (1983) ("When speakers and subjects are similarly situated, the State may not pick and choose."). Unjustified discrimination among speakers is a paradigmatic First Amendment violation. *See, e.g.*, *True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016).

B.   CAPPS Schools Will Suffer Irreparable Harm if the Forced-Speech Repayment Rate Provisions Take Effect

If the Repayment Rate Provisions go into effect, CAPPS schools will suffer irreparable harm through reputational injury, financial harm, and deprivation of their constitutional rights.

**First**, CAPPS schools will suffer irreparable reputational injury if forced to speak the government's message.  Any visitor of a school's website or reader of its promotional materials will unjustifiably view the institutions as being financially unstable and ill-equipped to prepare their students to succeed financially upon graduation.  *See* Johnson Decl. at ¶ 29-30.  Even if the Repayment Rate Provisions later are invalidated, the reputational damage will have been done. The harm will be especially severe if schools are required to issue these warnings mid-year, thereby harming recruitment and fundraising efforts.  *See* National Association of College and University Business Officers, Comment Letter on Borrower Defense Regulations 5, 11, No. ED-2015-OPE-0103 (Aug. 1, 2016).  Courts have recognized that this sort of reputational injury justifies the issuance of a preliminary injunction.  *See, e.g.*, *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017) (Moss, J.) (finding delivery company's reputational injury to be irreparable harm), *appeal filed*, No. 17-7172 (D.C. Cir. Dec. 14, 2017); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("Plaintiffs' reputation will be damaged by HUD's characterization of them in the March 17 letter as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate planning.'"); *Honeywell, Inc. v. Consumer Product Safety Comm'n*, 582 F. Supp. 1072, 1078 (D.D.C. 1984) (recognizing that once harmful information is released, courts "would become powerless to restore the status quo if it ruled for the plaintiffs on the merits").

**Second**, CAPPS schools would suffer irreparable harm because the deprivation of a fundamental constitutional right—here, the First Amendment right to refrain from government-mandated speech—is necessarily irreparable.  *See Davis*, 158 F.3d at 1346; *see also*, *e.g.*, *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury."); *Cigar Assoc. of Am. v. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (mandate that would "require Plaintiffs to communicate a government message" on packing and promotional materials constituted irreparable harm); *Kimberly-Clark Corp. v. District of Columbia*, 286 F. Supp. 3d 128, 146-47 (D.D.C. 2017) (similar).

**Third**, the Repayment Rate Provisions would also inflict irreparable financial harm on CAPPS schools.  Schools would be required to divert resources from students to cover the costs of creating an extensive amount of new materials that include the government-mandated speech. *See* 81 Fed. Reg. at 76,071 (subject materials include, but are not limited to, "an institution's Web site, catalogs, invitations, flyers, billboards, and advertising on or through radio, television, video, print media, social media, or the Internet").  Spending significant funds on "designing and creating new, conforming" materials that include government-mandated speech can constitute irreparable harm because the expenditures are "unrecoverable, leaving Plaintiffs with no remedy to restore themselves to the status quo ante." *Cigar Assoc. of Am.*, 317 F. Supp. 3d at 563.

C.     The Balance of Equities Favors Enjoining Enforcement of the Repayment Rate Provisions

As with the other challenged provisions, the balance of equities tips in CAPPS's favor because an injunction would merely maintain the status quo, the Department would not suffer significant harm if it prevails, and the Department currently is considering comments on an NPRM that would rescind the Repayment Rate Provisions. *See supra* pp. 24-25.

