**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,<br><br>*Plaintiff*,<br><br>v.<br><br>ELISABETH DEVOS, SECRETARY OF EDUCATION, *et al.*<br><br>*Defendants*,<br><br>MEAGHAN BAUER AND STEPHANO DEL ROSE<br><br>*Borrower Defendant-Intervenors*,<br><br>COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>*State Defendant-Intervenors*. | Civil Action No. 17-999 RDM |

<u>DECLARATION OF ROBERT JOHNSON</u>

I, Robert Johnson, submit this declaration in support of the California Association of Private Postsecondary Schools ("CAPPS")'s Motion for a Preliminary Injunction.  I have personal knowledge of the facts stated herein.

1.      I am the Executive Director of CAPPS. I have held this position since 1998. Working with the CAPPS Board of Directors, my responsibilities include representing the CAPPS membership and private postsecondary institutions in matters before the Governor, State Legislature, and various regulatory bodies. I routinely assist CAPPS schools in complying with regulatory mandates. One area in which CAPPS provides its members with assistance is in the drafting of enrollment agreements and arbitration provisions. Before joining CAPPS, I managed

public sector programs in California at the city and county level.

2.    Plaintiff CAPPS is a non-profit association of California private postsecondary schools.

3.    CAPPS's principal place of business is located in Sacramento, California.

4.    CAPPS has a membership of approximately 150 educational institutions, including proprietary (i.e., for-profit) and non-profit schools, most of which are eligible for Title IV funding.

5.    CAPPS members serve many students who are non-traditional, including students who did not attend college immediately after graduating from high school, part- time students, students with full-time jobs, students who are financially independent, students who have dependents, and students who have earned a GED.

6.    These students are often drawn to proprietary schools based on the schools' flexible schedules and career-focused instruction.

7.    Many CAPPS schools are technical or vocational colleges that prepare workers for occupations necessary to a thriving economy.

8.    CAPPS schools train future nurses, dialysis technicians, ultrasound technicians, home health aides, emergency medical technicians, information technology specialists, hardware and software experts, cyber-security specialists, HVAC and refrigeration technicians, heavy equipment specialists, electricians, paralegals, chefs, line cooks, and cosmetologists.

9.    Based on in-person surveys conducted at annual meetings, virtually all CAPPS schools utilize arbitration agreements with their students. For example, CAPPS members Colleen O'Hara's Beauty Academy and Pima Medical Institute use arbitration agreements. These schools also participate in Title IV of the Higher Education Act.

10.    Under the Department of Education's Final Rule, on July 1, 2017, Title IV schools, including CAPPS members, will be banned from enforcing their current arbitration agreements, including class-action waivers. Title IV schools, including CAPPS members, will also be required to send notices to their students advising them that the arbitration provisions in their agreements are no longer enforceable.

11.    Implementation of the Final Rule's ban on arbitration and class-action-waivers, including the mandatory notice to students and the effect on current and pending arbitrations, will cause immediate chaos and disruption for CAPPS schools and their students. This chaos and disruption will occur even if the implementation of the Final Rule's arbitration and class-action-waiver ban is only temporary.

12.    To comply with the Final Rule, CAPPS schools will need to amend their agreements; retrain their admissions staffs; and actually litigate new cases, including class actions, in federal and state court. This will come at an enormous cost to CAPPS schools, the largest number are considered small to medium sized and are often family owned and operated.

13.    A school's enrollment agreement is the basis of the relationship between a school and its students. Once the parties have signed the enrollment agreement, it will not be feasible to retroactively impose an arbitration provision.

14.    If schools do not comply with the Final Rule's ban on arbitration and class-action-waivers, they will lose their Title IV funding.

15.    Most CAPPS schools rely on Title IV for the large majority of their students' tuition payments.

16.    Accordingly, if any CAPPS school were to lose its Title IV funding, it would go out of business. As   proprietary institutions, CAPPS schools rely on tuition for almost all of their

revenues. No school could withstand the loss of such a large percentage of its revenue for even a single academic term.

17.     Under the Department of Education's Final Rule, the Financial Responsibility Provisions at 34 C.F.R. 668.171 were amended to include mandatory and discretionary "triggers" to assess financial responsibility.

18.     The mandatory triggers include a series of self-executing triggers that, if triggered, would require a school to post an automatic letter of credit. The triggers include: 1) the institution has a cohort default rate of 30% or greater for each of the two most recent official calculations; 2) the institution is a for-profit institution and fails in the previous fiscal year the 90/10 non-Title IV revenue requirement; or 3) the institution is publicly-traded and receives certain warnings from the Securities and Exchange Commission (SEC) or the exchange on which the stock is traded or fails to file timely certain required reports to the SEC.

19.     The mandatory triggers include events that would cause the Department of Education to recalculate the composite score, and if applicable, require a letter of credit equal to 10% of the prior year Title IV funds. The composite score is one of the standards which the Department utilizes to gauge the financial responsibility of an institution. It is a composite of three ratios derived from an institution's audited financial statements. A sub-optimal composite score typically requires that the school be subject to cash monitoring requirements and post a letter of credit. The enumerated triggers would negatively impact the composite score of any institution subject to one of the trigger events. The triggers that lead to a recalculation of the composite score include: 1) the institution is required to pay a debt or incur liability arising from a final judgment in a judicial or administrative proceeding or settlement, or is a defendant in an action brought by federal or state authorities, in connection with borrower-defense related

claims; 2) the institution is a defendant in a lawsuit or other action that has survived a motion for

summary judgment; 3) the institution is required by its accrediting agency to submit a teach-out

plan for certain reasons related to closure of the institution or any of its branch campuses or

additional locations; 4) the institution has gainful employment programs that could become

ineligible for Title IV based on their final debt-to-earnings rates for the next award year; or 5) the

institution is a proprietary institution, has a composite score of less than 1.5, and has a

withdrawal of owner's equity by any means, including by declaring a dividend.

20.     CAPPS members would be immediately subject to mandatory triggers.

21.     Many CAPPS schools are listed as defendants in lawsuits.

22.     A number of CAPPS schools have been required to submit teach-out plans by

their accreditor for reasons related to closure of the institution or any of its branch campuses or

additional locations.

23.     Many CAPPS schools have gainful employment programs that could become

ineligible for Title IV based on their final debt-to-earnings rates for the next award year.

24.     The triggers proposed by the Department would cause CAPPS members to post

letters of credit.

25.     Obtaining letters of credit or other financial protection involves substantial fees

and expense and may be difficult to secure for any institution in the current credit environment.

Often, institutions will have to provide a cash deposit sufficient to cover the entire letter of

credit.

26.     CAPPS schools are particularly vulnerable to such risk. Its member schools are

mostly smaller institutions, averaging less than 200 students and only one or two locations. Such

institutions do not have the resources or access to capital to post large letters of credit.

27.     Requiring letters of credit is a formula for shutting down many schools, particularly small schools with no endowment that cannot foot large and unexpected bills of the associated cost of letters of credit.

28.     If an institution is not able to meet the very onerous requirements of this trigger-based scheme it could effectively be forced out of business.

29.     Under the 2016 Rule, a proprietary institution is required in certain circumstances to include in all promotional materials a loan repayment rate warning.

30.     Any visitor of a school's website or reader of its promotional materials will unjustifiably view the institutions as being financially unstable and ill-equipped to prepare their students to succeed financially upon graduation.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of September, 2018, in Sacramento, CA.

*Robert W Johnson*

_____
Robert Johnson

3