**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CALIFORNIA ASSOCIATION OF
PRIVATE POSTSECONDARY SCHOOLS**,

Plaintiff,

v.

**BETSY DEVOS**, in her official capacity as
Secretary, and the **DEPARTMENT OF
EDUCATION**, et al.

Defendants.

Civil Action No. 17-999 (RDM)

**BRIEF OF AMICI COMMONWEALTHS OF MASSACHUSETTS, PENNSYLVANIA, STATES
OF CALIFORNIA, IOWA, NEW YORK, OREGON, WASHINGTON, PEOPLE OF ILLINOIS,
ATTORNEY GENERAL OF MARYLAND, AND DISTRICT OF COLUMBIA
IN OPPOSITION TO PLAINTIFF'S RENEWED
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION........................................................................................................... 1

FACTS AND PROCEDURAL HISTORY ......................................................................... 3

1.   *The 2016 Rule* .......................................................................................................... 3

    A.   The Arbitration and Class Action Waiver Provisions ................................................ 3

    B.   The Financial Responsibility Provisions ........................................................... 4

    C.   The Repayment Rate Disclosures ..................................................................... 5

    D.   The Borrower Defense Provisions .................................................................... 6

2.   *CAPPS's Motion for a Preliminary Injunction* ......................................................... 6

LEGAL STANDARD .................................................................................................... 8

ARGUMENT ................................................................................................................ 9

1.   *The Arbitration and Class Action Waiver Provisions Are Lawful and Appropriate
    Safeguards For Taxpayer Title IV Funds* ................................................................. 9

    A.   The Arbitration and Class Action Waiver Provisions are Within the
        Department's Broad Grant of Authority in the HEA to Set the Conditions for
        Schools to Participate in the Direct Loan Program............................................. 9

    B.   The Arbitration and Class Action Waiver Provisions Do Not Violate the Federal
        Arbitration Act ............................................................................................ 15

    C.   The Arbitration and Class Action Waiver Provisions Are Not Arbitrary Or
        Capricious ................................................................................................... 19

    D.   The Arbitration and Class Action Waiver Provisions Do Not Violate the Due
        Process Clause of the U.S. Constitution ......................................................... 21

    E.   CAPPS Does Not Show That It Is Likely to Suffer Irreparable Harm .................... 22

    F.   The Balance of the Equities Favors Immediately Allowing Students to Receive
        the Protections of the Arbitration and Class Action Waiver Provisions................. 23

    G.   The Public Interest Favors Allowing the Arbitration and Class Action Waiver
        Provisions to be Implemented Immediately .................................................... 24

2.   *The Financial Responsibility Provisions Are Lawful and An Appropriate Response
    To Crisis In The For-Profit School Industry* ....................................................... 24

3.   *The Financial Responsibility Provisions are Lawful*............................................. 25

    A.   The Financial Responsibility Provisions Do Not Exceed the Department's
        Authority under the HEA............................................................................... 25

    B.   The Financial Responsibility Provisions Do Not Violate the APA............................ 27

    C.   The Financial Responsibility Provisions Do Not Violate the Constitution.................. 29

    D.   CAPPS has Demonstrated No Irreparable Harm to its Member Institutions ............... 29

E.   The Balance of Equities Demands Implementation of the Financial
Responsibility Provisions ................................................................. 31

F.   The Public Interest Weighs in Favor of the Financial Responsibility Provisions ......... 32

4.   *The Repayment Rate Disclosure Is a Valid and Important Component of the 2016
Rule* ....................................................................................................... *32*

A.   The Repayment Rate Disclosure is Within the Department's Authority,
Reasonable, and Consistent with Applicable Law ......................................... 32

B.   The Repayment Rate Disclosure Was Reasonably Designed to Help Students
and Families Make Well-Informed Decisions about Where to go to College .............. 34

C.   The First Amendment Poses No Bar to the Repayment Rate Disclosure
Requirement .......................................................................................... 36

D.   CAPPS Has Failed to Establish a Likely Risk of Irreparable Harm ........................... 37

E.   The Balance of Equities Disfavors an Injunction of the Repayment Rate
Disclosure ............................................................................................. 39

F.   The Public Interest Favors Allowing the Repayment Rate Disclosure to Take
Effect ................................................................................................... 39

5.   *The Borrower Defense Provisions are Within the Department's Authority and Do
Not Harm Capps Members* ........................................................................ *40*

A.   An Affirmative Process is Within the Department's Statutory Authority and is
Not Arbitrary Or Capricious ....................................................................... 40

B.   CAPPS Schools Are Not Parties to the Borrower Defense Process and Have No
Due Process Rights with Regard to It ........................................................... 42

C.   CAPPS Does Not Actually Address the Department's Rationale for a Federal
Standard ............................................................................................... 44

D.   CAPPS Cannot Demonstrate That Its Members Will Be Irreparably Harmed by
the Borrower Defense Provisions ................................................................ 45

**CONCLUSION** ................................................................................................ **46**

## TABLE OF AUTHORITIES

### CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ........................................................................................................ 16, 18

*Am. Health Care Ass'n v. Burwell*,
    217 F. Supp. 3d 921 (N.D. Miss. 2016) ................................................................................ 17

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014) ................................................................................................. 35

*Ass'n of Accredited Cosmetology Sch. v. Alexander*,
    979 F.2d 859 (D.C. Cir. 1992) ............................................................................................... 21

*Ass'n of Private Sector Colleges & Universities v. Duncan*,
    110 F. Supp. 3d 176 (D.D.C. 2015) ................................................................... 33, 34, 37, 38

*Atari Games Corp. v. Nintendo of Am., Inc.*,
    897 F.2d 1572 (Fed. Cir. 1990) .......................................................................................... 8, 23

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) ......................................................................................... 38

*Aviles-Wynkoop v. Neal*,
    978 F. Supp. 2d 15 (D.D.C. 2013) ........................................................................................... 8

*Bailey v. Fed. Intermediate Credit Bank of St. Louis*,
    788 F.2d 498 (8th Cir. 1986) ................................................................................................. 33

*Boucher v. School Bd. of School Dist. of Greenfield*,
    134 F.3d 821 (7th Cir. 1998) ................................................................................................. 39

*Career Coll. Ass'n v. Riley*,
    74 F.3d 1265 (D.C. Cir. 1996) ............................................................................................... 34

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................................... 8, 38

*Cigar Assoc. of Am. v. FDA*,
    317 F. Supp. 3d 555 (D.D.C. 2018) .................................................................................. 38, 39

*City of Arlington, Tex. v. F.C.C.*,
    569 U.S. 290 (2013) ............................................................................................................... 13

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ................................................................................................. 8

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012) ............................................................................................ 15

*Cornish v. Dudas*,
540 F.Supp.2d 61 (D.D.C. 2008) ......................................................................... 8

*DIRECTV, Inc. v. Imburgia*,
136 S. Ct. 463 (2015) ........................................................................................ 15

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ...................................................................................... 28

*Epic Systems, Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ...................................................................................... 16

*Full Value Advisors, LLC v. SEC*,
633 F.3d 1101 (D.C. Cir. 2011) ......................................................................... 36

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ............................................................................................ 44

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) .......................................................................................... 16

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980) .......................................................................................... 12

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) ......................................................................... 30

*Judicial Watch, Inc. v. Department of Homeland Security*,
514 F. Supp. 2d 7 (D.D.C. 2007) ....................................................................... 40

*Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
856 F.2d 1558 (D.C. Cir. 1988) ......................................................................... 14

*Martini v. Fed. Nat. Mortg. Ass'n*,
178 F.3d 1336 (D.C. Cir. 1999) ......................................................................... 33

*Meese v. Keene*,
481 U.S. 465 (1987) .......................................................................................... 37

*Mission Grp. Kansas, Inc. v. Riley*,
146 F.3d 775 (10th Cir. 1998) ........................................................................... 34

*Mississippi Comm'n on Envtl. Quality v. E.P.A.*,
790 F.3d 138 (D.C. Cir. 2015) ........................................................................... 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................ 17, 18

*Neild v. District of Columbia,*
    110 F.2d 246, 254 (D.C. Cir. 1940) .................................................................. 21

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................................................ 17

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
    499 U.S. 117 (1991) ............................................................................................ 12

*Ohio Ass'n of Cmty. Action Agencies v. Fed. Energy Regulatory Comm'n,*
    654 F.2d 811 (D.C. Cir. 1981) ........................................................................... 12

*Orloff v. F.C.C.,*
    352 F.3d 415 (D.C. Cir. 2003) ........................................................................... 13

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
    494 F.3d 188 (D.C. Cir. 2007) ........................................................................... 19

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.,*
    467 U.S. 717 (1984) ............................................................................................ 22

*Resolute Forest Prods., Inc. v. USDA,*
    187 F. Supp. 3d 100, (D.D.C. 2016) .................................................................. 36

*Sampson v. Murray,*
    415 U.S. 61 (1974) .............................................................................................. 30

*SEC v. Wall Street Pub. Inst., Inc.,*
    851 F.2d 365 (D.C. Cir. 1988) ...................................................................... 36, 37

*United States v. Am. Library Ass'n, Inc.,*
    539 U.S. 194 (2003) ............................................................................................ 16

*United States v. Bean,*
    537 U.S. 71 (2002) .............................................................................................. 13

*Whitman v. Am. Trucking Ass'ns,*
    532 U.S. 457 (2001) ............................................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................... 8, 30, 38

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ............................................... 8, 38

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ............................................................................................ 37, 39

## STATUTES

12 U.S.C. § 1725(a) ............................................................................................ 14

20 U.S.C. § 1087c(b) .................................................................................... 10, 12

20 U.S.C. § 1087d .............................................................................................. 1

20 U.S.C. § 1087d(a) ........................................................................ 10, 11, 13, 14

20 U.S.C. § 1087e(h) ................................................................................... 15, 40

20 U.S.C. § 1094(a) ......................................................................................... 12

20 U.S.C. § 1099c(2) ....................................................................................... 27

20 U.S.C. § 1099c(3) ....................................................................................... 27

20 U.S.C. § 1099c(5) ....................................................................................... 27

20 U.S.C. § 1099c(c) ........................................................................................ 25

20 U.S.C. § 1221 ............................................................................................ 33

20 U.S.C. § 3474 ............................................................................................ 33

28 U.S.C. § 2201(a) ......................................................................................... 41

Higher Education Act, 20 U.S.C. § 1070 *et seq.* ........................................................... 1

## OTHER AUTHORITIES

*Uniform Declaratory Judgment Act*, National Conference of Commissioners on Uniform
    State Laws, August 1922 ................................................................................. 41

*Updated Data for College Scorecard and Financial Aid Shopping Sheet*,
    https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecardFinaid
    ShopSheet.html (last visited October 2, 2018) ...................................................... 35

# INTRODUCTION

The California Association of Private Postsecondary Schools (CAPPS) represents for-profit or "proprietary" schools, some – but not all – of whom participate in the William D. Ford Federal Direct Loan Program (the "Direct Loan Program") authorized by Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq*. To participate in the Direct Loan Program, schools must enter into a Program Participation Agreement ("PPA") with the U.S. Department of Education (the "Department"). *See* 20 U.S.C. § 1087d. Students of participating for-profit schools may obtain student loans from the federal government to pay the cost of their attendance. In other words, when proprietary schools chose to participate in the Direct Loan Program, the federal government will finance the cost of their for-profit private business ventures. Revenue from Title IV student loans, which can amount to millions of dollars a year for a single school, frequently represents the vast majority of revenue at participating for-profit schools.

