**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CALIFORNIA ASSOCIATION OF
PRIVATE POSTSECONDARY
SCHOOLS,

                Plaintiff,

v.

BETSY DEVOS, in her official capacity as
Secretary of Education, and THE
DEPARTMENT OF EDUCATION

                Defendants.

Civil Action No. 1:17-cv-999 (RDM)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.    Statutory And Regulatory Background ...................................................................... 2

        A.    Borrower Defense ............................................................................................ 2

        B.    Financial Responsibility ................................................................................. 3

    II.    The Department's 2016 Rulemaking ....................................................................... 4

        A.    The "Predispute Arbitration and Class Action Waiver Provisions" .......................... 5

        B.    The "Financial Responsibility Provisions" ................................................... 6

        C.    The "Repayment Rate Provisions" ............................................................... 7

        D.    The "Borrower Defense Provisions" ............................................................ 7

    III.    This Case And The Department's New Rulemaking .................................................. 8

LEGAL STANDARDS ......................................................................................................... 9

    I.    Preliminary Injunction ............................................................................................ 9

    II.    Arbitrary And Capricious Review .......................................................................... 10

ARGUMENT ....................................................................................................................... 10

    I.    Plaintiff Has Failed To Demonstrate Irreparable Harm .......................................... 10

        A.    The Asserted Economic Harms Are Not Irreparable .................................. 11

        B.    The Asserted Constitutional Violations Do Not Qualify as Irreparable Harm ........ 14

        C.    The Asserted Reputational Injury Does Not Qualify as Irreparable ....................... 15

    II.    Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Predispute Arbitration And Class Action Waiver Provisions ............................. 15

        A.    Plaintiff Fails to Show That the Predispute Arbitration and Class Action Waiver Provisions Expressly Conflict with the Federal Arbitration Act ............................. 16

        B.    Plaintiff Fails to Show That the HEA Clearly and Unambiguously Forecloses the Predispute Arbitration and Class Action Waiver Provisions .................................. 18

C.      The Predispute Arbitration and Class Action Waiver Provisions Are Not Arbitrary and Capricious.......................................................................................... 20

D.      Plaintiff's Conclusory Due Process Claim Is Unlikely To Succeed........................ 22

III.    Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Financial Responsibility Provisions ...................................................... 23

A.      The HEA Authorizes the Department To Take Into Account Certain "Triggering Events" When Determining Financial Responsibility ............................................. 23

B.      The Financial Responsibility Provisions Are Not Arbitrary and Capricious .......... 26

C.      The Financial Responsibility Provisions Do Not Violate the Constitution ............. 29

IV.     Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Repayment Rate Provisions ................................................................. 30

A.      The Repayment Rate Provisions Are Within the Department's Statutory Authority .................................................................................................................. 30

B.      The Repayment Rate Provisions Are Not Arbitrary and Capricious ....................... 31

C.      The Repayment Rate Provisions Are Constitutional ............................................... 33

V.      Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Borrower Defense Provisions................................................................. 34

A.      The Borrower Defense Provisions Are Consistent With the Department's Authority Under the HEA ........................................................................................ 34

B.      The Borrower Defense Provisions Are Not Arbitrary and Capricious .................... 38

C.      Plaintiff's Constitutional Challenges Are Not Likely to Succeed ........................... 44

CONCLUSION .................................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Air Cargo v. U.S. Postal Serv.*,
   756 F. Supp. 2d 116 (D.D.C. 2010) ................................................................. 9

*Air Transp. Ass'n of Am., Inc. v. Export–Import Bank of the U.S.*,
   840 F. Supp. 2d 327 (D.D.C. 2012) ............................................... 12-13, 14

*Allied-Bruce Terminex Cos. v. Dobson*,
   513 U.S. 265 (1995) ..................................................................................... 16

*Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*,
   303 F. Supp. 3d 11 (D.D.C. 2018) .............................................................. 15

*Am. Health Care Ass'n v. Burwell*,
   217 F. Supp. 3d 921 (N.D. Miss. 2016) ...................................................... 18

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
   281 F. Supp. 3d 88 (D.D.C. 2017) .............................................................. 15

*Arriva Med. LLC v. HHS*,
   239 F. Supp. 3d 266 (D.D.C. 2017) ............................................................ 11

*Ass'n of Accredited Cosmetology Schs. v. Alexander*,
   979 F.2d 859 (D.C. Cir. 1992) ................................................ 22, 29-30, 32

*Ass'n of Private Colls. & Univs. v. Duncan*,
   870 F. Supp. 2d 133 (D.D.C. 2012) ............................................................ 30

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
   110 F. Supp. 3d 176 (D.D.C. 2015) .............................................. 10, 30, 32

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) .................................................................... 40

*Ass'n of Proprietary Colls. v. Duncan*,
   107 F. Supp. 3d 332 (S.D.N.Y. 2015) ........................................................ 22

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ..................................................................................... 16

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*,
   430 U.S. 442 (1977) ..................................................................................... 45

*Bauer v. DeVos*,
   17-cv-1330 (D.D.C.) .................................................................................... 1

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ................................................................. 21

*Chauffeur's Training Sch., Inc. v. Spelling*,
    478 F.3d 117 (2d Cir. 2007) ................................................... 38

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ..................................... 28

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) .................................................. 9

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
    562 U.S. 277 (2011) ................................................................ 19

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ................................................................ 16

*Delta Air Lines, Inc. v. Export-Import Bank of U.S.*,
    85 F. Supp. 3d 436 (D.D.C. 2015) .......................................... 26

*DIRECTV, Inc. v. Imburgia*,
    136 S. Ct. 463 (2015) .............................................................. 18

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998) ................................................................ 23

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ............................................................ 21

*Envtl. Def. Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) .......................................... 10, 11

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*,
    857 F.3d 913 (D.C. Cir. 2017) ................................................ 28

*Estes v. U.S. Dep't of Treasury*,
    219 F. Supp. 3d 17 (D.D.C. 2016) .......................................... 29

*FBME Bank Ltd. v. Mnuchin*,
    249 F. Supp. 3d 215 (D.D.C. 2017) ........................................ 27

*FCC v. Nat'l Citizens Comm. for*,
    Broad., 436 U.S. 775 (1978) .................................................. 10

*Fisheries Survival Fund v. Jewell*,
    236 F. Supp. 3d 332 (D.D.C. 2017) .................................. 10, 11

*Friends of Blackwater v. Salazar*,
    691 F.3d 428 (D.C. Cir. 2012) ........................................................................ 18

*Good Samaritan Hosp. v. Shalala*,
    508 U.S. 402 (1993) ........................................................................................ 38

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) .......................................................................................... 45

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989) .............................................................................. 14

*Human Res. Mgmt., Inc. v. Weaver*,
    442 F. Supp. 241 (D.C. Cir. 1977) .................................................................. 42

*Indus. & Fin. Markets Ass'n v. CFTC*,
    67 F. Supp. 3d 373 (D.D.C. 2014) .................................................................. 42

*Intercity Transp. Co. v. United States*,
    737 F.2d 103 (D.C. Cir. 1984) ........................................................................ 39

*Inv. Co. Inst. v. CFTC*,
    720 F.3d 370 (D.C. Cir. 2013) ........................................................................ 40

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) ............................................................ 12, 13

*John Doe Co. v. CFPB*,
    235 F. Supp. 3d 194 (D.D.C. 2017) ................................................................ 10

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
    137 S. Ct. 1421 (2017) .............................................................................. 16, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... 10

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*,
    773 F. Supp. 2d 151 (D.D.C. 2011) .......................................................... 13, 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ........................................................................................ 17

*Nat'l Min. Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) .................................................................. 14

*Nat'l Wildlife Fed'n v. ICC*,
    850 F.2d 694 (D.C. Cir. 1988) ........................................................................ 23

*Otay Mesa Property, L.P. v. U.S. Dep't of Interior*,
   144 F. Supp. 3d 35 (D.D.C. 2015) ........................................................ 37

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
   467 U.S. 717 (1984) ............................................................................. 23

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ................................................................42-43, 45

*Reynolds v. United States*,
   292 U.S. 443 (1934) ...........................................................................31-32

*Reytblatt v. U.S. Nuclear Regulatory Comm'n*,
   105 F.3d 715 (D.C. Cir. 1997) ............................................................. 41

*Save Jobs USA v. DHS*,
   105 F. Supp. 3d 108 (D.D.C. 2015) ..................................................... 14

*Save the Mattaponi v. U.S. Army Corps of Eng'rs*,
   606 F. Supp. 2d 121 (D.D.C. 2009) ..................................................... 31

*Sea Containers Ltd. v. Stena AB*,
   890 F.2d 1205 (D.C. Cir. 1989) ........................................................... 11

*Shands Jacksonville Med. Ctr. v. Burwell*,
   139 F. Supp. 3d 240 (D.D.C. 2015) ..................................................... 20

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ........................................................... 14

*Southwest Airlines Co. v. TSA*,
   554 F.3d 1065 (D.C. Cir. 2009) ........................................................... 45

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
   687 F.3d 403 (D.C. Cir. 2012) ............................................................. 33

*Student Loan Mktg. Ass'n v. Riley*,
   907 F. Supp. 464 (D.D.C. 1995) .......................................................... 36

*Trudeau v. FTC*,
   384 F. Supp. 2d 281 (D.D.C. 2005) ..................................................... 15

*United States v. Mendoza*,
   464 U.S. 154 (1984) ............................................................................. 18

*Universal Health Servs., Inc. v. United States*,
   136 S. Ct. 1989 (2016) ......................................................................... 42

*UPS v. Postal Regulatory Comm'n*,
  890 F.3d 1053 (D.C. Cir. 2018) ............................................................... 38

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ................................................................. 35

*Wallaesa v. Fed. Aviation Admin.*,
  824 F.3d 1071 (D.C. Cir. 2016) ............................................................... 20

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) .................................................................................. 9, 11

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................ 11, 13

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ................................................................................ 33

## <u>Statutes</u>

5 U.S.C. § 705 ............................................................................................. 1

5 U.S.C. § 706(2)(A) .................................................................................. 10

9 U.S.C. § 2 ............................................................................................... 16

20 U.S.C. § 1070 ......................................................................................... 2

20 U.S.C. § 1087a ........................................................................................ 2

20 U.S.C. § 1087b(b) ................................................................................. 17

20 U.S.C. § 1087d(a) ............................................................................ 18, 19

20 U.S.C. § 1087e(a) .......................................................................... *passim*

20 U.S.C. § 1087ll ....................................................................................... 2

20 U.S.C. § 1089(c)(1) ................................................................................ 9

20 U.S.C. § 1094(c)(1)(B) ........................................................................ 3-4

20 U.S.C. § 1098a ....................................................................................... 5

20 U.S.C. § 1099c .............................................................................. *passim*

20 U.S.C. § 1221e-3 ....................................................................... 2, 30, 31

20 U.S.C. § 3474 ........................................................................... 2, 30, 31

**Rules**

Fed. R. Civ. P. 8(c) ................................................................................................ 35

