**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 17-999 (RDM) |
| **ELISABETH DeVOS, Secretary, U.S. Department of Education,** *et al.*, | |
| **Defendants.** | |

**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS'
REPLY BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY
INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.  THE COURT SHOULD ENJOIN THE ARBITRATION AND CLASS ACTION
    WAIVER BAN .............................................................................................................2

    A.  CAPPS Is Likely to Succeed on the Merits Because the Arbitration and
        Class Action Waiver Ban Is Unlawful................................................................2

        1.  The Arbitration and Class Action Waiver Ban Conflicts with the
            FAA and Exceeds the Department's Statutory Authority............................2

        2.  The Arbitration and Class Action Waiver Ban is Arbitrary and
            Capricious ..................................................................................................4

        3.  The Arbitration and Class Action Waiver Ban Violates the
            Constitution................................................................................................6

    B.  The Arbitration and Class Action Waiver Ban Will Cause CAPPS Schools
        Irreparable Harm ...............................................................................................6

    C.  The Remaining Factors Favor a Preliminary Injunction.........................................7

II.  tHE COURT SHOULD ENJOIN THE Repayment rate PROVISION ............................8

    A.  CAPPS Is Likely to Succeed on the Merits Because the Repayment Rate
        Provision Is Unlawful ........................................................................................8

        1.  A. The Department Lacks Statutory Authority For The Compelled-
            Speech Repayment Rate Provision .............................................................8

        2.  The Repayment Rate Provision Violates the First Amendment ...............10

        3.  The Repayment Rate Provision is Arbitrary and Capricious....................13

    B.  CAPPS Schools Will Suffer Irreparable Harm if the Forced-Speech
        Repayment Rate Provision Takes Effect ..............................................................15

    C.  The Remaining Factors Favor a Preliminary Injunction.......................................16

III.  THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING
     THE FINANCIAL RESPONSIBILITY PROVISIONS.................................................16

    A.  CAPPS Is Likely to Succeed on the Merits Because the Financial
        Responsibility Provisions Are Unlawful ..............................................................16

1. The Financial Responsibility Provisions Exceed the Department's Statutory Authority ......................................................................................16

2. The Financial Responsibility Provisions are Arbitrary and Capricious .................................................................................................17

3. The Financial Responsibility Provisions Violate the Constitution ............19

B. CAPPS Schools Will Suffer Irreparable Harm if the Financial Responsibility Provisions Take Effect .................................................................19

C. The Remaining Factors Favor an Injunction .........................................................20

IV. THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE BORROWER DEFENSE PROVISIONS ..............................................................20

A. CAPPS Is Likely to Succeed on the Merits Because the Borrower Defense Provisions Are Unlawful .........................................................................................20

1. The Borrower Defense Provisions Exceed the Department's Statutory Authority ....................................................................................20

2. The Borrower Defense Provisions are Arbitrary and Capricious ..............22

3. The Borrower Defense Provisions Contravene the Constitution...............24

B. CAPPS Schools Will Suffer Irreparable Harm if the Borrower Defense Provisions Take Effect ............................................................................................24

C. The Remaining Factors Favor a Preliminary Injunction........................................24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Am. Health Care Ass'n v. Burwell*,
   217 F. Supp. 3d 921 (N.D. Miss. 2016) ............................................................................3

*Association of Private Sector Colleges & Universities v. Duncan*,
   110 F. Supp. 3d 176 (D.D.C. 2015) ...........................................................................9, 10

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ............................................................................................................5

*Davis v. District of Columbia*,
   158 F.3d 1342 (D.C. Cir. 1998) ......................................................................................20

*DIRECTV, Inc. v. Imburgia*,
   136 S. Ct. 463 (2015) ........................................................................................................3

*Eastern Enterprises v. Apfel*,
   524 U.S. 498 (1998) ..........................................................................................................6

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ....................................................................................................18

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ..............................................................................................2, 3, 5

*Estes v. U.S. Department of the Treasury*,
   219 F. Supp. 3d 17 (D.D.C. 2016) ..................................................................................18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................................23

*Gunpowder Riverkeeper v. FERC*,
   807 F. 3d 267 (D.C. Cir. 2015) ......................................................................................24

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ......................................................................................15, 16

*Marmet Health Care Ctr., Inc. v. Brown*,
   565 U.S. 530 (2012) ..........................................................................................................3

*Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..............................................................................................13, 14, 23

*News Am. Public, Inc., v. FCC*,
   844 F.2d 800 (D.C. Cir. 1988) ........................................................................................13

*NLRB v. SW General, Inc.*,
    137 S. Ct. 929 (2017).............................................................................................10

*Public Employees Retirement System [s] Of Oh. v. Betts*,
    492 U.S. 158 (1989)............................................................................................21

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016)......................................................................15, 16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..............................................................................................9

*Resolute Forest Prods., Inc. v. USDA,,*
    187 F. Supp. 3d 100 (D.D.C. 2016)....................................................................14

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)..................................................................................................6

*Wis. Gas. Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)............................................................................19

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)......................................................................................11, 12

## STATUTES

20 U.S.C. § 1002(b)(1)(A)...............................................................................................10

20 U.S.C. § 1087e(h) .......................................................................................................21

20 U.S.C. § 1092...............................................................................................................8

20 U.S.C. § 1092(a)(1)....................................................................................................10

20 U.S.C. § 1099c(c).......................................................................................................17

20 U.S.C. § 1221e-3...........................................................................................................9

20 U.S.C. § 3474...............................................................................................................8

5 U.S.C. § 706(2)(A).......................................................................................................13

## RULES

Fed. R. Civ. P. 8(c) .........................................................................................................21

## REGULATIONS

60 Fed. Reg. 37,768 (July 21, 1995)...............................................................................22

81 Fed. Reg. 75,926 (Nov. 1, 2016)........................................................................ *passim*

83 Fed. Reg. 37,242 (July 31, 2018).............................................................18, 22, 23

83 Fed. Reg. 40,167 (Aug, 14, 2018)...................................................................11, 16

## OTHER AUTHORITIES

Black's Law Dictionary (10th ed. 2014)...............................................................12, 21

Direct Loan Master Promissory Note,
    https://studentloans.gov/myDirectLoan/subUnsub HTMLPreview.action......................22

## INTRODUCTION

As CAPPS explained in its opening brief, the Department of Education's 2016 Rule includes four ill-conceived provisions that lack any basis in the Department's lawful authority and that do not comport with the requirements of reasoned decision-making. In response, in its submission to this Court (as in its recent administrative pronouncements), the Department agrees that its challenged provisions are ill-conceived and erroneous, and that they should be rescinded and replaced. The Department, however, nevertheless submits that the provisions were within its authority, and that the adoption of these now-disavowed provisions comported with reasoned decision-making. But the Department is wrong, and CAPPS is likely to prevail on the merits.

