**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CALIFORNIA ASSOCIATION OF
PRIVATE POSTSECONDARY SCHOOLS,

    *Plaintiff*,

  v.

ELISABETH DEVOS, in her official capacity
as Secretary of the U.S. Department of
Education, *et al.*,

    *Defendants*,

Civil Action No. 17-999 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

   This is not the first (and presumably not the last) chapter in a dispute about the fate of

regulations that the Department of Education promulgated in November 2016 to address

perceived deficiencies in the William D. Ford Federal Direct Loan Program ("Direct Loan

Program"), which allows students who attend participating schools to obtain federal loans.  The

regulations were intended to "protect student loan borrowers from misleading, deceitful, and

predatory practices."  William D. Ford Federal Direct Loan Program ("2016 Rule"), 81 Fed.

Reg. 75,926 (Nov. 1, 2016).  Shortly before the 2016 Rule was scheduled to take effect, Plaintiff

California Association of Private Postsecondary Schools ("CAPPS") brought this action seeking

to set the rule aside in its entirety.  Dkt. 1 at 75–76.  About a week later, CAPPS moved

preliminarily to enjoin the implementation or enforcement of a single provision, which prohibits

participants in the Direct Loan Program from employing predispute arbitration clauses and class

action waivers in certain disputes with student-borrowers ("Arbitration and Class Action Waiver

Provision").  Dkt. 6.  That motion was never fully briefed or decided, however, because the

Department of Education, on its own accord, stayed the effective date of most of the 2016 Rule

pursuant to 5 U.S.C. § 705 pending resolution of this case.  William D. Ford Federal Direct Loan

Program ("Section 705 Stay"), 82 Fed. Reg. 27,621 (June 16, 2017).

  The Department's Section 705 Stay led to the next chapter of the dispute.  Within weeks

of issuance of the stay, two student-borrowers and a coalition of nineteen states and the District

of Columbia filed separate lawsuits seeking to invalidate the stay.  *See Bauer v. DeVos*, No. 17-

cv-1330 (D.D.C. filed July 6, 2017); *Massachusetts v. Dep't of Education*, No. 17-cv-1331

(D.D.C. filed July 6, 2017).  The Department subsequently issued an interim final rule on

October 24, 2017, staying the effective date of the 2016 Rule to July 1, 2018, and then issued a

final rule staying the effective date for another year.  *See* William D. Ford Federal Direct Loan

Program ("Interim Final Rule"), 82 Fed. Reg. 49,114 (Oct. 24, 2017); William D. Ford Federal

Direct Loan Program ("Final Delay Rule"), 83 Fed. Reg. 6,458 (Feb. 14, 2018).  With each new

rulemaking, the student-borrower and state plaintiffs amended their complaints to challenge the

new action.  The Court consolidated the *Bauer* and *Massachusetts* cases and, on September 12,

2018, issued an opinion resolving the consolidated action.  *Bauer v. DeVos,* No. 17-cv-1330,

2018 WL 4353656 (D.D.C. Sept. 12, 2018) ("*Bauer I*").  In that decision, the Court held that the

Section 705 Stay was arbitrary and capricious and thus unlawful under the Administrative

Procedure Act ("APA"); that the Interim Final Rule was, for the most part, moot; and that the

Final Delay Rule was issued in violation of the Higher Education Act's negotiated rulemaking

requirement.  *Id.*  Five days later, the Court entered a remedial order vacating the Final Rule and

Section 705 Stay but staying vacatur of the Section 705 Stay until October 12, 2018.  *Bauer v.*

*DeVos*, No. 17-cv-1330, 2018 WL 4483783 (D.D.C. Sept. 17, 2018) ("*Bauer II*").  On October

12, 2018, the Court extended that stay until noon on October 16, 2018.  Minute Order (Oct. 12, 2018), *Bauer,* No. 17-cv-1330.[1]

The *Bauer I* decision, in turn, opened the current chapter of the dispute.  Two days after issuing that decision, the Court held a status conference in this action and set a schedule for CAPPS to renew its motion for a preliminary injunction to enjoin the 2016 Rule, which would go into effect upon expiration of the Court's stay.  *See* Minute Order (Sept. 17, 2018).  The Court also granted the *Bauer* plaintiffs leave to intervene ("Bauer Intervenors") and granted the interested states and the District of Columbia leave to participate as amici ("State Amici").[2]  *See* Minute Entry (Sept 14, 2018); Minute Order (Sept. 18, 2018).  On September 22, 2018, CAPPS filed the pending motion for a preliminary injunction.  Dkt. 65.  This time, however, CAPPS has sought preliminarily to enjoin four provisions of the 2016 Rule: (1) the Arbitration and Class Action Waiver that it targeted in its original motion; (2) the "Financial Responsibility Provision;" (3) the "Repayment Rate Provision;" and (4) the "Borrower Defense Provision."  *Id.* at 17.  The United States and *Bauer* intervenors filed briefs in opposition, and the states and the District of Columbia filed an amicus brief in opposition.  *See* Dkt. 67 (State Amici); Dkt. 68 (*Bauer* Intervenors); Dkt. 69 (United States).  CAPPS filed a reply brief on October 8, 2018, Dkt. 72, and the Court held oral argument the following day, Minute Order (Oct. 9, 2018).

Each of the four provisions that CAPPS seeks to enjoin raises a distinct set of issues; overall, CAPPS raises *twenty-four* challenges to the four provisions.  As to most of the

---

[1]  The Department of Education now notes that it "will not publish by November 1, 2018 a final rule rescinding the 2016 Rule," but that "the Department remains committed to rescinding the 2016 Rule, for all of the reasons set forth in the 2018 NPRM."  Dkt. 69 at 2.

[2]  On September 22, 2018, CAPPS sought reconsideration of the Court's decision granting the *Bauer* plaintiffs leave to intervene based on new evidence.  Dkt. 64.  The motion has been fully briefed, Dkt. 71, Dkt. 73, and is pending.

challenged provisions, CAPPS has failed to demonstrate that it has standing or that the dispute is ripe for decision.  Moreover, with respect to each of the four provisions, CAPPS has failed to carry its burden of demonstrating that any one of its members is likely to suffer an irreparable injury in the absence of an injunction.  Because irreparable injury is the *sine qua non* for obtaining a preliminary injunction, that flaw is dispositive.  In light of these threshold obstacles, the Court need not reach the merits of the plethora of substantive arguments that CAPPS raises— and, indeed, concludes that it would not be prudent to do so on such an abbreviated schedule. Those issues, in short, are for the next chapter.

The Court will, accordingly, deny the motion for a preliminary injunction and will set a schedule for cross-motions for summary judgment.

## I.  BACKGROUND

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, empowers the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education" through various types of financial aid.  *Id*. § 1070(a).  The William D. Ford Federal Direct Loan Program ("Direct Loan Program") allows students who attend "participating institutions of higher education" to obtain direct loans from the federal government to pay for their educational expenses.  *Id*. § 1087a(a). To participate in the Direct Loan Program, institutions of higher education must enter into contracts, called Program Participation Agreements ("PPAs"), with the Secretary of Education and agree to comply with the HEA, all applicable regulations, and certain other conditions.  *See* 20 U.S.C. §§ 1087c(a), 1094(a)(4); 34 C.F.R. §§ 668.14, 685.300(b).  These contracts may include any provisions "the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program.  20 U.S.C.