D.     An Injunction of the Repayment Rate Provisions Is in the Public Interest

Finally, an injunction of the Repayment Rate Provisions would be in the public interest. As a threshold matter, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing America's Greatness*, 831 F.3d at 511.  Because the Department is in the process of rescinding the Repayment Rate

Provisions, moreover, the public interest weighs in favor of consistency and avoiding a regulatory whipsaw between fundamentally different regimes.  Additionally, an injunction would prevent misleading messages to potential students, who might mistakenly believe that an institution displaying the government-mandated disclosure offers a poor education.  Finally, as the Department now recognizes, enforcement of the Repayment Rate Provisions would prevent schools from being forced to divert critical resources away from students in order to create new promotional materials.  *See* 83 Fed. Reg. at 40,176 ("[T]he Department believes that these disclosures will not provide meaningful or clear information to students, and will increase cost and burden to institutions that would have to disclose this information.").

## IV.     THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE BORROWER DEFENSE PROVISIONS

### A.     CAPPS Is Likely to Succeed on the Merits Because the Borrower Defense Provisions Are Unlawful

#### 1.     *The Borrower Defense Provisions Exceed the Department's Statutory Authority*

The Borrower Defense Provisions exceed the authority conferred by the HEA, the General Education Provisions Act ("GEPA"), and the Department of Education Organization Act ("Organization Act").

The Department pointed to section 455(h) of the HEA as authority for the Borrower Defense Provisions.  *See* 81 Fed. Reg. at 75,932.  But the straightforward language of that provision allows the Department to create *defenses* to be used by borrowers in certain collections proceedings initiated *against the borrower* by the Secretary.  *See* 20 U.S.C. § 1087e(h).  It does not support the creation of an *affirmative action* for borrowers to cancel their debt.  And if Congress wished to authorize the Department to forgive or cancel student debt in a certain situation, it knew how to do so.  Other provisions of Section 455—for example, Section

455(m)(1)—allow the Department to "cancel the balance of interest and principal due" for certain borrowers, like those who have dedicated their lives to public service.  20 U.S.C. § 1087e(m).   Nor does section 455 mention anything about recovery from educational institutions, as do other provisions of the HEA.  *See, e.g.*, 20 U.S.C. § 1087(c)(1).  And where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.C. Cir. 2018).

Nor do any of the other sections of the HEA on which the Department relied suggest the authority to enact the Borrower Defense Provisions.   Section 487, for instance, authorizes targeted remedies (suspension or termination of "eligibility status" for Title VI loans and the imposition of civil penalties) for specific violations (making a "substantial misrepresentation of the nature of [a school's] educational program, its financial charges, or the employability of its graduates").   20 U.S.C. § 1094(c)(3)(A)-(B).  This language is careful, specific, and limited, precluding the Department from using it as a launching pad to impose *different* penalties for *different* transgressions.  *See, e.g.*, *Gomez v. United States*, 490 U.S. 858, 871-72 (1989) (a "carefully defined grant of authority to" act in one way "should be construed as an implicit withholding of the authority to" take a different, similar action).  The Department's reliance on section 437(c), which allows the Department to discharge student debt in three carefully circumscribed circumstances, is unavailing for similar reasons.  *See*   20 U.S.C. § 1087(c). Finally, the Department cannot rely on section 454(a), the catch-all provision that comes at the end of a series of requirements for loan participation agreements, to justify its sweeping Borrower Defense Provisions.  *See* 20 U.S.C. § 1087d(a)(6).  Because this general provision

follows five subsections dealing with institutions' ministerial duties, it must be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc.*, 532 U.S. at 114-15; *see also supra* p. 16.

In the 2016 Rule, the Department cited two additional sources of statutory support: section 410 of GEPA, 20 U.S.C. § 1221e-3, and section 414 of the Organization Act, *id.* § 3474. Section 410 is a generic grant of rulemaking authority that merely allows the Secretary to promulgate rules related to specific provisions of substantive statutory authority, as well as "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Similarly, Section 414, which authorizes the Secretary "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department," 20 U.S.C. § 3474, is not a substantive grant of authority and cannot support the creation of vast and novel liability for schools triggered by the Borrower Defense Provisions. *See generally supra* p. 16.