The Department appropriately places a variety of conditions on the receipt of Title IV by means of the Program Participation Agreement. In 2016, the Department sought to incorporate new requirements into the PPA in response to a wave of documented proprietary school misconduct and failure. These failures include the for-profit Corinthian Colleges, whose abuse and deception of its own students and subsequent bankruptcy has cost the U.S. taxpayer at least $176 million in foregone repayment of federal student loans. 81 Fed. Reg. 75,926, 75,985 (Nov. 1, 2016). The Department sought to respond by means of a new rule (the "2016 Rule") to amend the substance of and process for borrowers to assert defenses to the repayment of federal student loans based on the misconduct of their schools. 81 Fed. Reg. at 76,069-89.

The 2016 Rule specified additional conditions in the Program Participation Agreement to which schools must agree if they wish to receive Title IV revenue. The Department observed that

Corinthian, like most for-profit schools, prohibited students from seeking redress for its misconduct in court or in class actions by imposing forced arbitration clauses and class action waivers on their students. These clauses prevented students from obtaining redress from Corinthian while the business was still solvent, and instead shifted liability for Corinthian's misconduct to the Department and the federal taxpayer. In order to prevent such misuse of federal funds, the 2016 Rule required schools to agree not to enforce forced arbitration clauses and class action waivers in existing enrollment agreements, and not to include them in new agreements, but only as to borrower defense-type claims (the "Arbitration and Class Action Waiver Provisions"). 81 Fed. Reg. at 76,087 (to be codified at 34 C.F.R. § 685.300). The 2016 Rule also requires participating schools to obtain a letter of credit to cover the cost of borrower defense claims if certain events indicate that the school is in substantial financial peril (the "Financial Responsibility Provisions."). 81 Fed. Reg. at 76,069-77. If a majority of recent graduates of a for-profit school are not paying down their student loan debt, the 2016 Rule requires institutions participating in the Direct Loan program to disclose that fact to potential students in plain language (the "Repayment Rate Disclosures"). 81 Fed. Reg. at 76,070 (to be codified at 34 C.F.R. § 668.41(h)(3)). Finally, although Department has, since at least 1995, permitted students to asserted borrower defenses to repayment on an affirmative basis, the 2016 Rule codified the process for affirmative claims (the "Borrower Defense Provisions"). 81 Fed. Reg. at 76,083-87.

   All of these provisions were rational responses to the crisis in the for-profit school industry. All were well within the Department's authority to place conditions on the disbursement of direct student loans funds under the HEA. None violates the Administrative

Procedure Act ("APA") or the U.S. Constitution. None irreparably harms any member of CAPPS.

The 2016 Rule does not regulate proprietary colleges or the services they provide. It only sets conditions for participation in a program that enables schools to obtain revenue from taxpayer funds for the profit of their private enterprises. CAPPS schools are not entitled to participate in the Direct Loan Program and, indeed, many CAPPS members do not participate. If CAPPS members wish to require their students to arbitrate borrower defense claims, to avoid obtaining letters of credit and complying with the other requirements of the 2016 Rule, they can do so by foregoing federal student loan revenue.

CAPPS's renewed motion for a preliminary injunction should be denied in its entirety.

## FACTS AND PROCEDURAL HISTORY

### 1. The 2016 Rule

CAPPS seeks a preliminary injunction with regard to only the four categories of provisions of the 2016 Rule described below. CAPPS makes no challenge to other provisions of the 2016 Rule in its complaint or by the instant motion, including provisions requiring the automatic discharges for certain students whose schools closed before they graduated, 81 Fed. Reg. at 76,078-81, as well as changes to "ability to benefit" discharges. 81 Fed. Reg. at 76,082.

### A.  *The Arbitration and Class Action Waiver Provisions*

The 2016 Rule requires schools participating in the Direct Loan Program to agree not to enforce any predispute arbitration clauses in their enrollment agreements. 81 Fed. Reg. at 76,087 (to be codified at 34 C.F.R. § 685.300(d)). These clauses require students to submit any claims against the school to private arbitration, rather than adjudication by a court. The 2016 Rule also requires participating schools to agree not to enforce any mandatory waivers of students' rights

to join a class action lawsuit. 81 Fed. Reg. at 76,087 (to be codified at 34 C.F.R. § 685.300(e)).

Schools must also agree not to include any such clauses or waivers in their enrollment

agreements in the future. These restrictions apply, however, only with regard to claims relating

to borrower defenses to the repayment of their loans ("borrower defense claims"[1]) – schools may

continue to require students to arbitrate and to forego class actions with regard to other claims.

81 Fed. Reg. at 76,088 (to be codified at 34 C.F.R. § 685.300(f)(1)).

### B.  The Financial Responsibility Provisions

The 2016 Rule includes "Financial Responsibility Provisions" intended to identify

financial problems at participating schools at an early stage and to ensure financial protection for

the Department and taxpayers by requiring financially insecure schools to obtain letters of credit

in certain circumstances. Notice of Proposed Rulemaking ("NPRM"), 81 Fed. Reg. 39.330,

39,361 (June 16, 2016). There are eight categories of events that trigger evaluation of a school's

financial condition ("financial triggers") in the 2016 Rule. 81 Fed. Reg. at 76,073-74 (to be

codified at 34 C.F.R. §§ 668.171(c)(1)(i) – (v), (d) - (f)). In response to comments on the

proposed 2016 Rule, the Department fundamentally revised the fashion in which it would

evaluate the import of financial triggers. *See* 81 Fed. Reg. at 75,982. In a revision of its initial

proposal, the Department incorporated five categories of financial triggers into a financial

responsibility composite score methodology that existed prior to the 2016 Rule. 81 Fed. Reg. at

76,073 (to be codified at 34 C.F.R § 668.171(c)(1)) (incorporating 668.171(c)(1)(i) – (v) into a

"recalculated … composite score").  The composite score assesses the complete financial

---

[1] "'[B]orrower defense' refers to an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided, and includes one or both of the following: (i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and (ii) A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part." 81 Fed. Reg. at 76,083 (to be codified at 34 C.F.R. § 685.222(a)(5)).

circumstances of the institution and balances the existence of triggering events against the other financial circumstances of the school. *Id.* A letter of credit is not automatically required simply because an event in the five categories of triggers occurs. *Id.* A school must obtain a letter of credit only if a triggering event causes the school's composite score to fall below "1.0." Three remaining categories of trigger events do require a school to obtain a letter of credit. Two of these categories, violations of the cohort default rate rule and violations of the 90/10 rule, imperil a school's access to Title IV student loans and grants, and may therefore cause the school to close. 81 Fed. Reg. at 76,074 (to be codified at 34 C.F.R §. 668.171(d) – (e)). The final non-discretionary trigger concerns SEC actions that threaten access to capital for publicly traded companies. *Id.*

### C.  The Repayment Rate Disclosures

If a majority of recent graduates of a participating school are not paying down their student loan debt, the 2016 Rule requires educational institutions participating in the Direct Loan program to disclose that fact to potential borrowers in plain language. Specifically, if the institution's median borrower has neither fully repaid their federally guaranteed or direct loans nor made loan payments sufficient to reduce the outstanding balance of their loans by at least one dollar after three years, section 668.41(h)(3) of the 2016 Rule requires that such institutions inform potential borrowers that ''[a] majority of recent student loan borrowers at this school are not paying down their loans." 81 Fed. Reg. at 76,071. The statement is based "squarely on factual determinations of repayment patterns demonstrated by a recent cohort of student borrowers from that institution." 81 Fed. Reg. at 76,014. The 2016 Rule allows the covered institution to "contest the accuracy of the data elements." *Id.*

### D.  The Borrower Defense Provisions

Since at least 1995, the Department has permitted direct loan borrowers to assert a

defense to repayment of their loans even in the absence of a collection action, such as wage or

tax refund garnishment, brought by the Department – an "affirmative" rather than a "defensive"

assertion of the borrower defense claim. 81 Fed. Reg. at 75,956. In the 2016 Rule, the

Department set out rules and applicable standards to govern the process and substance of

affirmative assertions of defenses to the repayment of direct loans. 81 Fed. Reg. 76,083 *et seq.*

### 2.  **CAPPS's Motion for a Preliminary Injunction**

CAPPS initially filed a motion for a preliminary injunction relating to the 2016 Rule on

June 2, 2017, seven months after the Department issued the Rule, and a month before it was

scheduled to take effect. California Association of Private Postsecondary Schools' Renewed

Motion for a Preliminary Injunction, Dkt. 65 ("CAPPS Brief"), at 3. In that initial motion,

CAPPS sought an injunction with regard only to the Arbitration and Class Action Waiver

Provisions. Notably, CAPPS did not contend that the Financial Responsibility Provisions, the

Repayment Rate Disclosures, or the Borrower Defense Provisions irreparably harmed any

CAPPS member.

In its "renewed" motion for a preliminary injunction CAPPS contends for the first time

that the remaining three sets of provisions at issue pose a threat of irreparable harm. In support of

its motion, CAPPS submits the declarations of five CAPPS members. These declarations are

nearly identical. The declarations of the schools only address issues relating to the Arbitration

and Class Action Waiver Provisions – they do not mention the Financial Responsibility

provisions, the Borrower Defense Provisions or the Repayment Rate Disclosures. With regard to

irreparable harm, the schools each state little more than the following conclusory claim: "[w]hen

the arbitration and class action provisions go into effect, the resulting litigation will divert school resources from education, to the detriment of our school and its students." See, e.g., Declaration of Stanbridge University, Dkt. 65 at ¶ 12.

CAPPS also submits the declarations of Steve Gunderson ("Gunderson Decl."), who is associated with an organization called Career Education Colleges and Universities, and Robert Johnson ("Johnson Decl."), the Executive Director of CAPPS. These two declarants make generalizations about "many CAPPS members," but never identify the factual basis of their assertions or any particular member school. Neither Gunderson, nor Johnson mention the Borrower Defense Provisions.