**Regulations**

34 C.F.R. § 668.171 ........................................................................................... 4, 29

34 C.F.R. § 668.172 ........................................................................................... 4, 25

34 C.F.R. § 668.174 ................................................................................................ 28

34 C.F.R. § 668.413(b)(3) ...................................................................................... 33

34 C.F.R. § 685.206(c) ........................................................................................ 3, 37

**Adminstrative and Executive Materials**

Federal Direct Student Loan Program, 59 Fed. Reg. 42,646 (Aug. 18, 1994) ............................ 36

Office of Postsecondary Education,
    60 Fed. Reg. 37,768 (July 21, 1995) ............................................................. 36, 37

Arbitration Agreements,
    81 Fed. Reg. 32,830 (May 24, 2016) ……………………………………………………20, 21

Student Assistance General Provisions, Federal Loan and Grant Programs,
    81 Fed. Reg. 39,330 (June 16, 2016) ............................................................................. 5

Student Assistance General Provisions, Federal Loan and Grant Programs,
    81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................................ *passim*

Student Assistance General Provisions,
    82 Fed. Reg. 6253 (Jan. 19, 2017) ........................................................................... 44

Student Assistance General Provisions, Federal Loan and Grant Programs,
    82 Fed. Reg. 27,621 (June 16, 2017) ................................................................ *passim*

Student Assistance General Provisions, Federal Loan and Grant Programs,
    83 Fed. Reg. 37,242 (July 31, 2018) ................................................................ *passim*

Program Integrity: Gainful Employment,
    83 Fed. Reg. 40,167 (Aug. 14, 2018) ……………………………………………………31-3

## INTRODUCTION

In 2016, the U.S. Department of Education ("Department") promulgated a series of regulations establishing new rules for evaluating certain loan discharge claims and new conditions for educational institutions participating in a federal student loan program. *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule" or "2016 Rule") (attached as Ex. A, Administrative Record ("AR-A") at 1-164).[1]  The Final Rule is often referred to as the "Borrower Defense Rule" because it addresses the circumstances under which student borrowers can seek relief from federal student loan obligations based on misconduct by an educational institution, *i.e.*, assert a "defense to repayment" claim.

The Department now believes that many of the policies reflected in the Final Rule are misguided and should be changed.  Although the Final Rule was scheduled to take effect on July 1, 2017, the Department has taken various actions to delay that effective date.  These include (1) a final rule delaying the effective date of certain provisions of the 2016 Rule until July 1, 2019, to allow the Department time to conduct rulemaking proceedings to develop new borrower defense regulations; and (2) a notice pursuant to 5 U.S.C. § 705, which postponed the effective date of the same provisions pending the Court's review in this case, *see* 82 Fed. Reg. 27,621 (June 16, 2017) ("705 Notice").  In addition, on July 31, 2018, the Department published a notice of proposed rulemaking ("2018 NPRM") to rescind the 2016 Rule.  *See* 83 Fed. Reg. 37,242-370.  This Court has invalidated the Department's delay notices, but has stayed the vacatur of the 705 Notice until October 12, 2018, to allow the Department an opportunity to issue a new 705 Notice that complies with the Court's ruling.  *See Bauer v. DeVos*, 17-cv-1330 (D.D.C.), ECF No. 91.

---

[1] Both the Final Rule and its related Notice of Proposed Rulemaking ("NPRM") are a part of the administrative record.  *See* ECF No. 54.  Defendants attach these documents, respectively, as Exhibits A and B and cite them according to their Bates numbering in the administrative record.

Although the Department will not publish by November 1, 2018 a final rule rescinding the 2016 Rule, the Department remains committed to rescinding the 2016 Rule, for all of the reasons set forth in the 2018 NPRM.[2]  That the Department believes the 2016 Rule should not take effect for these reasons, however, does not mean that Plaintiff has satisfied the stringent requirements for a preliminary injunction.  Plaintiff, the California Association of Private Postsecondary Schools ("CAPPS"), has failed to establish a likelihood of success on the merits of its claims or that its members would suffer "irreparable" harm if the 2016 Rule were to go into effect.  Accordingly, Plaintiff's motion for a preliminary injunction should be denied.

## BACKGROUND

## I.     Statutory And Regulatory Background

Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, the Department can enter into a Program Participation Agreement ("PPA") with a post-secondary school that allows students at that school to receive federal grants and loans to pay for the cost of attendance at the school.  The William D. Ford Federal Direct Loan Program ("Direct Loan Program"), the largest student loan program authorized under Title IV, *see id*. § 1087a *et seq*., allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition as well as certain living expenses.  *Id*. § 1087ll.  Congress has granted the Department broad authority to promulgate regulations to implement and administer the HEA and the Direct Loan Program.  *See id*. §§ 1221e-3, 3474.

### A.     Borrower Defense

---

[2] The Department has determined that the public interest would be served by delaying the effective date of the 2016 Rule.  *See* 705 Notice, 82 Fed. Reg. at 27,621-622.  The Department concluded that there are "serious questions concerning the validity of certain provisions of the" 2016 Rule, and that "substantial injuries . . . could result if [those provisions] go into effect" before the legal questions are resolved.  *Id.* at 27,621.

One such source of authority is Section 455(h) of the HEA, 20 U.S.C. § 1087e(h), which authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment" of a Direct Loan.  Pursuant to this authority, the Department codified regulations in 1994 (the "1994 regulations"), permitting a borrower, "[i]n any proceeding to collect on a Direct Loan," to "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."   34 C.F.R. § 685.206(c)(1).   Such "proceedings" include, but are not limited to, administrative proceedings by the Department to collect on defaulted loans, including by tax refund offset, wage garnishment, and salary offset for federal employees.  *Id*. § 685.206(c)(1)(i)-(iv).

If a borrower is successful in asserting a defense against repayment, "the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay . . . [and] affords the borrower such further relief as the Secretary determines is appropriate under the circumstances."  *Id*. § 685.206(c)(2).  In addition, to protect taxpayers, the Secretary "may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies."  *Id*. § 685.206(c)(3).

**B.     Financial Responsibility**

Congress also requires that the Secretary determine the "administrative capability and financial responsibility," 20 U.S.C. § 1099c(a), of an institution of higher education that seeks to qualify to participate in the Title IV federal loan programs.  *See also* 20 U.S.C. § 1094(c)(1)(B) (directing the Secretary to prescribe regulations as necessary to establish "reasonable standards of

financial responsibility and appropriate institutional capability for the administration by an eligible institution of a program of student financial aid under [Title IV]"). The Secretary is to make this determination with reference to whether an institution is able to (1) provide the services described in its official publications and statements; (2) provide necessary administrative resources; and (3) meet all of its financial obligations. 20 U.S.C. § 1099c(c)(1). In addition to these general benchmarks, the HEA provides for the Secretary to prescribe "ratios that demonstrate financial responsibility." *Id*. § 1099c(c)(2). In establishing criteria for these ratios, the Secretary must "take into account an institution's total financial circumstances." *Id*. Pursuant to this authority, the Secretary has promulgated "financial ratios" regulations, which assign an institution a "composite score" based on a calculation of various indicators of an institution's financial viability. *See* 34 C.F.R. § 668.172. Under this "composite score methodology," an institution that achieves a score of 1.5 or greater may continue to participate in the Title IV programs without providing financial protection to the Department, while an institution with a score of less than 1.0 is deemed not financially responsible and thus prohibited from participation unless it provides financial protection. Final Rule, AR-A at 57-58.

If an institution fails to meet the Secretary's financial responsibility criteria, it must, to continue to participate in Title IV, provide a letter of credit (*i.e.*, a third-party financial guarantee to the Secretary), a letter demonstrating that it is a public institution and has a State guarantee or its equivalent, satisfactory evidence of its financial responsibility through audited financial statements demonstrating that the institution "has sufficient resources to ensure against the precipitous closure of the institution," or meet other criteria for financial strength established by regulation. 20 U.S.C. § 1099c(c)(3); *see also* 34 C.F.R. § 668.171.

## II.   **The Department's 2016 Rulemaking**

In 2015, in response to the failure of Corinthian Colleges, Inc. ("Corinthian"), the Department received a "flood of borrower defense claims submitted by Corinthian students." Student Assistance General Provisions, Federal Loan and Grant Programs, 81 Fed. Reg. 39,330 (June 16, 2016) ("NPRM") (attached as Ex. B, AR-B at 1-94).   In response, the Secretary announced that the Department would develop new borrower defense regulations.  *See* AR-B at 3. After failing to reach consensus through a negotiated rulemaking process, *see* 20 U.S.C. § 1098a, the Department published the NPRM.   The Department received comments from over 50,000 parties and, after reviewing those comments and making appropriate changes, the Department published the Final Rule on November 1, 2016.  Plaintiff challenges four provisions of the Final Rule, namely those addressing: (1) predispute arbitration and class action waivers; (2) financial responsibility; (3) repayment rate warnings; and (4) borrower defense.  *See, e.g.*, Complaint & Prayer for Declaratory & Injunctive Relief ("Compl.") ¶¶ 8-11, ECF No. 1.

### A.      The "Predispute Arbitration and Class Action Waiver Provisions"

The Final Rule added "provisions to schools' [Direct Loan PPAs] that, for claims that may form the basis for borrower defenses, . . . [p]rohibit the use of predispute arbitration agreements by schools[,]. . . [p]rohibit the use of class action lawsuit waivers[,] . . . [and] [t]o the extent schools and borrowers engage in arbitration in a manner consistent with applicable law and regulation, require schools to disclose to and notify the Secretary of arbitration filings and awards." AR-A at 2.  The Department's rationale for including these provisions was discussed at length in the Final Rule, *see* AR-A at 97-99, and in the NPRM, *see* AR-B at 55-58.  Addressing comments that the Department lacked the legal authority to "ban" these types of agreements, the Department posited that the HEA authorizes it to "impose conditions on schools that wish to participate in a Federal benefit program."  Final Rule, AR-A at 97.

### B.      The "Financial Responsibility Provisions"

The Department's experience with Corinthian played a central role in its decision to revise its financial responsibility regulations.   Because Corinthian collapsed in a manner that left the Department "with no financial protection for either closed school or borrower defense claims," the Department decided to "develop more effective ways to identify events or conditions that signal impending financial problems and secure financial protection while the institution has resources sufficient to provide that protection."  NPRM, AR-B at 33.