The Department, joined by the Borrower-Intervenors and by the States as amici, also maintains that a preliminary injunction is not warranted because CAPPS purportedly has failed to show irreparable harm. By focusing on supposed pleading defects and the specificity of harm alleged, the oppositions miss the forest for the trees. CAPPS has established that it likely will suffer a wide range of injuries that are irreparable. CAPPS also has shown that the remaining preliminary-injunction factors are met. Accordingly, the Court should grant its motion and prevent enforcement of the Arbitration and Class Action Waiver Ban; the Repayment Rate Provision; the Financial Responsibility Provisions; and the Borrower Defense Provision.

**ARGUMENT**

I. **THE COURT SHOULD ENJOIN THE ARBITRATION AND CLASS ACTION WAIVER BAN**

    A.     <u>CAPPS Is Likely to Succeed on the Merits Because the Arbitration and Class Action Waiver Ban Is Unlawful</u>

        *1.*     *The Arbitration and Class Action Waiver Ban Conflicts with the FAA and Exceeds the Department's Statutory Authority*

As CAPPS previously explained, the Arbitration and Class Action Waiver Ban conflicts with the Federal Arbitration Act ("FAA") and exceeds the Department's statutory authority because Congress has not authorized the Department to displace the strong federal policy in favor of arbitration. CAPPS Br. 11-16. In response, all parties agree that the Department has no authority to ban arbitration agreements between schools and individuals. For good reason. Only a "clear and manifest congressional command to displace the [FAA]" could permit the Department to impose such a ban. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018).[1] And, as the oppositions seem to concede, nothing in the HEA (or any other statute) "even hint[s] at a wish to displace the [FAA]—let alone accomplish that much clearly and manifestly." *Id.*

Instead, the Department, the Borrowers, and the States defend the Arbitration and Class Action Waiver Ban solely on the ground that, in their view, it is not actually a ban on arbitration, but rather a condition on the receipt of federal funds. Regardless of the terminology employed, the Arbitration and Class Action Waiver Ban violates the FAA and exceeds the Department's statutory authority for two primary reasons.

<u>**First**</u>, by conditioning a school's ability to receive federal funds on whether it includes arbitration provisions in its agreements with students, the Arbitration and Class Action Waiver

---

[1]     All internal citations and quotations marks are omitted unless otherwise indicated.

Ban plainly violates the "'equal-treatment' rule for arbitration contracts." *See Epic Sys.*, 138 S. Ct. at 1622.   The 2016 Rule singles out arbitration agreements—and only arbitration agreements—for disfavored treatment.   This failure to "place arbitration contracts on equal footing with all other contracts" violates the FAA because it "does not give due regard ... to the federal policy favoring arbitration." *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015); *see also*, *e.g.*, *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 929-30 (N.D. Miss. 2016) ("[E]ven if the Rule in this case is interpreted as a mere 'incentive' against arbitration, this does not necessarily mean that singling out a form of arbitration for such disincentives allows it to survive FAA scrutiny.").   The opposing parties simply ignore this fatal defect in the 2016 Rule.

**Second**, the Arbitration and Class Action Waiver Ban violates the FAA because, even if technically a condition on the receipt of federal funding, it operates as a de facto ban in light of schools' heavy reliance on Title IV funding and thus is impermissibly coercive. *See, e.g.*, CAPPS Br. 13-14.   Although the oppositions seek to limit this coercion principle to cases implicating federalism interests, they offer no persuasive reason for such a limitation.   The oppositions attempt to distinguish a well-reasoned case applying the coercion principle to the private arbitration context, *see Am. Health*, 217 F. Supp. 3d at 929-30, but, at the same time, fail to cite even a single case in which a court has upheld the conditioning of federal funds on the forsaking of arbitration agreements.   And the responses likewise altogether ignore the "emphatic federal policy in favor of arbitral dispute resolution," *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012), and the corresponding mandate to "abandon ... hostility" to arbitration agreements, *Epic Sys.*, 138 S. Ct. at 1621.   Just as the federal government may not undermine principles of federalism through its spending power, it follows that a federal agency may not use its spending authority to undermine the congressionally-mandated national policy protecting

3

arbitration and prohibiting disfavored treatment for arbitration agreements by both the federal government and states.

The responses, moreover, fail to recognize that, because schools rely in large part on Title IV funds to keep their doors open, the Arbitration and Class Action Waiver Ban operates as an effective ban on arbitration—even if schools theoretically have the option of continuing to enforce arbitration agreements by declining federal funding.  As was the case in *American Health*, schools are "so dependent upon [Title IV] funding that the Rule in this case effectively amounts to a ban on pre-dispute ... arbitration contracts" such that it should be "treated as what it effectively is (i.e., a *de facto* ban)."  *See* 217 F. Supp. 3d at 929.  And because such an arbitration ban violates the FAA, it is unlawful for that reason as well.[2]

> 2.      *The Arbitration and Class Action Waiver Ban is Arbitrary and Capricious*

CAPPS established that the Arbitration and Class Action Waiver Ban also is arbitrary and capricious for four fundamental reasons.  CAPPS Br. 16-20.  None of the arguments in response has merit.