4

§ 1087d(a)(6); *see also id*. § 1087c.

By statute, students who are harmed by a Title IV school's violation of certain laws, including prohibitions on fraud, may be entitled to relief from their federal Direct Loan obligations through a process known as "borrower defense" to repayment. *Id.* § 1087e(h); *see also* 34 C.F.R. § 685.206(c). In administering the Direct Loan Program, the Secretary must also "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan" made under the Direct Loan Program. 20 U.S.C. § 1087e(h). And more generally, the Secretary has authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the" Direct Loan Program. *Id.* § 1221e-3.

Pursuant to these authorities, in January 1994, the Secretary issued "standards, criteria, and procedures governing the Federal Direct Student Loan . . . program," including the first iteration of the Borrower Defense Rule. Federal Direct Student Loan Program, 59 Fed. Reg. 472, 472 (Jan. 4, 1994). In December 1994, the Secretary amended the Direct Loan Program regulations, including those governing borrower defenses, *see* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994), and under those regulations, borrowers were permitted to assert "as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). The 1994 regulations (1) permitted a student borrower to assert her school's misconduct as a reason for nonrepayment, and (2) if the borrower was successful, permitted the Department of Education to recoup the loan from the school. *Id.* § 685.206(c)(2), (3).

The adequacy of the 1994 Borrower Defense Rule was tested by the collapse of Corinthian Colleges in May 2015. *See* William D. Ford Federal Direct Loan Program ("June 16,

2016 Notice of Proposed Rulemaking ('NPRM')"), 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). Corinthian, a for-profit company that "operat[ed] numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide," *id*. at 39,335, filed for bankruptcy in 2015.  In the wake of Corinthian's closure, the Department ultimately determined "that the college had misrepresented its job placement rates."  *Id*.  In the aftermath, "thousands of claims for student loan relief" were filed, and Corinthian's bankruptcy meant that there was "no other party from which the Federal government [could] recover any losses." 2016 Rule, 81 Fed. Reg. at 76,022.  The Department concluded, against this backdrop, that the 1994 borrower defense rule was outdated and was no longer adequate to deal with the changed "landscape of higher education."  June 16, 2016 NPRM, 81 Fed. Reg. at 39,335.

To address these perceived deficiencies, the Department commenced a rulemaking, and on November 1, 2016, it published the final rule governing the Direct Loan Program that is at issue in the present action.  2016 Rule, 81 Fed. Reg. at 75,926.  In relevant part, the 2016 Rule: (1) prohibits schools "participating in the Direct Loan Program from obtaining" or relying upon a borrower's "waive[r] [of] his or her right to initiate or participate in a class action lawsuit," or "from requiring students to engage in internal dispute processes before contacting accrediting or government agencies" ("Arbitration and Class Action Waiver Provision"); (2) requires "financially risky institutions [to be] prepared to take responsibility for the losses to the government for discharges of and repayments for [f]ederal student loans" ("Financial Responsibility Provision"); (3) adopts certain disclosure obligations for institutions "at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at the least one dollar the outstanding balance of the borrower's loans received at the institution"

("Repayment Rate Provision"); and (4) amends the standards and procedures applicable to the borrower defense process ("Borrower Defense Provision").  *Id*. at 75,926–27.

CAPPS seeks preliminarily to enjoin the implementation of each of these provisions.

## II. ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  Although the moving party may rely on "evidence that is less complete than in a trial on the merits," *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998), he nevertheless "bear[s] the burden of produc[ing] . . . credible" evidence sufficient to demonstrate his entitlement to injunctive relief, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (quotation marks omitted) (first alteration in original).

Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *id*. at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)), but it "has not yet needed to decide the issue," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d

1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) ("This circuit has repeatedly declined to take sides . . . on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction.") (en banc); *Sherley*, 644 F.3d at 393 (reading "*Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction'" but declining to decide the issue (quoting *Davis*, 571 F.3d at 1296)).

But, regardless of whether the sliding scale approach applies, a party seeking a preliminary injunction must clear two, non-negotiable hurdles. *First*, a court must—at each successive stage of the proceeding—evaluate whether it has jurisdiction to provide the relief sought, and it must do so through the lens of the standard applicable at that stage of the proceeding. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As a result, "a party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). That same reasoning, moreover, extends to other jurisdictional prerequisites, such as ripeness.

*Second*, as *Winter* makes clear, a mere "possibility" of irreparable harm will not suffice. *Winter*, 555 U.S. at 22. "Rather, a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *3–4 (D.D.C. Feb. 8, 2016); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Texas Children's Hosp. v.*

*Burwell*, 76 F. Supp. 3d 224, 241–42 (D.D.C. 2014); *Trudeau v. FTC*, 384 F. Supp. 2d 281, 296

(D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006).  As a result, if the moving party fails to

demonstrate that it is likely to suffer an irreparable injury, the Court must deny the motion.

With these guideposts in mind, the Court will consider whether CAPPS has established

that there is a "substantial likelihood" that the Court has Article III jurisdiction to consider its

challenge to each of the four provisions at issue and whether it has shown that the association, or

one of its members, is likely to suffer an irreparable injury if the Court does not issue a

preliminary injunction.

## A.      Arbitration and Class Action Waiver

The first of the provisions that CAPPS seeks to enjoin adds conditions to the Direct Loan

Program Participation Agreements—or "PPAs"—that participating schools must enter with the

Secretary of Education in order to receive Title IV funding.  2016 Rule, 81 Fed. Reg. at 75,927.

To qualify as a "participating institution," a school must enter a PPA promising to undertake an

array of responsibilities, such as estimating the needs of student-borrowers, reconciling certain

records on a monthly basis, and implementing a quality assurance system.  34 C.F.R. § 685.300.

As relevant here, the 2016 Rule amended this regulation to require that each participating school

must also agree that (1) it "will not seek to rely in any way on a predispute arbitration agreement

or on any other predispute agreement with a student who has obtained or benefited from a Direct

Loan, with respect to any aspect of a class action that is related to a borrower defense claim;" (2)

it "will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any

way on a predispute arbitration agreement with respect to any aspect of a borrower defense

claim;" and (3) if the school has existing contracts with student-borrowers that include covered

predispute class action waivers or arbitration agreements, "the school must either ensure [that]

the agreement[s] [are] amended . . . or provide the student[s] with written notice" that it will not "use" the predispute class action waivers or arbitration agreements.  2016 Rule, 81 Fed. Reg. at 76,087–88 (34 C.F.R. § 685.300(e)(1), (e)(3)(ii), (e)(3)(iii)(B), (f)(1), (f)(3)(ii), (f)(3)(iii)(B)).

According to CAPPS, these additional conditions "conflict with" the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2; exceed the Secretary's authority under the HEA, 20 U.S.C. 1087d; were promulgated in violation of the APA, 5 U.S.C. § 702(2); and violate the Due Process Clause.  *See* Dkt. 65 at 11–20.  For present purposes, however, the Court does not reach these questions but, instead, considers whether CAPPS has established standing to bring these claims and, if so, whether it has established that at least one of its members is likely to suffer an irreparable injury if the Court does not issue a preliminary injunction.  The answer to the first question is "yes," but the answer to the second is "no."  As a result, the Court must deny CAPPS's motion for a preliminary injunction with respect to the Arbitration and Class Action Waiver Provision.