## 2. *The Borrower Defense Provisions Violate the APA*

The Borrower Defense Provisions also are arbitrary and capricious because they are not the product of reasoned decision making.

**First**, the Department did not adequately explain why it removed "borrower defenses" as a defense in collection proceedings and instead initiated a novel administrative process for affirmative debt relief. The Department's primary justification for this fundamental transformation was that the pre-existing regulation "does not establish any process for [asserting borrower defenses as an affirmative claim]." 81 Fed. Reg. at 39,345. But the reason the pre-existing regulation does not include such a process, of course, is because the Department has no statutory authority to impose such a process in the first instance. Using a long-standing

recognition of a regulatory limit as the rationale for regulation is an archetype of arbitrary and capricious decision-making.  At the least, it begs the question rather than answers it.

**Second**, the Department did not adequately explain why it decided to abandon a more certain and predictable standard to govern borrower defenses, in favor of a highly disruptive and unpredictable standard.  Rather than using existing state law to govern what typically are state-law claims—as is the case in the pre-existing regulation—the Department proposed creating an entirely new jurisprudence (a "Federal standard" for breach of contract and substantial misrepresentations).  And this new jurisprudence would be determined in the future on a "case-by-case basis" rather than build on pre-existing state (or federal) law.  *See* 81 Fed. Reg. at 75,943-45.  The Department's principal justification was that a new federal standard is needed because the expansion of distance learning has added complexity to the application of state law.  *Id.* at 75,938.  But the Department failed to explain why a more circumscribed approach—such as identifying a uniform way to determine which state's law to use in a particular dispute— would be inadequate.  The Department's unexplained choice to bypass the predictability and certainty of applying well-settled state-law principles in favor of a novel and ad hoc application of some kind of new federal common law is arbitrary and capricious.

**Third**, to the extent that the Department provided any guidance, the Department failed adequately to explain its reasons for selecting new standards for borrowers' claims of substantial misrepresentation and breach of contract.  For instance, the Department suggested that a borrower need not prove intent to establish a misrepresentation claim, *see id.* at 75,937, even though such a requirement is critical to "effectively address[ing] . . . concerns about fair notice and open-ended liability."  *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016).  Worse still, the Department planned to enact a "rebuttable presumption that each

member [of the group] reasonably relied on the misrepresentation," 81 Fed. Reg. at 76,084-85—even though cases indicate that this is often not a fair or reasonable presumption. *See, e.g.*, *Rodriguez v. McKinney*, 156 F.R.D. 112, 116 (E.D. Pa. 1994) (individual questions regarding reliance on misrepresentations prevented class certification). Now the Department has belatedly—and appropriately —recognized that it must "examine the facts and circumstances of each borrower's individual situation" to determine if the borrower reasonably relied on a school's misrepresentation. 83 Fed. Reg. at 37,262-63. In the 2016 Rule, moreover, the Department concluded that a borrower need not prove the classic elements of materiality or injury when asserting a breach-of-contract claim. The Department's replacement of core legal principles with vague standards conflicts with its duty to provide "precision and guidance" in regulations "so that those enforcing the law do not act in an arbitrary or discriminatory way," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)—as the Department now acknowledges, *see* 83 Fed. Reg. at 37,243 (the Department "realize[s] that a clear Federal standard is required in order to adjudicate borrower defense claims in a fair and equitable manner").

**Fourth**, the Department conspicuously failed to provide schools with a host of critical procedural safeguards—including the right to a hearing, to receive relevant evidence, and to challenge the certification of a group of borrowers. *See, e.g.*, 83 Fed. Reg. 37,261 (noting the 2016 Rule's failure to provide an opportunity for schools to submit evidence in response to a borrower defense claim). The Department offered no explanation for why it displaced its existing hearing and review process in favor of a novel framework lacking crucial procedural protections. *See* 81 Fed. Reg. at 75,960. And the Department now has acknowledged these profound procedural shortcomings. *See* 83 Fed. Reg. at 37,243 (expressing concern that the

2016 Rule "would allow the Department to afford relief to borrowers without providing an opportunity for institutions to adequately tell their side of the story").