Gunderson and Johnson address the Financial Responsibility Provisions and assert in conclusory fashion that "[t]he triggers proposed by the Department would cause CAPPS members to post letters of credit" and that the triggers would "cripple many institutions and force others into financial exigency or closure." Johnson Decl. at ¶ 24; Gunderson Decl. at ¶¶ 14, 19. Gunderson and Johnson never identify any particular institution that would both be required to post a letter of credit and would suffer "crippl[ing]" consequences as a result.

Gunderson and Johnson only identify three triggering events as problematic to the unidentified CAPPS members: lawsuits (for which the plaintiffs are never identified and the stage of litigation is not identified); teach-out plans arising out of schools choosing to close particular campuses or branches "as they properly respond to changing enrollment and economics"; and "gainful employment programs that could become ineligible for title IV based on their debt-to-earning rates for the next award year." Johnson Decl. at ¶¶ 21 - 23; Gunderson Decl. at ¶¶ 12 - 14.

**LEGAL STANDARD**

In order to obtain a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). "[A] district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).

To meet the "high standard for irreparable injury," the moving party must demonstrate an injury that is "both certain and great," "actual and not theoretical," and must also "show '[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 297 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The moving party must show that the injury is "*likely*," rather than a merely speculative "possibility." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). "The movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [it] must 'submit[ ] ... competent evidence into the record ... that would permit the Court to assess whether [it], in fact, faces irreparable harm . . . if an injunction is not issued.'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F.Supp.2d 61, 65 (D.D.C. 2008)).

**ARGUMENT**

**1. The Arbitration and Class Action Waiver Provisions Are Lawful and Appropriate Safeguards For Taxpayer Title IV Funds**

The Arbitration and Class Action Waiver Provisions do not ban the use of arbitration clauses or class action waivers by for-profit schools. These Provisions instead place a condition on the receipt of federal funds designed to preserve and protect those funds from fraud and abuse, and to ensure that the federal government and taxpayers do not bear the consequences of misconduct by schools. They only require recipients to agree not to enforce arbitration clauses and class action waivers in connection with borrower defense claims – claims that arise directly out of funding from the Direct Loan Program. The Provisions are therefore well within the Department's authority under the HEA. Furthermore, the Provisions do not violate the Federal Arbitration Act because they do not prevent courts from enforcing arbitration clauses according to their terms and do not prohibit participating schools from arbitrating matters unrelated to their receipt of federal funds. The Provisions are the result of a thorough rulemaking process in which the Department addressed all issues raised by commenters and did not violate the APA. CAPPS has failed to demonstrate that the Provisions are unlawful, and it likewise cannot demonstrate they will irreparably harm its members. The equities and public interest require the implementation of the Arbitration and Class Action Waiver Provisions, and CAPPS's motion to enjoin them should be denied.

   *A. The Arbitration and Class Action Waiver Provisions are Within the Department's Broad Grant of Authority in the HEA to Set the Conditions for Schools to Participate in the Direct Loan Program*

The HEA delegates broad authority to the Department to set the requirements for schools to participate in the Direct Loan Program, in part by specifying what schools must agree to do in their applications to participate, and in their Program Participation Agreements. *See* 20 U.S.C. §

9

1087c(b)(1) ("Each institution of higher education desiring to participate in the direct student loan program under this part shall submit an *application satisfactory to the Secretary* containing *such information and assurances as the Secretary may require*.") (emphasis added); § 1087c(b)(2) ("The Secretary shall select institutions for participation in the direct student loan program under this part, and shall enter into agreements …, from among those institutions that submit [] applications … and *meet such other eligibility requirements as the Secretary shall prescribe*.") (emphasis added); § 1087d(a)(6). This authority is broad, and explicitly entrusted by Congress to the Department's discretion to determine what "other provisions" should be included in the Program Participation Agreement because they "are necessary to protect the interests of the United States and to promote the purposes of [Part D, the Direct Loan program]." 20 U.S.C. § 1087d(a)(6). It is under this broad authority that the Department promulgated the Arbitration and Class Action Waiver Provisions. *See* 81 Fed. Reg. at 39,381.

In issuing the 2016 Rule, the Department reasoned that, since the Direct Loan program is a program for making loans, not grants, to students and their parents, "the overall 'purpose' of the [program] is to make loans that will then be repaid." 81 Fed. Reg. at 39,381. "Acts and omissions by schools that give a borrower grounds for avoiding repayment of a Direct Loan . . . frustrate the achievement" of that purpose. *Id.* The Department reviewed extensive evidence of the benefits and drawbacks of mandatory arbitration agreements and class action waivers, including a massive study conducted by the Consumer Financial Protection Bureau of such clauses in private student loans, among other consumer contracts. *See* 81 Fed. Reg. at 39,381–84. In particular, the Department noted its experience with the collapse of Corinthian Colleges, and the role that such clauses had in limiting the ability of student borrowers to obtain relief directly from abusive schools, and the ability of the Department to identify abuses before Corinthian was

insolvent and unable to satisfy its massive liabilities. *See* 81 Fed. Reg. at 39,382–83; 81 Fed. Reg. at 76,022–23. In the end, the taxpayers were left holding the bag. *See* 81 Fed. Reg. at 76,022 ("Corinthian's widespread use of these waivers and mandatory arbitration agreements resulted in grievances against Corinthian being asserted not against the now-defunct Corinthian, but as defenses to repayment of taxpayer financed Direct Loans, with no other party from which the Federal government may recover any losses."). The Department found that barring participating schools from enforcing arbitration agreements and class waivers would further the interests of the United States, and the purposes of the program by allowing students to more easily obtain relief directly from schools, rather than from the Department through a borrower defense claim, and would better deter unlawful conduct by schools in the first place, thereby "lessen[ing] the amount of financial risk to the taxpayer." 81 Fed. Reg. at 39,383.

       CAPPS contends that this plainly broad grant of discretionary authority to the Department cannot be used to condition schools' participation in the Direct Loan program on an agreement not to use mandatory arbitration agreements and class action waivers for claims that relate to the program. First, it claims that because Congress explicitly gave the CFPB "the authority to abrogate arbitration provisions," CAPPS Brief at 15, the Department may not do so merely under a general grant of authority to "protect the interests of the United States and to promote the purposes of [the Direct Loan Program]," 20 U.S.C. § 1087d(a)(6). The Department, however, is not seeking "to abrogate arbitration provisions" in consumer contracts by means of the Arbitration and Class Action Waiver Provisions. These Provisions instead merely condition participation in a federal program on voluntarily agreeing not to enforce such agreements as they relate to funds disbursed through the program.

       Second, CAPPS deploys the *ejusdem generis* canon, claiming that because Section

1087d(a)(6) follows a list of specifically enumerated provisions that the Department *must* include

in a Program Participation Agreement, Section 1087d(a)(6) only gives the Department authority

to add provisions that are similar "ministerial requirements for loan administration." CAPPS

Brief at 16. The *ejusdem generis* "canon does not control, however, when the whole context

dictates a different conclusion." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S.

117, 129 (1991). Here, the context and structure of the HEA clearly gives the Department broad

discretion to control which schools will be eligible to participate, and what practices they will

have to voluntarily agree to discontinue if they wish to participate. *See, e.g.*, 20 U.S.C. §

1087c(b)(2). Pursuant to this authority, the Department has imposed a wide variety of

requirements, including restrictions on participating schools' ability to enter or enforce contracts

with third parties. *See, e.g.*, 20 U.S.C. § 1094(a)(16) (requiring the Department to include, in

program participation agreements applicable to *all* Title IV programs, a ban on employing or

contracting with individuals or organizations convicted of fraud); § 1094(a)(20) (banning

incentive compensation for recruiters). Courts have regularly declined to apply *ejusdem generis*

when Congress intended to give an agency broad discretion. *See Ohio Ass'n of Cmty. Action

Agencies v. Fed. Energy Regulatory Comm'n*, 654 F.2d 811, 819 (D.C. Cir. 1981) ("We find no

reason to apply [ejusdem generis and another canon] here where the text and the legislative

history of section 206 combine to project a clear Congressional intent to confer a broad

exemption authority."); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588–89 (1980) (rejecting

use of *ejusdem generis* when the meaning of "any other final action" was clear and "expansive").

Furthermore, the types of provisions specifically required by Congress to be included in

Section 1087d(a) Program Participation Agreements are not limited to "ministerial requirement

for loan administration." CAPPS Brief at 16. Instead, they include requirements that a

participating school expressly "accept responsibility and financial liability from its failure to perform its functions pursuant to the agreement," 20 U.S.C. § 1087d(a)(3), and "provide for the implementation of a quality assurance system, as established by the Secretary . . . to ensure that the institution is complying with program requirements and meeting program objectives," 20 U.S.C. § 1087d(a)(4). These provisions suggest that rather than being limited to "ministerial" issues, Congress contemplated that the Program Participation Agreement would include measures aimed at ensuring that participating schools are appropriately incentivized against misconduct related to the Direct Loan program – exactly what the Arbitration and Class Action Waiver Provisions aim to achieve.

Third, CAPPS wrongly and implausibly accuses the Department of finding an "elephant[] in [a] mousehole[]." CAPPS Brief at 16 (quoting *Whitman v. Am. Trucking Ass'ns*, 532 U.S. 457, 468 (2001)). This principle addresses whether an agency may interpret a seemingly minor term of a statute in an expansive fashion that is contrary to the overall statutory scheme. *See Whitman*, 532 U.S. at 465, 468. Section 1087d(a)(6) is not a minor term of the HEA. It requires the Department to consider whether additional provisions in the Program Participation Agreement are "necessary to protect the interests of the United States or to promote the purposes of [the Direct Loan program]," both of which are general terms that indicate a wide range of discretion. *Cf. Orloff v. F.C.C.*, 352 F.3d 415, 420 (D.C. Cir. 2003); *United States v. Bean*, 537 U.S. 71, 77 (2002) ("[T]he 'public interest' standard calls for an inherently policy-based decision best left in the hands of an agency"). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013). Section 1087d(a)(6) is thus far bigger than a "mousehole[]."