The Final Rule reorients the Secretary's financial responsibility inquiry away from a static focus on an institution's financial statements from the previous year and towards the institution's ongoing ability to meet its financial obligations in light of present circumstances.   Under the pre-2016 Rule framework, the Department, in general, "determines annually whether an institution is financially responsible based on its audited financial statements."  Final Rule, AR-A at 130.  Under the Final Rule, on the other hand, the Department is to determine "at the time a material action or event occurs that the institution is not financially responsible."  *Id.*  Thus, it introduces certain "triggers," *i.e.*, events or actions that "pose a potential material adverse risk to the financial viability of [a] school" in the short term.  *Id.* at 58.  The Department reasoned that "[if] an institution is subject to material actions or events that are likely to have an adverse impact on the financial condition or operations of an institution, we believe that the Federal government and taxpayers should be protected from any resulting losses incurred by requiring a letter or credit, regardless of the institution's sector."  *Id.* at 9.

The occurrence of some of these triggers (namely an institution's failure to derive at least 10 percent of its revenue from non-Title IV funds, a default rate of 30 percent or greater for an institution's two most recently calculated official cohort default rates, and the occurrence of certain

publicly traded stock events) automatically would render an institution not financially responsible. *See* Final Rule, AR-A at 149. But the majority of the triggers (including those that Plaintiff focuses on, such as the pendency of certain lawsuits) are measured "not in isolation," but with reference to an institution's "overall financial strength," as assessed "under the financial ratio analysis." *Id.* at 56. Only when an institution is subject to one or more of these triggering events after the end of the fiscal year used to most recently calculate the institution's composite score *and*, as result of the triggering event, the recalculated composite score is less than 1.0, is the institution deemed not financially responsible. *Id.* at 148.

### C.    The "Repayment Rate Provisions"

The Final Rule's repayment rate provisions require proprietary institutions that participate in the Title IV student loan programs, which meet certain criteria, to include a warning to prospective or current students in their promotional materials about the fact that the institution has poor student loan repayment rates. A proprietary institution must issue this warning if its repayment rate, which is calculated by a formula designated in the Final Rule, "shows that the median borrower has not either fully repaid all [Federal Family Education Loans] FFEL or Direct Loans received for enrollment in the institution or made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution." Final Rule, AR-A at 145-46. Although the Department has not yet promulgated regulations for the form, place, and manner prescribed for the warning, the text of the warning would read: "U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans." *Id.* at 146.

### D.    The "Borrower Defense Provisions"

The Final Rule "specif[ied] the conditions and processes under which a borrower may assert a defense to repayment of a Direct Loan," *i.e.*, a "borrower defense."   AR-A at 1.   In particular, it established a "new Federal standard" to govern borrower defense claims.   Instead of basing the defense on conduct that would give rise to a cause of action under applicable state law, as under the 1994 regulations, the new Rule allowed a borrower to assert a defense on the basis of a school's substantial misrepresentation, breach of contract, or the existence of a favorable, nondefault contested judgment against the school.   *Id.*   The Department noted that the state law standard had become unworkable given the increasing role of "distance education in the higher education sector," NPRM, AR-B at 7, and the administrative burden to and difficulties experienced by the Department in interpreting and applying 50 states' laws, Final Rule, AR-A at 14.

Further, the Final Rule established a process for individual borrowers to affirmatively assert defenses to repayment by submitting applications to the Department, AR-A at 158-59, as well as a process for the assertion and resolution of borrower defense claims on a group basis, *see* NPRM, AR-B at 19.

## III.   **This Case And The Department's New Rulemaking**

Plaintiff initiated this lawsuit on May 24, 2017.   A few weeks later, Plaintiff filed a motion seeking to preliminarily enjoin only the predispute arbitration and class action waiver provisions, which were originally scheduled to take effect, along with the rest of the 2016 Rule, on July 1, 2017.   *See* ECF No. 6.   The Department issued its 705 Notice shortly thereafter, based on the Department's determination that CAPPS' suit raised "serious questions concerning the validity" of certain provisions of the 2016 Rule and that "substantial injuries" could result if the Rule were to take effect before this Court resolved those questions.   *See* 705 Notice, 82 Fed. Reg. at 27,621.

8

The Department conducted a new round of negotiated rulemaking on borrower defense issues in 2017-2018 and published an NPRM on July 31, 2018.  *See* 2018 NPRM, 83 Fed. Reg. 37,242.  There, the Department proposed to rescind the 2016 Rule that it had delayed.  Given the volume of comments received, uncertainty as to the future of the 2016 Rule as a result of litigation, and the complexity of the issues, the Department has determined that it will not publish a final rule by November 1, 2018, which it would have to do for the rule to become effective next July, *see* 20 U.S.C. § 1089(c)(1), but the Department continues to work on the rule and is committed to promulgating new regulations on the issues addressed in the NPRM.

The Court has now invalidated the Department's actions delaying the 2016 Rule, ordered the Rule to take effect on October 12, 2018, and set a briefing schedule for Plaintiff's renewed preliminary injunction motion.  While Plaintiff does not specify with precision the regulatory provisions it seeks to preliminarily enjoin, its motion asserts challenges to aspects of the four major provisions discussed above, *see* Pl.'s Mem. in Supp. of Renewed Mot. for Prelim. Inj. ("PI Mem.") at 5-9, ECF No. 65 and its arguments are addressed in turn below.

## LEGAL STANDARDS

### I.  <u>Preliminary Injunction</u>

"Preliminary injunctive relief is an 'extraordinary remedy never awarded as of right.'"  *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 121 (D.D.C. 2010) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)).  The party seeking relief must, "by a clear showing, carr[y] the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  A court should grant a preliminary injunction "only when the moving party shows '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest

would be furthered by the injunction.'" *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 201 (D.D.C. 2017) (citation omitted).  A plaintiff's failure to demonstrate irreparable harm in the absence of preliminary injunctive relief suffices to deny the request.  *See Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (if party makes "no showing of irreparable injury," court may deny a motion for preliminary injunction "without considering the other factors").

## II.    Arbitrary And Capricious Review

Plaintiff argues that each of the regulatory provisions it challenges result from arbitrary and capricious decision making.  Plaintiff "'carries a heavy burden indeed' regarding th[ese] claim[s]." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 190 (D.D.C. 2015) (citation omitted).  Under the Administrative Procedure Act ("APA"), an agency decision is set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency action "may be invalidated ... if [it is] not rational and based on consideration of the relevant factors."  *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978).  "[T]he scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "Arbitrary and capricious" review is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

## ARGUMENT

## I.    Plaintiff Has Failed To Demonstrate Irreparable Harm

In its 705 Notice, the Department explained that the 2016 Rule would cause "substantial injuries" to CAPPS if it were to "go into effect." 82 Fed. Reg. at 27,621.  For example, institutions would be required "to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests."  *Id*.  In addition, "institutions would

be subject to financial responsibility trigger provisions that could impose substantial costs." *Id.* However, even if the standard for an agency's delay of a final rule under Section 705 of the APA could be met under these circumstances, Plaintiff has not demonstrated the sort of "irreparable" harm that is necessary to justify the extraordinary remedy of a preliminary injunction.

A party seeking preliminary emergency relief has the "burden of showing sufficient irreparable harm to command a preliminary injunction from the district court." *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989). To make this showing, "a plaintiff must, at minimum, 'demonstrate that irreparable injury *is likely* in the absence of an injunction,' not just that injury is a 'possibility.'" *Arriva Med. LLC v. HHS*, 239 F. Supp. 3d 266, 277 (D.D.C. 2017) (quoting *Winter*, 555 U.S. at 21). Moreover, "[t]he standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund*, 236 F. Supp. 3d at 336. A plaintiff in this Court bears the "'considerable burden' of proving" that its asserted injuries are "'certain, great and actual – not theoretical – and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Id.* (citation omitted). The required proof includes "'some evidence'" that substantiates the claim that "'the harm is certain to occur in the near future.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). In addition, the alleged "certain and immediate harm" must also be "truly irreparable in the sense that it is beyond remediation." *Id.* (citation omitted).

## A.   The Asserted Economic Harms Are Not Irreparable

Most of Plaintiff's asserted harms are economic in nature and therefore fail to qualify as "irreparable." Plaintiff challenges funding conditions associated with the Title IV student financial aid programs in which Plaintiff's member schools voluntarily participate. The harm Plaintiff identifies is primarily the cost of complying with the requirements of the Final Rule. *See, e.g.*, PI

Mem. at 21-22 (possible costs of complying with predispute arbitration and class action waiver provisions), *id*. 29-30 (costs associated with compliance with financial responsibility provisions), *id*. at 37 ("financial harm" due to cost of complying with repayment rate provisions), *id*. at 43-44 (schools will have to "expend substantial transition costs to comply with these new [borrower defense provisions]").[3]  While the Department agrees that this includes "substantial injuries" that justified delaying the effective date of these provisions, *see* 705 Notice, 82 Fed. Reg. at 27,621, the injuries are at bottom economic, and "the law of this Circuit is clear that economic loss, in and of itself, does not constitute irreparable harm." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 80 (D.D.C. 2013).

Plaintiff engages in various attempts to avoid this rule, all of which fail.  First, Plaintiff suggests that the predispute arbitration and class action waiver provisions may implicate past, present, and future contractual or litigation interests.  *See* PI Mem. at 21-22.  The Department recognizes that, under the Final Rule, Plaintiff's member institutions will be required "to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests."  705 Notice, 82 Fed. Reg. at 27,621.  However, Plaintiff fails to identify any such interests with specificity (such as, for example, by identifying specific arbitration disputes and how they would actually be impacted), instead simply asserting fear of "chaos" and "disarray."  *See* PI Mem. at 21-22.  Moreover, the asserted contractual and litigation interests are themselves economic.  *E.g*., *Air Transp. Ass'n of Am., Inc. v. Export–Import Bank of the U.S.,* 840 F. Supp. 2d 327, 335 (D.D.C. 2012) ("loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms.").  Plaintiff's citation of cases in other

---

[3] As noted above, Plaintiff's original preliminary injunction motion only sought to enjoin the predispute arbitration and class action waiver provisions, undermining its arguments that any of the other provisions will cause it irreparable harm.

jurisdictions does nothing to change the fact that in this Circuit, economic harm alone is not irreparable. *See Jack's Canoes & Kayaks, LLC*, 933 F. Supp. 2d at 80.[4]

Second, Plaintiff attempts to invoke cases suggesting that economic harm may be irreparable where "the loss threatens the very existence of the movant's business." *E.g.*, PI Mem. at 22 (quoting *Wisc. Gas Co.*, 758 F.2d at 674). However, in order for such harm to qualify as irreparable, a moving party must show that the asserted economic loss is "certain and imminent." *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 179-180 (D.D.C. 2011). Here, Plaintiff has provided no evidence that any of its member schools face the certain and imminent prospect of shutting down in the absence of an injunction.[5]

Plaintiff first refers to such cases in connection with the notion that an alternative to complying with the Final Rule – foregoing Title IV funding – would cause schools to go bankrupt and close. *E.g.*, PI Mem. at 22. But Plaintiff identifies no member school that actually plans to pursue this option. Plaintiff also suggests that the financial responsibility provisions could in some instances force schools to close. *Id.* at 29. However, even by Plaintiff's own description, there is no indication that such closures would be certain and imminent in the absence of a preliminary injunction. *See id.* For example, Plaintiff acknowledges that, even where a letter of credit is issued, it begins at 10 percent of the school's Title IV receipts and rises to 50 percent only after

---

[4] Plaintiff points to the potentially temporary nature of the Final Rule as an additional basis for concluding that schools would suffer irreparable injury in the absence of a preliminary injunction. *See* PI Mem. at 22. Again, however, these potential injuries – primarily, the need to take steps to cease complying with the Final Rule if it were no longer in effect – are economic and thus do not qualify as irreparable harm.