**First**, the Department failed adequately to consider the extensive data in the record establishing the benefits of arbitration.  Indeed, the Department has reiterated in its brief that it "no longer supports" the Arbitration and Class Action Waiver Ban "in light of the benefits of arbitration for both educational institutions and borrowers."  Dep't Br. 17.  Despite the Department's belated acknowledgment of the core problems inherent in the Arbitration and Class Action Waiver Ban, the opposing parties claim that the 2016 Rule did not dismiss the benefits of

---

[2] The opposing parties challenge the reasoning in *American Health* and try to limit the decision to that unique administrative record.  As outlined above, however, the decision in *American Health* comports with the strong federal policy in favor of arbitration—expressed both in the almost century-old FAA and in a robust line of Supreme Court decisions.  None of the oppositions cites a single case disagreeing with the reasoning of *American Health*.

arbitration because it did not ban arbitration outright.  As discussed above, however, and in CAPPS's initial brief, the Arbitration and Class Action Waiver Ban operates as a prohibition on the execution and enforcement of specified arbitration agreements.  As a result, the Department's failure to consider adequately the benefits of arbitration was arbitrary and capricious.

**Second**, the Department failed to consider sufficiently the disadvantages of class actions for students and the benefits of a class action waiver in an arbitration agreement. *See generally, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-52 (2011); *see also Epic Sys.*, 138 S. Ct. at 1622-23.  Here again, the Department concedes that it "takes a different position than it did in 2016 with respect to the drawbacks of class actions."  Dep't Br. 20.  Although the Department claims that students can decline a class action, the fact remains that the Department failed to consider and address, in any meaningful way, the extent to which class-action waivers might benefit borrowers—and whether a different policy was appropriate in light of those benefits.

**Third**, the Department relied extensively on an inapposite CFPB study.  The oppositions seek to conjure reasons why the CFPB study actually is relevant, but none can refute that the Department, for purposes of reasoned decision-making, should have considered, based on its own review of the data, any pertinent differences between the CFPB study and the public student loan context at issue in the 2016 Rule.  Nor do the oppositions grapple with the CFPB's own statements that federal loans fundamentally differ from private loans.  *See* CAPPS Br. 19.

**Fourth**, the Department failed to consider schools' reliance interests on the pre-existing regulatory framework regarding the permissibility of arbitration agreements.  The agency was not "writing on a blank slate."  Borrowers Br. 25.  To the contrary, schools long have relied on arbitration provisions, including class action waivers, and the strong federal policy in favor of them.  The Department's failure adequately to consider these interests—which the Department

comes close to conceding, Dep't Br. 22 (arguing only that it considered reliance interests "in at least *some* aspects of the Final Rule") (emphasis added)—was arbitrary and capricious.

       3.    *The Arbitration and Class Action Waiver Ban Violates the Constitution*

Contrary to the position of the opposing parties and as set forth above, the Arbitration and Class Action Ban represents "arbitrary and irrational" agency action preventing the enforcement of existing contracts and, consequently, violates the Due Process Clause. *See, e.g.*, *Eastern Enters. v. Apfel,* 524 U.S. 498, 547 (1998) (Kennedy, J., concurring) (referring to "[a]ccepted principles forbidding retroactive legislation ... The Court's due process jurisprudence reflects this distrust. For example, in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976), the Court held due process requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way."). That is exactly what the Department's Arbitration and Class Action Ban would do – prevent, by its explicit terms, the enforcement of existing contracts, through a mandate that reflects arbitrary and irrational government action, as discussed above, if a school is to remain in the Title IV program. While the Department argues that there is no right to Title IV participation and thus no violation, this misses the point as the violation arises from the interference with existing contracts.

    B.    <u>The Arbitration and Class Action Waiver Ban Will Cause CAPPS Schools Irreparable Harm</u>

As CAPPS previously explained (at 20-23), enforcement of the Arbitration and Class Action Waiver Ban will cause schools irreparable harm because, among other things, they will lose their ability to enforce existing arbitration agreements with current and new students; they will suffer disruption from the imposition of a regulatory regime that will upend arbitration proceedings; and they will not be able to recover any funds improperly denied by the Department should they choose to enforce arbitration agreements. Although the oppositions quibble with the

specificity of the allegations of harm, they do not seriously dispute that the Rule's immediate mandatory halt to enforcement of current arbitration agreements (including in existing arbitration proceedings) will cause injury to schools.  Nor can that injury be undone.  It will be impossible to unscramble the eggs once arbitration proceedings are halted and prevented.  And the sending of a no-enforcement-of-arbitration-provisions notice to students, followed by a rescission of such notice when the Department's ban is invalidated, will lead to deep and lasting confusion and distrust that benefit nobody. The oppositions also do not meaningfully challenge CAPPS' contractual argument—that enforcement of the arbitration ban effectively will deprive schools (and students) of their pre-existing contractual rights and will forever prevent them from executing arbitration agreements with students who enter school while it is in effect.  And, contrary to the Department's assertion, interference with lawful contracts is not mere economic harm.

C.      The Remaining Factors Favor a Preliminary Injunction

Finally, the equities and the public interest support a preliminary injunction of the Arbitration and Class Action Waiver Ban, as CAPPS previously established.  CAPPS Br. 24-25. The Department does not even dispute this point.  The States, meanwhile, claim only that CAPPS purportedly "s[a]t on its rights for more than a year" and that students "deserve the right to assert meritorious claims against schools that have harmed them." States Br. 23-24.  As to the first point, CAPPS diligently has sought to prevent enforcement of the Arbitration and Class Action Waiver Ban, having moved for a preliminary injunction of this provision more than a year ago (and before the 2016 Rule was scheduled to go into effect).  Once the Department announced its intent not to enforce the Arbitration and Class Action Waiver Ban, no injunctive relief – and no claim on the court's time and resources for such relief – was needed.  As to the Borrowers' second contention, the Borrowers conspicuously ignore that arbitration—strongly

protected under federal law, as repeatedly emphasized by both Congress and the Supreme Court—provides students with an avenue to "assert meritorious claims against schools" through a fair and orderly arbitration process.