     1.    *Standing*

As a first step, the Court must consider whether CAPPS has met its burden of establishing a "substantial likelihood" that it has standing to challenge the Arbitration and Class Action Waiver Provision.  *See Food & Water Watch, Inc.*, 808 F.3d at 913.  When an association, like CAPPS, seeks to establish standing, it may proceed in one of two ways: it may show that the association has "organizational standing" to sue on its own behalf, or it may demonstrate that it has "associational standing" to sue on behalf of its members.  *See Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018).  Here, CAPPS relies only on the latter theory.

Associational standing is premised on the theory that the plaintiff is not seeking a remedy on its own behalf but, rather, is proceeding "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  As such, the plaintiff need not establish that it has standing to sue in its own right, but must show that (1) at least one of "its members would otherwise have standing to sue in [her] own right," (2) the interests that the association "seeks to protect" in the litigation "are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Viewed through the lens of the pending motion, the Court has little difficulty in concluding that CAPPS is "likely" to satisfy the second and third prongs of the *Hunt* test.  According to the CAPPS's executive director, Robert Johnson, CAPPS provides its member schools with advice regarding compliance with regulatory mandates and assists "in the drafting of enrollment agreements and arbitration provisions."  Dkt. 65-2 at 1 (Johnson Decl. ¶ 1).  And this is not a case—like a damages action, for example—that requires the participation of individual members.  The first prong—the requirement that at least one member have standing to sue—however, requires more detailed analysis.

The standing inquiry begins with the oft-quoted test articulated in *Lujan v. Defenders of Wildlife*:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual and imminent, not 'conjectural' or 'hypothetical.'" . . .  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." . . . .  Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. 555, 560 (1992) (alterations in original) (internal citations omitted).  Because standing must be evaluated on a claim-by-claim basis, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000), and because standing must be assessed in light of the standard applicable at the relevant stage of the proceeding, *Lujan*, 504 U.S. at 561, this means that CAPPS must establish a "substantial likelihood" that at least one of its members (1) will suffer an "actual and imminent" injury, (2) that is "fairly traceable" to each of the challenged provisions, and (3) that "the injury will be redressed by a favorable decision."  As explained below, the Court concludes that CAPPS has met this burden with respect to its challenge to the Arbitration and Class Action Waiver Provision.

Six of the seven declarations CAPPS offers in support of its motion at least briefly touch on the question of arbitration.  In the most extensive discussion, Johnson attests that "virtually all CAPPS schools utilize arbitration agreements with their students," and he identifies two such member schools—Colleen O'Hara's Beauty Academy and Pima Medical Institute—by name. Dkt. 65-2 at 2 (Johnson Decl. ¶ 9).  Johnson adds that the Arbitration and Class Action Waiver Provision will require these schools "to send notices to their students" regarding the rule change, "to amend their agreements[,] retrain their admissions staffs[,] and actually litigate new cases, including class actions, in federal and state court."  *Id.* at 3 (Johnson Decl. ¶¶ 10–12).  Declarants from five member schools confirm that member schools "use[] arbitration provisions in [their] enrollment agreements."  Dkt. 65-4 at 1 (Casanover Decl. ¶ 5); Dkt. 65-5 at 1 (Gourji Decl. ¶ 5); Dkt. 65-6 at 1 (Wood Decl. ¶ 5); Dkt. 65-7 at 1 (Second Casanover Decl. ¶ 5); Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 5).  Those declarants, moreover, attest to the efficiency and reduced expense of resolving disputes through arbitration.  Dkt. 65-4 at 1-2 (Casanover Decl. ¶¶ 6, 8–10); Dkt. 65-5 at 1-2 (Gourji Decl. ¶¶ 6, 8–10); Dkt. 65-6 at 2 (Wood Decl. ¶¶ 6, 8–10); Dkt. 65-7 at

1–2 (Second Casanover Decl. ¶¶ 6, 8–10); Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 6–9).  Finally, three member schools assert: "We currently have disputes in arbitration and are not certain how we could proceed with those disputes if the [2016 Rule] goes into effect."  Dkt. 65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 11); Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 10).

The Court concludes that this showing is sufficient to establish that at least one CAPPS member school has standing to challenge the Arbitration and Class Action Waiver Provision. CAPPS has identified specific member schools that will likely suffer a concrete injury if the challenged provision takes effect, and it is likely that the relief sought from the Court—including a preliminary injunction—would redress that injury.  To take the most obvious example, the declarations establish that, if the Arbitration and Class Action Waiver Provision takes effect, each of the identified schools would be required promptly to send a notice to students with existing enrollment agreements informing them that the school will "not . . . use any predispute arbitration agreement to stop [the student] from bringing a lawsuit concerning" the covered conduct, 2016 Rule, 81 Fed. Reg. at 76,088 (new § 685.300(f)(3)(iii)(B)).  Because "standing does not depend on the size or quantum of harm to the party," *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1008 (D.C. Cir. 1977), that imminent cost is sufficient to sustain CAPPS's standing.

2.   *Irreparable Injury*

A prospective injury that is sufficient to establish standing, however, does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.  The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  The injury must be unrecoverable; it must be "both certain and great; [and] it must be actual and not theoretical." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674

(D.C. Cir. 1985).  To be sure, economic loss sustained due to a federal administrative action is typically "uncompensable" in the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not reach damages claims, 5 U.S.C. § 702 (permitting actions "seeking relief other than money damages").  But it proves too much to suggest that "irreparable" injury exists, as a matter of course, whenever a regulated party seeks preliminarily to enjoin the implementation of a new regulatory burden.  *See Air Transport Ass'n of Am., Inc. v. Export-Import Bank*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012).  Rather, an asserted "economic harm" must "be significant, even where it is irretrievable because a defendant has sovereign immunity."  *Id.* at 335.  In other words, the loss "must . . . be serious in terms of its effect on the plaintiff."  *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981).

This conclusion is consistent with an array of decisions from this Court holding that irreparable injury requires damage to a business "above and beyond a simple diminution in profits," *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000), and that, even where the United States is the defendant, "a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business,'" *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (quoting *Gulf Oil Corp.*, 514 F. Supp. at 1025).  The standard also requires more than conclusory assertions of potential loss.  To permit the Court to evaluate the nature and extent of the alleged irreparable injury, the movant bears the burden of presenting "specific details regarding the extent to which [its] business will suffer."  *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Res. Syst.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011).

The declarations offered in support of CAPPS's motion do not satisfy this "high standard." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Although they show that specific member schools use arbitration agreements and that they will incur some presumably imminent cost in providing the required notices to existing student-borrowers, they say nothing about the extent of that cost.[3]  Likewise, although the Court understands that, if the Arbitration and Class Action Waiver Provision takes effect, those schools will need to amend their enrollment agreements, the declarations—once again—provide no meaningful information about the extent of that cost.  Rather, each simply recites the same boilerplate conclusion that implementing the required "changes will be enormously burdensome and disruptive to [the school's] educational mission."  Dkt. 65-4 at 2 (Casanover Decl. ¶ 14); Dkt. 65-5 at 2 (Gourji Decl. ¶ 13); Dkt. 65-6 at 2 (Wood Decl. ¶ 13); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 14); Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 13); *see also* Dkt. 65-2 at 3 (Johnson Decl. ¶ 12) (referring to "enormous cost").  It is well-established that such "'broad conclusory statements' about the likelihood of harm" will not suffice.  *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 102 (D.D.C. 2014) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).  In short, "[b]are allegations of what is likely to occur are of no value;" the movant must, instead, "*substantiate* the claim that irreparable injury is 'likely' to occur."  *Wis. Gas Co.*, 758 F.2d at 674 (emphasis added).