### 3. The Borrower Defense Provisions Contravene the Constitution

The Borrower Defense Provisions also violate the Constitution. First, the provisions violate the Due Process Clause because Department officials are responsible for both prosecuting and hearing cases, thereby depriving schools of their right to be heard by a neutral decision maker. *See, e.g.*, *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of Univ. of D.C.*, 56 F.3d 1469, 1473 (D.C. Cir. 1995) (referring to "the opportunity to be heard by a neutral decision-maker" as "the basic element of due process"). Second, the Borrower Defense Provisions violate Article III and an institution's Seventh Amendment right to a jury trial because they allow agency officials to adjudicate what in essence is a private right—the right of a student to recover for fraud or contract violations against his or her school. An institution has the right to have a jury determine its liability for such private rights. *See, e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51–52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

### B. CAPPS Schools Will Suffer Irreparable Harm if the Borrower Defense Provisions Take Effect

Permitting enforcement of the Borrower Defense Provisions will irreparably harm CAPPS schools by forcing them to expend substantial transition costs to comply with these new regulations and by embroiling them in countless administrative proceedings raising new claims based on novel legal theories. And once the schools develop new procedures for handling the far-reaching ramifications of the Borrower Defense Provisions and begin to defend claims against them in the administrative proceedings, it is likely that the Department will rescind or modify the governing regulations. Yet again, schools will be forced to spend valuable resources

to ensure compliance with another regulatory regime.  This diversion of resources from schools' mission of educating students and the effects of such a regulatory whiplash will cause irreparable harm.  So, too, will the deprivation of the schools' constitutional rights.

Even if the schools' showing of irreparable harm on account of enforcement of the Borrower Defense Provisions is difficult to quantify, moreover, their strong showing with respect to the other three prongs of the preliminary-injunction standard justifies enjoining those provisions.  *See, e.g.*, *Ellipso*, 480 F.3d at 1157; *see also supra* p. 9 n.8.

C.      The Balance of Equities Favors an Injunction of the Borrower Defense Provisions

As with the other challenged provisions, the balance of equities tips in CAPPS's favor because an injunction would maintain the status quo, the Department would not suffer significant harm if it prevails, and the Department currently is considering comments on an NPRM that would modify or rescind the Borrower Defense Provisions.  *See supra* pp. 24-25.

D.      An Injunction of the Borrower Defense Provisions Is in the Public Interest

Finally, an injunction of the Borrower Defense Provisions would be in the public interest because it would promote consistency in regulation while the Department reconsiders the 2016 Rule; would save the public, the Department, and CAPPS from having to navigate multiple fundamental transitions in regulatory regimes over a short period of time; and would avoid having proprietary institutions direct much-needed resources for the education of underserved populations to a broad, amorphous, and confusing new regime lacking basic procedural protections and ascertainable standards.

## CONCLUSION

For the foregoing reasons, the Court should grant CAPPS's Renewed Motion for a Preliminary Injunction and enjoin the Department from enforcing the Arbitration and Class Action Waiver Ban, the Financial Responsibility Provisions, the Repayment Rate Provisions, and the Borrower Defense Provisions.

Dated:  September 22, 2018

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
4 Times Square
New York, NY 10036
T: 212/735-3834


GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
155 N Upper Wacker Dr. #2700
Chicago, IL 60606
T: 312/407-0739
F: 312/407-8604

Respectfully submitted,

/s/ Clifford M. Sloan
CLIFFORD M. SLOAN, DC Bar No. 417339
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com

ROBERT L. SHAPIRO, DC Bar No. 415854
DUANE MORRIS LLP
505 Ninth Street, NW
Washington, DC 20004
T: 202/776-7867
F: 202/330-5290

*Attorneys for CAPPS*