13

The D.C. Circuit's treatment of a similarly broad grant of regulatory authority is instructive. In *Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 856 F.2d 1558 (D.C. Cir. 1988), a thrift insured by the Federal Savings and Loan Insurance Corporation challenged the statutory authority of the Federal Home Loan Bank Board to issue a rule. The Board claimed authority under 12 U.S.C. § 1725(a), which authorized "laws, rules, and regulations *as [the Board] may prescribe for carrying out the purposes of this subchapter*." *See Lincoln Sav. & Loan*, 856 F.2d at 1561 (quoting 12 U.S.C. § 1725(a) (1982)) (emphasis added). The D.C. Circuit agreed. "Section 1725(a) authorizes the Board to issue 'such bylaws, rules, and regulations as it may prescribe for carrying out the purposes of this *subchapter*' (emphasis added). Subchapter IV of Title 12 of the United States Code … deals with every aspect of the savings and loan insurance program, one of whose specific purposes is to protect savings through a system of deposit insurance." *Id.* "[A]bsent evidence that Congress intended otherwise," the rule was within the broad general rulemaking authority of the statute. *Id.*

The Department's promulgation of the Arbitration and Class Action Waiver Provisions fits clearly under its mandate to include in the Program Participation Agreement "other provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of this part [Part D]." 20 U.S.C. § 1087d(a)(6). The purposes of Part D, governing the Direct Loan Program, are not limited to what CAPPS characterizes as "ministerial" requirements for schools when originating loans. CAPPS Brief at 16. Instead, Part D governs "every aspect of the [Direct Loan] program," including, as the Department reasonably concluded, "the overall 'purpose' . . . to make loans that will then be repaid." 81 Fed. Reg. at 39,381.[2]

---

[2] Part D also includes the Borrower Defense provision, requiring the Department to develop regulations for "which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan

B.  *The Arbitration and Class Action Waiver Provisions Do Not Violate the Federal Arbitration Act*

The Federal Arbitration Act (FAA) "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). The FAA is an instruction to courts to enforce arbitration contracts on an "equal footing with all other contracts." *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015). Through the operation of the Supremacy Clause, the FAA preempts *state* laws that impose restrictions on courts' enforcement of arbitration clauses. *Id.* at 471.

The Arbitration and Class Action Waiver Provisions, contrary to CAPPS's framing, do not "ban" or prohibit the use of forced arbitration clauses and forced class action waivers in the enrollment agreements of for-profit schools. Nor do these Provisions prevent courts from enforcing such clauses and waivers according to their terms and on an equal footing with other contracts.

Instead, the Arbitration and Class Action Provisions impose a well-reasoned condition on the future receipt of taxpayer funds through a federal subsidy program – Title IV of the HEA – in which no schools are presumptively entitled to participate. These Provisions simply require that if schools wish to receive Title IV funds in the future, they must agree not to include in their enrollment agreements any forced arbitration clauses or class action waivers for borrower defense-type claims, and they must also agree not to enforce existing clauses and waivers for such claims. If the perceived benefits of arbitrating borrower defense claims and prohibiting class actions are paramount to schools, they need not participate in the Title IV program. The Arbitration and Class Action Waiver Provisions do not seek to "incentiv[ize]" the discontinuance

made under this part." 20 U.S.C. § 1087e(h). The purposes of Part D thus also include promoting fairness for student borrowers who have been defrauded or unlawfully mislead by their schools.

of arbitration in the for-profit school industry in general. CAPPS Brief at 14. There are thousands of for-profit, vocational schools nationwide that do not participate in the Title IV program and may require arbitration clauses whenever it is lawful to do so. For those for-profit schools that do wish to receive public taxpayer funds to subsidize their businesses, the Department chose, quite reasonably, to ask that those schools be held accountable for their use of those funds through the public adjudication of borrower defense claims and the class action device.

A federal agency may, operating squarely within its authority, set reasonable conditions on the receipt of federal funds. *See, e.g.*, *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (upholding regulations implementing Title IX as conditions on a school's participation in federal student aid programs). The Supreme Court has viewed with skepticism the idea that conditions imposed on federal funds are coercive. *See Agency for Int'l Dev. [AID] v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality opinion) ("To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance."); *Grove City Coll. v. Bell*, 465 U.S. at 575 ("Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept."). Similarly, the Arbitration and Class Action Waiver Provisions merely condition to the receipt of federal funds on an agreement: that recipients will cease forcing third parties to arbitrate claims or to abandon class actions to the extent those matters relate to the federal funds received. No controlling precedent of the D.C. Circuit or the Supreme Court has ever found such conditions to be impermissible.[3]

---

[3] CAPPS's reliance on *Epic Systems, Corp. v. Lewis*, 138 S. Ct. 1612 (2018) is misplaced. That case concerned whether the National Labor Relations Board has power to issue direct regulation of the use of arbitration clauses by

Instead, in order to reach its desired conclusion that the FAA somehow dictates the content of agreements between the Department and private, for-profit businesses, CAPPS adopts an implausibly expansive interpretation of the "economic dragooning" federalism principle set forth in *Nat'l Fed'n of Indep. Bus. [NFIB] v. Sebelius*, 567 U.S. 519, 582 (2012). In fact, the Provisions do not "dragoon" the States or anyone else into a course of conduct, but instead are intended to preserve and protect taxpayer funds, and CAPPS's reasoning would imperil a broad range of conditions on federal funding, including those explicitly upheld by the Supreme Court.

The Arbitration and Class Action Waiver Provisions, CAPPS claims, are a "de facto ban" on arbitration, *id.* (quoting *Am. Health Care Ass'n*, 217 F. Supp. 3d at 929), because the Department has violated the Spending Clause principle that the federal government may not "engage in 'economic dragooning,'" *id.* (quoting *NFIB*, 567 U.S. at 582), to coerce recipients to accept "otherwise unlawful requirements." *id.* However, the prohibition on "economic dragooning" is actually a principle of federalism which prevent the federal government from "requir[ing] the *States* to regulate." *NFIB*, 567 U.S. at 578 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)) (emphasis added); *id.* at 577 ("Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system."). Conditions on grants to private entities – designed to preserve federal funds, not "dragoon" the states or anyone else into any unlawful

---

*private* business. The NLRB was not imposing a condition on the receipt of federal funds. Similarly, the district court's decision in *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016) is both inapposite and of limited persuasive value. That case concerned a condition on Medicaid funds prohibiting arbitration clauses on any matter, not, as here, merely a condition not to enforce arbitration on claims directly relating to the funds disbursed. Moreover, in applying the "economic dragooning" principle, the district court conceded that "Defendants counter that *[NFIB v.] Sebelius* has a number of distinguishing facts, and they appear to be correct." *Am. Health Care Ass'n*, 217 F.Supp.3d at 929. The district court did not address the fact that *NFIB v. Sebelius* concerned the sovereign rights of states, not nursing homes, a basic error in applying the holding of that case.

course of conduct – do not imperil the federal system.[4] CAPPS is implausibly attempting to use a federalism principle about the rights of states to attack conditions on federal grants to private entities. This unsound argument should be rejected.

The Arbitration and Class Action Waiver Provisions are limited, moreover, to those claims that relate directly to the Direct Loan program:

> The final regulations do not bar schools from using any kind of predispute arbitration agreements, or class action waivers, so long as they pertain only to grievances unrelated to the Direct Loan Program. The regulations merely require that a school that participates in the Direct Loan program cannot enter into a predispute arbitration agreement regarding borrower defense-type claims with a student who benefits from aid under that program.

81 Fed. Reg. at 76,023 The Supreme Court has upheld conditions on funding that impinge even on Constitutionally-protected conduct where they do not "prohibit[ ] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *AID*, 570 U.S. at 217. There is no Constitutionally protected right to resolve disputes through arbitration. Thus, the Department plainly has the authority to impose conditions on Title IV funding limited to the scope of the program at issue.

Because the Provisions are conditions on federal funds that are voluntarily assumed by schools when they agree to participate in the Title IV Direct Loan Program, and the conditions are limited to that program, the Provisions are permissible exercises of the Department's

---

[4] Because the bar on coercive grants does not apply to private entities, the Department's interpretation of its statutory authority raises no "deeply problematic issues under the Spending Clause," CAPPS Brief at 14 n.10, and constitutional avoidance is inappropriate. Even if the "economic dragooning" principle enunciated in *NFIB* were applicable here, and it is not, the Arbitration and Class Action Waiver Provisions would pass the test. The controlling opinion on this principle is the plurality opinion of Chief Justice Roberts in *NFIB*. *See Mississippi Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138, 176 (D.C. Cir. 2015). The plurality only applied its analysis of coercion to conditions imposed on federal funds that "threat[en] to terminate other significant *independent* grants." *NFIB*, 567 U.S. at 580 (emphasis added). The plurality contrasted the impermissible new conditions in the Medicaid expansion with earlier permissible changes to *existing* Medicaid spending, including ones that threatened funding for the whole Medicaid population, "both old and new." *Id.* at 583. Because the Arbitration and Class Action Waiver Provisions are merely new conditions imposed on future funding in an existing program, the relative share of funding provided in the program and however undesirable it might be for an individual school to forgo that funding is irrelevant.

authority to condition federal funding, and therefore do not violate the FAA.

C.  *The Arbitration and Class Action Waiver Provisions Are Not Arbitrary Or Capricious*

CAPPS makes four arguments that the Department acted in an arbitrary and capricious in issuing the Arbitration and Class Action Waiver Provisions, and thereby violated the APA. All of these arguments fail after merely a cursory review of the administrative record. CAPPS inaccurately claims that the Department failed to consider various matters, which the Department, in fact, explicitly considered – CAPPS simply prefers a different policy outcome. This does not amount to a violation of the APA.

First, contrary to CAPPS's assertion that the Department "failed to adequately consider extensive data in the record demonstrating the benefits of arbitration," CAPPS Brief at 17, the Department did consider these benefits:

> [C]ommenters believed that the Department did not sufficiently consider conflicting evidence, such as the benefits of arbitration and the drawbacks of class actions. A commenter cited to literature and academic studies that the commenter asserts demonstrate the merits of arbitration. . . . As discussed elsewhere, we do not deny the merits of arbitration, and the regulations do not ban arbitration. The Department gathered substantial evidence to support the position taken in the regulations, as detailed in the NPRM.

*See* 81 Fed. Reg. at 76,025. The Department concluded, after weighing the benefits against the demonstrated harms of abusive schools "aggressively us[ing] waivers and arbitration agreements to thwart timely efforts by students to obtain relief from the abuse," that "the ability of the school to continue that abuse unhindered by lawsuits from consumers has already cost the taxpayers many millions of dollars in losses and can be expected to continue to do so." *Id.* CAPPS "may disagree with this policy balance, but it does not reflect a failure to consider relevant factors." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

Second, CAPPS claims that the Department "failed to adequately consider the serious drawbacks of class actions for students," and then lists a number of what it considers to be drawbacks: class actions are supposedly not effective at obtaining relief for consumers; attorneys may obtain more compensation than individual consumers, and students are statistically unlikely to win in class actions once the class is certified. Again, the Department did consider these potential drawbacks, *see* 81 Fed. Reg. at 76,025–26, but it simply determined that the costs imposed upon the public by class action waivers were greater:

> We do not suggest that class actions are a panacea … We stress that class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later ... recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool.