[5] Plaintiff's assertion that the financial responsibility provisions "might" cause schools to lose "indispensable" approvals of state licensing agencies, PI Mem. at 30, also describes essentially economic harm, but Plaintiff does not assert that any member school is likely to lose such approvals in the imminent future. To assert that a lower composite score "could affect the eligibility of an institution" to participate in a state grant program, *id.*, is not to assert an imminent threat to any school's business.

three years. *Id.* But Plaintiff identifies no school that would be unable to provide a letter of credit at the 10 percent level. Plaintiff also relies on the impact of "pending" lawsuits, which "might" result in substantial expenses, *id.*, but identifies no such lawsuit that has actually been filed. Plaintiff cannot rely on such possibilities to establish certain, imminent irreparable harm.

Third, Plaintiff suggests that schools cannot recover financial losses from the Department due to sovereign immunity. *E.g.*, PI Mem. at 23. However, "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015) (quoting *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52–53 (D.D.C. 2011)). Plaintiff's suggestion on this point is "not the law of this Circuit" and would "effectively eliminate the irreparable harm requirement" in cases involving the government. *Air Transp. Ass'n*, 840 F. Supp. 2d at 335. Instead, a movant still faces a "considerable burden of proving that those losses are *certain, great and actual*." *Save Jobs USA*, 105 F. Supp. 3d at 114. Plaintiff has failed to make these required showings.

**B.      The Asserted Constitutional Violations Do Not Qualify as Irreparable Harm**

Plaintiff also argues that it has demonstrated irreparable harm because its claims include alleged constitutional violations. PI Mem. at 23 (predispute arbitration and class action waiver provisions); *id.* at 30 (financial responsibility provision); *id.* at 36-37 (repayment rate provisions); *id.* at 43 (borrower defense provisions). But courts have repeatedly rejected the notion that the mere assertion of a constitutional violation is sufficient to establish the irreparable harm necessary for a preliminary injunction. *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (collecting cases for this proposition); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."). In this Circuit, courts have generally recognized that such

an irreparable harm argument "rises and falls" with the movant's merits arguments. *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,* 281 F. Supp. 3d 88, 116 (D.D.C. 2017); *see also Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 27-28 (D.D.C. 2018).   As discussed below, Plaintiff's constitutional claims are without merit, so its assertions of irreparable harm based on those claims must also be rejected.

## C.    The Asserted Reputational Injury Does Not Qualify as Irreparable

Plaintiff also asserts that the repayment rate provisions may cause its member schools to suffer a reputational injury because they could be required to issue warnings that they are "financially unstable and ill-equipped to prepare their students to succeed financially upon graduation."  PI Mem. at 36.  However, the Final Rule requires such warnings only when a school's repayment rate has been calculated as falling below a certain level.  *See* Final Rule, AR-A at 145-46.  No calculations have yet taken place.  In addition, as indicated above, the Department has not yet published any notice that specifies the form, place, and manner that would be required for such warnings.  At this stage, the prospect of any of Plaintiff's member schools facing a requirement to issue such warnings is too remote to qualify as irreparable harm. *See Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) (explaining that reputational injury must be "concrete and corroborated, not merely speculative").

## II.    Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Predispute Arbitration And Class Action Waiver Provisions

In its 705 Notice, the Department acknowledged that Plaintiff "ha[s] raised serious questions concerning the validity" of the predispute arbitration and class action waiver provisions. 82 Fed. Reg. at 27,621.  And in its 2018 NPRM proposing to rescind this provision, the Department described its "reweighing of the issue" and noted that "subsequent legal developments have led us to believe that the Department should take a position more in line with the strong Federal policy

favoring arbitration."  83 Fed. Reg. at 37,265.  The Department has proposed a "change in its position to align with the strong Federal policy in favor of arbitration."  *Id*.  Even so, Plaintiff fails to demonstrate that the 2016 Rule conflicts with the Federal Arbitration Act ("FAA"), that the HEA clearly and unambiguously forecloses this provision, that the Department acted arbitrarily and capriciously in adopting it, or that it conflicts with the Constitution.

### A.    Plaintiff Fails to Show That the Predispute Arbitration and Class Action Waiver Provisions Expressly Conflict with the Federal Arbitration Act

By its terms, the FAA makes "valid, irrevocable, and enforceable" a "written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2.  "The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that [courts] rigorously enforce agreements to arbitrate."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Passed to "overcome judicial hostility to arbitration agreements," *Allied-Bruce Terminex Cos. v. Dobson*, 513 U.S. 265, 272 (1995), the FAA requires that courts "place arbitration agreements on an equal footing with other contracts and enforce them according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  The FAA prohibits any "rule that discriminates on its face against arbitration or that covertly accomplishes the same objective by disfavoring contracts that have the defining features of arbitration agreements."  *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1423 (2017).

In the 2016 Rule, the Department, in exercising its statutory authority to establish conditions for the Direct Loan Program, recognized that it "does not have the authority . . .to displace or diminish the effect of the FAA."  AR-A at 98.  Nevertheless, the Department required that a school seeking to remain eligible to participate in the Direct Loan program "cannot enter into a predispute arbitration agreement regarding borrower defense-type claims with a student who

benefits from aid under that program." *Id*. The Department explained that the HEA authorizes it to "impose conditions on schools that wish to participate in a Federal benefit program." *Id*. at 97. For the reasons explained in the Department's 2018 NPRM, the Department no longer supports this condition in light of the benefits of arbitration for both educational institutions and borrowers, and the recent legal developments emphasizing the strong federal policy favoring arbitration. *See* 83 Fed. Reg. at 37,265. But Plaintiff has not, at this point, met its burden to establish a likelihood of success on its challenge to this funding condition.

Plaintiff first argues that the Department cannot condition the receipt of Title IV funds on an institution's agreement not to employ predispute arbitration agreements because the threatened loss of Title IV funds for some schools represents unlawful compulsion. PI Mem. at 14. But Plaintiff cites no support for the notion that regulatory coercion (if that concept applies to a spending clause program in which no institution "shall have a right to participate," 20 U.S.C. § 1087b(b)) against *private* institutions is impermissible. Plaintiff cites *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) ("*NFIB*"), PI Mem. at 14, but that case involved a claim that a federal spending clause program was an unconstitutional coercion of *states*. Allegations of compulsion are relevant there because "when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *NFIB*, 567 U.S. at 577-78 (citation omitted); *see also id.* at 578 ("Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system."). No such federalism concerns are present when the alleged "compulsion" runs to private institutions.

Plaintiff also argues that the Supreme Court "has frequently vacated rules that have a disproportionate impact on arbitration clauses even when they do not impose a flat ban." PI Mem. at 14. But nothing in the case that Plaintiff cites for this argument, *DIRECTV, Inc. v. Imburgia*,

136 S. Ct. 463 (2015), stands for the proposition that the FAA limits a federal agency's authority to impose conditions on the receipt of federal funds. Accordingly, Plaintiff has not established a likelihood of success on the merits of its claim that the FAA prevents the Department from conditioning federal funding on higher education institutions not creating or exercising predispute arbitration agreements pertaining to borrower defense claims.[6]

### B.   Plaintiff Fails to Show That the HEA Clearly and Unambiguously Forecloses the Predispute Arbitration and Class Action Waiver Provisions

20 U.S.C. § 1087d(a) grants the Department discretion to regulate the terms of its agreements with higher education institutions, including the authority to include in such agreements provisions that "the Secretary determines are necessary to protect the interests of the United States and to promote the purposes" of the Direct Loan Program. *See id*. § 1087d(a)(6). Nothing in the text of this statute "unambiguously forecloses the agency's interpretation," *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (citation omitted), as authorizing, in PPAs, terms that prevent institutions of higher education from employing predispute arbitration and class action waiver provisions. *See* Final Rule, AR-A at 97.

Plaintiff contends that 20 U.S.C. § 1087d(a)(6) cannot be read to provide an agency authority to "abrogate" arbitration provisions. PI Mem. at 15. This is largely duplicative, however, of its incorrect argument that the funding conditions imposed by the Final Rule contravene the FAA. *See supra* Sec. II.A. Plaintiff also argues that Section 1087d(a)(6) is a catch-all provision

---

[6] Plaintiff cites *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016), which granted a preliminary injunction against an agency rule barring federal funding for nursing homes that entered into certain arbitration agreements. That decision rested primarily on the state of the administrative record, did not take a definitive position on the scope of the FAA, and does not address the arguments the Department has raised here. *See id.* at 932-33. And the fact that the government chose not to pursue an appeal should not be taken as a concession on the merits of the underlying decision. *See United States v. Mendoza*, 464 U.S. 154, 161 (1984).

at the end of a "series of ministerial requirements for loan administration under program participation agreements," and as such any provision promulgated under its authority should be similarly limited.  PI Mem. at 16.  But the agreement provisions that appear in subsections (1)-(5) are not as limited as Plaintiff suggests.  They provide for the establishment and maintenance of the Direct Loan Program, which accounts for hundreds of billions of dollars in outstanding Direct Loans, and contemplate extensive participation by the Secretary in determining relevant program standards.

More importantly, subsection (6) of Section 1087d(a) differs in kind from subsections (1)-(5).  Where the latter provisions set forth a concrete list of provisions that Congress has determined that a PPA "shall" include, subsection (6) provides a grant of future authority for the Secretary to, in the exercise of discretion, include further provisions as necessary to protect the interests of the United States and promote the purposes of the Direct Loan Program.  The canon of *ejusdem generis*, on which Plaintiff relies, is "typically" used to "ensure that a general word will not render specific words meaningless."  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011).  Here, on the other hand, the "list" at issue includes a series of mandatory contractual provisions that operate in the present followed by an express grant of broad discretion to the Secretary to include new provisions in the future.  The latter term, designed to create flexibility to build upon the former terms, does not render the former terms meaningless: "[a] canon meaning literally 'of the same kind' has no application to provisions directed toward dissimilar subject matter."  *Id.*  *Ejusdem generis*, which "merely 'aids in the process of statutory construction, nothing more, nothing less,'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 253 (D.D.C. 2015) (citation omitted), "does not control when the whole context dictates a different conclusion." *Wallaesa v. Fed. Aviation Admin.*, 824 F.3d 1071, 1081 (D.C. Cir. 2016) (citation omitted).