## II.     THE COURT SHOULD ENJOIN THE REPAYMENT RATE PROVISION

### A.     CAPPS Is Likely to Succeed on the Merits Because the Repayment Rate Provision Is Unlawful

As CAPPS explained in its opening brief, the forced-speech repayment rate provision is unlawful because the Department lacks authority to compel the speech at issue; because the confusing, harmful, and unjustified speech violates the First Amendment; and because the Department's administrative action compelling the speech conflicts with reasoned decision-making.  Far from undermining these conclusions, the opposing briefs confirm them.

#### 1.     A. The Department Lacks Statutory Authority For The Compelled-Speech Repayment Rate Provision

As CAPPS explained in its opening brief, the Repayment Rate Provision exceeds the Department's statutory authority.   The provision of the HEA that explicitly addresses the information that schools must provide – Section 485 (20 U.S.C. § 1092) – sets forth twenty-two categories of information that a school must provide to prospective students.  Repayment rate information is not among them.  None of the three opposing briefs claims that the information-disclosure provision – Section 485 –  authorizes the new information disclosure.  It does not.

Rather than the information-disclosure provision of the HEA, the opposing briefs maintain that the Department's new provision compelling the disclosure of information – government-mandated speech – is authorized by the Secretary's general housekeeping authority to run the Department and all of its programs.  The opposing briefs rely on 20 U.S.C. § 3474 (which authorizes the Secretary "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or

the Department") and 20 U.S.C. § 1221e-3 (which likewise authorizes the Secretary to adopt "rules and regulations governing the manner of operation of, and governing the applicable programs administered by the, Department").  It is well-settled and axiomatic, however, that, when a specific provision addresses a subject, the specific controls the general.  *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("A well established canon of interpretation succinctly captures the problem: [I]t is a commonplace of statutory construction that the specific governs the general."); *id*. (the specific-controls-the-general canon is especially strong where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions").  Here, Congress explicitly and comprehensively addressed information disclosure requirements.  That provision should control, and it does not authorize the Secretary's action in this proceeding.  Reliance on the Secretary's authority to run the Department and its programs would mean that Congress's detailed enumeration of information disclosure requirements was unnecessary and that the Secretary's broad and undefined charter to run the Department and its programs was sufficient. That, however, flies in the face of established principles for interpreting Congress's enactments, and it stands in sharp contrast with what Congress actually did in the HEA – carefully and extensively sculpting the required categories of information disclosure.

As support for their proposition of relying on the Secretary's general statutory authority to run the Department and its programs, the opposing briefs cite *Association of Private Sector Colleges & Universities v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016).  However, that case, which concerns disclosure requirements in the "gainful employment" context, is inapposite.  **First**, unlike here, the Court found that requiring additional disclosures in addition to those already specified by Congress did not conflict with the HEA

because the Department was filling a "gap" with *program-level* disclosure requirements to supplement the *institution-level* requirements already contained in 20 U.S.C. § 1092(a)(1). *See Duncan*, 110 F. Supp. at 187, 200. There is no  such "gap" to fill here. As CAPPS has previously noted, and as detailed above, the HEA includes a specific list of *institution-level* disclosure requirements, which conspicuously omits repayment rates. *See* 20 U.S.C. § 1092(a)(1). The fact that Congress did not include repayment rates in its statutory disclosure provision shows that it did not authorize any additional *institution-level* disclosures. *See, e.g.*, *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017).

**Second**, as CAPPS noted in its opening brief, the HEA does not provide any basis for differentiating between proprietary schools and non-profit schools when it comes to requiring disclosure of information to students. In other contexts, such as the Gainful Employment Rule, the statutory basis relied upon to compel proprietary schools to disclose certain information specifically applied only to proprietary schools. *See* 20 U.S.C. § 1002(b)(1)(A). Here, no such direction or authorization by Congress exists to require only proprietary schools to provide certain speech. Nor have the oppositions suggested that, in this case (unlike the Gainful Employment case), an explicit statutory anchor exists for the targeting only of proprietary schools for information disclosure requirements. For that reason as well, the forced-speech provision, applying only to proprietary schools, is beyond the Department's statutory authority.

2.    *The Repayment Rate Provision Violates the First Amendment*

As CAPPS explained in its opening brief, the Repayment Rate provision violates CAPPS schools' First Amendment rights by compelling misleading and harmful speech in the form of a government-mandated "warning" on promotional materials for proprietary institutions in certain circumstances. And the First Amendment violation is compounded by the fact that it does not apply to similarly situated non-profit institutions, even if their circumstances are identical.

The opposing briefs do not dispute – and cannot dispute – that the government mandate compels speech.  Instead, they attempt to argue that the forced-speech Repayment Rate Provision does not violate the First Amendment under the test laid out in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  That test provides that a disclosure is constitutional only if (1) the government requires "purely factual and uncontroversial information"; and (2) the means of disclosure is reasonably related to the government's interest.  *See id.* at 651.

That test cannot possibly be satisfied here, however, for two reasons.  First, unlike in every case cited by the opposing briefs, the government itself has explicitly disavowed the value, helpfulness, and benefit of the compelled government speech. Just a few months ago, the Department of Education explicitly explained that the forced-speech requirement should be rescinded because "the Department believes that *these disclosures will not provide meaningful or clear information to students*."  83 Fed. Reg. at 40,176  (emphasis added).   The Department further explained that the forced-speech requirement should be rescinded because it did not "reflect[] ...  educational quality" and because it "unfairly targeted proprietary institutions."  *Id.* None of the oppositions addresses the fact that the benefit and value of the required disclosure have been categorically disavowed by the Department itself – a very important threshold point for a First Amendment analysis of government-compelled speech under any standard.