---

[3]  Defendants respond to CAPPS's allegations of harm with respect to this provision by pointing out that a school could elect to forego Title IV funding and continue employing predispute arbitration agreements and class action waiver provisions.  Dkt. 68 at 28; Dkt. 69 at 11–12. CAPPS, in turn, argues that this only serves to "severely exacerbate[] the prospect of irreparable injury."  Dkt. 65 at 22.  CAPPS has not suggested, however, that any one of its member schools is likely to make this choice with respect to the Arbitration and Class Action Waiver Provision or any other provision they have sought to preliminarily enjoin.  The Court, accordingly, does not consider whether the loss of Title IV funding would constitute irreparable harm.

Each of the five declarations from CAPPS member schools also refers to the "harm[]" they will suffer due to "the absence of arbitration and class action provisions in [their] enrollment agreements."  Dkt. 65-4 at 2 (Casanover Decl. ¶ 9); Dkt. 65-5 at 2 (Gourji Decl. ¶ 9); Dkt. 65-6 at 2 (Wood Decl. ¶ 9); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 9); Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 8).  But, even putting aside the question whether requiring parties to litigate in court, as opposed to before an arbitrable tribunal, constitutes irreparable harm, none of the declarations says anything about when, if at all, such injury is likely to occur.  Specifically, they say nothing about how often they are confronted by covered legal claims brought by their students, about the nature of those claims, or about actual expense of litigating those cases, if any.  Such "theoretical" or "[un]certain" losses, once again, will not suffice.  *Wis. Gas Co*., 758 F.2d at 674.

As noted above, three declarations do assert, in identical language: "We currently have disputes in arbitration and are not certain how we could proceed with those disputes if the [2016 Rule] goes into effect."  Dkt. 65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 11); Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 10).  Notably, however, these declarations stop short of saying that the arbitrations would be affected by the rule; they merely assert that they are *uncertain* about how they could proceed.  By definition, uncertainty falls short of the type of actual and imminent threat needed to show irreparable injury.  *Wis. Gas Co*., 758 F.2d at 674.  One source of uncertainty, of course, is that nothing in the 2016 Rule prevents the parties to an existing dispute from agreeing to arbitrate, and, to the extent any pending case is on the eve of arbitration, it is not difficult to imagine that all parties might have an interest moving forward as planned.  The Court, of course, can only speculate about what might happen because these three declarations devote only single, qualified sentence to matters "currently . . . in arbitration."  Dkt.

65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 11); Dkt. 65-8 at 1

(Weerasuriya Decl. ¶ 10). Because those declarations say nothing about the number of

arbitrations, the nature of the disputes, whether the disputes clearly fall within the scope of the

2016 Rule (or whether the declarants are merely "[un]certain" about that question, *Wis. Gas Co.*,

758 F.2d at 674), whether the opposing parties would agree to continue the arbitrations, the cost

of litigating the disputes, or even about the stage of the proceedings, they fail to advance the ball

in any meaningful way.[4]

At oral argument, CAPPS offered a further theory of irreparable injury—the CAPPS

schools will sustain "reputational injury" stemming from the need to "zigzag" in their dealings

with students. Dkt. 75 at 21. Today, member schools employ arbitration clauses and class action

waivers; if the 2016 Rule takes effect, they will need to notify their students that they will not

use these agreements; and, if the 2016 Rule is set aside, they will want to shift back to using

arbitration clauses and class action waivers. To be sure, "[i]njury to reputation can, at least at

times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l*

*Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017). This, however, is not such a time.

To start, the declarations from the individual schools that CAPPS submitted in support of its

---

[4]  The declarations of all five member schools also make the qualified claim that, if they "cannot
include arbitration provisions in [their] enrollment agreements, the agreements will be difficult if
not impossible to amend at a future date" to reincorporate predispute arbitration agreements and
class action waivers. Dkt. 65-4 at 2 (Casanover Decl. ¶ 12); Dkt. 65-5 at 2 (Gourji Decl. ¶ 12);
Dkt. 65-6 at 2 (Wood Decl. ¶ 12); Dkt. 65-7 at 2 (Second Casanover Decl. ¶ 12); Dkt. 65-8 at 1
(Weerasuriya Decl. ¶ 11). Again, the qualification bears consideration. The declarations notably
stop short of asserting that it would, in fact, be impossible to amend the agreements at a future
date, presumably because they want to keep that option open. "Difficult" is very different from
"impossible," yet the declarations offer no insight into what might be required. They do not
indicate, for example, whether it would be permissible for the schools to include fallback
language in their enrollment agreements that would become operative when, and if, the
Arbitration and Class Action Waiver Provision is set aside.

motion make no mention of reputational harm.  Moreover, the schools have a ready answer to

any criticism they may face based on changes to their contracts; the changes are not a matter of

whim, but rather, they are compelled by federal law.  A preliminary injunction requires far more

than the indefinite prospect that some students might mistakenly blame one or more CAPPS

schools for the "zigzag" required by implementation of the 2016 Rule.

Finally, CAPPS argues that the arbitration and class action waiver provision "violates the

Due Process Clause through its retroactive application to current contracts" and that a

constitutional violation is *per se* irreparable.  Dkt. 65 at 36.  CAPPS is, of course, correct that

"suits for declaratory and injunctive relief against the threatened invasion of a constitutional right

do not ordinarily require proof of any injury other than the threatened constitutional deprivation

itself."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  But, even

assuming that this principle extends to constitutional claims of the type at issue here, the mere

assertion of a constitutional violation is not sufficient to establish irreparable injury.  Because the

alleged irreparable injury is the constitutional violation itself, the Court must consider whether

the movant has established that it "is likely to suffer [that] harm"—that is, the constitutional

injury—"in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.

CAPPS does not come close to clearing that hurdle.  It devotes just two sentences to its

due process argument, Dkt. 65 at 33, and for good reason:  To prevail on a due process challenge

to retroactive application of an economic law, the movant must show that the government action

bears no rational and legitimate relationship to the interest the government seeks to support.  *See*

*E. Enters. v. Apfel*, 524 U.S. 498, 549 (1998) (Kennedy, J., concurring).  Indeed, in the words of

the only majority opinion CAPPS cites, "[i]t is by now well settled that legislative Acts adjusting

the burdens and benefits of economic life come to the Court with a presumption of

constitutionality, and that burden is on one complaining of a due process violation to establish

that the [government] has acted in an arbitrary and irrational way." *Pension Benefit Guar. Corp.*

*v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984). CAPPS offers no basis to conclude that the

Department has crossed that deferential constitutional line by imposing a new condition on

schools that participate in the Direct Loan Program, even though that condition extends to

existing contracts.

The Court, accordingly, concludes that CAPPS has failed to carry its burden of

demonstrating that it, or one of its members, is likely to incur some irreparable injury if the

Arbitration and Class Action Waiver Provision is not preliminarily enjoined.