81 Fed. Reg. at 76,026.

Third, CAPPS complains that the Department should not have relied on a study of arbitration agreements and class action waivers conducted by the Consumer Financial Protection Bureau because the CFPB study included private student loans, which have different protections for borrowers than public student loans. CAPPS Brief at 19. Rather than "fail[ing] to even consider the[] differences" between federal and private student loans, CAPPS Brief at 19–20, the Department in fact noted that "the CFPB's study did analyze the prevalence of arbitration agreements for private student loans as well as disputes concerning those loans. Schools participating in the Direct Loan Program not infrequently provide or arrange private student loans to their students; these private loan borrowers may also have Direct Loans, and in any case can be expected often to share characteristics with Direct Loan borrowers." 81 Fed. Reg. at 76,025.

Finally, contrary to CAPPS's assertion, the Department did in fact consider the ways in which schools may have organized their affairs in reliance on mandatory arbitration and class action waiver clauses. *See* 81 Fed. Reg. at 76,026. However, the Department simply found that those interests were not as important as the benefits of the Provisions. *See* 81 Fed. Reg. at 76,026 ("It is possible that banning class action waivers may increase legal expenses and could divert funds from educational services, or lead to tuition increases. We expect that the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place.").

### D.  The Arbitration and Class Action Waiver Provisions Do Not Violate the Due Process Clause of the U.S. Constitution

The brief discussion that CAPPS devotes to its Due Process claim underscores its lack of merit. It is highly questionable whether the Arbitration and Class Action Waiver Provisions are retroactive rules that would implicate any special Due Process Clause inquiry. Even if they were, the Provisions would survive the lenient applicable test. A law is retroactive if it "takes away or impairs vested rights acquired under existing law. . . ." *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992) (quoting *Neild v. District of Columbia*, 110 F.2d 246, 254 (D.C.Cir.1940)). At the time of their promulgation in 2016, the Provisions merely gave schools the choice to sign a new Program Participation Agreement in which the school would agree to not enforce any predispute arbitration agreements against borrowers with regard to claims related to the program. Since schools have "no 'vested right' to future eligibility to participate in" Title IV programs, *Alexander*, 979 F.2d at 864, any choice of whether to submit to new conditions on the program is a voluntary one. Furthermore, since the Provisions do not diminish the legal enforceability of any contractual rights that schools have in their arbitration clauses, it is not clear that those rights are "impair[ed]" in a relevant way. CAPPS cites no

21

authority for the proposition that voluntarily waiving existing contractual rights in order to participate in a federal program implicates the Due Process Clause at all. If CAPPS members do not wish to waive those rights, they can choose not to continue to participate in the Direct Loan Program after the Provisions go into effect. As the Department noted, other provisions of the Program Participation Agreement may require schools to agree to cease enforcing existing contract provisions, such as incentive compensation agreements with their employees. 81 Fed. Reg. at 76,024.

Even if the Court were to conclude that the Provisions have "retroactive" effects, it is clear that they pass muster under the lenient applicable constitutional test. Retroactive regulation does not violate the Due Process Clause if its effects on past conduct are "justified by a rational legislative purpose." The burden is on the plaintiff to show that there is no rational justification. *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984). CAPPS has failed that burden.

Here, the Department noted that "[o]ne of the primary problems [it] identified" was that mandatory arbitration clauses and class action waivers made it more difficult for unlawful practices by schools to come to light in time for affected students, state regulators, and the Department itself to take action and obtain relief for students before schools went out of business. 81 Fed. Reg. at 76,022. Requiring participating schools to forego the enforcement of such clauses is a rational response. The Arbitration and Class Action Provisions do not violate the Due Process Clause.

### E.  CAPPS Does Not Show That It Is Likely to Suffer Irreparable Harm

CAPPS fails to demonstrate that it will suffer any actual and immediate harm from the imposition of the Arbitration and Class Action Waiver Provisions. Instead of containing specific

examples of immediate harm, CAPPS's declarations are bare skeletons with only conclusory assertions of harm. This is plainly inadequate. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d at 1575 ("[A] district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff.").

CAPPS does not actually allege that it, or its member schools have any ongoing arbitration or litigation concerning *borrower defense claims* that would actually be subject to the Provisions. CAPPS's declarations vaguely assert that "[m]any CAPPS schools are listed as defendants in lawsuits," Johnson Decl. at ¶ 21, but they fail to specify whether these lawsuits include borrower defense claims. The evidence that CAPPS member schools will face new litigation is also sparse. On this count, CAPPS presents only the declaration of Robert Johnson. *See* Johnson Decl. at ¶ 12 ("CAPPS schools will need to . . . actually litigate new cases, including class actions, in federal and state court."). These conclusory assertions are insufficient to demonstrate a likelihood of irreparable harm.

CAPPS's claim that its members will be irreparably harmed by the denial of their due process rights fails for the simple reason that they have no likelihood of prevailing on their due process claim.

F. *The Balance of the Equities Favors Immediately Allowing Students to Receive the Protections of the Arbitration and Class Action Waiver Provisions*

The States have a strong interest in the immediate implementation of the Provisions. The States participated in the negotiation of the Provisions, submitted comments to the Department, and affirmatively sought the Provisions to enhance their ability to detect and deter violations of state consumer protection law by for-profit schools. CAPPS, on the other hand, after bringing its original motion for a preliminary injunction little more than one month before the Provisions were originally scheduled to be effective, has continued to sit on its rights for more than a year

during the Department's unlawful attempts to delay the Final Rule's implementation. In a case concerning unlawful delay, CAPPS's attempt to maintain the "status quo" should carry little weight.

### G. *The Public Interest Favors Allowing the Arbitration and Class Action Waiver Provisions to be Implemented Immediately*

The Department promulgated the Arbitration and Class Action Waiver Provisions to protect federal taxpayers and student borrowers from the misconduct of schools. Implementing such protections is surely in the public interest. While CAPPS claims its members disproportionately serve underserved populations, these underserved populations deserve the right to assert meritorious claims against schools that have harmed them. The Department has proposed to rescind the Arbitration and Class Action Waiver Provisions, it has not yet produced a final rule and has not survived the legal challenges that will result from any final rule that substantially resembles its proposed rule. Any "regulatory whiplash," CAPPS Brief at 25, is purely speculative.

### 2. The Financial Responsibility Provisions Are Lawful and An Appropriate Response To Crisis In The For-Profit School Industry

CAPPS similarly fails to demonstrate that the Financial Responsibility Provisions should be enjoined. The Financial Responsibility Provisions are explicitly authorized by the HEA, and do not violate the APA or the Constitution. More fundamentally, however, CAPPS does not present the Court with an accurate account of how the Provisions actually function. CAPPS, without naming any of its member institutions or identifying particular instances of triggering events, raises the specter that its schools will automatically and immediately be required to obtain crippling letters of credit. In fact, this is an inaccurate description of how the Financial Responsibility Provisions would apply to any school. Most of the financial responsibility triggers

24

factor into a larger, composite score methodology that existed prior to the 2016 Rule, pursuant to which triggering events are considered as a part of the larger financial picture of the school. *See* 81 Fed. Reg. at 76,073 (to be codified at 34 C.F.R § 668.171(c)(1)). Indeed, CAPPS identifies only three types of triggering events as potentially implicating its member schools – litigation, the imposition of teach out plans, and violations of the Gainful Employment Rule. Johnson Decl. ¶¶ 21-23; Gunderson Decl. ¶¶ 12-14. However, these triggering events are among those that factor into a larger composite score. *See* 81 Fed. Reg. at 76,073-74 (to be codified at 34 C.F.R §§ 668.171(c)(1), (c)(1)(i) – (iv)). On their own, these triggering events do not require the schools to obtain letters of credit unless they result in a composite score that "is less than 1.0." 81 Fed. Reg. at 76,073 (to be codified at 34 C.F.R § 668.171(c)(1)). Accordingly, CAPPS has not demonstrated that any of its member schools will actually suffer immediate, harmful consequences should the Financial Responsibility Provisions go into effect and has failed to present a likelihood of irreparable harm. This is unsurprising given that CAPPS did not even seek to enjoin the Financial Responsibility Provisions in its original motion for preliminary injunction.

### 3. The Financial Responsibility Provisions are Lawful

#### A. *The Financial Responsibility Provisions Do Not Exceed the Department's Authority under the HEA*

CAPPS incorrectly asserts that the Financial Responsibility Provisions violate the HEA. To the contrary, the HEA actually requires the Department to determine if an institution is financially responsible by, amongst other things, assessing its ability to "meet all of its financial obligations." 20 U.S.C. § 1099c(c)(1)(C). Importantly, the HEA leaves much of the specific details of that determination wholly to the Department's discretion. CAPPS argues that the Financial Responsibility Provisions represent an abdication of the Department's duty to

determine financial responsibility where the triggers are based on third-party conduct. This argument ignores the fact that the Department proposed to evaluate five of the eight categories of triggers not in isolation, but as part of an analysis of the institution's larger financial condition reflected in a composite score. 81 Fed. Reg. at 76,073 (to be codified at 34 C.F.R § 668.171(c)(1)). Moreover, the HEA does not expressly prohibit the Department from considering third-party actions, which, the Department notes, "would be recognized in the financial statements submitted annually and evaluated under the current composite score methodology." 81 Fed. Reg. at 75,990.

CAPPS next claims that the triggers are too narrow and incomplete to apprise the Department of the school's "total financial circumstances." Again, CAPPS ignores the fact that the Department did not propose to evaluate five of the eight categories of triggers in isolation, but instead as part of a composite score calculation that examines the entirety of the institution's finances and which existed prior to the 2016 Rule. The remaining triggers, the cohort default rate, 90/10 rule, and SEC actions, threaten the institution's access to capital or to federal student loans, the primary source of funding for many CAPPS schools. *See* Johnson Decl. at ¶¶ 15-16. These three categories of triggering events effectively can have existential consequences. The Department reasonably concluded that these events are *per se* indication that a school "is not able to meet its financial or administrative obligations." 81 Fed. Reg. at 76,074 (to be codified at 34 C.F.R § 668.171(d) – (f)).

Finally, CAPPS bizarrely misreads the HEA when it apparently claims that the Department must not consider "metrics other than a school's audited and certified financial statement." The relevant provision of the HEA reads, in full, "[t]he determination as to whether an institution has met the standards of financial responsibility *provided for in paragraphs (2) and*

26

*(3)(C)* shall be based on an audited and certified financial statement of the institution." 20 U.S.C. § 1099c(5) (emphasis added). This is not a requirement that the Department rely exclusively on a school's financial statement and not on any other evidence of its financial responsibility, a result that would, in any event, be absurd. When examined in context, it is clear that the HEA only requires *institutions* to provide such audited and certified financial statements, not that the Department must rely exclusively upon them. *See* 20 U.S.C. § 1099c(2) ("if an institution fails to meet criteria prescribed by the Secretary regarding ratios that demonstrate financial responsibility, then the institution shall provide the Secretary with satisfactory evidence of its financial responsibility"); 20 U.S.C. § 1099c(3)(C) ("The Secretary shall determine an institution to be financially responsible…if… *such institution establishes* to the satisfaction of the Secretary, with the support of a financial statement…that the institution has sufficient resources") (emphasis added).