**C.     The Predispute Arbitration and Class Action Waiver Provisions Are Not Arbitrary and Capricious**

Plaintiff first argues that the Department "failed to adequately consider extensive data in the record demonstrating the benefits of arbitration." PI Mem. at 17.  But the Department did not "deny the merits of arbitration," nor did it ban arbitration in the 2016 Rule.  Final Rule, AR-A at 100; *see also id*. at 104 ("The regulations do not bar the use of arbitration and therefore do not deny students the benefits that the commenters ascribe to arbitration.").  Indeed, the Final Rule contemplated that some disputes would be referred to arbitration, and adopted measures to ensure that the Department is kept apprised of borrower defense claims presented in those proceedings. That decision was amply supported by record evidence.  *See id*. at 97; NPRM, AR-B at 54-56; *see also* 81 Fed. Reg. 32,830, 32,859 (May 24, 2016) ("CFPB Rule").  Although the Department's current view, as reflected in the 2018 NPRM, weighs the benefits of arbitration differently, *see* 83 Fed. Reg. at 37,265, Plaintiff does not establish a likelihood of success on its APA claim.

Plaintiff next argues that the Final Rule "failed to adequately consider the serious drawbacks of class actions for students." PI Mem. at 18.  Again, the Department currently takes a different position than it did in 2016 with respect to the drawbacks of class actions, but that does not mean that Plaintiff has shown a likelihood of success on the merits.  The Final Rule does not *require* class action proceedings, and if individuals determine that a class action suit is not appropriate to resolve their claims, they are free to proceed individually.   The Final Rule acknowledged that class actions are not "a panacea," but discussed examples in which they provided meaningful relief for student loan borrowers and concludes that they also have important deterrence and publicity benefits.  AR-A at 101.  This explanation comports with the APA's requirement that an agency supply "a reasoned basis" for its action.  *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

Separately, Plaintiff faults the Final Rule for relying on a Consumer Financial Protection Bureau ("CFPB") arbitration study in support of its conclusions regarding predispute arbitration agreements and class action waivers in the Direct Loan Program.  PI Mem. at 19-20.  That study examined predispute arbitration agreements and class action waivers with respect to six categories of financial products, including private student loans.  *See* CFPB Rule, 81 Fed. Reg. at 32,840. Plaintiff recites a number of features that differ between private student loans and federal Direct Loans, including the availability of fixed interest rates, income-based repayment plans, and forbearance for federal loans.  PI Mem. at 19.  None of those features support Plaintiff's sweeping claim that private student loans are "an entirely separate legal and factual setting" from federal Direct Loans.  *Id.*  Both types of loans are offered and provided to post-secondary students, and private loan borrowers "can be expected often to share characteristics with Direct Loan borrowers."  *See* Final Rule, AR-A at 100.

Finally, citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), Plaintiff argues that the Final Rule did not consider institutions' reliance interests on their arbitration agreements. PI Mem. at 20.  The Department recognizes that, as explained in *Encino Motorcars*, an agency, in explaining its "changed position," "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  136 S. Ct. at 2126.  But the Department had not previously taken a position on its legal authority to include conditions governing the use of predispute arbitration agreements in PPAs.  And in any event, the Final Rule explained that "[t]he regulations do not make an institution prospectively ineligible because it has already entered into contracts with arbitration provisions," and "impose no fine or liability on a school that has already obtained such agreements.  The regulations address only future conduct by the institution, and only as that conduct is related to the institution's participation in the Federal

21

Direct Loan Program." Final Rule, AR-A at 99. The Department considered institutions' reliance interests in at least some aspects of the Final Rule.

### D.     Plaintiff's Conclusory Due Process Claim Is Unlikely To Succeed

Plaintiff's constitutional claim asserts only that, to the extent that the predispute arbitration and class action waiver provisions are "applied to existing contracts between students and former students and institutions," they violate the Due Process Clause. PI Mem. at 20. But D.C. Circuit precedent forecloses any due process claim arising out of participation in the Title IV funding programs: A higher education institution's PPA with the Department "confers upon [it] no legally protectible interest in, or reasonable expectation of, continued eligibility in" Title IV programs. *Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 867 (D.C. Cir. 1992); *accord Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 349, 350 (S.D.N.Y. 2015) (rejecting procedural due process claim because institutions are not "direct beneficiaries of the funding programs administered under the HEA," and the HEA "does not create entitlements that receive constitutional protection" (citations omitted)).

In any event, Plaintiff's argument that the provisions violate due process simply because they apply to existing contracts is not supported by case law. Indeed, the cases on which Plaintiff relies reiterate the fundamental notion that "[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984); *see also E. Enters. v. Apfel*, 524 U.S. 498, 549 (1998) (Kennedy, J. concurring) (agreeing with plurality's finding of a due process violation only where the legislative remedy at issue "b[ore] no legitimate relation to the interest which the Government

22

assert[ed] in support of the statute"). Here, as discussed above, the agency has supplied a rational

basis in support of this condition, and its decision was not arbitrary. *See* Final Rule, AR-A at 97-

98. Plaintiff "has not even attempted" to demonstrate that the Final Rule is unconstitutionally

irrational. *See Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 702 n.12 (D.C. Cir. 1988). Accordingly,

it has not demonstrated a likelihood of success on the merits of this claim.

**III.    Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge
To The Financial Responsibility Provisions**

**A.    The HEA Authorizes the Department To Take Into Account Certain
"Triggering Events" When Determining Financial Responsibility**

In discussing the Final Rule's financial responsibility provisions, the Department noted the

statute's overarching directive to the Secretary to determine whether an institution has the requisite

level of financial responsibility to participate in the Title IV programs, providing for the Secretary

to take into account whether the institution is able "to meet all of its financial obligations, including

(but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities

and debts incurred in programs administered by the Secretary." Final Rule, AR-A at 55 (quoting

20 U.S.C. § 1099c(c)(1)). As the Department noted, this language uses the "present tense" in

directing the Secretary to assess the ability of an institution "to meet current obligations." *Id*. The

Department thus reasonably interpreted the statute to allow it to promulgate regulations that

"address[] the significance of new events that occur after the close of an audited period" to assess

whether a school remains able "to meet all its financial obligations." *Id*. at 58 (quoting 20 U.S.C.

§ 1099c). Plaintiff's arguments are based on a substantive disagreement with the Department over

the effectiveness of its chosen triggers in measuring financial health, which provides no basis for

a preliminary injunction.

First, Plaintiff argues that, insofar as some of the triggers designated in the Final Rule incorporate actions taken by third parties, the Secretary has improperly delegated her statutory authority to determine an institution's financial responsibility.  PI Mem. at 26.  Plaintiff elaborates little upon this theory, but appears to be referring to the Department's designation of pending lawsuits as triggering events that require an immediate recalculation of an institution's composite score.  *See* Final Rule, AR-A at 148.  These events, however, are to be considered only as they affect an institution's "overall financial strength," as determined by a recalculated composite score, not "in isolation."  *Id*. at 56.  Thus, in taking these events into account as part of its overall method of determining financial responsibility, the Department has not delegated the ultimate determination to any third party.  Moreover, in specifying in advance particular events that it has determined "affect the assessment of the school's ability to meet its financial obligations," *id*. at 64, it is still the Department, and not the initiator of any triggering event, that has determined the effect of that event on an institution's financial responsibility.  *See id*. at 55.

Plaintiff next argues that the Rule's focus on "triggers" violates the HEA's directive that the Secretary, in setting ratios to determine financial responsibility, must take into account "an institution's total financial circumstances."  20 U.S.C. § 1099c(c)(2).  Plaintiff cursorily states that the triggers provide an "inadequate and incomplete picture of a school's 'total financial circumstances.'"  PI Mem. at 26.  As discussed above, however, most of the triggers are not, on their own, dispositive of financial responsibility, and nothing about a statutory directive to consider "total financial circumstances" precludes the Department from taking into account the occurrence of significant events that present a serious risk of financial loss, or even institutional closure, in determining an institution's ongoing ability "to meet current and impending obligations."  Final Rule, AR-A at 55 (providing examples from the HEA and implementing regulations).

Plaintiff's argument also ignores the broader statutory and regulatory context.  The statute does not require that every financial responsibility determination the Department makes be based on an institution's total financial circumstances; rather, it contemplates that the Department will set certain "ratios" designed to assess an institution's financial responsibility, and requires that in determining whether an institution meets the criteria in these ratios, the Department account for total financial circumstances.  20 U.S.C. § 1099c(c)(2).  The Department has achieved this goal with its "financial ratios" regulations, which assign participating institutions a "composite score" based on a relative weighing of three aspects of an institution's overall financial strength.  *See* 34 C.F.R. § 668.172; *see also* Final Rule, AR-A at 57 (noting that these regulations, which "serve as the core of the Department's evaluation process," were the product of a "comprehensive study of the issue").  Plaintiff neither challenges this composite score methodology nor asserts that it fails to consider an institution's total financial circumstances.

More importantly, the statutory provision upon which Plaintiff relies does not require that the "ratios" be the Secretary's sole tool for assessing financial responsibility.  Rather, it provides that "[n]otwithstanding paragraph (1)," an institution that fails to meet the Secretary's ratios must provide evidence of financial responsibility.   *See* 20 U.S.C. §§ 1099c(c)(2)-(3).   This subparagraph, then, provides an alternative means for the Department to determine financial responsibility, "notwithstanding" the general directive to assess an institution's overall financial responsibility based on, among other things, the ability to meet financial obligations.  The statute does not preclude the Department from supplementing its "ratios," *i.e.*, the composite score methodology, with consideration of certain adverse events that occur after the calculation of that score and that compromise the school's ability to meet financial obligations as set forth in subsection (c)(1).  *See* AR-A at 55 ("Far from precluding the Secretary from giving controlling

weight to a single significant occurrence . . . , the statute recognizes that the Secretary may do so" based on the occurrence of "certain enumerated single adverse events"). That Plaintiff disagrees that the Secretary's chosen triggers are accurate indicators of financial viability does not mean that the statute precludes the Secretary from reaching a different conclusion about how best to capture an institution's current "overall financial strength." *Id*. at 56; s*ee Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 436, 456 (D.D.C. 2015) (deferring to agency's statutory interpretation where agency exercised "judgment as to matters within its area of expertise").