Nor can the Department's unequivocal disavowal of the value of its compelled disclosure be dismissed as a mere preliminary statement in a Notice of Proposed Rulemaking.  It is an official government statement of position about the lack of value of government-compelled speech for its asserted purpose.  And, removing any conceivable doubt about the government's position on the lack of benefit from this compelled speech, the Department has explicitly reiterated its agreement that the compelled speech lacks value in its brief.  *See* Dep't Br. 31.

The Borrowers assert that the government-compelled "warning" will be "reasonably related" to the Department's goal of "ensur[ing] students and families have the information they need to make well-informed decisions." Borrowers Br. 40, citing 81 Fed. Reg. 76,018. But it is impossible to find that the government-mandated disclosures are reasonably related to any permissible government interest when the Department itself disavows them.

As discussed in CAPPS' opening brief, moreover, the compelled speech is not "purely factual or uncontroversial information," as *Zauderer* requires. 471 U.S. at 651. The Department's required language belies such a characterization. Here the Department has required select schools to include the language "U.S. Department of Education *Warning*: A Majority of recent student loan borrowers at this school are not paying down their loans." 81 Fed. Reg. at 76,071 (emphasis added). "Warning" is not a neutral or "purely factual" word; it is meant to convey danger "esp. to one who would not otherwise be aware of it." *See Black's Law Dictionary* (10th ed. 2014). The Department was not attempting to compel the provision of speech to consumers with factual or noncontroversial information. Instead the Department mandated a disclosure with language meant to cause apprehension in students and discourage them from attending the proprietary schools forced to convey that "warning."

Additionally, none of the opposition briefs seriously engages with the Department's impermissible First Amendment discrimination against proprietary schools. The Department has failed to explain why, of two schools that have the exact same repayment rate, one should be targeted for compelled speech merely because it is a proprietary school. For such blatant discrimination in compelling speech, the First Amendment requires more than a statement in the record that proprietary schools in general have worse repayment rates to selectively burden one of two similarly situated institutions. *See* 81 Fed. Reg. at 76,071; *see also News Am. Publ'g, Inc.*

*v. FCC*, 844 F.2d 800, 815 (D.C. Cir. 1988) (when "First Amendment values are implicated," it "require[s] evenhanded treatment."). The Department and the amici States fail to address this impermissible discrimination. The Borrowers, in turn, assert (at 40) that the Department made a "reasonable distinction involving corporate form ... grounded in evidence unrelated to speech" without meaningfully explaining why this distinction in "corporate form" is a permissible basis for drawing distinctions among speakers.

The Department compels speech even though it now views that speech as valueless. It requires that the compelled speech be labeled a "warning," rather than being factual and noncontroversial. And it compels speech from certain private actors, but not from other similarly situated private actors. A mandate by the government compelling speech in these circumstances violates the First Amendment.

### 3. The Repayment Rate Provision is Arbitrary and Capricious

As CAPPS pointed out in its opening brief, the Repayment Rate Provision is not the product of reasoned decision-making. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). The Department's decision-making was arbitrary and capricious because the Department: (1) unreasonably applied the Repayment Rate Provision only to proprietary schools; (2) failed to consider adequately the effect of income-based repayment plans, and its support of those plans, on students' repayment rates; (3) relied on inaccurate data in determining only proprietary schools should be subject to the provisions; and (4) decided to impose the Repayment Rate Provision retroactively. None of the opposing briefs remedies these fundamental flaws.

The Department's decision to target only proprietary schools was arbitrary and capricious. While the Department stated that loan repayment outcomes in general are worse for proprietary schools, the Department never explained why non-proprietary schools *with the same*

*repayment rates* should not be subject to the disclosure requirement.  *See* 81 Fed. Reg. at 76,017.
Accordingly, the Department has not "articulate[d] a satisfactory explanation for its action
including a rational connection between the facts found and the choice made" to target only
proprietary schools in the Repayment Rate Provision.  *State Farm*, 463 U.S. at 43.

The Department also failed to adequately consider that its method for calculating loan
repayment rates effectively would punish institutions who enrolled students in income-based
repayment plans.   CAPPS Br. 33.   While the opposing briefs point to language by the
Department in the 2016 rulemaking that addresses income-based repayment plans, this does not
change the fact that the Department failed to *adequately* or meaningfully consider the effects the
Repayment Rate Provision would have on these plans.  *See* 81 Fed. Reg. at 76,018.   In its
opening brief, CAPPS pointed to the Department's language and noted that that Department
failed to adequately consider that the method used by the Department to calculate the repayment
rate would harm schools that had enrolled students in income-based repayment plans supported
by the Department and that this would frustrate the Department's own objective in encouraging
these plans.  *See* CAPPS Br. 33.  That language does not change the fundamental fact that, here
too, the Department failed  to "articulate a satisfactory explanation ... between the facts found
and the choice made." *State Farm.*, 463 U.S. at 43.

The Repayment Rate Provision also is arbitrary and capricious because it relies on
inaccurate data.  *See, e.g.*, *Resolute Forest Prods., Inc. v. USDA*, 187 F. Supp. 3d 100, 123
(D.D.C. 2016).  The Department does not deny that it relied on the data or that it was inaccurate;
it merely notes that the decision to target proprietary schools was not based "solely" on the
inaccurate data.  Dep't Br. 33 n.7.  The Department also notes, moreover, that it now disagrees
with other evidence cited in the 2016 Rule as well.  *See id.* at 32-33.  While the Borrowers and

14

the States attempt to downplay the significance of the data error, the Department does not take that position about its own decision-making. And it is undisputed that the erroneous information was considered in determining that only proprietary schools should be subjected to the forced disclosure warning.  That error itself is sufficient to render the decision-making arbitrary and capricious.

Finally, the Repayment Rate Provision is arbitrary and capricious because it imposes the provisions retroactively.  As CAPPS explained above and in its opening brief, penalizing schools for actions taken based on a prior regulatory regime and in furtherance of objectives previously promoted by the Department is manifestly unreasonable.

B.      CAPPS Schools Will Suffer Irreparable Harm if the Forced-Speech Repayment Rate Provision Takes Effect

As CAPPS explained, CAPPS schools will suffer irreparable harm from the Repayment Rate Provision due to the deprivation of First Amendment rights and reputational harm.