**B.      Financial Responsibility Provision**

CAPPS also asks that the Court preliminarily enjoin the Financial Responsibility

Provision of the 2016 Rule. That provision amends the standards that the Department uses to

determine whether a participating school is "financially responsible." *See* 20 U.S.C.

§ 1094(c)(1). The Secretary makes this determination by considering whether an institution is

able (1) to provide the services described in its official publications and statements; (2) to

provide necessary administrative resources; and (3) to meet all of its financial obligations. 20

U.S.C. § 1099c(c)(1). Pursuant to this authority, the Secretary has promulgated "financial ratios"

regulations, which assign a school a "composite score" based on a calculation of various

indicators of an institution's financial viability. *See* 34 C.F.R. § 668.172. Under the composite

score methodology, a school that achieves a score of 1.5 or greater may continue to participate in

the Title IV programs without providing financial protection to the Department, while an

institution with a score of less than 1.0 is deemed "not financially responsible" and must provide

financial protection in order to participate. *See* 2016 Rule, 81 Fed. Reg. at 75,983. Those

schools that are between 1.0 and 1.5 may continue to participate, but are "subject to increased reporting and monitoring." *Id*.

In response to concerns about identifying financial problems at participating schools at an early enough stage to ensure financial protection for the Department and taxpayers, *see* June 16, 2016 NPRM, 81 Fed. Reg. at 39,361, the 2016 Rule adds various events that can, either directly or indirectly, "trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities to the Department," 2016 Rule, 81 Fed. Reg. at 75,927.

First, there are a small number of triggers that automatically require a school to obtain a letter of credit without regard for any recalculation of its composite score. The "automatic" triggers apply if (1) the school "did not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds" in the most recent fiscal year; (2) a publicly traded school fails to file required reports with the Securities and Exchange Commission ("SEC"), is warned that it "may be suspended from trading" by the SEC or has been delisted by the exchange on which it trades, or "is not in compliance with exchange requirements;" or (3) the school has a "cohort default rate," which measures the extent to which students default on their loans, of greater than thirty percent. 2016 Rule, 81 Fed. Reg. 76,074. The Department has emphasized that these triggers automatically require financial protection because they so clearly indicate that an institution is financially at risk. For example, "[a]n institution that fails the requirement to derive at least 10 percent of its revenues from non-[T]itle IV sources is so dependent on [T]itle IV, HEA funds as to make the loss of those funds almost certainly fatal . . . [ . ] That risk requires financial protection regardless of the most recent composite score achieved by the institution." *Id*. at 75,984.

Second, there are a number of events that require the Department to recalculate an institution's composite score. *Id*. at 76,073. These triggers include (1) a requirement to pay any debt or "liability arising from a final judgment in a judicial" or administrative proceeding or settlement; (2) a suit brought "by a Federal or State authority for financial relief on a claim related to the making of the Direct Loan for enrollment at the school or the provision of educational services," but only if "the suit has been pending for 120 days;" (3) a suit that has made it past a motion for summary judgment (or the deadline for moving for summary judgment) or that is scheduled for a pretrial conference or trial; (4) a circumstance in which the school "was required to submit a teach-out plan . . . that covers the closing of the [school] or any of its branches or additional locations;" (5) a Department calculation shows that the school's "gainful employment programs . . . could become ineligible . . . for the next award year" based on calculations of graduates' debt-to-earnings rates; or (6) "any withdrawal of owner's equity . . . by any means" if the school operates for profit and its composite score is less than 1.5.[5] *Id*. If the recalculated "composite score" is less than 1.0, the school must provide a letter of credit or other financial protection. *Id*.

CAPPS challenges this provision on various grounds, arguing that it exceeds the Secretary's authority under the HEA, 20 U.S.C. 1087d; violates the APA, 5 U.S.C. 702(2); and violates the Due Process Clause. Dkt. 65 at 25–28. The Court concludes that CAPPS has failed to establish standing or irreparable injury and, thus, does not reach the merits of CAPPS's arguments.

---

[5] The 2016 Rule also recognizes certain "discretionary" triggers, which require a school to provide letters of credit when the "Secretary demonstrates that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution." Id. at 76,074 (providing a non-exhaustive list of examples, such as failure of a financial stress test and high annual dropout rates).

1.  *Standing*

Although "there is ordinarily little question" that a plaintiff who "is himself an object" of a regulatory action has sustained some "injury" and thus has standing to sue, *Lujan*, 504 U.S. at 561–62, the question presented here is not so easy.  The problem that CAPPS faces is that, "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured."  *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011).  Rather, "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered [or will suffer] an injury-in-fact."  *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006).  Here, however, not one of the declarations that CAPPS submitted from its member schools makes any mention of the Financial Responsibility Provision.  Dkt. 65-4 (Casanover Decl.); Dkt. 65-5 (Gourji Decl.); Dkt. 65-6 (Wood Decl.); Dkt. 65-7 (Second Casanover Decl.); Dkt. 65-8 (Weerasuriya Decl.).  No identified member even hints that it might be subject to one or more of the triggers that CAPPS seeks to challenge, and not one has indicated that it has incurred any compliance cost related to those triggers.  *Cf. State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (regulated party alleged that it incurred costs in monitoring the program).  In short, there is not even a passing reference to any present or future injury that any identified CAPPS member has or will sustain due to the Financial Responsibility Provision.

The only relevant evidence that CAPPS has offered appears in the Johnson and Gunderson declarations.  Both declarations assert that CAPPS member schools will be subject to the triggers, but they do so without reference to a single member school.  Absent the identification of a member likely to suffer an injury, these declarations fail to satisfy an essential requirement for establishing associational standing.  That omission, moreover, is not simply a

22

technical error.  Without any evidence about how an identified member school is likely to be

affected by the provision, the Court cannot determine whether the risk is minimal or substantial,

whether the prospective loss is minor or great, or whether the school may have an alternative

remedy, such as an APA action.  CAPPS may well be able to cure this deficiency but, on the

present record, the Court is left to conclude that CAPPS has failed "to show a substantial

likelihood of standing" and, thus, "is not entitled to a preliminary injunction." *Food & Water*

*Watch, Inc.*, 808 F.3d at 913 (internal citation omitted).

The Court need not, however, premise its decision on this ground alone because CAPPS

has also failed to carry its burden of showing that a specific member—or, indeed, any member—

is likely to sustain an irreparable injury if the financial responsibility provision is not

preliminarily enjoined.

    2.    *Irreparable Injury*

The Court's conclusions with respect to injury-in-fact extend with even greater force to

the question of irreparable injury.  As explained above, not one of the declarations offered by a

CAPPS member school so much as mentions the Financial Responsibility Provision.  The

Johnson and Gunderson declarations do address the provision, but they fail to show that any

member will suffer any harm that is "certain and great," "actual and not theoretical," and

"beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citations and

quotation marks omitted).   Johnson and Gunderson each attest that, if the rule takes effect,

"CAPPS members w[ill] be subject to [the] triggers;" that some CAPPS members are currently

defending lawsuits, and others "have been required to submit teach-out plans;" that CAPPS

schools "have gainful employment programs that could become ineligible for Title IV;" that the

triggers "would cause CAPPS members to post letters of credit;" and that "[o]btaining letters of

credit or other financial protection" would require schools to incur "substantial fees and expenses," Dkt. 65-2 at 5 (Johnson Decl. ¶¶ 20–25); Dkt. 65-3 at 3–4 (Gunderson Decl. ¶¶ 11–16).  Johnson notes that these consequences would pose a particular hurdle for the "smaller institutions" that make up most of CAPPS's membership.  Dkt. 65-2 at 5 (Johnson Decl. ¶ 26).