### B.  The Financial Responsibility Provisions Do Not Violate the APA

CAPPS asserts that the financial responsibility provisions violate the APA "because they are not the product of reasoned decision-making and fail to respond to significant comments in the record." CAPPS Brief at 27. A review of the record, however, shows that the Department considered comments relevant to this issue at length, substantively modified the Financial Responsibility Provisions in response to those comments, and thoroughly explained any deviations from prior policy. *See, e.g.*, 81 Fed. Reg. at 75,982 ("After carefully considering the comments . . . we are changing the method of assessing the effect of many of the triggering events."). The Department's consideration of comments on the calculation of financial responsibility scores occupy more than 30 pages of the Federal Register and, in consideration of these comments, the Department modified the financial triggers proposed in the NPRM

specifically to incorporate them into the existing framework for determining institutions'
financially responsibility. 81 Fed. Reg. at 75,978-76,010. The Department's conduct is wholly
dissimilar to the action of the agency described in *Encino Motorcars*, where the agency "said
almost nothing" about its change in policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117,
2127 (2016). The Department's careful response to comments is fatal to CAPPS's argument that
the Department "failed to consider the extent to which institutions relied on the pre-existing
regulatory framework" with regard to the calculation of financial responsibility scores. CAPPS
Brief at 27.

The use of the existing composite score structure also undermines CAPPS argument that
the Department "failed adequately to address concerns regarding its decision to base significant
regulatory consequences on factors that are speculative or not directly relevant to an institution's
financial well-being." CAPPS Brief at 27. By incorporating the triggers into the composite score
methodology, most triggers do not, in and of themselves, require institutions to post letters of
credit. The Department notes that the few triggers that are not incorporated into the composite
score system have such a large effect on the institution's finances as to essentially require the
institution to go out of business by reason of losing access to Title IV federal student loans and
grants or access to capital markets. 81 Fed. Reg. at 75,984 ("An institution that fails the
requirement to derive at least 10 percent of its revenues from non-title IV sources is so dependent
on title IV, HEA funds as to make the loss of those funds almost certainly fatal.").

CAPPS's claim that the Department failed "to provide institutions an opportunity to be
heard regarding the merits (or lack thereof) of any underlying claims" in litigation that
constitutes a triggering event ignores multiple mechanisms for addressing such suits before they
are factored into the institution's composite score. CAPPS Brief at 27, *citing* 81 Fed. Reg. at

76,006. For example, the Department allows institutions to show that "the amount claimed under the lawsuit exceeds the potential recovery" before any adjustment to their composite score. 81 Fed. Reg. at 76,006. Furthermore, suits filed by entities other than the state and federal governments are only triggering events if they survive a summary judgment motion or the time for such motion has passed. 81 Fed. Reg. at 76,073. Institutions may also file motions to dismiss or summary judgment motions within 120 days in suits filed by state or federal government entities and thereby avoid any adjustment to their composite score. *Id.*

C.  *The Financial Responsibility Provisions Do Not Violate the Constitution*

CAPPS's contention that the Financial Responsibility Provisions are unconstitutional is meritless. CAPPS argues that the Provisions violate the constitutional right to due process because they do "not allow an opportunity to contest the requirement to provide a letter of credit for many of the triggering events." CAPPS Brief at 28. This claim is inaccurate. As discussed at length above, most of the triggers do not automatically require a letter of credit, as CAPPS implies, but are simply incorporated into the overall financial picture of the school. 81 Fed. Reg. at 76,073. This includes all the triggers that CAPPS claims might affect its member institutions. The Department also provides other opportunities to contest whether a given trigger should actually factor into the school's composite score. The Department allows institutions to show that "a reportable event no longer applies or is resolved or that it has insurance that will cover the debts and liabilities that arise at any time from that triggering event." 81 Fed. Reg. at 76,006. Institutions also have the opportunity to show that certain triggering events "are not material or relevant." 81 Fed. Reg. at 76,005.

D.  *CAPPS has Demonstrated No Irreparable Harm to its Member Institutions*

29

CAPPS asserts that its schools may suffer harm, but it fails to show that such harm is irreparable or that any of its member schools will imminently suffer such harm.

First, the economic harms CAPPS claims do not constitute irreparable harm. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) ("[I]t is well settled that economic loss does not, in and of itself, constitute irreparable harm.") The cost of letters of credit and any other economic harm is not, therefore, irreparable.

Second, CAPPS seems to rest its claim of irreparable harm on the theoretical prospect that the cost of obtaining a letter of credit may cause one of its member schools to close, lose agency accreditation, or have its constitutional rights violated. However, CAPPS has identified no such school and therefore fails to meet the clear burden for showing that irreparable harm is likely to occur. CAPPS's invocation of the mere possibility of irreparable harm is insufficient to justify a preliminary injunction. *See Winter.*, 555 U.S. at 7 (noting that the "possibility standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."). CAPPS has not met this straightforward burden.

The declarations offered by CAPPS fail to identify a specific member school that will face the prospect of closure. The Johnson Declaration, for instance, merely notes that "*[i]f* an institution is not able to meet the very onerous requirements of this trigger-based scheme it *could* effectively be forced out of business." Johnson Decl. ¶¶ 25-26, 28 (emphasis added). The Gunderson declaration is likewise deficient: "Obtaining letters of credit or other financial protection involves substantial fees and expense and *may* be difficult to secure for any institution

30

in the current credit environment." Gunderson Decl. ¶ 15 (emphasis added). Similarly, when describing the harm associated with agency approvals, CAPPS notes that "the Financial Responsibility Provisions *could* lower the composite score such that the school would be deemed out of compliance with the state authorizing requirements. Such a determination *could* affect the eligibility of an institution and its students to participate in the state grant program." CAPPS Brief at 30 (emphasis added). Indeed, CAPPS cannot demonstrate that any of its member schools will likely suffer irreparable harm as a result of the Financial Responsibility Provisions. As discussed above, the triggering events CAPPS identifies as applicable to its schools do not automatically require a letter of credit, and schools have the right to contest the relevance or applicability of any event. Hypothetical, worst-case-scenarios fail to show that harm to a CAPPS member is likely.

Finally, CAPPS's failure to raise these issues over a year ago in its original Motion for Preliminary Injunction makes clear that even CAPPS itself did not believe these provisions would lead to irreparable harm.

> E.  *The Balance of Equities Demands Implementation of the Financial Responsibility Provisions*

CAPPS concludes without support that the Department would not suffer significant harm were the Provisions stayed indefinitely. CAPPS fails to acknowledge the very real harm the Department has already suffered in the absence of the Financial Responsibility Provisions. The Department and, more fundamentally, taxpayers have already suffered $176 million in losses from the failure of Corinthian Colleges, with additional borrower defense and closed school discharge claims expected to be approved. 81 Fed. Reg. at 75,985. A letter of credit at the level required by the 2016 Rule would have covered $143 million of those losses. *Id.* The financial responsibility provisions guard against failing institutions by providing financial protection to the Department

"while the institution has resources sufficient to provide that protection." 81 Fed. Reg. at 39,361. The Department was right to insist upon such protection for public funds, and their implementation would be wholly equitable.

*F.   The Public Interest Weighs in Favor of the Financial Responsibility Provisions*

The public maintains a strong interest in ensuring that schools receiving tens of millions of dollars or more in federal loans and grants are financially stable enough to provide the education they promise. Taxpayers, for example, have a clear interest in ensuring that irresponsible institutions are held liable for their own financial instability or outright fraud. The States also have a strong interest in the implementation of these provisions. The Financial Responsibility Provisions increase the costs to institutions of violating state consumer protection laws, thereby promoting compliance. Most importantly, students themselves would be harmed by an injunction. These regulations are meant to identify impending financial failure early, before the ultimate collapse of a school. Such early identification would enable prospective students to attend stable institutions at the outset of their educational career, reducing the possibility of students' education being interrupted, having to file a closed school discharge application, or repaying student loans used to attend a failed institution. Moreover, current students would also benefit from the incentive these provisions give to schools to be financially responsible and take corrective action where necessary.

## 4.   The Repayment Rate Disclosure Is a Valid and Important Component of the 2016 Rule

*A.   The Repayment Rate Disclosure is Within the Department's Authority, Reasonable, and Consistent with Applicable Law*

The Department has broad authority under the HEA to require educational institutions participating in the Direct Loan Program to make factually accurate disclosers to potential

borrowers about the experiences of recent graduates. Specifically, under 20 U.S.C. § 1221e–3 and 20 U.S.C. § 3474, the Department has broad authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e–3. As this Court has previously recognized when rejecting a claim nearly identical that advanced by the Plaintiff, "[t]hese provisions fashion an awfully big umbrella, and it is no stretch to conclude that . . . disclosure regulations fall under it." *Ass'n of Private Sector Colleges & Universities v. Duncan*, *("ASPCU III")* 110 F. Supp. 3d 176 (D.D.C. 2015) (upholding Gainful Employment disclosures). Such regulations are "designed to give the public 'access to meaningful and comparable information about student outcomes and the overall performance of [educational] programs,'" which is "a goal that surely advances the purposes of both the Higher Education Act and Title IV." *Id.* (internal citations omitted).

CAPPS challenges the Department's broad authority, suggesting that because the HEA requires some specified disclosures, the statute forbids the Department from requiring other disclosures, i.e. the principle of "*expressio unius, exclusio alterius.*" CAPPS Brief at 32. This claim is unpersuasive. The principle invoked by CAPPS is merely "[a] non-binding rule of statutory interpretation, not a binding rule of law," and one that is "is often misused." *Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1342 (D.C. Cir. 1999) (internal quotation omitted). "'Expressio unius' should not prevail when a nonexclusive reading serves the purposes for which the statute was enacted or allows the exercise of incidental authority necessary to an expressed power or right." *Bailey v. Fed. Intermediate Credit Bank of St. Louis*, 788 F.2d 498, 500 (8th Cir. 1986).

This Court has rejected precisely the same argument in a nearly identical context and recognized that the Department has the authority to require reasonable disclosures designed to help students make informed decisions and thereby improve the likelihood that the Department's loans are repaid. *See APSCU III,* 640 F. App'x at 8 (noting "[i]t would be strange for Congress to loan [as opposed to grant] out money" in circumstances where it would be unlikely that "the students [would] to repay their loans."). In similar circumstances, courts have upheld the Department's authority to impose more than the minimum requirements set out in the HEA, where doing so was necessary to fulfill the Department's statutory mandates. *See Mission Grp. Kansas, Inc. v. Riley*, 146 F.3d 775, 779 (10th Cir. 1998) (list of conditions for continued eligibility to participate in Title IV program "does not plainly indicate that the Secretary is without authority to impose [additional requirements]"); *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1272–75 (D.C. Cir. 1996) (upholding Refund Regulation where the statute was silent).