Plaintiff's final statutory argument fails for similar reasons. Notwithstanding the statutory text described above, Plaintiff suggests that the sole metric on which financial responsibility is to be based is "a school's audited and certified financial statements." PI Mem. at 26. This argument is inconsistent with the HEA's structure. The statute requires that when the Secretary determines "whether an institution has met the standards of financial responsibility provided for in paragraphs (2) and (3)(C)" – *i.e.*, an institution that fails to meet the criteria prescribed in the ratios, 20 U.S.C. § 1099c(c)(2), but then seeks to establish financial responsibility by submitting evidence of ability to ensure against precipitous closure, *id*. § 1099c(c)(3)(C) – that determination "shall be based on an audited and certified financial statement of the institution." *Id*. § 1099c(c)(5). As discussed above, this does not prevent the Department, as part of its subsection (1) authority, from "[u]sing the composite score methodology to assess new or threatened risks" that are not fully addressed in such statements. AR-A at 59. Financial statements may serve as the building block for the composite score methodology, but they do not include "[o]bligations that accrue after the close of [the previous] fiscal year," *id*. at 55, and the statute does not preclude the Department from addressing this limitation.

###### B.    The Financial Responsibility Provisions Are Not Arbitrary and Capricious

Plaintiff contends that the Department "failed adequately to address concerns regarding its decision to base significant regulatory consequences on factors that are speculative or not directly relevant to an institution's financial well-being." PI Mem. at 27. The Department, however, received comments about its proposal to make triggering events the *sole* determinant of an institution's financial responsibility, *see, e.g.*, NPRM, AR-B at 31, and, based on those comments, decided to tie most of the triggering events to the Department's composite score methodology. *See* Final Rule, AR-A at 57. While recognizing the value of this methodology, which many of the commenters "laud[ed]," *id*. at 58, the Department also recognized that the methodology's reliance on *past* accounting statements could prevent it from accurately capturing an institution's financial capability at any given point during an accounting period. The Department thus decided to incorporate the triggering events into the composite score methodology, allowing for a "regular[]" "recalculation" "as threats or events identified in these regulations" actually occur. *Id*. The Final Rule thus considered the possibility of the outsized influence of certain triggering events on financial responsibility determinations and responded. *See FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) (agencies need only address significant comments "in a reasoned manner"; it need not respond to such comments "in a manner that satisfies the commenter").

With regard to Plaintiff's substantive concern that certain of the Department's triggering events are unrelated to financial well-being, PI Mem. at 27, it likewise identifies no failure of reasoned decision making. Plaintiff's request for a preliminary injunction is limited to the argument that a pending lawsuit "bears no relation" to an institution's financial responsibility, and that an institution should have some opportunity to contest the merits of a suit before it is required to provide financial protection. *Id*. The Department, however, addressed this concern in the Final Rule, and provided a rational explanation for why it considered a pending lawsuit to be a

significant event requiring the recalculation of the institution's composite score. *See* AR-A at 64 (a pending suit potentially threatens "the continued existence and operation of the school," "[r]egardless of the substantive basis or motivation of the party suing"). The Department's current view, as reflected in the 2018 NPRM, is that the only lawsuits that should be triggering events are those that have been reduced to final judgment. *See* 83 Fed. Reg. at 37,273, 37,292. But that does not mean that pending lawsuits have no relationship to financial well-being. In 2016, the Department reasoned that a lawsuit represents a potential liability that would eventually be reflected in year-end financial statements and made the determination that the risk of judgment associated with any lawsuit is sufficiently significant to factor that lawsuit into an institution's composite score on an ongoing basis. *Id.* at 65-66. Plaintiff disagrees with this conclusion, but that is no basis to set aside agency action under the "highly deferential" arbitrary and capricious standard. *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017).

Second, Plaintiff again urges reliance on *Encino Motorcars*. *See* PI Mem. at 27-28. But as touched on above, that precedent only applies when an agency "had an explicit rule in place, only to later issue the opposite rule with limited or no explanation." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 620 (E.D. Pa. 2017). Neither condition is met here. The existing regulatory framework has long considered certain "single . . . occurrence[s]" as sufficient threats to an institution's ability to meet its current financial obligations as to make it "not financially responsible." Final Rule, AR-A at 55; *see also* 34 C.F.R. § 668.174 ("past performance" regulation, cited in Final Rule, which deems an institution "not financially responsible" based on the occurrence of specified events, such as a Title IV sanctions action or a failure to timely submit financial statements), *id.* § 668.171 (current version of financial responsibility regulation, which similarly mandates that an institution is not financially responsible if, for example, it fails to make

28

certain debt payments).   Thus, the Department has not enacted any "opposite rule," but merely "articulate[d] a more comprehensive list of adverse events that," like the currently effective regulations, "call into question [an] institution's ability to meet current and impending obligations."  Final Rule, AR-A at 55.

Moreover, the Department has not attempted to "depart from a prior policy *sub silentio*." *Estes v. U.S. Dep't of Treasury*, 219 F. Supp. 3d 17, 33 (D.D.C. 2016).   As discussed above, the Department provided an explanation for the new requirements it imposed, namely the need to assess, in the wake of what happened with Corinthian, "the significance of new events that occur after the close of an audited period" and their effect on an institution's ability, "regardless of its composite score," to "'provide the services described in its publications and statements, to provide the administrative resources necessary to comply with the requirements of [Title IV], and to meet all its financial obligations.'"   Final Rule, AR-A at 58 (quoting 20 U.S.C. § 1099c(c)(1)). Accordingly, *Encino Motorcars* is inapposite.   *See Estes*, 219 F. Supp. 3d at 33 (noting that the problem in that case was that "the agency offered barely any explanation for an undisputed change in a policy on which there had been decades of industry reliance" (empasis omitted)).

### C.       The Financial Responsibility Provisions Do Not Violate the Constitution

Plaintiff asserts that the financial responsibility provisions violate the Due Process Clause to the extent they "impose significant financial consequences automatically based on 'triggering events.'"  PI Mem. at 28.  But an institution has no protected interest in continued eligibility for or participation in a Title IV loan program.  *Ass'n of Accredited Cosmetology Schools*, 979 F.2d at 867.  Just as the Secretary can terminate an institution's participation and receipt of funding for failure to comply with program requirements, so too can she require financial protection in accordance with her statutory directive to determine financial responsibility.  *See* 20 U.S.C.

29

§ 1099c.  "Without a property right in their participation in Title IV programs, schools cannot press a Fifth Amendment challenge to the regulation of those programs."  *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 154 n.7 (D.D.C. 2012); *see also* AR-A at 65 (accounting for financial risk associated with triggers in determining "whether an institution qualifies to participate in [Title IV] cannot deprive the institution of any constitutionally protected right").

## IV. Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Repayment Rate Provisions

### A. The Repayment Rate Provisions Are Within the Department's Statutory Authority

Plaintiff argues that the repayment rate provisions are outside of the scope of the Department's statutory authority because the HEA does not (1) compel proprietary institutions to provide information about repayment rates or (2) differentiate between proprietary schools and non-profit schools with regard to providing information to current and prospective students.  PI Mem. at 32.  But the agency has several additional statutes which give it the general authority to promulgate regulations.  For example, 20 U.S.C. § 3474 gives the Secretary the authority to issue regulations to "administer and manage the functions of the Secretary or the Department."  Relevant to this matter, the function that must be administered is the Direct Loan Program.  In addition, 20 U.S.C. § 1221e-3 explicitly authorizes the Secretary to issue regulations relating to the programs it administers.  Both sources of authority have been recognized in this district as permitting the Department to promulgate regulations relating to disclosure requirements for educational institutions.  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d at 199 (citing 20 U.S.C. § 3474 and 20 U.S.C. § 1221e-3, and similar case law reaching the same conclusion, as providing sufficient statutory authority for the Department to promulgate disclosure requirements for participants in its programs).

**B.      The Repayment Rate Provisions Are Not Arbitrary and Capricious**

Plaintiff claims that the repayment rate provisions are arbitrary and capricious because (1) they fail to consider the effect that income-based payment plans have on repayment rates; (2) the Department is acting retroactively by using data from students who graduated prior to the 2016 Rule; and (3) the provisions only apply to proprietary institutions.  PI Mem. at 32–34.  The Department's current position, as reflected in a notice of proposed rulemaking related to gainful employment, is that the repayment rate provisions should be rescinded.  *See* 83 Fed. Reg. 40,167, 40,176 (Aug. 14, 2018).  Nevertheless, the Court should reject Plaintiff's arguments as a legal matter.  The Department considered comments raising Plaintiff's concern about the effect on income-based repayment plans during the rulemaking process, but rationally concluded that a "post-college safety net program [such as an income-driven repayment program] for borrowers does not eliminate the responsibility the institution has to provide a high-quality education that ensures borrowers are able to, at a minimum, afford to pay down their loans."  Final Rule, AR-A at 93.  The Department also cited to a report from the Council of Economic Advisers to support its position.  *Id*.  The APA did not require it to do more.  *See All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 132 (D.D.C. 2009).

Second, Plaintiff's retroactivity argument is also without basis.  Although the Department uses data relating to students who graduated prior to 2016, the repayment rate provisions are not "rendered retroactive merely because the facts or requisites upon which [their] subsequent action depends, or some of them, are drawn from a time antecedent to the enactment."  *Reynolds v. United States,* 292 U.S. 443, 449 (1934).  Generally, a regulation is impermissibly retroactive only if it "alter[s] the *past* legal consequences of past actions."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d at 196 (citation omitted).  However, the repayment rate provisions do not

alter past legal consequences.  Rather, they only attach prospectively a disclosure requirement based on an institution's failure to meet the new repayment rate calculation.  Further, they do not attach any new liabilities for student outcomes prior to 2016 or even affect a school's eligibility for participation in the Direct Loan Program.  Thus, Plaintiff's argument fails.  *See id.* at 196-97 (rejecting retroactivity arguments as to the Department's gainful employment regulations); *Ass'n of Accredited Cosmetology Schs.*, 979 F.2d at 865  ("Instead of undoing past eligibility, . . . the Act and the regulations merely require the Department to look at schools' past default rates in determining future eligibility for . . . program participation.").

Finally, the Department provided a rationale for applying the repayment rate provisions only to proprietary institutions.  *See* Final Rule, AR-A at 91-93.  As noted above, the Department now proposes to rescind the repayment rate provisions.  *See* 83 Fed. Reg. at 40,176.  But in the 2016 Rule, it argued that: (1) debt levels and repayment/default rates are generally worse in the proprietary school sector than in other sectors; (2) the repayment rate calculation focuses on the repayment rates for gainful employment program graduates of a school, and although public and private nonprofit schools have gainful employment programs, they do not typically constitute the entirety of the programs at such schools, so that a repayment rate calculation, performed at an institutional level, would not be representative of students at such schools; and (3) any additional burden to schools because of the repayment rate calculation should be lessened because the affected schools are already reporting such information to the Department via the gainful employment regulations.  *Id.*  This rationale was based on evidence in the record and several studies, including a study by the National Postsecondary Student Aid Study for 2012 and FY 2013

(that the Department now disagrees with).  *Id.* at 92 and fns. 67-71.[7]  The Department's rational explanation meets the requirements of the APA.