None of the opposing briefs disputes that a deprivation of First Amendment rights is an irreparable injury.  *See, e.g.*, *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Since the forced-speech Repayment Rate Provision would cause a deprivation of First Amendment rights, CAPPS has established irreparable harm.  Additionally, conveying the government-mandated "warning" unquestionably will lead to reputational harm.  *See, e.g., Declaration of Robert Johnson ("Johnson Decl.") ¶¶ 29-30 (Sept. 21, 2018).  None of the opposing briefs refute the proposition that a reputational harm is irreparable.

The Department states that any harm is not irreparable because the Department has not finalized its repayment calculation.  Dep't Br. 15.  A law or regulation need not be currently enforced, however, to show a likely injury for the purposes of a preliminary injunction;  the requirement is likelihood of irreparable injury.  *See League of Women Voters of U.S. v. Newby*,

838 F.3d 1, 8-9 (D.C. Cir. 2016) (finding irreparable harm when harm was likely to "spring up" when the statutes were enforced); *id.* ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.").  The forced-speech regulatory regime, with its First Amendment and reputational injuries, is finalized in the 2016 Rule.  The imminence of this harm presents the likelihood of irreparable injury.

> C.    The Remaining Factors Favor a Preliminary Injunction

As CAPPS previously established, the equities and public interest likewise support a preliminary injunction on the enforcement of the Repayment Rate Provision.  The balance of the equities tips in CAPPS's favor because the implementation of the Repayment Rate Provision would lead to a deprivation of First Amendment rights and unwarranted reputational injury, while an injunction would merely delay any perceived benefit to the parties until the litigation is resolved.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing America's Greatness*, 831 F.3d at 511. The Department does not contest this point. The Borrowers assert (at 40-42) that allowing the disclosures will provide useful information to students.  As the Department itself has recognized, however, these disclosures "will not provide meaningful or clear information."  83 Fed. Reg. at 40,176.   And the States' erroneous suggestion (at 39) that CAPPS has not established any cognizable First Amendment interest or harm has been addressed above.

## III.    THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE FINANCIAL RESPONSIBILITY PROVISIONS

> A.    CAPPS Is Likely to Succeed on the Merits Because the Financial Responsibility Provisions Are Unlawful

>> *1.    The Financial Responsibility Provisions Exceed the Department's Statutory Authority*

As CAPPS explained in its opening brief (at 25-36), the Financial Responsibility Provisions exceed the statutory authority granted to the Department under 20 U.S.C. § 1099c(c). The new provisions conflict with the requirements that (1) the *Secretary* make financial responsibility determinations; (2) financial responsibility be determined according to an institution's "total financial circumstances"; and (3) financial responsibility determinations be based on "audited and financial certified financial statement[s] of the institution."

The Department claims (at 24) that it has not exceeded its statutory authority by delegating financial responsibility determinations to third parties because the delegated triggering events lead only to a recalculation of a school's composite score. But it is impermissible delegation under the statute to use triggers that rely exclusively on the acts of third parties, because that use, in essence, allows third parties to determine an institution's financial responsibility. When a third party's determination is an essential element of the composite score, the Department cannot reasonably claim that it is not relying on the third party's evaluation.

The oppositions likewise argue that the Department did not conflict with the statutory requirement that financial responsibility consider an "institution's total financial circumstances" by adopting triggers with little to no bearing on a school's financial circumstances because most of the triggers are considered as part of a composite score. Dep't Br. 24; States Br. 26. They again fail to address, however, that certain mandatory triggers bear little relation to total financial circumstances, including the cohort default rate trigger, and several discretionary triggers, such as state accreditation violations and dropout rates, have no bearing on a school's total financial circumstances. *See* 81 Fed. Reg. at 76,074.

### 2.   The Financial Responsibility Provisions are Arbitrary and Capricious

As CAPPS previously explained (at 27-28), the Financial Responsibility Provisions are arbitrary and capricious because the Department failed to (1) adequately address concerns

regarding its decision to base significant consequences on facts that are speculative and (2) consider adequately schools' reliance on the pre-existing regulatory framework.

With regard to the mere pendency of a lawsuit, for example, while the Department reiterates its reasoning in the 2016 Rule that such a lawsuit is not too speculative to be used as a trigger potentially causing significant economic consequences, it severely undercuts its own argument by, in the same paragraph, reaffirming its current position that some of the triggering events are "speculative" and "better suited to increased oversight" rather than the imposition of massive financial consequences. *See* Dep't Br. 27-28 (citing 83 Fed. Reg. at 37,273, 37,292). Borrowers and the States assert that the Department's decision to turn a pending lawsuit into a trigger is reasoned because it requires that a lawsuit be past the motion to dismiss phase. Borrowers Br. 44; States Br. 29. But it is obvious that many non-meritorious lawsuits may progress beyond a motion to dismiss and have nothing to do with financial responsibility.

The Department also seeks to dismiss the reliance principle of *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), because, in the Department's view, that principle applies only when an agency "had an explicit rule in place." Dep't Br. 28. The Supreme Court's decision in *Encino*, however, does not require an explicit rule in place. Nor do cases applying *Encino* in this circuit. *See, e.g., Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 28-30 (D.D.C. 2016) (applying *Encino* analysis to assess unexplained inconsistencies in Treasury rule that changed prior informal guidance policy). Borrowers assert that it is "not unreasonable" that the Department incorporated this new trigger-based recalculation schedule. Borrowers Br. 44. As CAPPS previously explained (at 27-28), however, it certainly was unreasonable to create this rolling trigger-based recalculation schedule without at least adequately considering schools' reliance on the prior regulatory framework.