As to much of this, Johnson and Gunderson do not say when it is likely to occur.  Each merely says, in conclusory terms and without explanation, that CAPPS members will be required to post letters of credit, but they do not indicate whether that is likely to happen in the next weeks or months or at some time years from now.  Moreover, neither declaration provides any basis to conclude that any CAPPS school is likely to face a trigger that would *automatically* require a member school to obtain a letter of credit; they do not say, for example, that a CAPPS member has a cohort default rate in excess of thirty percent or is likely to be delisted from the exchange on which it trades.  Even with respect to those triggers that simply require that the Department recalculate the school's "composite score," moreover, the Johnson and Gunderson declarations fail to establish any imminent threat of irreparable harm.  Johnson says, for example, that "[m]any CAPPS schools are listed as defendants in lawsuits," Dkt. 65-2 at 5 (Gunderson Decl. ¶ 21), but he does not indicate whether those lawsuits have pending motions for summary judgment or whether the size of the claim for monetary relief in any of those cases is likely to push an otherwise acceptable "composite score" into the range requiring the posting of a letter of credit.  2016 Rule, 81 Fed. Reg. at 76,073.  *See also* Dkt. 65-3 at 3 (Gunderson Decl. ¶ 12) (making similarly general assertions).  Similarly, although Johnson asserts that CAPPS schools "have been required to submit teach-out plans" in the past, Dkt. 65-2 at 5 (Johnson Decl. ¶ 22), he does not say that any such demand is "likely" in the near future or that, even if it was, that the re-calculation of that school's "composite score" would require the posting of a letter of credit.

*See also* Dkt. 65-3 at 3 (Gunderson Decl. ¶ 13) (same).  And, finally, he asserts that CAPPS

"schools have gainful employment programs that *could* become ineligible for Title IV," Dkt. 65-

2 at 5 (Johnson Decl. ¶ 23) (emphasis added); *see also* Dkt. 65-3 at 3 (Gunderson Decl. ¶ 14)

(same), but that assertion is—on its face—too speculative to support preliminary relief.  *See Wis.*

*Gas Co.*, 758 F.2d at 674.

CAPPS has failed to demonstrate, moreover, that its members would be without a remedy

if subject to an unlawful or arbitrary and capricious direction to post a letter of credit.  At oral

argument, CAPPS did not dispute that the APA, 5 U.S.C. § 706(2), would provide a cause of

action, but argued that "the mere recalculation of the composite score requires notifying state

agencies with possibly profound consequences" and added that "there [is] no guarantee the state

agencies will [be willing to] wait until the outcome of" the APA action before taking adverse

action against a school with an unacceptable composite score.  Dkt. 75 at 36.  That concern—

without evidence that any CAPPS member will likely receive an unacceptable "composite score"

due to the operation of the 2016 Rule *and* that a state agency will likely take adverse action

before the school can obtain relief under the APA—is far too speculative to support a finding

that any CAPPS member is "likely" to sustain an irreparable loss if the financial responsibility

provision is not preliminarily enjoined.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–

98 ("speculative" injury insufficient to support preliminary injunction).

Finally, CAPPS argues that the automatic triggers violate the rights of its members to

procedural due process, Dkt. 65 at 41, and that any related injury is, accordingly, "per se

irreparable," *id*. at 43.  On the present record, however, it is far from clear that an aggrieved

school would lack any opportunity to contest or to refute the Department's conclusions.  *See,*

*e.g.*, 2016 Rule, 81 Fed. Reg. at 76,074 (discussing challenges relating to the cohort default rate);

*id.* at 76,006 ("an institution may show (1) that a reportable event no longer exists, has been resolved, or that it has insurance that will cover debts and liabilities that arise at any time from that triggering event; or (2) that the amount claimed in a lawsuit . . . exceeds the potential recovery the claimant may receive").  Indeed, CAPPS merely asserts that "the ability to contest a trigger exists on very narrow grounds" and "only for some, not all, of the triggers."  Dkt. 72 at 25.  That may be true, but the Court cannot discern whether any CAPPS member faces an imminent threat that it will be forced to post a letter of credit based on some set of facts that might escape review under the Financial Responsibility Provision.  And, even if CAPPS had shown that at least one of its members might be required to obtain a letter of credit without an opportunity to contest the Secretary's decision, it has not shown that its members have the type of interest in participating in the Title IV program that even implicates the Due Process Clause.  *See Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 867 (D.C. Cir. 1992) (noting that a "Program Participation Agreement confers upon member schools no legally protectible interest in . . . continued eligibility" for a Title IV program).  Absent any such evidence, or argument, the Court cannot conclude that CAPPS has demonstrated that it, or any of its members, is likely to suffer an imminent constitutional injury.

The Court, accordingly, concludes that CAPPS has failed to carry its burden of showing that it, or one of its members, is entitled preliminarily to enjoin the Financial Responsibility Provision.

## C.      **Repayment Rate Provision**

Next, CAPPS seeks preliminarily to enjoin the Repayment Rate Provision.  Under that provision, "the Secretary calculates a proprietary [school's] loan repayment rate[] for the cohort of borrowers who entered repayment on their [Title IV loans] at any time during the two-year

cohort period."  2016 Rule, 81 Fed. Reg at 76,070.  If that calculation shows "that the median

borrower has not either fully repaid . . . or made loan payments sufficient to reduce by at least

one dollar the outstanding balance of each of the borrower's [Title IV loans] received for

enrollment [at] the [school], the [school] must, in all of its promotional materials that are made

available to prospective or enrolled students, . . . include a loan repayment warning in a form,

place, and manner prescribed by the Secretary in a notice published in the Federal Register."  *Id.*

at 76,071.  Unless otherwise specified in the forthcoming regulation, the warning language must

provide: "U.S. Department of Education Warning: A majority of recent student loan borrowers at

this school are not paying down their loans."  *Id.*  To date, the Department has yet to promulgate

a rule specifying the form, place and manner for the required notice.  Dkt. 69 at 15 (noting that

"the Department has not yet published any notice that specifies the form, place, and manner that

would be required for such warnings").

CAPPS raises a host of challenges to this provision, both statutory and constitutional.  It

argues that the Secretary lacked statutory authority to adopt the rule; that it was adopted in

violation of the APA; and that it will violate the First Amendment rights of those schools

required to provide the mandated warning.  *See* Dkt. 65 at 31–35.  Once again, however, the

Court declines to reach the merits because CAPPS has failed to establish that it has standing or

that it or any member faces an imminent threat of irreparable injury.

1.      *Standing*

As with the Financial Responsibility Provision, in order to establish associational

standing to challenge the Repayment Rate Provision, CAPPS must show that "at least one

specifically-identified member has suffered [or will suffer] an injury-in-fact."  *Am. Chemistry*

*Council*, 468 F.3d at 820.  At the preliminary injunction stage, this means that CAPPS bears the

burden of establishing "a 'substantial likelihood'" that it will be able to prove that an identified member will suffer an injury as a result of the Repayment Rate Provision. *Food & Water Watch, Inc.*, 808 F.3d at 913.  It has failed to do so.