### B. The Repayment Rate Disclosure Was Reasonably Designed to Help Students and Families Make Well-Informed Decisions about Where to go to College

CAPPS advances three arguments that the Repayment Rate Disclosure is arbitrary and capricious and in violation of § 706(2)(A) of the APA. Each is entirely unsupported by the administrative record. Accordingly, CAPPS's claims under the APA should be rejected.

First, CAPPS claims, without citing any support, that the Repayment Disclosure violates the APA because the Department "failed to consider the effect that income-based repayment plans have on a student's rate of repayment." CAPPS Brief at 32. The administrative record flatly contradicts this contention. The record makes clear that the Department did not fail to consider this argument, it expressly disagreed. As the Department noted, "[w]e disagree with the commenters' statements that income-driven repayment plans conflict with the loan repayment warning provision." 81 Fed. Reg. at 76,018. The Department observed that while the availability

of income-driven repayment plans provided an important "safety net for struggling borrowers" the availability of such a safety net "does not eliminate the responsibility the institution has to provide a high-quality education that ensures borrowers are able to, at a minimum, afford to pay down their loans, even in the first years after entering repayment." *Id*. Citing to a report from the Council of Economic Advisers concerning the number of borrowers who experienced one of several kinds of economic distress shortly after entering the repayment process, the Department concluded that the percentage of recent graduates actually paying down their loans was "critical information that prospective students and potential borrowers should be aware of prior to making enrollment or financial aid decisions." *Id*.

Next, CAPPS argues that the Department's decision to rely on data from prior to the announcement of the 2016 Rule to determine when the Repayment Disclosure is required is "arbitrary and capricious" because it amounts to a "sanction" that would "penaliz[e] schools." CAPPS Brief at 33. But the Repayment Disclosure is not a sanction or a penalty any more than the nutrition facts on the side of a bag of potato chips, or a country of origin label on a bottle olive oil is a sanction. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22 (D.C. Cir. 2014). Consumers benefit from access to accurate information about the products they buy. Requiring the disclosure of such information is not a punishment.

Finally, CAPPS argues that the Repayment Disclosure is arbitrary and capricious because it applies only to "proprietary institutions." CAPPS Brief at 33.[5] CAPPS goes on to argue that

---

[5] CAPPS's spurious claim that the Department "concedes that the decision to target only proprietary schools was based on inaccurate data" hardly merits a response. Even a cursory review of the January 13, 2017 "e-announcement" cited by CAPPS reveals that the Department merely acknowledged a coding error that resulted in a "modest" <u>undercounting</u> of some borrowers who haven't been able to repay their loans. The Department concluded that the issue made no difference in "over 90 percent" of institutions on the College Scorecard, but because it undercounted struggling borrowers, the coding issue was actually to CAPPS's benefit. The Department notes that it "worked to get accurate, refreshed data as soon as possible." *Updated Data for College Scorecard and Financial Aid Shopping Sheet*, https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecardFinaid ShopSheet.html (last visited October 2, 2018). Plainly, a modest coding error on a spreadsheet that (i) worked to

the Department "failed to explain" why traditional institutions are not subject to the Repayment

Rate Disclosure but proprietary institutions are. *Id*. at 34. Again, the administrative record flatly

contradicts Plaintiff's claims. As set forth in the register, the Department limited the scope of the

Repayment Rate Disclosure to proprietary institutions because "a wide body of evidence

demonstrates that student debt and loan repayment outcomes are worse for students in the

proprietary sector than students in other sectors." 81 Fed. Reg. at 76,017. The Department went

on to note that "[m]ost students in the proprietary sector borrow Federal loans, while borrowing

rates among public and private nonprofit institutions are far lower; and debt levels are often

higher." *Id*. The Department further noted that "in addition to higher rates of borrowing, students

at proprietary schools also default at higher rates than borrowers who attend schools in other

sectors." *Id*. Thus, the Department "decided to limit the repayment rate warning requirement to

the sector of institutions where the frequency of poor repayment outcomes is greatest." *Id*.

> C. *The First Amendment Poses No Bar to the Repayment Rate Disclosure Requirement*

Disclosure requirements may be problematic where they "compel[] a speaker to endorse a

position contrary to his beliefs, or to affirm a belief and an attitude of mind he opposes," *Full

Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (internal quotation marks

and brackets omitted), or if they "pose[] the danger that speech deserving of greater

constitutional protection will be inadvertently suppressed," *SEC v. Wall Street Pub. Inst., Inc.*,

851 F.2d 365, 374 (D.C. Cir. 1988) (internal quotation marks and brackets omitted). Absent such

---

CAPPS benefit and (ii) was corrected almost a year ago, is entirely different from the issues at work in the case relied upon by CAPPS. *See Resolute Forest Prods., Inc. v. USDA*, 187 F. Supp. 3d 100, 122 -123 (D.D.C. 2016) (vacating USDA's selection of 15 million board feet per year as the quantity exempted from softwood lumber checkoff order because nearly every calculation upon which the agency relied had significant mismeasurements or inaccuracies, and many of the agency's explanations across its original rulemaking process, its briefings, and its two responses to the district court's remand orders contradicted one another.)

concerns, disclosure requirements do not intrude on any significant First Amendment interest. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

The Repayment Disclosure does not offend the Constitution. It does not require any institution to express a political or ideological viewpoint, or refrain from doing so, nor does it pose any risk of a chilling effect. The Repayment Disclosure requires merely that institutions receiving the benefit of the Department's funding provide factual, non-controversial information to students and families in order to assist them with making a well-informed decision. That is entirely consistent with the First Amendment. *See ASPCU III*, 110 F. Supp. 3d at 199 (upholding disclosure requirement and noting that "requiring commercial entities to disclose "purely factual and uncontroversial information" does not contravene the First Amendment") (citations omitted). As the key case relied on by CAPPS states explicitly, the government may, in some commercial circumstances, require the disclosure of "purely factual and uncontroversial information" to consumers as long as such disclosures "reasonably relate" to an "adequate interest." *Zauderer*, 471 U.S. at 651. In such circumstances, a company's First Amendment interest in withholding that information is "minimal." *Id.*; *see also Wall Street Pub. Inst., Inc.*, 851 F.2d at 374 (concluding that it would be "impermissibly 'paternalistic' for courts to challenge…disclosure requirements because 'zeal to protect the public from "too much information" could not withstand First Amendment scrutiny") (quoting *Meese v. Keene*, 481 U.S. 465, 482 (1987)).

### D.  CAPPS Has Failed to Establish a Likely Risk of Irreparable Harm

To meet the "high standard for irreparable injury," the moving party must demonstrate an injury that is "both certain and great" and must also "show '[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable

harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 297 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d at 674). CAPPS has failed to meet this high burden.

First, citing only to the declaration of Robert Johnson, CAPPS speculates that its members will suffer irreparable injury to their reputations because of the Repayment Disclosure. CAPPS Brief at 36. But CAPPS fails to explain why visitors to a school's website or those who review its promotional materials would draw "unjustifiabl[e]" conclusions about a school's financial stability or the quality of the educational programming based on the anodyne observation that a majority of recent alumni aren't successfully paying down their loans. *Id*. Such purely speculative harms are not sufficient to meet CAPPS's high burden. *Winter*, 555 U.S. at 22 (finding that preliminary relief only when irreparable injury is likely in the absence of an injunction, not merely speculative). To bolster this claim, CAPPS looks to this Court's opinion in *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017). That case, which applies the Railway Labor Act, is inapposite. Not only is irreparable injury *not* required to obtain injunctive relief under the Railway Labor Act, nothing submitted by the CAPPS comes close to the data establishing the nearly certain harms demonstrated by the shipping company in *Atlas. See Atlas*, 280 F. Supp. 3d at 88.

Second, in the course of recapitulating the First Amendment argument raised above, CAPPS correctly notes that constitutional harms constitute irreparable harm. But, unlike the parties in the cases relied upon by CAPPS, CAPPS does not face any constitutional injury. *See ASPCU III*, 110 F. Supp. 3d at 200 n.12. Further, the authority relied on by CAPPS in support of this portion of their argument concerned a grant of a stay pending appeal, not a preliminary injunction. *See Cigar Assoc. of Am. v. FDA*, 317 F. Supp. 3d 555, 557 (D.D.C. 2018). Accurate

disclosure requirements reasonably calculated to advance a valid public purpose do not violate the First Amendment. *Zauderer*, 471 U.S. at 651.

Finally, CAPPS alleges that the potentially unrecoverable costs associated with the Repayment Rate Disclosure taking effect establish a likelihood of irreparable harm. But unlike the prevailing parties in the cases cited in its brief, CAPPS has failed to offer even so much as a reasoned guess as to the cost of complying with the Repayment Rate Disclosure requirement. *See Cigar Assoc. of Am. v. FDA*, 317 F. Supp. 3d at 563. CAPPS's hand waiving is not sufficient to establish irreparable harm.

### E. The Balance of Equities Disfavors an Injunction of the Repayment Rate Disclosure

The balance of the equities favors the implementation of the Repayment Rate Disclosure requirement. In the absence of some likely tangible harm to a party's interests, or a cognizable constitutional injury, the balance of the equities weighs against the moving party, particularly when a public agency is likely to prevail over a challenge to the valid exercise of its authority. *See Boucher v. School Bd. of School Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) (denying motion for a preliminary injunction because school board was likely to prevail on the merits of First Amendment challenge). Here, the balance of the equities favors the Department.

### F. The Public Interest Favors Allowing the Repayment Rate Disclosure to Take Effect

The public interest weighs in favor of implementation of the Repayment Rate Disclosure requirement. CAPPS's reiteration of its First Amendment argument and unsupported concern about student confusion, as set out above, do not provide an adequate basis for further bureaucratic delay and all of the associated expenses that delay would entail. *Judicial Watch,*

*Inc. v. Department of Homeland Security*, 514 F. Supp. 2d 7, 10-11 (D.D.C. 2007) (denying

motion for preliminary injunction). CAPPS's motion should be denied.

**5. The Borrower Defense Provisions are Within the Department's Authority and Do Not Harm Capps Members**

*A. An Affirmative Process is Within the Department's Statutory Authority and is Not Arbitrary Or Capricious*

By codifying a process for borrowers to assert defenses to repayment of their student

loans on an affirmative basis, CAPPS maintains that the Borrower Defense Provisions exceed the

Department's authority under the HEA. CAPPS claims that the "the straightforward language of

[section 455(h) of the HEA] allows the Department to create *defenses* to be used by borrowers in

certain collections proceedings initiated *against the borrower* by the Secretary." CAPPS Brief at

38 (emphasis in original). This claim is inaccurate. In fact, the full text of section 455(h) states as

follows:

> Notwithstanding any other provision of State or Federal law, the Secretary shall specify
> in regulations which acts or omissions of an institution of higher education a borrower
> may assert as a defense to repayment of a loan made under this part, except that in no
> event may a borrower recover from the Secretary, in any action arising from or relating to
> a loan made under this part, an amount in excess of the amount such borrower has repaid
> on such loan.