###    C.    The Repayment Rate Provisions Are Constitutional

Plaintiff argues that the repayment rate provisions violate the First Amendment because the provisions compel proprietary institutions to engage in government-mandated speech.  PI Mem. at 34-35.  However, compelled commercial speech in the form of required disclosures is constitutional if (1) the government requires inclusion of "purely factual and uncontroversial information" and (2) there is a rational connection between the purpose of the disclosures and the means employed to realize that purpose.  *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985); *see also Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 413–15 (D.C. Cir. 2012) (determining that the *Zauderer* test should be applied when there is an imposition of a disclosure requirement rather than an affirmative limitation on speech).

The repayment rate provisions require proprietary institutions that meet certain objective criteria to include in their promotional materials a simple and factual warning to current and prospective students that recent students have not paid down their loans.  The formula used is specified in existing regulations, calculating the "number of borrowers paid in full plus number of borrowers in active repayment" divided by the "number of borrowers entering repayment."  *See* Final Rule, AR-A at 145 (adopting calculation in 34 C.F.R. § 668.413(b)(3), with specified changes); *see also* 34 C.F.R. §§ 668.413(b)(3)(i)-(iii) (defining relevant terms).  The formula is used for each award year, for the "cohort of borrowers who entered repayment on their FFEL or Direct Loans at any time during the two-year cohort period."  Final Rule, AR-A at 145.  If the

---

[7] Plaintiff asserts that the Department's decision to apply the warning to proprietary schools "was based on inaccurate data."  PI Mem. at 33.  But as described above, the Department relied on a variety of evidence in making this determination, not solely on the data Plaintiff references.

resulting rate "shows that the median borrower has not either fully repaid all FFEL or Direct Loans received for enrollment in the institution or made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution," the proprietary institution will be subject to the mandatory warning requirement. *Id.* 146.  To the extent an institution disagrees with the determination made by the Department that it meets the objective criteria, it can appeal that determination by notifying the Secretary within 15 days of the notification that it would be subject to the repayment rate warning requirement. *Id*.  Therefore, the mandated warning for qualifying institutions is a factual statement as it is based on the results of the application of objective criteria.

The mandatory warning would provide information to current or prospective students that previous students have had difficulty repaying their loans.  The Department determined, through analyzing various studies, that the repayment rate calculation would "effectively identify the proprietary institutions that are generating zero or negative repayment outcomes and that should be providing warnings to students as they are assessing the likelihood of their ability to repay the loan debt they may incur."  NPRM, AR-B at 45.  The Department also found that proprietary institutions are in the best position to deliver the warning as they are the primary source of loan information for students. *Id.* at 44.   Hence, the method of delivery of the warning is rationally related to its purpose.  Finally, a proprietary institution is free to provide any explanation it wants along with the warning, such as why it qualifies for the warning, Final Rule, AR-A at 89, or can choose not to participate in the Title IV loan program if it does not wish to provide the warning.

**V.      Plaintiff Fails To Establish A Likelihood Of Success On The Merits Of Its Challenge To The Borrower Defense Provisions**

**A.      The Borrower Defense Provisions Are Consistent With the Department's Authority Under the HEA**

Plaintiff argues that the "Borrower Defense Provisions" exceed the Department's statutory authority, focusing on three aspects of the Final Rule: (1) its recognition of "an affirmative action for borrowers to cancel their debt"; (2) its provision for forgiveness/cancellation of student loan debt based on a successful borrower defense; and (3) its authorization of a process for the Department to recover from institutions loan amounts discharged on the basis of a successful borrower defense. *See* PI Mem. at 38-39 (emphasis omitted). Plaintiff's arguments lack merit.

Plaintiff asserts that the "straightforward language" of the relevant statutory provision limits the Department to the creation of "*defenses* to be used by borrowers in certain collections proceedings initiated *against the borrower* by the Secretary." PI Mem. at 38. But to succeed on this claim, Plaintiff would need to show that the HEA "unambiguously forecloses" the Department's interpretation. *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011). Here, the relevant statute authorizes the Department to specify the acts or omissions of a school that will give rise to a "defense to repayment." 20 U.S.C. § 1087e(h). The "defense" referenced is to the borrower's repayment obligation, but the text does not explicitly state whether the borrower must assert that response in a "defensive" posture (*e.g.*, in a defaulted loan collection proceeding, as Plaintiff asserts). Indeed, the concept of an "affirmative defense" is well-recognized in the law, *see, e.g.*, Fed. R. Civ. P. 8(c), and, without further indication, it is just as likely that a borrower would be able to assert this defense affirmatively, upon learning of institutional misconduct that might nullify her obligation to repay a loan.[8]

Plaintiff has not met its burden to establish that the Department's interpretation of 20 U.S.C. § 1087e(h) is unreasonable. When the Department first proposed borrower defense

---

[8] In the 2018 NPRM, the Department considered whether to limit borrowers' ability to raise defenses to repayment to the context of a collection action by the Department, or instead whether to provide for the affirmative assertion of borrower defense claims. *See* 83 Fed. Reg. at 37,243.

regulations in 1994, it stated that it was extending to Direct Loan borrowers the opportunity to "request that the Secretary exercise his long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  Federal Direct Student Loan Program, 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994).  As the Department subsequently clarified, the 1994 regulation was "not intended to create new Federal rights" in the area of borrower defense.  *See* Office of Postsecondary Education, 60 Fed. Reg. 37,768, 37,769 (July 21, 1995).  In the Department's view, the borrower defense regulations would apply to Direct Loan borrowers and participating institutions the "same treatment" and "same potential liability" that existed for the FFEL Program[9] – "which allowed borrowers to assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings."  Final Rule, AR-A at 31; *see also id.* (noting that, since 1994, the FFEL master promissory note has included a provision that the lender would be subject to "*all the claims and defenses* that the borrower could assert against the school with respect to the loan" (citation omitted)).  As the Department has clarified, a FFEL-participating school's liability "results from causes of action allowed to borrowers under various State laws, not from the [HEA] or any of its implementing regulations."  60 Fed. Reg. at 37,769.

The Department's desire to harmonize the Direct Loan and FFEL Programs is consistent with the HEA's instruction that, unless otherwise specified, Direct Loans "shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers" under the FFEL Program.  20 U.S.C. § 1087e(a)(1).  To the extent the decision to allow for such affirmative borrower defense claims alters the existing regulatory scheme, the Department

---

[9] The FFEL Program allowed "financial institutions to make low-interest loans to students or their families," "guaranteed by state or non-profit guaranty agencies," and reinsured by the Department. *See Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 467 (D.D.C. 1995).

provided a reasonable explanation for doing so, and its interpretation is entitled to deference.  *See, e.g.*, *Otay Mesa Property, L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 66 (D.D.C. 2015).

Plaintiff also argues that 20 U.S.C. § 1087e(h) does not authorize the Department to "forgive or cancel student debt" based on the assertion of a borrower defense.  PI Mem. at 38. However, the statutory text contemplates that a successful borrower defense to repayment would entail discharge of the related loan debt.  As the Department explained in the Final Rule, Section 1087e(h), "by directing that the Secretary determine by regulation which acts or omissions of the school constitute defenses to repayment, requires the Department to discharge the borrower's obligation to repay when the borrower establishes such a defense."  AR-A at 7.

Finally, Plaintiff argues that the HEA does not "mention anything about recovery from educational institutions," thus apparently precluding the Department from recovering from institutions amounts discharged due to successful borrower defenses.  PI Mem. at 39.  As an initial matter, the 1994 regulations, which have been in effect for more than 20 years, already authorize the Secretary to "initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies."  34 C.F.R. § 685.206(c)(3).  *See, e.g.*, *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("the consistency of an agency's position is a factor in assessing the weight that position is due").

Nonetheless, the Department addressed its right to recover from schools borrower defense-related losses extensively in the Final Rule.  *See* AR-A at 5-7.  In short, this right is inherent in the structure of the HEA, which has long authorized recovery against FFEL Program participants based on institutional misconduct and equalized treatment across the FFEL and Direct Loan Programs.  *See id*. at 6 ("from the inception of the Direct Loan Program, [the Department has]

considered its administrative authority under the HEA for the Direct Loan Program to authorize the Department to hold schools liable for losses incurred through borrower defenses"); *see also Chauffeur's Training Sch., Inc. v. Spelling*, 478 F.3d 117 (2d Cir. 2007).   It is no response to counter that the HEA's FFEL Program provisions make the Secretary's right to recover explicit in certain circumstances, while the Direct Loan borrower defense provision does not, *see* PI Mem. at 39, given that Congress also provided for loans under both programs to have "the same terms, conditions, and benefits."  20 U.S.C. § 1087e(a).   Given the Department's historical authority to recover losses from institutions based on a borrower's assertion of institutional misconduct as a defense to repayment, the Department's interpretation of the HEA's borrower defense provision is reasonable.  *See UPS v. Postal Regulatory Comm'n*, 890 F.3d 1053, 1065 (D.C. Cir. 2018) (deferring to agency interpretation that created "no anomalies and flow[ed] sensibly from text, history, and statutory structure").[10]

### B.      The Borrower Defense Provisions Are Not Arbitrary and Capricious

Plaintiff asserts that the "Borrower Defense Provisions" are "not the product of reasoned decision making" in four ways.  *See* PI Mem. at 40-43.  But Plaintiff's challenges are ultimately to the "wisdom, not the lawfulness," of the Final Rule, *Intercity Transp. Co. v. United States*, 737 F.2d 103, 109 (D.C. Cir. 1984), and provide no basis for a preliminary injunction.

---

[10] In any event, regardless of the HEA, the Department has a common law right to recover borrower defense losses from schools.  As the Department explained in the Final Rule:

> To the extent that the borrower proves that the act or omission of the school gave the borrower a defense, the amount not recoverable from the borrower was a loss incurred because of the Department's legal obligation to honor that defense.  That loss . . . is not one incurred voluntarily, but . . . by legal obligation.  By honoring the proven defense of the Direct Loan borrower . . . the Secretary acquires by subrogation the claim of the Direct Loan borrower . . . , as well as a claim for reimbursement from the [school] that caused the loss.

AR-A at 7.

Plaintiff first contends that the Department did not adequately explain its decision to authorize an "administrative process for affirmative debt relief." PI Mem. at 40. This argument is necessarily intertwined with Plaintiff's argument that the Department lacked statutory authority to take this action and fails for the same reason. In any event, the Department made clear its reasons for acting. Although a borrower defense regulation had been in place for more than 20 years, it was "rarely used" prior to 2015, leaving the Department ill-equipped for the "flood" of claims that were submitted in the wake of Corinthian's collapse. *See* NPRM, AR-B at 2. In response, the Department committed to enact new regulations to, among other things, "clarify and streamline the borrower defense process to protect borrowers." *Id*. at 3; *see also id*. at 18 (noting that the 1994 regulations' lack of process "led to confusion for borrowers and inconsistency in the types and format of information submitted for [borrower defense] requests"). Thus it was not merely the lack of a claims process that motivated the Department to establish one, as Plaintiff asserts (PI Mem. at 40), but the need to "protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." Final Rule, AR-A at 1. Such considerations are both consistent with the Department's statutory mandate under the HEA and, given the Department's documented experience following Corinthian's collapse, a reasonable basis on which to establish a clear claims procedure. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012) (noting that HEA and Title IV are designed to "foster access to higher education" and "ensure against abuse by schools").