3.      *The Financial Responsibility Provisions Violate the Constitution*

As CAPPS previously explained, the Financial Responsibility Provisions violate the Due Process Clause by imposing significant financial consequences automatically and by not allowing an opportunity to contest or refute the financial implications of the "triggers."  CAPPS Br. 28.  In attempting to dismiss the due process violations, the Department and Borrowers focus on schools' lack of entitlement to Title IV funds.  *See* Dep't Br. 29; Borrowers Br. 44-45. However, significant financial consequences are imposed automatically, with no process, from the triggers themselves.  CAPPS has demonstrated (at 29-30) that the triggers themselves will cause financial ruin and loss of important licensure and accreditation.  The devastating consequences of low composite scores will occur without a meaningful opportunity to contest or refute the financial applications of these triggers.  While the States suggest (at 29) that there is an opportunity to appeal a trigger, the ability to contest a trigger exists on very narrow grounds and the Department will consider specific, limited information only for some, not all, of the triggers. *See* 81 Fed. Reg. at 76,073.

B.      <u>CAPPS Schools Will Suffer Irreparable Harm if the Financial Responsibility Provisions Take Effect</u>

In its opening brief, CAPPS explained that the Financial Responsibility Provisions will cause irreparable harm in three ways: (1) they will cause schools to face financial crises; (2) they will cause schools to lose agency approvals when composite scores are automatically recalculated; and (3) they will violate schools' due process rights, which is per se irreparable.

The oppositions claim that financial harms cannot be irreparable and that the harm to CAPPS would be too speculative.  *See, e.g.* Borrowers Br. 41-42. But when economic harm "threatens the very existence of movant's business," as it does here, the harm is irreparable.  *See Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g.*, Declaration of Steve

Gunderson ¶ 19 (Sept. 21, 2018); Johnson Decl. ¶¶ 27-28.  While the oppositions question the specificity of harms arising from the loss of state approvals due to the change in composite score calculations, none seriously refutes that losing these approvals would represent an irreparable harm to schools.  Finally, depriving institutions of a constitutional right, in this case schools' due process rights, is per se an irreparable harm.  *Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998).

        C.    <u>The Remaining Factors Favor an Injunction</u>

The balance of the equities and the public interest support an injunction of the Financial Responsibility Provisions.  An injunction will merely maintain the status quo while the parties engage in expedited summary judgment briefing.  Additionally, an injunction will prevent schools from being forced to divert vital resources from their educational mission.  The Department does not dispute this point.  The Borrowers suggest that CAPPS members' interests are too attenuated, while the States argue that the interest in financial stability overcomes any harms to CAPPS.  Borrowers Br. at 45; States Br. at 31-32.  As CAPPS has demonstrated, however, absent an injunction, CAPPS schools (and their students) will suffer acute and immediate harm that would outweigh the interests cited by the States.

## IV.    THE COURT SHOULD ENJOIN THE DEPARTMENT FROM ENFORCING THE BORROWER DEFENSE PROVISIONS

        A.    <u>CAPPS Is Likely to Succeed on the Merits Because the Borrower Defense Provisions Are Unlawful</u>

                *1.    The Borrower Defense Provisions Exceed the Department's Statutory Authority*

The Borrower Defense Provisions set forth a new *affirmative* administrative cause of action for borrowers.  As CAPPS explained in its opening brief (at 38-39), the statutory authority that the Department has relied upon to enact the Borrower Defense Provisions refers only to a

"defense," not to an affirmative cause of action.  *See* 20 U.S.C. § 1087e(h) (the Secretary will specify "which acts or omissions of an institution of higher education a borrower may assert *as a defense* to repayment of a loan made under this part") (emphasis added).

The oppositions offer two principal arguments for the Department's authority – that the statutory meaning of "defense" includes an affirmative cause of action and that the Department purportedly has long taken this view of its authority.  Both are unavailing.

First, the plain meaning of the statutory language cannot bear the proposed interpretation. The ordinary meaning of "defense" is a response to a case brought by another party, such as a plaintiff or a prosecutor.  *See, e.g.*, *Black's Law Dictionary* (10th ed. 2014).  Congress used that term for a reason; "defense" means a case initiated by another.   Indeed, the weakness of the Department's attempt to construe "defense" as meaning "offense" is highlighted by the Department's strained attempt to rely on the availability of "affirmative defenses" in Fed. R. Civ. P. 8(c).  Dep't Br. 35.  Rule 8(c), of course, allows for affirmative defenses only when "*responding* to a pleading" – that is, when in a defensive position.  It thus proves the opposite point and further undermines the Department's untenable interpretation.

Second, the oppositions claim that their idiosyncratic interpretation of the statutory term "defense" is supported by the Department's past practice.  At the outset, even if that were correct, longstanding practice would not salvage a fundamental error in statutory construction. *See, e.g., Pub. Emps. Ret. Sys. of Oh. v. Betts*, 492 U.S. 158, 171 (1989) ("Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.").  But the Department's attempted revisionist history is erroneous.  Its 1995 interpretation, cited in the 2016 Rule, actually confirms that the borrower defense provisions apply only as a defense in a collections process – as a common-sense reading of the

statutory language requires.  *See* 60 Fed. Reg. 37,770 (July 21, 1995) (explaining that the Direct Loan Program regulations have a "similar process" as the FFEL Program regulations that allow a borrower to present his or her defense against repayment arguments "to the guaranty agency or the Department *during the collection process*.") (emphasis added). Similarly unpersuasive is the Department's contention that it has allowed for affirmative borrower defenses for claims on *Direct Loans* based on the language it included in the *FFEL* Master Promissory Note (*see* Dep't Br. 36; 81 Fed. Reg. at 75,956); the Department never included that, or similar, language in the Master Promissory Note that governed Direct Loans.  *See* Promissory Note, https://studentloans.gov/myDirectLoan/subUnsubHTMLPreview.action (last visited Oct. 4, 2018).  The Department's statement that it has previously allowed affirmative claims, moreover, is contradicted by its explicit statement in the 2018 NPRM: "[f]rom 1994 to 2015, the Department's regulation ... provided defense to repayment loan discharge opportunities only to borrowers who were in a collections proceeding."  83 Fed. Reg. at 37,253.