CAPPS submitted seven declarations in support of its motion, yet only one—the Johnson declaration—even mentions the Repayment Disclosure Pule, and that declaration fails to meet CAPPS's burden.  It merely asserts (1) that the 2016 Rule requires for-profit, participating schools, "in certain circumstances[,] to include in all promotional materials a loan repayment rate warning," and (2) that "[a]ny visitor of a school's website or reader of its promotional materials will unjustifiably view the institution[] as being financially unstable and ill-equipped to prepare [its] students to succeed financially upon graduation."  Dkt. 65-2 at 6 (Johnson Decl. ¶¶ 29–30). The declaration does not identify a single member school with a repayment rate that is sufficiently low that the school faces a concrete threat that it will be required to provide the mandated notice.  And, indeed, the declaration does not even posit that some unidentified member school faces such a threat.  Because CAPPS has failed to offer any evidence that any specific member school is likely to be subject to the challenged provision, it has failed to carry its burden of establishing a substantial likelihood that it has standing to challenge the Repayment Rate Provision.

     2.    *Irreparable Injury*

CAPPS's claim to irreparable injury is on even weaker ground.  To start, absent evidence that any specific CAPPS member is likely to find itself subject to the new rule, CAPPS cannot establish irreparable injury.  At oral argument, moreover, the Department removed any doubt regarding the risk that a CAPPS member school is likely to be harmed if the Court does not preliminarily enjoin the Repayment Rate Provision.  As noted above, the 2016 Rule expressly

contemplates that the Department will publish a notice in the Federal Register regarding the

form, place, and manner of the required notice.  *See* 2016 Rule, 81 Fed. Reg. at 76,071 (noting

that the warning will be "in a form, place, and manner prescribed by the Secretary in a notice

published in the Federal Register).  At oral argument, the Court asked whether the Department

would enforce the Repayment Rate Disclosure Provision before that notice is issued, and the

Department represented—in unqualified terms—that it will not take any enforcement action

before the notice issues.  Dkt. 75 at 122–23.  That is unlikely to occur anytime soon, moreover,

because the Department further represented the notice will "go through notice and comment

rulemaking," *id*. at 52, and will not take effect for at least thirty days following the promulgation

of a final notice.  *See* 5 U.S.C. § 553(d).

Plaintiff asserts three potential injuries relevant to this provision: "reputational injury,

financial harm, and deprivation of their constitutional rights."  Dkt. 65 at 35.  All of these harms,

however, turn on the premise that at least one member school will be subject to the Repayment

Rate Provision, and on the (incorrect) premise that the Department will enforce the provision in

the near future.  At oral argument, CAPPS suggested that First Amendment harms are *sui generis*

and that the mere *risk* of future enforcement may be enough to pose an irreparable injury.  Dkt.

75 at 28.  But the cases that recognize that type of harm are premised on the chilling effect that a

speech-regulating rule might have.  *See, e.g.*, *Chaplaincy of Full Gospel Churches*, 454 F.3d at

301 (in order to make out claim of irreparable harm, "moving parties must also establish they are

or will be engaging in constitutionally protected behavior to demonstrate that the allegedly

impermissible government action would chill allowable individual conduct").  A risk of criminal

prosecution for marching in parade, for example, might dissuade plaintiffs from attending, and

that chill could provide a basis for seeking preliminary relief.  This case, however, is different in

kind: CAPPS has failed to even identify any speech that could be chilled by the Repayment Rate

Provision.  In short, no substantial First Amendment issue will be presented until a member

school faces some risk that it will be required to issue the warnings, and that risk is non-existent

at least until the Department promulgates the required notice.

The Court, accordingly, concludes that CAPPS has not made the requisite showing to

entitle it to a preliminary injunction with respect to the Repayment Rate Disclosure Provision.

**D.      Borrower Defense Provision**

The final portion of the 2016 Rule that CAPPS seeks to enjoin is the Borrower Defense

Provision.  As State Amici note, the parties at times conflate two distinct processes.  Dkt. 67 at

49.  The first process is addressed in the 2016 Rule, and it amends the way in which student

borrowers may assert "defenses" to repayment of loans made to them by the Department under

Title IV, *see* 20 U.S.C. § 1087e(h).  Under the 2016 Rule, student-borrowers may now raise

"defenses" to repayment affirmatively; that is, they need not default on a loan and wait to assert a

defense to repayment in a collection action.  2016 Rule, 81 Fed. Reg. at 76,083.  In addition, the

2016 Rule changes the standard for what constitutes a defense to repayment.  In the past, student-

borrowers could only invoke defenses to repayment premised on violations of state law.  34

C.F.R. § 685.206(c)(1).  But, under the 2016 Rule, they may now rely on a new, federal standard

applicable to loans dispersed on or after July 1, 2017.  2016 Rule, 81 Fed. Reg. at 76,083.  That

new standard is available if (1) "the borrower . . . has obtained against the school a nondefault,

favorable contested judgment based on State or Federal law in a court or administrative

tribunal;" (2) "the school the borrower received a Direct Loan to attend failed to perform its

obligations under the terms of a contract with the student;" or (3) "the school or any of its

representatives . . . made a substantial misrepresentation . . . that the borrower reasonably relied

on to the borrower's detriment when the borrower decided to attend, or to continue attending, the

school or decided to take out a Direct Loan." *Id*.  Finally, the new Borrower Defense Provision authorizes "the Secretary [to] initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense." *Id*. at 76,084.

The second process begins where the first ends and contemplates that the Department, having relieved a student-borrower, in whole or in part, of his or her obligation to repay a Direct Loan, may seek to recover the amount due from the student's school.  34 C.F.R. § 685.206(c)(3). Among other potential theories of recoupment, the 2016 Rule provides that "the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school."  NPRM, 81 Fed. Reg. at 39,353.  As the Department explained in the final 2016 Rule, it intends to "undertake any action to recover against a school under specific procedures that are being developed and will ensure an opportunity for the school to present its defense and [to] be heard."  2016 Rule, 81 Fed. Reg. at 75,960.  Those procedures "will be comparable to that provided" under existing regulations "for actions to find, or to limit, suspend or terminate participation of, a school;" "[t]he hearing will be conducted by a Department official who is independent of the component of the Department bringing the action;" and "[a]ny decision reached in these proceedings would be reviewable under section 706 of the APA."  *Id.* Although the 2016 Rule permits "the school of the borrower" to offer certain "evidence or argument" in the proceeding between the student-borrower and the Secretary, *id*. at 76,084, the Department has represented to the Court that it will not invoke collateral estoppel to bind the school with respect to findings made in that proceeding, Dkt. 75 at 83–84.

CAPPS challenges both processes.  It challenges the Department's authority to adopt the new Borrower Defense Provision and argues that, in any event, the provision is arbitrary and capricious and not the product of reasoned decision making under the APA.  Dkt. 65 at 38–43. And it argues that both steps in the process violate the Due Process Clause, Article III, and the Seventh Amendment "because Department officials are responsible for both prosecuting and hearing cases," and because "agency officials" are authorized "to adjudicate what in essence is a private right."  *Id*. at 43.  Once again, however, the Court declines to reach the merits of CAPPS's arguments because it has yet to demonstrate that CAPPS has standing to challenge any final rule and has not carried its burden of establishing irreparable injury.