20 U.S.C. § 1087e(h). Contrary to CAPPS's paraphrase of the statute, it makes no reference to

"certain collection proceedings," or to actions "initiated against the borrower by the Secretary."

Section 455(h) does not state that borrowers can only assert acts or omissions of their school

"defensively" in response to a claim by the Department. The statute makes no mention of

defenses to collection actions, but instead authorizes defenses to repayment of a loan.

In fact, under widely applicable statutory principles, a defense to the obligation to repay a

loan can be asserted affirmatively, such as when a borrower seeks a declaratory judgment that he

or she need not make any further payments to his or her creditor. State and federal declaratory

judgment acts typically grant courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Uniform Declaratory Judgment Act*, National Conference of Commissioners on Uniform State Laws, August 1922, Sec. 1; *see also* 28 U.S.C. § 2201(a) (authorizing federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). Declaratory judgment acts exist, amongst other reasons, to allow parties to clarify their rights before default, nonpayment or other breach of a contract occurs. *See* Preface to *Uniform Declaratory Judgment Act* ("Men ought not be forced to the necessity of encountering damage or assuming ruinous responsibilities before they are permitted to seek and secure a court decision as to their rights and duties."). As a result, parties may assert a defense to the repayment of a loan on an affirmative basis. There is no reason to believe the HEA departs from this generally applicable principle and instead requires borrowers to suffer the severe consequences of student loan default before seeking an adjudication of their rights.

Relatedly, CAPPS claims that the Department's provision of an affirmative process in the Borrower Defense Regulations is arbitrary and capricious because the 1995 regulations did not set out appropriate procedures for affirmative claims. CAPPS claims that "the Department did not adequately explain" this change, but CAPPS fails to acknowledge the Department's actual explanation. In fact, the Department explained that applicable law has long permitted affirmative claims, and that the regulations do not represent an expansion of borrowers' rights, but are instead merely a codification of appropriate procedures for making affirmative claims. Indeed, the Department has permitted affirmative claims since at least 1995. The Department explained:

> We disagree that proposed § 685.206(c) would be an expansion of borrowers' rights as to the context in which a borrower defense may be raised. As explained by the Department in 1995 … the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed

in the FFEL Program—which allowed borrowers to assert both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings.

81 Fed. Reg. at 75,956. The HEA does not limit the Department to recognizing only defenses to collection actions, and the Department has accordingly long permitted borrowers to raise defenses affirmatively. The fact that the Department proscribed a formal affirmative process for the first time in 2016 in response to a dramatic increase in the affirmative assertion of defenses is perfectly logical, and certainly not arbitrary or capricious.

B. *CAPPS Schools Are Not Parties to the Borrower Defense Process and Have No Due Process Rights with Regard to It*

CAPPS contends that its member schools are entitled to "a host of critical procedural safeguards" with regard to the borrower defense process, "including the right to a hearing, to receive relevant evidence, and to challenge the certification of a group of borrowers." CAPPS Brief at 42. It argues that the Department's failure to provide CAPPS members with these rights violates the Constitution and renders the Borrower Defense Rule arbitrary and capricious.

However, CAPPS fundamentally misconstrues what is at issue in the borrower defense process. That process is an adjudication of the rights of student loan borrowers and the Department, respectively, and of whether particular students have a continuing obligation to the Department to repay their loans. CAPPS schools are not a party to this adjudication. Their rights are not determined by the process. The outcome of the process does not bind them. A successful borrower defense claim, for instance, does not itself relieve a student of the obligation to pay an outstanding tuition bill to a CAPPS member, or to repay a private institutional loan that a CAPPS school has extended.

Instead, if the Department wishes to attempt to hold a CAPPS school liable for a successful borrower defense claim, the Borrower Defense Rule requires the Department to

initiate a new and separate "proceeding to collect from the school the amount of relief resulting from a borrower defense." 81 Fed. Reg. at 76,084 (to be codified at 685.222(e)(7)). The Department has not yet issued regulations governing these proceedings, but has acknowledged that such proceedings must comply with the due process requirements of the APA and the Constitution. The Department explains:

> [T]he Department will undertake any action to recover against a school under specific procedures that are being developed and will ensure an opportunity for the school to present its defenses and be heard … The hearing will be conducted by a Department official who is independent of the component of the Department bringing the action … The separation of functions … fully complies with the requirements that would apply under the APA.

81 Fed. Reg. at 75,960. The due process rights of CAPPS institutions apply to this proceeding, not to a borrower defense proceeding determining the rights of students with regard to the Department. The Borrower Defense Provision accordingly do not violate the due process rights of CAPPS schools under the APA or the Constitution.

Similarly, CAPPS objects that the Borrower Defense Provisions violate its members' Seventh Amendment right to a jury with regard to the private right of "a student to recover for fraud or contract violations against his or her school." CAPPS Brief at 43. CAPPS once again misconstrues the borrower defense process. A successful borrower defense claim gives students no right whatsoever to "recover … against his or her school," but, instead, determines the student's obligations with regard to the Department. CAPPS schools have no Seventh Amendment rights in a proceeding to which they are not a party and by which their rights are not determined. Schools' Seventh Amendment right, if any, would attach to any proceeding brought by the Department against a school. However, while the Court need not reach the question, the Seventh Amendment applies only to private rights, *Granfinanciera, S.A. v. Nordberg*, 492 U.S.

33 (1989), and the question of a whether a school must repay taxpayer Title IV funds wrongfully obtained is a plainly a public right.

Finally, although CAPPS schools do not have a Constitutional right to participate in borrower defense proceedings, the Borrower Defense Rule nevertheless give them this opportunity. The rule provides that Department will consider "[a]ny response or submissions from the school" when evaluating a borrower defense claim. 81 Fed. Reg. at 76,084 (to be codified at 685.222(e)(3)(i)(B)).

### C. CAPPS Does Not Actually Address the Department's Rationale for a Federal Standard

CAPPS claims that the adoption of a federal standard, rather than a state law standard, to evaluate defenses to repayment is an "unexplained choice" and hence arbitrary and capricious in violation of the APA. CAPPS Brief at 41. In fact, CAPPS simply does not acknowledge the Department's extended response to comments – more than four pages in the Federal Register – to comments on the federal standard. Moreover, the Department directly responds to CAPPS's claim that the federal standard would be unpredictable. The Department explains that the federal standard is necessary because some state laws do not protect or apply to distance education students:

> We have also described how the complexity of adjudicating State-based claims for borrower defense has increased due to the expansion of distance education. … while a determination might be made as to which State's laws would provide protection from school misconduct for borrowers who reside in one State but are enrolled via distance education in a program based in another State, some States have extended their rules to protect these students, while others have not. Additionally, we have discussed the administrative burden to the Department … and the inherent uncertainties in interpreting another authorities' laws.

81 Fed. Reg. at 75,940. Because, amongst other reasons, no state law is even applicable to some distance education students, the Department concluded that it was necessary to supply a federal

44

standard to ensure comparable and equitable protection of all similarly situated students. CAPPS simply does not acknowledge or address this explanation.

### D. CAPPS Cannot Demonstrate That Its Members Will Be Irreparably Harmed by the Borrower Defense Provisions

CAPPS's gestures at irreparable harm arising out of the Borrower Defense Provisions are woefully inadequate. None of the declarations that CAPPS submits so much as mention the Borrower Defense Provisions. CAPPS instead makes vague and unsupported assertions about the "diversion of resources" and concedes that harm to CAPPS schools would be "difficult to quantify." CAPPS Brief at 44. CAPPS offers no real explanation for how its members would be irreparably harmed by the evaluation of defenses to repayment in accordance with a federal standard or pursuant to an affirmative process. This is plainly inadequate to justify enjoining the national implementation of a duly promulgated rule.

Moreover, CAPPS objects to a variety of provisions in the 2016 Rule – that it provides for an affirmative process and that it does not require successful claims to demonstrate intent or materiality – that are already current Department policy. As described above, it has been the Department's policy since at least 1995 to permit an affirmative process for asserting defenses to repayment. Similarly, the state law standard in the 1995 Regulations incorporates state unfair and deceptive practices (UDAP) statutes, which, unlike common law fraud or misrepresentation, typically do not require plaintiffs to demonstrate intent or materiality. Under current law, students may affirmatively assert borrower defenses to repayment based on the acts or omissions of CAPPS schools, and successful claims need not demonstrate the intent of any CAPPS school or the materiality of misrepresentation by a CAPPS school. At a minimum, CAPPS cannot credibly claim to be irreparably harmed by aspects of a rule that merely continue existing policy.

## **CONCLUSION**

For the foregoing reasons, the Court should deny CAPPS's motion in its entirety.

Dated: October 2, 2018

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By:   */s/ Max Weinstein*
Yael Shavit
Max Weinstein
Assistant Attorneys General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197 (Shavit)
(617) 963-2499 (Weinstein)
Yael.Shavit@state.ma.us
Max.Weinstein@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA, CALIFORNIA
ATTORNEY GENERAL
Bernard A. Eskandari
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

PEOPLE OF THE STATE OF ILLINOIS, by
LISA MADIGAN, ATTORNEY GENERAL
OF ILLINOIS
Joseph Sanders
Assistant Attorney General
Illinois Attorney General's Office
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
(312) 814-6796
jsanders@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
Tel: (515) 281-8772
Jessica.Whitney@iowa.gov

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585
Cmadaio@oag.state.md.us

FOR THE STATE OF NEW YORK
BARBARA UNDERWOOD
ATTORNEY GENERAL OF NEW YORK
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
120 Broadway, 3rd floor
New York, NY 10271
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM, ATTORNEY
GENERAL
Andrew Shull
Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
Tel: 503-934-4400
Andrew.shull@doj.state.or.us

47

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL
Jesse Harvey
Deputy Attorney General
Office of the Pennsylvania Attorney General
Bureau of Consumer Protection
6th Floor Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
(412)565-2883
jharvey@attorneygeneral.gov

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
Benjamin Wiseman
Office of Consumer Protection
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 741-5226
benjamin.wiseman@dc.gov

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL
Jeffrey T. Sprung
Benjamin J. Roesch
Cynthia Alexander
Assistant Attorneys General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
jeff.sprung@atg.wa.gov
benjaminr@atg.wa.gov
cynthiaa@atg.wa.gov

## CERTIFICATE OF SERVICE

I certify that on October 2, 2018, I caused a copy of the foregoing to be filed electronically and that these documents are available for viewing and downloading from the ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Max Weinstein*

Max Weinstein