Second, Plaintiff challenges the Department's adoption of a uniform federal standard to govern borrower defense claims. Plaintiff considers this new standard to be "highly disruptive and unpredictable," and the previous state law standard to be "certain," "predictable," and "well-settled." PI Mem. at 41. But the Department reached a different conclusion that is rationally

explained.  *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 380 (D.C. Cir. 2013) (rejecting, under the arbitrary and capricious standard, argument that "amounts to nothing more than [a] policy disagreement with [the agency]").  The Department noted that, following its experience with Corinthian, the development of a new federal standard to govern borrower defense claims was a prime motivation for promulgating the Final Rule.  *See, e.g.*, NPRM, AR-B at 2-3 (describing need for "more accessible and consistent" standard to adjudicate "flood" of borrower defense claims from Corinthian students).  The Department posited that the 1994 regulations' applicable state law standard imposed a "significant burden," exacerbated by the growth of "distance education in the higher education sector," on both borrowers, who must make a "threshold determination as to whether they may have a claim" under relevant state law, and the Department, in "determin[ing] the applicability and interpretation of laws that may vary from one State to another."  *Id.* at 7, 11. Even worse, reliance on state law risked providing "uneven relief" where, for example, students are affected by the same bad practices at a nationwide institution, but attend schools in different states.  *Id.* at 11.  In the Final Rule, the Department expanded upon these concerns, citing comments asserting that "consumer protection laws vary greatly from State to State," and reiterating the burden to the Department in determining which state's law to apply, and then having to apply and interpret "[other] authorities' laws."  AR-A at 13.

Commenters raised the same concerns Plaintiff raises here: that state law provides sufficient clarity based on established patterns of enforcement, and that the federal standard would be disruptive and complex.  *See* Final Rule, AR-A at 12-13.  The Department considered that argument, but concluded that the Federal standard "more clearly and efficiently captures the full scope of acts and omissions that may result in a borrower defense claim."  *Id.* at 14.  Whereas the Federal standard, as discussed below, sets forth three bases for borrower defense and the elements

necessary to obtain relief under each, reliance on state law "necessarily involves complicated questions relating to which State's laws apply to a specific case" and "the proper and accurate interpretation of those laws." *Id*. There is thus no "unexplained choice" involved here, *see* PI Mem. at 41, and the Department set forth its reasons for disagreeing with Plaintiff's conclusion that the Department disregarded a certain standard for a complex one.

Still, Plaintiff contends, the Department could have proceeded instead by "identifying a uniform way to determine which state's law to use in a particular dispute." *Id*. The Department was under no obligation to consider this vague suggestion. *See, e.g.*, *Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997) ("An agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."). But even if Plaintiff's proposal might, if fleshed out, resolve some choice of law questions, it would not reduce the Department's burden in interpreting and applying myriad provisions of state law with which it lacks familiarity, or the risk of different borrowers in different states obtaining different borrower defense results despite suffering the same harm from the same conduct.

Plaintiff further attacks the Department for adopting a new "federal common law" standard and for determining to apply that standard on a case-by-case basis. PI Mem. at 41. But there is nothing improper about an agency announcing a substantive standard through notice-and-comment rulemaking and allowing that standard to develop through case-by-case adjudication. *See Human Res. Mgmt., Inc. v. Weaver*, 442 F. Supp. 241, 251 (D.C. Cir. 1977) ([I]t is well established that agencies may articulate policies, interpret rules, and develop guidelines in the course of adjudicative proceedings, so long as adjudication is not used as a substitute for substantive, legislative rulemaking."); *Sec. Indus. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 426-27

(D.D.C. 2014).   The Department's adoption of a uniform federal standard was the result of reasoned decision making.

Plaintiff's third arbitrary and capricious challenge asserts that the Department did not adequately explain its reasons for "selecting new standards for borrowers' claims of substantial misrepresentation and breach of contract."  PI Mem. at 41.  In particular, Plaintiff takes issue with the Department's determination not to include an intent element in its misrepresentation standard, citing a Supreme Court case stating that "scienter" is an important element in a case arising under the False Claims Act.  *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016).  The Department's current position, as reflected in the 2018 NPRM, is "that defense to repayment should be granted only where a preponderance of the evidence shows that a school has made a misrepresentation with either knowledge of its falsity or with a reckless disregard of the truth."  83 Fed. Reg. at 37,257.  Still, that does not mean the Department's earlier position was arbitrary.  An administrative proceeding adjudicating a borrower's obligation to repay a federal student loan is a far cry from a False Claims Act prosecution, and, in general, agencies are "free to fashion their own rules of procedure," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015).  Here, the Department rationally concluded, consistent with its "longstanding position that a misrepresentation does not require knowledge or intent on the part of the institution," that it would not incorporate an intent element in its borrower defense standard, particularly given its concern that gathering evidence of intent would "likely be nearly impossible for borrowers" due to the "[i]nformation asymmetry between borrowers and institutions."  Final Rule, AR-A at 12.

Plaintiff also challenges the Department's inclusion of a "rebuttable presumption," PI Mem. at 41-42, where "a group borrower defense claim involves a substantial misrepresentation that has been widely disseminated," Final Rule, AR-A at 45.  Plaintiff disagrees with the utility of

this presumption, but the Department reasoned that "if a representation that is reasonably likely to induce a recipient to act is made to a broad audience, it is logical to presume that those audience members did in fact rely on that representation." *Id*. at 46. The Department's current view, as reflected in the 2018 NPRM, is that there should be "a level of evidence that ensures misrepresentation actually took place and the student relied upon that misrepresentation and suffered harm." 83 Fed. Reg. at 37,257. But Plaintiff provides no basis to overturn the agency's decision, particularly given the general rule that administrative agencies have flexibility to "establish evidentiary presumptions." *Id*.

Plaintiff's final argument regarding the substance of the Department's standard is that it does not include, in its breach of contract definition, "the classic elements of materiality or injury." PI Mem. at 42. But given the purpose of the borrower defense statute and regulation, the Department determined that it was "appropriate" to "allow borrowers to assert a borrower defense based on any breach of contract that would entitle them to any relief – including relatively minor breaches," thus making a materiality element unnecessary. AR-A at 19. As noted above, an agency generally has flexibility to determine standards and procedures for adjudicating the administrative claims that come before it, and Plaintiff's cursory argument does not establish that the Department's method for determining borrower defense relief on the basis of a breach of contract is arbitrary or capricious.

Plaintiff's fourth and final arbitrary and capricious argument is that the Department "offered no explanation for why it displaced its existing hearing and review process in favor of a novel framework lacking crucial procedural protections." PI Mem. at 42. Once again, Plaintiff conflates the Department's decision to adopt a policy with which Plaintiff does not agree with the Department's failure to explain that policy decision. Here, commenters raised the due process

43

concerns that Plaintiff asserts here, and the Department addressed them by clarifying that any action to recover against a school on the basis of borrower defense liability would only be taken pursuant to procedures designed to "ensure an opportunity for the school to present its defenses and be heard." Final Rule, AR-A at 35. The Department also published a separate final rule for the purpose of defining relevant procedures for a "recovery proceeding" against an institution under the borrower defense regulations. *See* Student Assistance General Provisions, 82 Fed. Reg. 6253 (Jan. 19, 2017) (providing for notice, presentation of evidence, and a hearing before neutral Department decision maker). Thus, before taking any actions affecting the rights or liabilities of institutions, the Department provides the very procedural protections Plaintiff claims are lacking.

The decision whether to recognize a borrower defense, and discharge a borrower's obligation on a federal loan, is between the Department and the borrower. *See, e.g.*, Final Rule, AR-A at 4. Before any action is taken to hold schools liable for a borrower defense claim, *i.e.*, to recover discharged amounts, schools will receive the benefit of "an administrative proceeding that provides them due process." *Id.* at 34. But they are not entitled to any such process before the Department makes a decision about whether to discharge federal student loan debt, and so the Department's alleged "fail[ure] to provide schools with a host of critical procedural safeguards," PI Mem. at 42, is not arbitrary and capricious.

### C.     Plaintiff's Constitutional Challenges Are Not Likely to Succeed

In a single paragraph, Plaintiff asserts two constitutional challenges to the borrower defense provisions. Neither has merit. Plaintiff first argues a due process violation because "Department officials are responsible for both prosecuting and hearing cases." PI Mem. at 43. As discussed above, however, borrower defense applications involve an individual's rights against the federal government and do not involve a claim by the borrower or the government against the institution;

thus, the institution has no protected interest, sufficient to trigger due process, in the outcome of a borrower defense claim.  Plaintiff thus fails to show "the rare conditions" necessary in order for a court to declare an agency's procedures for adjudicating the rights it creates unconstitutional. *Southwest Airlines Co. v. TSA*, 554 F.3d 1065, 1074-75 (D.C. Cir. 2009); *see also Perez*, 135 S. Ct. at 1207 (emphasizing that a court lacks authority to "impose upon an agency its own notion of which procedures are best" (citation omitted)).

Plaintiff also argues that the Final Rule's adjudication process for borrower defense claims impermissibly assigns the adjudication of a private right to a non-Article III body.  But a borrower's right, under federal law, to seek discharge of her federal loan debt from the federal government is not, as Plaintiff would have it, a private right to recover "for fraud or contract violations against his or her school."  PI Mem. at 43.  As such, a borrower defense is the type of "public right" claim, brought against the government under federal law, that has long been permissibly adjudicated in non-Article III bodies.  *See, e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-55 (1989) (concluding that a dispute is only required to be adjudicated before an Article III court where it involves a "statutory right [that] is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government"); *see also* Final Rule, AR-A at 3-4.[11]

## CONCLUSION

The Court should deny Plaintiff's motion for preliminary injunction.

---

[11] Plaintiff also asserts that this method of adjudication violates an institution's Seventh Amendment right to a jury trial.  PI Mem. at 43.  But as the Department explained, "the Seventh Amendment is generally inapplicable in administrative proceedings."  Final Rule, AR-A at 4 (quoting *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 454 (1977)).

Dated:  October 2, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
KAREN S. BLOOM
LAURA A. HUNT
KATHRYN WYER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 22903
(202) 616-8098 (phone)
(804) 819-7417 (fax)
robert.c.merritt@usdoj.gov

*Counsel for Defendants*