Finally, as a last resort, the Department attempts to find authority to recover from schools by citing the structure of the HEA and the Department's "historical authority" to recover losses as authority for the right to recover from schools.  Dep't Br. 38.  But nowhere does it list the actual statutory provisions that purportedly provide this authority.  Similarly, the Borrowers vaguely invoke reliance on common law as authority to recover from schools.  Borrowers Br. 32. But this again does not address the source of the Department's *statutory* authority for its new regime recasting "defenses" as affirmative causes of action.

## 2. The Borrower Defense Provisions are Arbitrary and Capricious

As CAPPS explained in its initial brief, the Department's decision adopting the Borrower Defense Provisions conflicted with the requirements of reasoned decision-making.  First, the decision to create affirmative causes of action under the rubric of "defenses" was arbitrary and

capricious.  Here too, the oppositions cite the Department's statement in the 2016 Rule that it had always allowed affirmative defenses since 1995.  Dep't Br. 39; Borrowers Br. 32-33; States Br. 41-42.  As explained above, however, the Department's statements are erroneous and highlight the failures of reasoned decision-making.  As the Supreme Court has held, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *id.* (An agency may not "depart from a prior policy *sub silentio*").

CAPPS also explained (at 41-42) that the Department's failure to adequately explain its decision to abandon a certain and predictable standard in state law, as well as its failure to adequately explain its reasons for selecting new standards for borrowers' claims of substantial misrepresentation and breach of contract, also reflected arbitrary and capricious decision-making. The oppositions reassert the Department's justifications that CAPPS already has refuted. For example, CAPPS has explained (at 41) why the Department's "distance learning" rationale was inadequate to justify adopting a new undefined federal standard and jettisoning well-established state law standards.  CAPPS has also explained (at 41-42) that the Department's decisions to adopt new substantive standards, such as dropping the intent requirement from materiality and getting rid of the materiality and injury elements of a breach-of-contract claim, were arbitrary and capricious.  The failure to adequately explain these decisions demonstrates a failure of reasoned decision-making.  *State Farm*, 463 U.S. at 43.

Finally, CAPPS previously explained that the Department failed to provide schools with critical procedural safeguards in the 2016 Rule.  *See* CAPPS Br. 42-43.  While the Department claims that some of these safeguards have since been implemented, Dep't Br. 43-44, the Department admits that the 2016 Rule lacks important protections.  *See* 83 Fed. Reg. at 37,243.

### 3. *The Borrower Defense Provisions Contravene the Constitution*

In its opening brief, CAPPS explained that the Borrower Defense Provisions violate the Due Process Clause.  The oppositions suggest that CAPPS cannot raise a constitutional objection because its schools would not be involved in the proceedings between the Department and Borrowers. Dep't Br. 44-45.   But Department officials will be responsible for both prosecuting and hearing cases – both on students' claims and in subsequent recovery proceedings – and the provisions therefore violate CAPPS's Due Process rights.  *See* CAPPS Br. 43.[3]

B.   CAPPS Schools Will Suffer Irreparable Harm if the Borrower Defense Provisions Take Effect

As CAPPS previously explained, the implementation of the Borrower Defense Provisions will irreparably harm CAPPS schools by forcing them to comply with these new regulations and embroiling them in myriad administrative proceedings raising new claims on novel legal theories to be decided on the basis of unspecified legal theories.  If the Borrower Defense Provisions were to go into effect, it would be impossible for CAPPS schools to subsequently untangle themselves from the knot of administrative proceedings.[4]

C.   The Remaining Factors Favor a Preliminary Injunction

As with the other challenged provisions, the balance of the equities and public interest considerations support an injunction because it would maintain the status quo during the

---

[3]   CAPPS's further constitutional concerns regarding procedural issues in the Borrower Defense Provisions, CAPPS Br. 43,  highlight the uncertainty in this imminent regulatory regime, particularly if borrower proceedings were to have any preclusive effect.

[4]   Borrowers suggest, Borrower Br. at 30, 36, that CAPPS lacks standing to challenge certain provisions of the 2016 Rule.  But CAPPS certainly is "arguably within the zone of interests to be protected or regulated by the statute" whose violation is alleged."  *Gunpowder Riverkeeper v. FERC*,  807 F. 3d 267, 275 (D.C. Cir. 2015).  And the Department itself concedes that the 2016 Rule would cause CAPPS schools "substantial injuries" if it were to go into effect.

expedited proceedings while implementing the 2016 Rule would result in lasting damage. The Department does not contest this point. And, contrary to Borrowers' assertion, CAPPS is not considering only the interests of schools and the Department. Students would similarly be caught up in the chaos that would occur if the provisions were implemented and then invalidated. This is not simply a question of financial harm. It is a question of harming the educational mission that all parties support, and that serves the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant CAPPS's Renewed Motion for Preliminary Injunction.


Dated:  October 5, 2018

Respectfully submitted,

/s/ Clifford M. Sloan

| | |
|---|---|
| BORIS BERSHTEYN | CLIFFORD M. SLOAN, DC Bar No. 417339 |
| SKADDEN, ARPS, SLATE, MEAGHER | SKADDEN, ARPS, SLATE, MEAGHER |
| & FLOM LLP | & FLOM LLP |
| 4 Times Square | 1440 New York Avenue, NW |
| New York, NY 10036 | Washington, DC 20005 |
| T: 212/735-3834 | T: 202/371-7000 |
| | F: 202/661-8340 |
| | Email: cliff.sloan@skadden.com |
| | |
| GREGORY BAILEY | ROBERT L. SHAPIRO, DC Bar No. 415854 |
| SKADDEN, ARPS, SLATE, MEAGHER | DUANE MORRIS LLP |
| & FLOM LLP | 505 Ninth Street, NW |
| 155 N Upper Wacker Dr. #2700 | Washington, DC 20004 |
| Chicago, IL 60606 | T: 202/776-7867 |
| T: 312/407-0739 | F: 202/330-5290 |
| F: 312/407-8604 | |

*Attorneys for CAPPS*