      1.     *Standing and Ripeness*

To the extent CAPPS challenges the standards and procedures applicable to the proceeding between the student-borrower and the Secretary, it has yet to show that it has standing.  As clarified at oral argument, that proceeding is not binding on the relevant school; it binds only the student-borrower.  Dkt. 75 at 6–8.  The question, then, is—if the new rules governing the process between the student-borrower and the Department are not set aside—what "concrete and particularized" and "actual and imminent" injury, *Lujan*, 504 U.S. at 560, will any CAPPS member likely suffer?  Or, more precisely because we are at the preliminary injunction phase, what has CAPPS offered to show that there is a "substantial likelihood" that it will be able to carry its burden of proving that at least one identified CAPPS member will suffer a concrete and imminent injury?  *Food & Water Watch, Inc.*, 808 F.3d at 913.

At least at this stage of the proceeding, CAPPS has failed to carry this burden.  Notably, not one of the seven declarations that CAPPS has submitted so much as mentions the Borrower Defense Provision.  Not a single school has indicated that the rule will affect its conduct in any

way or that a proceeding between a student-borrower and the Secretary is likely to have any effect on the school.  It is possible that CAPPS might eventually show that the proceeding between a student-borrower and the Secretary—which is not binding on the school—will cause a member school some cognizable injury-in-fact.  Thus far, however, it has not done so.

To the extent that CAPPS, instead, challenges the Department's authority to bring a recoupment action against a CAPPS member school, that challenge faces both standing and ripeness difficulties.  Ripeness is a justiciability doctrine designed "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)); *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007).  "The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57, n. 18 (1993)).  "Determining whether an administrative action is ripe for judicial review requires" the Court to "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Labs*, 387 U.S. at 149).

For the most part, the standing and ripeness issues raised by CAPPS's challenge to the Department's recoupment authority overlap.  As the Department explained in the final 2016 Rule, it is still "develop[ing]" procedures to govern actions "to recover against a school" based on loan obligations the Department decides to relieve under the new Borrower Defense Provision.  2016 Rule, 81 Fed. Reg at 75,960.  Before such an action could commence, a student-borrower from a CAPPS member school would need to institute a borrower-defense action; the

Department would need to decide that action in favor of the student; the Department would need to develop procedures governing a recoupment action; and the Department would need to bring such an action.  The Court cannot discern on the present record whether—and, if so, when—a CAPPS member would be subject to a proceeding to recoup amounts foregone in a borrower-defense proceeding.

Even putting this threshold difficulty aside, CAPPS has yet to demonstrate that its challenge to the recoupment process is ripe for decision.  To take one example, with the evidence now before it, the Court cannot determine whether the Department might seek to recover from a participating school based on a violation of the new, federal standard, or whether it would simply seek to recover based on the theory that it is subrogated to, or has been assigned, whatever rights the student borrower may have had against the school under state law.  *See* 2016 Rule, 81 Fed. Reg. at 76,086.  To take another example, CAPPS argues that the recoupment procedure is unconstitutional because the same "Department officials are responsible for both prosecuting and hearing cases," Dkt. 65 at 65, but the Court cannot evaluate that premise before the Department has finalized the rules that will govern those proceedings, *see* 2016 Rule, 81 Fed. Reg at 75,960.  Because these questions and others that bear on CAPPS's challenge remain unanswered, the Court concludes that CAPPS has not shown a "substantial likelihood" that it will be able to establish that the challenge is fit for review.[6]

---

[6]  To be sure, portions of CAPPS's challenge might be; to the extent CAPPS argues that the Department is entirely without authority to seek recoupment, for example, a challenge to the provision assigning the borrower's right to a loan refund to the Secretary might be fit for adjudication.  But, even as to that more limited challenge, CAPPS has not carried its burden of showing that an *identified* member school faces an actual threat of injury.

Finally, given the undisputed availability of APA review of any final recoupment decision, *see* 2016 Rule, 81 Fed. Reg. at 95,960, it has not shown that the association or its members will face a significant "hardship" if review is postponed.

2.      *Irreparable Injury*

Even if CAPPS has standing to bring a ripe challenge to some portion of the Borrower Defense Provision, CAPPS makes no plausible claim to irreparable injury.  As noted above, none of CAPPS's declarations even mentions the Borrower Defense Provision and, as far as the Court can discern on the current record, there is no prospect that the Department will initiate a recoupment action against a CAPPS member school in the near future.  Moreover, even if the Department were to do so, CAPPS does not dispute that the Department's decision would be subject to APA review, and a harm that can be remedied under the APA is not irreparable.[7]

At oral argument, CAPPS suggested that, even if the result of a proceeding between a student-borrower and the Secretary is not binding on the student's school, a finding by the Secretary that the student should be relieved of its obligation to repay a student loan due to a breach of contract or a misrepresentation by the school "would obviously have a reputational damage" to the school.  Dkt. 75 at 9.  That assertion, however, is once again unsupported by any evidence and is far from self-evident.  Indeed, when asked at oral argument, the Department represented that its decisions in proceedings between student-borrowers and the Department will not be published in the Federal Register.  Dkt. 75 at 84; *see also id.* at 9.  And, although it is

---

[7]  CAPPS does assert in its brief that the provision will require CAPPS member schools to "expend substantial transition costs to comply with these new regulations;" which will cause a "diversion of resources from schools' mission of educating students;" and will cause a "regulatory whiplash," if the Department later rescinds the rule.  Dkt. 65 at 43–44.  None of that, however, is supported by any evidence, nor is it self-evident that any CAPPS members will sustain any loss related to the Borrower Defense Provision in the near future.

possible that such a decision might be subject to a FOIA request, *id*. at 84, it is speculative—at best—to suggest that a student from an unidentified CAPPS member school might someday bring a successful borrower defense claim that reflects poorly on that school; that someone would obtain that decision under FOIA or some other disclosure statute; and that the disclosure of the decision would cause the school some material, reputational damage above and beyond whatever accusations of wrongdoing are already public.  At least on the present record, this theory does not demonstrate that type of "actual and not theoretical" harm necessary to support a preliminary injunction.  *Wis. Gas Co.,* 758 F.2d at 674.

The Court, therefore, must deny CAPPS's motion with respect to the Borrower Defense Provision.

*   *   *

In sum, the Court concludes that CAPPS has failed to carry its burden of demonstrating that it is entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*, 556 U.S. at 24.  With respect to many of CAPPS's challenges, the Court is not convinced that the association has shown a "substantial likelihood" that it has standing to sue.  *Food & Water Watch, Inc.*, 808 F.3d at 913.  With respect to some challenges, that conclusion is clear, while it is less certain as to others.  But, as to each of the challenges that CAPPS raises in the pending motion, it falls well short of the "high standard for irreparable injury" that the Court of Appeals "has set." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Because the likelihood that the movant will suffer an irreparable injury is the *sine qua non* for issuance of a preliminary injunction, that flaw is dispositive.  *See, e.g.*, *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *Achagzai*, 2016 WL 471274, at *3–4; *Texas Children's Hosp.*, 76 F. Supp. 3d at 241–42; *Trudeau v. FTC*,

384 F. Supp. 2d at 296.  The Court will, accordingly, deny CAPPS's motion for a preliminary

injunction and set a schedule for cross-motions for summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff's renewed motion to for preliminary injunction, Dkt.

65, is hereby **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  October 16, 2018