## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,**

2520 Venture Oaks Way #170
Sacramento, CA 95833

**Plaintiff,**

v.

**BETSY DEVOS, in her official capacity as Secretary of the Department of Education,**

Office of the Secretary
400 Maryland Avenue, SW
Washington, D.C. 20202, and

**THE DEPARTMENT OF EDUCATION,**

400 Maryland Avenue, SW
Washington, D.C. 20202

**Defendants.**

Civil Action No. ~~————————~~ **17-999 (RDM)**

## AMENDED COMPLAINT AND PRAYER
## FOR DECLARATORY ~~AND INJUNCTIVE~~ RELIEF

Plaintiff California Association of Private Postsecondary Schools ("CAPPS"), for its amended complaint against Defendants, the Honorable Betsy DeVos, Secretary of the Department of Education ("Secretary"), and the Department of Education (the "Department") alleges, by and through its attorneys, as follows:

## INTRODUCTION

1.     This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706 ("APA")~~, and the United States Constitution~~ challenging regulations promulgated by the

Department on November 1, 2016, as well as supplemental regulations promulgated on
January 19, 2017. *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule" or "Borrower
Defense Regulations"); 82 Fed. Reg. 6253 (Jan. 19, 2017) ("Borrower Defense
Procedures"). The Department stated that the Final Rule was adopted pursuant to Title
IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq*., which
governs federal financial aid for postsecondary education. The regulations exceed the
Department's authority under the HEA and conflict with the Federal Arbitration Act
("FAA"), and are arbitrary and capricious under the APA, ~~and violate the United States
Constitution~~.

2.      Plaintiff CAPPS is a non-profit association of California private postsecondary schools.
CAPPS has a membership of around 150 institutions, including proprietary (*i.e.*, for-
profit) and non-profit schools, most of whom are eligible for Title IV funding. Nearly all
CAPPS schools offer curriculum-driven educational programs designed to prepare
students for occupations that are necessary to a thriving economy. For example, CAPPS
schools train future nurses, ultrasound technicians, emergency medical technicians,
electricians, and individuals in numerous other occupations. Neither the local nor the
national economy would function without workers in these fields.

3.      Most CAPPS member schools are smaller institutions, averaging less than 400 students
and one or two locations. Moreover, CAPPS members serve many students who are non-
traditional, including students who did not attend college immediately after graduating
from high school, part-time students, students with full-time jobs, students who are
financially independent, students who have dependents, and students who have earned a

GED.  Students at CAPPS schools are also more likely to be low-income, older, and minorities than are students at public or non-profit colleges and universities.

4.     The Final Rule threatens the existence of many CAPPS member institutions.  The increased costs and the dramatically escalated threat of meritless claims and litigation, both before the Department and in court, will be crippling for many schools.  The lack of procedural safeguards and clear standards throughout the Final Rule severely exacerbates these problems.

5.     The Borrower Defense Regulations are likely to shutter many vocational schools without any reasonable justification and will needlessly leave many non-traditional students with few or no educational options.  A wide range of industries across America will suffer when their supply of qualified employees slows to a trickle.

6.     Many traditional liberal arts schools will suffer as well.  The Final Rule exposes all schools to massive new liability, and likely will be particularly harmful to schools serving low-income and minority students.  As a result, a wide and disparate group of citizens and institutions, including many historically black colleges and universities ("HBCUs"), have expressed concern about the unwarranted cost and burdens of the new rules.

7.     CAPPS supports thoughtful, appropriate regulation of the postsecondary education sector.  CAPPS works with its schools to foster a strong culture of compliance.  CAPPS also supports providing relief to students who have been victims of fraud, as the Final Rule purportedly aims to do.  But the Final Rule is not a lawful, common-sense, well-considered, reasoned regulatory intervention.  It goes far beyond aiding students who have been the victims of fraud and threatens massive, unnecessary, harmful, and severe consequences.  The Final Rule is a sprawling mass of thinly studied new requirements

that, by the Department's own estimates, will cost schools almost one billion dollars per year.  The ten-year impact on the public fisc is estimated at $14.9 billion dollars.  It is necessary and important that regulations with such a profound fiscal impact be justified and supported by reasoned decision-making.  This Rule was not.

8. The Final Rule creates a seismic shift in multiple areas of higher education regulation without legal basis or reasonable justification.  First, the Department has radically changed the grounds and processes for student borrowers to raise "borrower defenses" to Title IV loan repayment ("Borrower Defense Provisions").  Previously, as its name suggests, a so-called "borrower *defense*" could be raised by a student only as a defense in a proceeding *against* the student to collect on his or her debt, and only when a school had contravened state law.  But the Department has transformed the borrower "defense" into a wide-ranging affirmative cause of action that a student can use to have all of his or her Title IV debts cancelled, or even recover loan amounts previously paid, with the student's financial liability transferred to either the student's school or federal taxpayers.  Although Congress has created a handful of explicit and targeted debt forgiveness programs that help borrowers who commit their careers to public service, Congress has never intimated that borrower "defenses" were meant to erase debt for thousands of students who were reliably paying back their loans, or to charge schools for those losses.  Making matters worse, the Department has failed to provide sufficient procedural protections for affected educational institutions.

9. Second, the Final Rule imposes sweeping new requirements regarding a school's "financial responsibility" ("Financial Responsibility Provisions").  These provisions fail to appropriately account for an institution's total financial circumstances and go well

~~beyond assessing institutional financial responsibility.  Their far-reaching mandates and automatic "triggers" may label a school financially unsound if it, for example, merely is sued by a public entity, regardless of the merits of the suit.  Educational institutions that trip one of these "triggers" may be required to post expensive and difficult-to-obtain letters of credit for large sums of money.  And these same educational institutions may now be required by law to report negatively on their financial situation to current and prospective students – even if the school is able to demonstrate, despite a pending lawsuit or regulatory filing, that it is otherwise financially sound.~~

~~10.~~    ~~Third, the Department unjustifiably requires a new loan repayment rate warning that applies only to proprietary institutions ("Repayment Rate Provisions").  These provisions would require proprietary schools to "warn" prospective students when the median recent alumnus or alumna is not paying his or her loans back quickly enough.  As commenters explained, this new metric unjustifiably penalizes institutions whose students are on income-based repayment plans, despite the Department and Congress's strong support for those very plans.  It also penalizes schools based on students' educational and financial background.  In addition, the Repayment Rate Provisions fail to apprise students and prospective students at non-profit and public schools that have failed to meet the same repayment rate requirements as proprietary schools.  The decision to adopt proprietary-school-specific regulations was based on data that the Department now admits was erroneous.~~

~~11~~8.    ~~Fourth, with~~ The Final Rule creates a seismic shift in higher education regulation without legal basis or reasonable justification.  With no statutory authorization and in conflict with the strong federal policy favoring arbitration, the Department prohibits institutions

from including arbitration provisions or class action waivers in their agreements with students ("Arbitration and Class Action Provisions").  The Department prohibits these clauses in contracts despite the fact that Congress and the United States Supreme Court have repeatedly emphasized the benefits of arbitration and of class action waivers, embodied in the FAA.  In addition to banning these provisions in future agreements, the Department forbids schools from enforcing their existing contracts regarding arbitration and class actions.

1~~2~~9.  The Final Rule harms institutions and their students, without legal authority and without a sound or adequate justification.  ~~Each of the Final Rule's four categories of regulation promises~~The Arbitration and Class Action Provisions promise to be extremely costly, especially to proprietary and career-oriented schools and other schools that serve underrepresented groups.  ~~If the Final Rule takes~~ With the Arbitration and Class Action Provisions in effect, many schools serving non-traditional students, particularly small schools, may be forced to shut down due to the crushing burden of the regulations' cost, which are imposed without accompanying public benefit.

1~~3~~10.  These unfortunate outcomes are the product of a rushed and flawed rulemaking process.  The Secretary gave students, lenders, schools, and others only 45 days to comment on this massive regulatory project.  Still, over 10,000 comments were filed.  The Department then purportedly read, considered, and responded to each material comment in its final draft in less than six weeks.  After that, the Department sent the final version of its rule to the Office of Management and Budget ("OMB") for review.  The OMB review process generally takes 90 days.  This review was complete in a little over 30 days, despite the regulations' $14.9 billion price tag.

14·11.  The Department's rush was aimed at finalizing the rule before November 1, 2016, which

was one week before the presidential election and the last possible date under the

applicable statute for promulgating rules that will go into effect the next fiscal year.  The

hurried timetable is evident in the sloppy drafting of the Final Rule.

15·12.  The regulatory provisions published in the Federal Register lack any statutory basis, and

demonstrate an absence of reasoned decision-making, and run headlong into contrary

provisions of the U.S. Constitution.

16.  The Final Rule is unlawful for several reasons.  First, the Rule exceeds the statutory

authority conferred by the HEA.  Contrary to the Final Rule's Borrower Defense

Provisions, the HEA does not allow borrowers to affirmatively move to cancel their debt;

nor does the HEA authorize the Department to pursue schools in an administrative setting

for whatever borrower liability the Department chooses to forgive.  Similarly, with regard

to the Financial Responsibility Provisions, the methods the Final Rule uses to determine

financial responsibility do not comport with the terms of the HEA.  Instead, the

Provisions fail to fulfill the statute's mandate to account for an institution's total financial

circumstances, impermissibly delegate tasks to third-party actors, and specify regulatory

consequences different from those in the statute.  With regard to the Repayment Rate

Provisions, the Department cites no relevant authority for mandating disclosures in all

marketing communications with prospective students.  And, with regard to the

Arbitration and Class Action Provisions, the HEA also does not authorize the

Department's sweeping changes to existing contracts between schools and students.  The

Department's actions expressly conflict with Congress's pro-arbitration policy embodied

in the FAA.

13. The Arbitration and Class Action Provisions are unlawful for several reasons. First, the Department's actions expressly conflict with Congress's pro-arbitration policy embodied in the FAA. The Rule exceeds the statutory authority conferred by the HEA, which does not authorize the Department's sweeping changes to contracts between schools and students.

17 14. Second, the Department's massive rewrite of current regulations suffers from a lack of reasoned decision-making and is arbitrary and capricious under the APA. Among other things, the Final Rule does not explain why its creation of an affirmative right to cancel debt through the Borrower Defense Provisions is reasonable, or why it affords schools only minimal process before holding the institution liable for borrower defense to repayment claims. In the Financial Responsibility Provisions, the Department arbitrarily imposes significant consequences, in some cases *automatically*, based on "triggering events" that may have little or nothing to do with the school's financial soundness. It then estimates the impact of several events using a novel and unsound methodology without employing standard accounting practices. These "triggers" raise serious problems regarding fairness, due process, and reasoned decision-making. The Department's Repayment Rate Provisions arbitrarily target proprietary schools and punish institutions whose students use the Department's income-based repayment plans, in contravention of the APA. Moreover, the The Department's Arbitration and Class Action Provisions are arbitrary and capricious for numerous reasons, including, but not limited to, a lack of reasoned discussion of the benefits of arbitration; significant reliance on a study completed by a different agency unrelated to the federal student loan market; and contradictions in the Department's reasoning in the preamble itself.

8

18.   ~~Finally, the Final Rule violates the Constitution.  By providing schools with little process before an administrative tribunal, the Borrower Defense Provisions violate the Due Process clause of the Fifth Amendment, Article III of the Constitution, and the Seventh Amendment right to a jury trial in a civil case.  The Financial Responsibility Provisions also violate the Due Process clause by imposing penalties automatically, without the ability to demonstrate a school's financial soundness.   The Repayment Rate Provisions force schools to engage in broad, prophylactic speech that may misrepresent the school's views, in violation of the First Amendment.  And the Department's retroactive application of the Arbitration and Class Action waiver provisions creates significant constitutional problems.~~

~~19~~15.   The Court should vacate the challenged regulations and, if necessary, remand this matter to the agency for further, more careful consideration.

## PARTIES

~~20~~16.   Plaintiff CAPPS is a voluntary, non-profit association of California private postsecondary schools.  Its principal place of business is located in Sacramento, CA.  CAPPS has a membership of approximately 150 institutions, including proprietary and non-profit schools.  Most of CAPPS's member schools are smaller institutions, averaging less than 400 students.  The vast majority of CAPPS schools are accredited and participate in financial aid programs under Title IV of the HEA.  20 U.S.C. §§ 1070-1099d.  They thus will be subject to the Final Rule.  CAPPS schools will face additional regulatory burdens and compliance costs as a result of the new regulations, and those costs are already accruing.  These injuries are directly traceable to the Final Rule.  The injuries would be remedied by a favorable judgment vacating the regulations.  The interests CAPPS seeks

to protect are germane to its purpose of promoting reasonable policy and regulation in the postsecondary education sector, and the claims asserted and relief requested do not require the participation of individual members.  CAPPS is also injured in its administrative capacity because it will have to alter its own compliance and training programs in light of these novel and unlawful regulations, which will cost the organization substantial time and money.

2117.  Defendant Betsy DeVos is the Secretary of Education.  She is sued in her official capacity.  The Secretary's official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.  The Secretary, in her official capacity, is responsible for the Department's promulgation of the Final Rule.

2218.  Defendant Department of Education is an agency of the United States.  As such, it is subject to the APA.  *See* 5 U.S.C. § 551(1).  The Department is located at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

2319.  This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-06, and the United States Constitution.  Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331.

2420.  Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States; because Defendant Department of Education resides in this judicial district; because Defendant Secretary DeVos performs her official duties in this judicial district; and because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**I.      CAPPS AND PRIVATE SECTOR SCHOOLS**

~~25~~21.   CAPPS is the only California state association that represents the full and diverse range of private postsecondary schools in California.  CAPPS has a membership of approximately 150 institutions, which includes proprietary and non-profit institutions. CAPPS schools offer a wide range of degrees, from certificates, to associates degrees, masters degrees, and professional degrees.

~~26~~22.   CAPPS schools prepare workers for many occupations that are necessary to a thriving economy.  CAPPS schools train future nurses, dialysis technicians, ultrasound technicians, home health aides, emergency medical technicians, information technology specialists, hardware and software experts, cyber-security specialists, HVAC and refrigeration technicians, heavy equipment specialists, electricians, paralegals, chefs, line cooks, cosmetologists, and even gunsmiths.  Some CAPPS members specialize in training injured workers to reenter the workforce, and others partner with workforce training organizations to educate their participants in labor-demand occupations.

~~27~~23.   The economy would not function adequately without workers in these fields.  Local hospitals, labs, repair companies, and restaurants depend on a reliable stream of well-trained workers.  So do consumers.  Many elderly patients, for example, would suffer if home health aides or dialysis technicians were in short supply.  Registered nurses, whom many CAPPS schools train, are among the most in-demand workers in the national economy.  Without private schools supplying much-needed workers in these trades, industry would suffer.  Private sector schools supply approximately half of all technically trained workers entering the workforce each year.

2824.   Many CAPPS schools are also small, family-owned businesses.  These small businesses offer upward mobility for their owners as well as their students.  These small schools, often labeled "technical colleges," differ from traditional higher education institutions in that they do not offer broad-based liberal arts degrees.  Instead, they offer degrees and certificates based on specific occupational skillsets that often require state or national licensing.  These educational institutions are closely connected to employers, and their presence ensures that businesses can recruit well-trained staff and remain competitive.  These occupational degrees and certificates allow consumers and companies to benefit from employees who are skilled in the latest techniques and tools of their craft.

2925.   CAPPS is dedicated to protecting the interests of all of its members, including smaller institutions.  Proprietary institutions are among the most intensely regulated entities in California and nationally.  The California legislature has imposed dozens of legal requirements that apply only to proprietary schools.  The California state regulatory agency that oversees proprietary schools has also imposed multiple onerous regulations implementing proprietary-school-only legislation.  There are also scores of statewide boards, bureaus, and commissions that oversee the licensing of practitioners and approval of programs concerning various occupations offered by CAPPS institutions.  In addition, federal oversight of these schools has been increasing rapidly.

3026.   On information and belief, the fiscal burden that the Final Rule imposes will pose a serious threat to the viability of some CAPPS schools.

3127.   The harm to students would be particularly acute if schools begin to close in large numbers as a result of the unlawful and detrimental new regulations.

~~32~~28.  Most CAPPS members are proprietary institutions, which serve a student population that has a high percentage of low-income and minority individuals who otherwise are not well served by traditional institutions.  For example, proprietary schools' students are more likely to receive Pell grants, which provide financial aid exclusively for low-income borrowers.  *See* Comments of CAPPS, ED-2015-OPE-0103, Attach. 1, Declaration of Jonathan Guryan, Ph.D., ¶ 14 (Aug. 1, 2016).  Students at proprietary schools are also likely to be the first in their family to graduate from college.  *Id.*  In addition, in 2011-12, 26 percent of students at proprietary schools were African-American, compared to only 15 percent at public schools and 14 percent at private non-profit schools.  *Id.* ¶ 10.  "The fraction of students who were Hispanic at for-profit schools was 19 percent, similar to the 17 percent at public schools, but greater than the 10 percent at private not-for-profit schools."  *Id.*  Students at proprietary schools are also more likely to be single parents, financially independent, and over the age of 25.

~~33~~29.  These students are often drawn to proprietary schools based on the schools' flexible schedules and focused instruction.  Many proprietary schools offer classes on evenings and weekends, or even online.  Those programs are also tailored toward specific, in-demand occupations.  Since proprietary school students are likely to be financially independent – and many are single parents – this flexibility and responsiveness to the market is important.

~~34~~30.  Proprietary schools have established a record of successful efforts to help those students, whom other schools might label "at risk," actually graduate.  As the former president of Northwestern University has noted, "The graduation rates of some for-profit institutions are well above 50% – as high or higher than those of many four-year public colleges, let

13

alone community colleges and nonselective public and private colleges (which often have rates below 50%),” even given their non-traditional student populations.  Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010), http://www.wsj.com/articles/SB10001424052748703724104575378933954267308.

~~35~~31.  As the Department itself acknowledged, “there are many proprietary career schools and colleges that play a vital role in the country’s higher education system.”  81 Fed. Reg. at 75,934.

~~36~~32.  ~~If~~In light of the new regulations ~~are implemented~~, many non-traditional students may be unable to access postsecondary education.  ~~For example, the Repayment Rate Provisions, which apply only to proprietary schools, are triggered if a loan “repayment rate” for students is below a certain threshold.  These provisions penalize schools even when *students are current on their loans but repaying slowly* as they launch their careers and deal with daunting economic challenges.  Schools will therefore be required, under the new regulations, to issue disclosures that will harm their reputations and recruitment efforts based on statistics that are not clearly correlated with student achievement.  Similarly, by targeting and forcing the closure of proprietary schools, the Final Rule harms the schools’ students, many of whom are non-traditional.~~  This will negatively affect both the diversity of schools and the diversity of the American workforce.

## II.    STATUTORY FRAMEWORK

~~37~~33.  Title IV of the HEA was enacted “to assist in making available the benefits of postsecondary education to” students who otherwise could not afford the cost of a degree or certificate.  20 U.S.C. § 1070(a).  Title IV programs are administered by the Department.

38 34.  The vast majority of postsecondary students – over two million each year – depend on Title IV funds to achieve their educational goals.  Around 83 percent of full-time, first-time undergraduate students rely on Title IV financial aid to help pay for their degrees. Nat'l Ctr. For Educ. Statistics, Digest of Education Statistics, Table 331.20 (Dec. 2016), https://nces.ed.gov/programs/digest/d15/tables/dt15_331.20.asp (outlining financial aid statistics for 2013-14 school year).  The average student receives over $7,000 in federal loans each year.  *Id.*  Title IV programs include many of the most familiar loan and grant programs: the Direct Loan Program, Federal Perkins Loans, and Pell Grants, among others.

39 35.  Congress already strictly regulates the provision and use of Title IV funds, including eligibility for participation in Title IV programs.  For example, to receive Title IV funds, a school must be "legally authorized within [a] State to provide a program of education beyond secondary education."  20 U.S.C. § 1001(a)(2).  Institutions must also be "accredited by a nationally recognized accrediting agency or association" to receive those funds.  *Id.* § 1001(a)(5).  Through these requirements, Congress has already ensured that Title IV funds will flow only to legitimate, degree- or certificate-granting institutions.

40 36.  Congress also provided the Department with specific, carefully cabined tools to ensure compliance with Title IV.

41 37.  For example, Section 487 of the HEA allows the Secretary to take action against an institution upon "determination, after reasonable notice and opportunity for a hearing, that an eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."  *Id.* § 1094(c)(3)(A).  When that happens, there are two specified remedies: the Secretary

may "suspend or terminate" an institution's "eligibility status" for Title IV loans or the Secretary may "impose a civil penalty upon such institution of not to exceed $25,000 for each violation." *Id.* § 1094(c)(3)(A)–(B).  When "determining the amount of such penalty," the Secretary must consider "the appropriateness of the penalty to the size of the institution of higher education subject to the determination, and the gravity of the violation, failure, or misrepresentation." *Id.* § 1094(c)(3)(B)(ii).  Congress thus provided specific, delineated penalties that may be imposed based on a substantial misrepresentation.

4238. In addition, Congress provided that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert *as a defense* to repayment of a loan made under" Title IV.  *Id.* § 1087e(h) (emphasis added).  This provides a "defense" for students who should not be liable in repayment proceedings.

4339. Prior to the promulgation of the Borrower Defense RegulationsFinal Rule, the Department interpreted this language as providing for *defenses* to be used in collection proceedings: "In any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

4440. Congress also imposed certain bookkeeping duties on institutions receiving Title IV funds.  These duties are written into the school's Title IV program participation agreement with the Department.  Those agreements outline the basic expectations for Title IV participants, and they, too, are governed by statute.  For example, under the HEA, an institution must agree to "provide a statement that certifies the eligibility of any

16

student to receive a loan." 20 U.S.C. § 1087d(a)(1)(C).  The institution must also "set

forth a schedule for disbursement of the proceeds of the loan in installments."  *Id.*

§ 1087d(a)(1)(D).  And the school must "provide assurances that [it] will comply with

requirements established by the Secretary relating to student loan information," *id.*

§ 1087d(a)(2), and may "not charge any fees of any kind, however described, to student

or parent borrowers for origination activities."  *Id.* § 1087d(a)(5).  As part of requiring

institutions to adhere to these ministerial duties, the Secretary may "include such . . .

provisions as the Secretary determines are necessary to protect the interests of the United

States and to promote the purposes of" the Direct Loan Program in program agreements.

*Id.* § 1087d(a)(6).  Congress thus ensured that loan disbursement and information

collection would proceed in an orderly manner.

45<u>41</u>.    Over the years, Congress has also created several specific loan forgiveness programs for

student borrowers who have provided public service.  For example, Section 455(m)(1)

allows the Department to "cancel the balance of interest and principal due" for borrowers

who have dedicated their lives to public service and paid their loans for ten years.  *Id.*

§ 1087e(m).  The Higher Education Opportunity Act added a similar provision for service

in areas of national need.  *See* Pub. L. No. 110-315, § 430, 122 Stat. 3078, 3236-42

(2008).

46<u>42</u>.    Congress also set a cap on the total amount of loans an individual student can take out.

*See, e.g.*, 34 C.F.R. § 685.203.  But schools are not permitted to limit the amount students

borrow from Title IV to, for example, cover only the cost of tuition.  *See* Dep't of Educ.,

2016-2017 Federal Student Aid Handbook 3–90 (2016) (A "school may not have a policy

of limiting Direct Loan borrowing on an across-the-board or categorical basis.  For

example, you may not have a policy of limiting borrowing to the amount needed to cover the school charges, or not allowing otherwise eligible students to receive the 'additional' Direct Unsubsidized Loan amounts that are available under the annual loan limits.").

4743. Congress also included detailed provisions requiring schools receiving Title IV funds to be financially responsible.  Section 498(c)(1) of the Act provides that "[t]he Secretary shall determine whether an institution has the financial responsibility required," based on whether it is able to provide the services it claims to offer, provide the administrative resources necessary to comply with the Act, and meet all of its financial obligations.  20 U.S.C. § 1099c(c)(1).

4844. The Act further provides that "[t]he Secretary shall take into account an institution's total financial circumstances in making a determination of its ability to meet the standards" for financial responsibility required under the Act.  *Id.* § 1099c(c)(2).  An institution may be required to provide "satisfactory evidence of its financial responsibility" if it "fails to meet criteria prescribed by the Secretary regarding ratios that demonstrate financial responsibility."  *Id.*  Such evidence may consist of, *inter alia*, a letter of credit, *id.* § 1099c(c)(3)(A), or a showing that it "has met standards of financial responsibility, prescribed by the Secretary by regulation, that indicate a level of financial strength not less than those required" by the ratio-based criteria, *id.* § 1099c(c)(3)(C).  The Act specifically provides that the Secretary's determinations under these provisions "shall be based on an audited and certified financial statement of the institution," and that the criteria "shall take into account any differences in generally accepted accounting principles, and the financial statements required thereunder, that are applicable to for-profit, public, and nonprofit institutions."  *Id.* § 1099c(c)(2), (5).

4945.    In other words, Congress tasked the Department with ensuring financial responsibility

based on an institution's total financial circumstances, an assessment that involves audits,

accounting, and ratio-based criteria.  And Congress mandated that institutions have an

opportunity to demonstrate their financial responsibility based on the institution's overall

financial health before a school is deemed financially deficient.  *See id.* § 1099c(c)(2)–

(3).

5046.    In its detailed provisions outlining the administration of federal loans, the HEA does not

~~contain any provisions related to repayment rate warnings and does not draw distinctions~~

~~on loan repayment rates between non-profit and proprietary institutions.  The HEA also~~

~~does not~~ address arbitration agreements or class action waivers.

## III.    THE DEPARTMENT'S RUSH TO REGULATE

5147.    Despite the broad scope and enormous financial impact of the Final Rule, the

Department's rushed rulemaking procedure crammed multiple, unrelated provisions into

a single rule and left little time for public input or departmental revisions.  The result is

an understudied, overbroad rule based on very little data or concrete evidence.

5248.    Section 492 of the HEA requires the Secretary to obtain public involvement in the

development of proposed regulations affecting Title IV programs.  20 U.S.C. § 1098a.

5349.    After obtaining public input, the Secretary must subject the proposed regulations to a

negotiated rulemaking process, collaborating with stakeholders to draft consensus rules.

*Id.*

5450.    In accordance with the statute, the Department attempted to reach consensus with a

negotiating committee representing various stakeholders as to new borrower defense,

financial responsibility, anti-arbitration and class-action waiver, and loan repayment

disclosure regulations.  Of the 16 groups ultimately represented on the negotiating

committee, only one group – consisting of two individuals – represented the interests of

proprietary schools, large and small.

~~55~~51.  Arbitration provisions and class-action waivers were not included in the original notice as

topics for negotiated rulemaking.  Rather, the Department decided to jam those topics

into the agenda once negotiated rulemaking had already commenced, without adding

additional experts on the topic to the negotiating committee.

~~56~~52.  After failing to reach consensus in March 2016, the Department set about finalizing its

preferred regulations.  Less than three months after disbanding the negotiating

committee, the Department released a draft of its proposed regulations.  The publicly

released draft was 530 pages long.  The Notice of Proposed Rulemaking ("NPRM")

consumed 93 pages of the Federal Register when it was officially published on June 16,

2016.  The Department announced that it planned to finalize the rules by November 1,

2016, slightly over four months later.

~~57~~53.  Despite the broad scope of its regulatory effort and the tremendous impact it was

expected to have on the public and private fisc, the Department provided commenters

with a mere 45 days to respond to its proposed rules.  By contrast, Executive Order 12866

contemplates a standard 60-day period for commenting on significant rules.  *See*

Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).  This rule is classified as

"significant," and has a far more expansive and costly impact than many "significant"

rules.

~~58~~54.  Even in the face of this tight deadline, over 10,000 schools, students, legislators, and

public officials commented on the proposed rule by August 1, 2016.

5955.  Schools, legislators, public interest groups, and others offered a broad range of criticisms.
Historically black colleges and universities, including Spelman College, noted that the
cumulative impact of the Department's Financial Responsibility Provisions could cause
an enormous and unjustified negative financial impact on HBCUs and other under-
resourced institutions that nevertheless provide quality educational opportunities.  *See*
Comments of Spelman College, ED-2015-OPE-0103 (July 28, 2016).  Then-
Representative Tom Price and Senator Mike Enzi – chairmen of the House and Senate
Budget Committees – wrote to the Secretary to express concern over the expense of the
proposed rule.  *See* Letter from Rep. Tom Price, M.D., Chairman, House Budget Comm.,
& Sen. Mike Enzi, Chairman, Senate Budget Comm., to John B. King, Jr., Secretary,
U.S. Dep't of Educ. (July 14, 2016).  They noted that the "broad scope" of the proposed
rule "could increase tuition (by increasing schools' legal liability), bankrupt proprietary
schools, and potentially close down many nonprofit colleges, thus limiting higher
education options for students."  *Id.* at 2.  They commented that "under the proposed rule,
even an unintentional misrepresentation or omission of information in a school catalogue
could result in the Secretary certifying a claim for a group of thousands of borrowers."
*Id.*  Groups representing both non-profit and proprietary schools echoed those concerns.
*See, e.g.*, Comments of Career Education Colleges and Universities, ED-2015-OPE-0103
(Aug. 1, 2016); Comments of American Council on Education *et al.*, ED-2015-OPE-0103
(Aug. 1, 2016).  The Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and
Texas also took issue with "triggers" that would penalize schools whenever the state or
federal government brings a lawsuit or administrative action against them.  *See*
Comments of Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and Texas,

21

ED-2015-OPE-0103 (Aug. 1, 2016).  The Attorney General of Iowa also raised concerns about the "chilling effect" the triggers would have on potential settlements between institutions and state or federal oversight agencies.  *See* Comments of the Attorney General of Iowa, ED-2015-OPE-0103 (Aug. 1, 2016).

6056.  Despite these numerous comments, which the Department is obligated to review and consider when drafting its final rule, the Department sent a final draft to the OMB less than six weeks after the close of the comment period.

6157.  Ordinarily, a thorough review by OMB consumes 90 days.  *See* Exec. Order No. 12866, 58 Fed. Reg. 190 (Oct. 4, 1993).  Yet OMB purportedly completed its review of the regulations – which are expected to have a $14.9 *billion* dollar impact on the public fisc over the next ten years – in less than half the usual period (44 days).

6258.  The Final Rule was published in the Federal Register on November 1, 2016.  It did not include a description of the process to which schools were entitled before being held liable for borrower defense claims, which was only fully explained in a subsequent regulation issued on January 19, 2017.

6359.  Under Section 482(c) of the HEA, final regulations must be published by November 1 in order to be effective by July 1 of the following year.  *See* 20 U.S.C. § 1089.  The Department barreled through the rulemaking process to meet this deadline and to finalize the regulations before the end of the previous administration.

6460.  This practice, known as "midnight regulation," has been criticized by scholars and administrations alike as creating sloppy, under-analyzed, and legally problematic regulations.

6561.   The rushed rulemaking process is especially troubling in light of the scope and expense

of the Final Rule, as well as the profound impact it will have on schools and students.

## IV.   CHALLENGED REGULATIONS

66.   In the Final Rule, the Department instituted four major changes to its existing rules.

First, the Department radically altered the grounds and processes for student borrowers to

raise "borrower defenses" to Title IV loan repayment, including the transformation of the

borrower "defense" into an affirmative action.  Second, the Department imposed

sweeping new requirements regarding a school's "financial responsibility," including

novel automatic triggers for financial responsibility violations, as well as several

provisions that may require institutions to report on their financial situation to current and

prospective students.  Third, the Department introduced a new loan repayment rate

warning that applies only to proprietary institutions.  Fourth, the Department prohibited

institutions from including or enforcing certain arbitration provisions or class action

waivers in their enrollment agreements or any other pre-dispute agreements with

students.

### A.   Borrower Defense Provisions

67.   The new Borrower Defense Provisions contain at least three major changes.  First, the

Final Rule changes *how* borrowers may assert defenses for all Title IV loans, regardless

of when the loan was disbursed.  Under the prior regulations, which had been in place

since shortly after the borrower defense language was added to the HEA, the defense was

available only in a "proceeding to collect on a Direct Loan" that has already been

instituted against a borrower, such as wage garnishment proceedings, salary garnishment

proceedings, or tax offset proceedings.  34 C.F.R. § 685.206(c) (2012).  The defense has

23

for some time been exactly what its plain meaning suggests—a "defense" used when the Department attempts to collect from the borrower.

68.     The Final Rule, however, would expand the rights of former students and allow any borrower to initiate an action for affirmative debt relief in front of a Department official at essentially any time.  *See* 81 Fed. Reg. at 75,956 (noting that borrower defenses now cover "claims" as well as "defenses").  The Department does not point to any instance in the first decade of the existence of borrower defenses in which the "defense" was used as an affirmative claim for relief.  Thus, the regulations turn a defense into a novel affirmative cause of action that will expose schools to massive liability.

69.     Second, for loans first disbursed on or after July 1, 2017, the Final Rule drastically changes the standard for establishing a borrower defense.  For those loans, a borrower defense is available when (i) a non-default, contested judgment is obtained against the school based on any State or Federal law, whether obtained in a court or administrative tribunal; (ii) the borrower demonstrates a breach of contract by the school; or (iii) the borrower establishes a substantial misrepresentation by the school on which the borrower reasonably relied to his or her detriment.  *See* 81 Fed. Reg. at 75,926; 34 C.F.R. § 685.222.  The Department will establish its own unspecified standard for contract and misrepresentation claims, and will do so in the future through case-by-case proceedings, rather than relying on established state or federal law.

70.     For loans disbursed before July 1, 2017, the Final Rule maintains the current definition of a "borrower defense," which requires a borrower to show that some "act or omission of the school attended by the student . . . would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1).

71. Third, the Final Rule creates a new "group borrower defense" process. The preamble stipulates that the Department may both prosecute and adjudicate claims as to groups of students, much like a class or collective action. *See, e.g.*, 81 Fed. Reg. at 75,960, 75,964-65. In a group proceeding, the Department is both judge and plaintiffs' counsel. The Department may institute a group proceeding on behalf of students even if those students have not applied to the agency for debt relief, as long as the students do not opt out. *See id.* The Department does not explain what this opt-out mechanism would entail or how students would receive notice of the group proceeding. In the case of allegedly actionable misrepresentations, the Department has instituted a rebuttable presumption that all students in the group relied on the misrepresentation when making educational decisions. *See id.* at 75,971.

72. In addition, many of the procedural aspects of the borrower defense process were determined only after the Final Rule was promulgated, in a separate regulation that was not subject to notice and comment. *See* 82 Fed. Reg. 6253 (Jan. 19, 2017).

   **B.  Financial Responsibility Provisions**

73. The applicable statute directs that "[t]he Secretary shall determine whether an institution has the financial responsibility required" on the basis of whether the institution is able to: (i) provide the services described in its official publications; (ii) provide necessary administrative support; and (iii) meet all of its financial obligations, including refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary. 20 U.S.C. § 1099c(c)(1).

74. In the past, the Department has evaluated whether an institution has the financial responsibility required to participate in Title IV loan programs using ratio-based criteria

for evaluating the institution's "total financial circumstances" as contemplated by the HEA.  20 U.S.C. § 1099c(c)(2).  But the Financial Responsibility Provisions restructure the congressionally required framework by adding provisions that could substantially expand the set of institutions deemed not financially responsible.  These institutions would be required to obtain a letter of credit or other financial protection (such as cash equivalent to the amount of the letter of credit).  This determination could be made based on a single event without regard to an institution's overall financial condition, or based on the estimated impact of one or more events on an institution's financial condition according to a novel methodology created by the Department.

75.   Under the Final Rule, an institution is automatically required to provide a letter of credit or other financial protection for at least 10 percent of the school's Title IV receipts for the most recent fiscal year whenever one or more of several "triggering events" occurs.

76.   The automatic triggering events include failing to meet the "90/10 revenue test" as provided under 34 C.F.R. § 668.28(c).  That test measures the ratio of funding institutions receive from Title IV compared to other sources and applies only to proprietary institutions.  The trigger results in a finding of a lack of financial responsibility after only one year of failing to satisfy the 90/10 test, even though, by statute, a loss of eligibility for Title IV funding occurs only after two years of failure to satisfy the test.  34 C.F.R. § 668.28(c)(1).

77.   The automatic triggering events also include having two consecutive "cohort default rates" of 30 percent or greater.  The cohort default rate measures the percentage of graduates who default on their loans within a given period of time.  The institution will be required to provide financial protection pursuant to this trigger unless the institution

files a related challenge, request for adjustment, or appeal, and that action "results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification." 81 Fed. Reg. at 76,074.

78.   The automatic triggering events include, for publicly traded institutions, (i) being warned by the SEC that it may suspend trading on the institution's stock, (ii) failing to timely file certain required SEC filings, or (iii) being notified by the exchange on which the institution's stock is traded that the institution is not in compliance with exchange requirements or its stock is delisted.  These triggers target only proprietary institutions. Institutions would be penalized for filing their quarterly reports "late" even in some cases where those reports are considered timely under the SEC's own rules.

79.   Under the Financial Responsibility Provisions, an institution is now automatically required to provide a letter of credit or other financial protection for at least 10 percent of the school's Title IV receipts for the most recent fiscal year when, after the end of its most recent fiscal year, it is subject to one or more triggering events that, according to the Final Rule, result in a recalculated financial responsibility composite score of less than 1.0.  The composite score, which is already computed for each institution pursuant to existing regulations, uses three ratios drawn from an institution's audited and certified financial statements to evaluate its overall financial health.  The Private Reserve ratio (which measures liquid resources), Equity ratio (total resource base), and Net Income ratio (annual gain or loss) are weighted and consolidated to create the composite score. *See id.* at 39,362-64.  Under the Final Rule, each time one or more of several triggering events occurs, the Department will recalculate the composite score based on the

estimated actual or potential debts, liabilities, or losses that may stem from those events. In many cases, the Department assumes that the worst-case scenario will come to pass – even if the institution can demonstrate that it almost certainly will not incur excessive liability based on the triggering event.

80. The triggering events that require a recalculation of the composite score include being sued by a Federal or State authority for education- or borrower defense-related claims, once the suit has been pending for 120 days. If that occurs, the Final Rule provides that the amount of loss is calculated as the amount of relief demanded in the complaint, or, if the complaint demands no specific amount of relief, then the amount demanded by the agency prior to the suit, or if it demanded no specific amount, then the amount of tuition and fees received by the institution during the period described in the complaint for the program or location described in the complaint. The Department thus assumes not only that the school will lose but that it will be liable for every penny the government requests. The Department offers no data or study supporting this approach.

81. The triggering events that require a recalculation of the composite score also include being sued for claims of any kind, including by private parties, if the institution does not file a motion for summary judgment or summary disposition within a certain timeframe or if the institution does file such a motion and the court denies it or issues an order reserving judgment on it. If that occurs, the Financial Responsibility Provisions state that, for purposes of the recalculation, the amount of loss is presumed to be the amount of relief demanded in the complaint, or, if the complaint demands no specific amount of relief, then the amount demanded by the claimant prior to the suit, or if it demanded no specific amount, then the amount of the claim as stated in a response to a discovery

request.  Again, the Department assumes the school will lose and that the plaintiff's demand is a reasonable measure of liability, without any study or data supporting that conclusion from past lawsuits.

82.   In addition, the triggering events that require a recalculation of the composite score include being required by the institution's accrediting agency to submit a teach-out plan that covers the closing of the institution, any of its branches, or additional locations.  *See* 34 C.F.R. § 602.24(c)(1).  If that occurs, the Final Rule provides that, for purposes of the recalculation, the amount of loss is calculated as the amount of Title IV funds the institution received in its most recent fiscal year for the location, branch, or institution at issue.  A voluntary action by an institution to teach out a program or location would require a teach-out plan by most accreditors even though such actions are routinely taken without financial risk to the institution.

83.   The triggering events that require a recalculation of the composite score include having gainful employment programs—typically career-oriented programs—that could become ineligible for Title IV funding in the next award year based on their students' debt-to-earnings rates.  *See id.* § 668.403.  If that occurs, the Final Rule provides that, for purposes of the recalculation, the amount of loss is presumed to be the amount of Title IV funds the institution received in its most recent fiscal year for the programs at issue.  The gainful employment regulations primarily affect proprietary schools.

84.   The triggering events that require a recalculation of the composite score include any withdrawal of owner's equity for an institution with a composite score of less than 1.5, subject to limited exceptions.  If that occurs, the Financial Responsibility Provisions state

that, for purposes of the recalculation, the amount of loss is the amount of equity transferred to any entity other than the institution.

85. The Final Rule also provides that an institution is required to provide a letter of credit or other financial protection for at least 10 percent of the school's Title IV receipts for the most recent fiscal year when "[t]he Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution." 81 Fed. Reg. at 76,074. A non-exhaustive list of examples of such an "event or condition" includes a significant fluctuation in the amount of Direct Loan or Pell Grant funds received that cannot be accounted for by changes in those programs; a citation by a state licensing or authorizing agency for failing any state or agency requirement; failure of a yet-to-be-announced financial stress test adopted by the Secretary; high annual dropout rates; placement on probation, show-cause, or similar status by the institution's accrediting agency for failing to meet one of the accreditor's standards; violation of a provision in a loan agreement; pendency of claims for borrower relief discharge; or the Secretary's expectation to receive a significant number of borrower defense claims as a result of a judicial or administrative proceeding. The Department explicitly declines to explain what would make an event "material." Institutions thus have no way of knowing what will constitute a discretionary trigger.

86. The regulations provide that the Secretary may require, over and above the 10 percent minimum financial protection, "any additional amount" that the Secretary "estimate[s] is reasonable to expect based on the circumstances presented by the risks posed for the particular institution." *Id.* at 75,985. The Secretary is required to ensure that the total

amount of financial protection provided "is sufficient to fully cover any estimated losses." *Id.* at 76,076.  The Secretary is not required to observe any maximum level of financial protection.  Nor do the regulations cabin the Secretary's discretion by, for example, prohibiting the imposition of a letter of credit that would put an institution out of business.

87.  The Final Rule permits no opportunity to contest the imposition of a letter of credit or other financial protection for many of the triggering events.  Institutions are permitted to demonstrate to the Department only that certain triggering events should not require financial protection, and only on narrow grounds.  In particular, an institution may demonstrate that a lawsuit by a Federal or State agency, if fully successful on all claims, could not recover the amount claimed; that a withdrawal of owner's equity was used solely to meet tax liabilities for income derived from the institution; and that a reported violation of a provision in a loan agreement was waived by a creditor.  An institution also may demonstrate that a triggering event no longer exists or has been resolved or that the institution has insurance that will cover part or all of the liabilities that may arise.  As for discretionary triggering events, an institution may demonstrate that the event "does not and will not have a material adverse effect on the financial condition, business, or results of operations of the institution." *Id.* at 76,072.  Because the regulations are silent as to the definition of a "material" effect, it is unclear how an institution might demonstrate to the Department that an event is not material or how the Department would evaluate such a showing.

88.  For any portion of the Department's financial protection demand that is greater than 10 percent of the school's Title IV receipts for the most recent fiscal year, an institution may

attempt to demonstrate that "[t]he amount is unnecessary to protect, or contrary to, the Federal interest." *Id.* However, a hearing officer no longer has authority to overturn the Department's demand for financial protection based on a finding that it is "unreasonable." *See id.* at 39,375. Previously, the Department had employed this "reasonableness" standard.

89. Under the Final Rule, any institution that is required to provide financial protection may also be required to distribute a warning to students and prospective students in a form and manner to be prescribed by the Department communicating that the school is not financially responsible. *See id.* at 76,071–72.

## C.   Loan Repayment Rate Warning Provision

90.   Under the Final Rule, a proprietary institution—and only a proprietary institution—may be required to include in all promotional materials a loan repayment rate warning.  The warning is required if the institution's median borrower has neither fully repaid all FFEL or Direct Loans nor made loan payments sufficient to reduce the outstanding balance of each loan by at least one dollar after three years.  *See id.* at 76,071.  Public and non-profit schools with similar repayment rates are not required to furnish their students with any warnings.  The decision to apply this provision only to proprietary schools was made based on data that the Department now acknowledges was inaccurate.  *See* Dep't of Educ., *Updated Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13, 2017), https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecard FinaidShopSheet.html.

91.   The warning language must read: ''U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans.''  81 Fed. Reg. at 76,072; 34 C.F.R. § 668.41.

92.   The Department will calculate the median borrower's repayment status using the data and methodology provided in the gainful employment regulations, which govern vocational programs.  An institution is exempt from the requirement if it demonstrates to the Secretary's satisfaction that, if borrowers in its non-gainful employment programs were included in the calculation, it would have a passing loan repayment rate.  *See id.*

93.   An institution required to provide a warning under this rule will be notified by the Department of its loan repayment rate and will then be allowed 15 days to appeal the determination.  *See id.*

33

94. ~~Warnings required under this rule must be made in a form, place, and manner prescribed by the Secretary.  The warning must be prominent, clear, and conspicuous, and the Secretary may require an institution to modify its promotional materials, including its website, to ensure this requirement is met.  *See id.*~~

95. ~~An institution will not be permitted to argue that, for example, its students are repaying their loans slowly using Department-approved income-based repayment plans.  Nor will schools be allowed to show that their students are paying off their loans in the long term. The warnings will be based solely on a three-year snapshot of repayment rates.~~

   ~~**D.**~~      ~~**Arbitration and Class Action Provisions**~~

~~96~~62. In the Final Rule, the Department instituted major changes to its existing rules.  Under the Final Rule, institutions that participate in the Direct Loan Program are prohibited from entering into a predispute agreement to arbitrate claims that could form the basis of a borrower defense.  81 Fed. Reg. at 76,066; 34 C.F.R. § 685.300(f).  Those same institutions are prohibited from obtaining agreement that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims. 81 Fed. Reg. at 76,067; 34 C.F.R. § 685.300(e).

~~97~~63. Additionally, the Final Rule bars institutions from enforcing existing arbitration provisions or class action waivers in their agreements with students to the extent those agreements would govern borrower defense-type claims.  81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).   Schools must either notify borrowers of this change or amend their agreements. 81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).

~~98~~64. Institutions are required to notify current students that arbitration provisions will not be enforced no later than the date on which they provide exit counseling or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.  81 Fed. Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(iii), 685.300(f)(3)(iii).

**THE CHALLENGED REGULATIONS EXCEED THE DEPARTMENT'S AUTHORITY~~,~~ AND VIOLATE THE ADMINISTRATIVE PROCEDURE ACT~~,~~. ~~AND ARE UNCONSTITUTIONAL.~~**

~~99~~65. ~~Each of the four major regulatory initiatives in the Final Rule suffers~~The Arbitration and Class Action Provisions suffer from fatal legal flaws.

**~~I.~~   ~~The Final Rule Exceeds the Department's Authority and Conflicts with the HEA and FAA.~~**

~~100.~~   ~~Each of the four major regulatory initiatives in the Final Rule oversteps the bounds of the Department's authority.~~

**~~A.~~   ~~The Borrower Defense Provisions Exceed the Department's Authority Under the HEA, GEPA, and the Organization Act.~~**

~~101.~~   ~~The Borrower Defense Provisions exceed~~ the statutory authority conferred by the HEA, ~~the General Education Provisions Act ("GEPA"), and the Department of Education Organization Act ("Organization Act").~~

~~102.~~   ~~First, the Department attempts to support the changes to the borrower defense regulations by citing Section 455(h) of the HEA, the enabling statute for the borrower defense regulations.  That Section allows the Secretary to specify "acts or omissions . . . a borrower may assert as a defense to repayment of a loan."  20 U.S.C. § 1087e(h).~~

~~103.~~   ~~The straightforward language of the statute allows the Department to create *defenses* to be used by borrowers when certain collection proceedings are initiated against the borrower.  But the statute does not support an affirmative action to cancel a student's~~

debt.  Rather, it uses the term "defense," which establishes that Congress enacted Section 455(h) for use by a borrower acting as a *defendant*.

104.   When Congress wants to authorize the Department to forgive or cancel student debt, it does so explicitly.  Other provisions of Section 455—for example, Section 455(m)(1)—allow the Department to "cancel the balance of interest and principal due" for certain borrowers, like those who have dedicated their lives to public service and who have faithfully paid their loans for ten years.  20 U.S.C. § 1087e(m).  Section 455(h) does no such thing.

105.   Moreover, Section 455(h) does not mention recovery from educational institutions.  If Congress had intended Section 455(h) to be used to recoup funds from schools, it could have and would have said so.  It did not.  That is especially important, because Congress included other provisions in the HEA that expressly allow the Department to recover funds from an educational institution.

106.   Similarly, Section 487 of the HEA, which the Department also identifies as a source of its authority to issue these regulations, allows the Secretary to take action upon "determin[ing], after reasonable notice and opportunity for a hearing, that an eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." *Id.* § 1094(c)(3)(A).  When that happens, there are two specified remedies: the Secretary may "suspend or terminate" an institution's "eligibility status" for Title IV loans or "impose a civil penalty upon such institution of not to exceed $25,000 for each violation." *Id.* § 1094(c)(3)(A)-(B).

107. ~~This language is careful, specific, and limited.  Congress considered the issue and decided to give the agency (as opposed to a court) jurisdiction over one type of action, with the authority to impose two particular penalties on educational institutions.  The regulations defy this cabined statutory regime by authorizing additional actions (based on breach of contract or other state or federal legal claims) and the ability to impose additional penalties (up to the full amount the Department lost on any given loan).  In so doing, the Department attempts to rewrite the statute.~~

108. ~~In addition, the Department cites Section 437(c) of the HEA as a basis for the Borrower Defense Provisions.  But Section 437(c) only allows the Department to discharge student debt in three specific circumstances: upon the "closure of the institution" before the student completes his or her program; "if such student's eligibility to borrow under this part was falsely certified by the eligible institution"; or "if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender."  20 U.S.C. § 1087(c).  The fact that Congress expressly permitted loans to be discharged in those circumstances, but not in others, reinforces the conclusion that the Borrower Defense Provisions exceed the Department's statutory authority.~~

109. ~~Finally, the Department attempts to rely on Section 454(a) as a source of additional statutory support.  Under Section 454(a)(6), in program participation agreements with educational institutions, the Secretary may "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program.  20 U.S.C. § 1087d(a)(6).~~

110. ~~The provision is a catch-all phrase that comes at the end of a series of ministerial requirements for loan administration.  Under the precept of *ejusdem generis*, any~~

provision promulgated under Section 454(a)(6) should likewise deal with the calculating, tracking, and disbursement of loan funds – or at least a similar ministerial function.

111.   Section 454(a)(6) is not a blank check for the Department to create new causes of action against an institution for unrelated state or federal legal failings, or to set up a novel in-house court.

112.   In the Final Rule, the Department—for the first time—cited two additional provisions that it claims support the Borrower Defense Provisions: Section 410 of GEPA, 20 U.S.C. § 1221e-3, and Section 414 of the Organization Act, *id.* § 3474.  Section 410 permits the Secretary "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."  *Id.* § 1221e-3.  This generic grant of rulemaking authority does not give the Secretary unbridled discretion to issue *any* rule governing *any* matter arguably related to education.  Rather, it allows the Secretary to promulgate rules related to specific provisions of substantive statutory authority, as well as "rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).

113.   Similarly, Section 414 authorizes the Secretary "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."  20 U.S.C. § 3474.  This is not a substantive grant of authority and cannot support the creation of vast and novel liability for schools triggered by the Borrower Defense Provisions.

114.   One additional, important aspect of the borrower defense regulations lacks any statutory support.  The Department does not include *any* statutory basis for the creation of class-action-like "group borrower defenses" that would enable the Department to discharge the

debt of certain borrowers who have not even filed an application with the Department. The statute says nothing that would authorize collective actions against institutions, let alone anything that would authorize the Department to institute processes and presumptions that place institutions at a serious disadvantage in such proceedings. The Department's creation of this novel "group" action exceeds the Department's statutory authority under the HEA or any other relevant statute.

**B. The Financial Responsibility Provisions Exceed the Department's Authority Under the HEA.**

115. The Department purports to base the Financial Responsibility Provisions on Section 498(c)(1) of the HEA. *See* 20 U.S.C. § 1099c(c)(1). But the statute does not support the scope of the Final Rule. Section 498(c)(1) provides that "[t]he Secretary shall determine whether an institution has the financial responsibility required" based on whether it is able to provide the services it claims to offer, provide the administrative resources necessary to comply with the Act, and meet all of its financial obligations. *Id.* The next paragraph provides that "[n]otwithstanding paragraph (1), if an institution fails to meet criteria prescribed by the Secretary regarding ratios that demonstrate financial responsibility," then it shall provide "satisfactory evidence of its financial responsibility" in one of several other ways, one of which is to demonstrate that it "has met standards of financial responsibility, prescribed by the Secretary by regulation, that indicate a level of financial strength not less than those required" by the ratio-based criteria. *Id.* § 1099c(c)(2)–(3).

116. This language does not authorize the Secretary to prescribe whatever regulations he or she might wish in the name of financial responsibility. The Act specifically provides that "[t]he Secretary shall take into account an institution's total financial circumstances in

making a determination of its ability to meet the standards herein required." *Id.* §

1099c(c)(2).  It further provides that "[t]he determination as to whether an institution has

met the standards of financial responsibility provided for in paragraphs (2) and (3)(C)

shall be based on an audited and certified financial statement of the institution," which

"shall be conducted by a qualified independent organization or person in accordance with

standards established by the American Institute of Certified Public Accountants." *Id.* §

1099c(c)(5).  The criteria used by the Secretary also "shall take into account any

differences in generally accepted accounting principles, and the financial statements

required thereunder, that are applicable to for-profit, public, and nonprofit institutions."

*Id.* § 1099c(c)(2).  Moreover, these provisions allow institutions to demonstrate financial

responsibility based on their overall financial health in various ways, including through

"the support of a financial statement audited by an independent certified public

accountant in accordance with generally accepted auditing standards." *Id.* §

1099c(c)(3)(c).

117.  The Department also purports to base its rules on Section 487(c)(1) of the HEA, which

provides that "in matters not governed by specific program provisions," the Secretary

shall prescribe "reasonable standards of financial responsibility . . . including any matter

the Secretary deems necessary to the sound administration of the financial aid programs,

such as the pertinent actions of any owner, shareholder, or person exercising control over

an eligible institution." *Id.* § 1094(c)(1)(B).  To the extent the Department seeks to rely

on this provision as a broad catch-all, that reliance fails.  Financial responsibility

standards for postsecondary institutions are governed by Section 498(c), which sets out

particular factors by which the Secretary is to judge an *institution's* financial

responsibility.  Section 487(c)(1)—the provision relied on by the Department—is plainly meant to govern entities *other than* the educational institution itself.

118.    The Department's new financial responsibility regulations conflict with the framework set forth in the HEA.  The Financial Responsibility Provisions include factors that do not pertain to financial responsibility and evaluate the financial impact of "triggering events" in novel ways that are not grounded in any concept of accounting principles and do not account for an institution's total financial circumstances.  The Department's extra-statutory scheme, which has little, if anything, to do with "financial responsibility," much less "the sound administration of the financial aid programs," is not encompassed in the Secretary's statutory authority under this provision.

119.    The Department's attempt to salvage the Financial Responsibility Regulations in the Final Rule by citing a grab bag of HEA provisions that do not pertain to financial responsibility also fails.  *See* 81 Fed. Reg. at 75,957.  Section 454—Title IV's catch-all provision governing program participation agreements—does not authorize the Secretary to establish whatever terms he or she might wish for the Direct Loan participants, especially in light of the HEA's specific financial responsibility provisions.  Section 455(h), which pertains to borrower defense claims, certainly does not authorize the Financial Responsibility Regulations.  Nor do the various other sections the Department cites authorize, individually or in combination, these rules.  As for the Department's claimed authority under common law to recoup losses incurred under the Direct Loan program, it is irrelevant and also inadequate to justify these regulations.  The Department seeks not to recoup losses, but to require costly up-front guarantees against potential

losses based on a wide variety of events or conditions. This approach is not contemplated or authorized by the statute.

120. The Department attempts to minimize conflict with the HEA's language by claiming that the triggering events are necessary to allow for consideration of "a new financial risk that is realistically imminent" but not yet recognized in the audited financial statements. 81 Fed. Reg. at 75,987. But this rationale is belied by the procedures the Department employs. Under the Final Rule, once the Department has adjusted an institution's composite score to account for the "new risk," the adjustment continues to apply *even after* the institution submits updated audited and certified financial statements that take all liabilities into account, until the event or condition is resolved. *Id.* at 76,076. By requiring adjustments that do not comport with accounting principles, and requiring those adjustments to continue even after updated audited and certified financial statements are available, the Final Rules contravene the HEA's language.

121. Despite Section 498(c)(1)'s explicit statutory mandate that financial responsibility determinations must be made by the Secretary, the Department proposes the use of triggers that are based on intervening acts of a third party, such as a state Attorney General, federal regulator, or private claimant. These triggers by other actors fail to require a determination by the Secretary at all. Instead, they simply rely on a third party's decisions to file litigation and to claim a certain amount of damages, an amount which—at a preliminary litigation stage—is then automatically counted against an institution's assets as if the third party had already succeeded on its claims. This constitutes an impermissible delegation of authority that is contrary to the statutory structure as well as to its language ("the Secretary shall determine").

122. The regulations' delegation to third parties also is particularly problematic when made to a state entity: although other sections of the Act explicitly provide for state involvement in certain decisions and processes, *see, e.g.*, 20 U.S.C. § 1070d-33, the Act's financial responsibility section conspicuously does not.

123. Additionally, the regulations single out proprietary institutions for stricter treatment under the "trigger" framework, which is wholly unsupported by the statute. Several of the triggers apply exclusively to proprietary schools.

124. The rules requiring notice to students and prospective students whenever the Department deems an institution financially irresponsible also exceed its statutory authority. The HEA's financial responsibility provisions—unlike other provisions of the Act, *see, e.g.*, *id.* § 1092(a)(1)—do not provide for mandatory notices. *See id.* § 1099c.

125. Thus, both the substantive requirements of the Financial Responsibility Provisions and the attendant notice requirements exceed the Department's statutory authority.

**C.    The Loan Repayment Rate Provisions Exceed the Department's Authority Under the HEA.**

126. The Repayment Rate Provisions exceed the Department's statutory authority. The HEA requires institutions to provide and make available to students and prospective students information regarding an extensive list of topics. That list notably does not include loan repayment rates. *See* 20 U.S.C. § 1092(a)(1). Thus, Congress did not authorize the notices required under the Repayment Rate Provisions.

127. Additionally, the regulations single out proprietary institutions as the only institutions required to provide loan repayment rate warnings. This is also unsupported by the statute.

128. ~~The Department fails to point to any substantive provision of the HEA that justifies the Repayment Rate Provisions.~~

**~~D~~I.   The Arbitration and Class Action Provisions Exceed the Department's Authority Under the HEA and Violates the FAA.**

~~129~~66. The Department purports to find authority for the arbitration and class action waiver provisions in Section 454(a)(6) of the HEA, a catch-all provision codified at 20 U.S.C. § 1087d(a)(6).  This catch-all provision allows the Department to impose ministerial accounting or bookkeeping requirements similar to those found in Section 454(a) subsections (1)-(5).  It does not empower the Department to impose novel and disruptive regulations that govern the substance of contracts between schools and their students.

~~130~~67. Moreover, the arbitration and class action prohibitions conflict with Congress's pro-arbitration policy embodied in the FAA.  The FAA provides that arbitration agreements in contracts are enforceable.  However, the Final Rule seeks to retroactively invalidate arbitration clauses in thousands of contracts and prohibit mandatory arbitration clauses in thousands of prospective contracts.

~~131~~68. Congress has not explicitly afforded the Department authority to abrogate arbitration provisions.  When Congress intends to give an agency the authority to abrogate arbitration provisions, it has done so clearly and unambiguously.  For example, the Consumer Financial Protection Bureau ("CFPB") was given explicit authority by Congress to study the issue of mandatory arbitration and then to promulgate a rule regarding mandatory arbitration, if the CFPB believed such a rule to be necessary after completing the study.  Without such explicit authorization, the FAA prohibits an agency from altering arbitration agreements.

132~~69~~. The Department contends that it is not invalidating arbitration or class action provisions in existing contracts. Rather, it is simply preventing institutions from enforcing those provisions. That is a distinction without a difference. The FAA prohibits either course of action.

## II.    The ~~Final Rule Is~~ <u>Arbitration and Class Action Provisions Are</u> Arbitrary and Capricious Under the APA.

~~133.    The APA mandates that agency action be reasonable and reasonably explained. The Final Rule is neither.~~

~~A.    The Borrower Defense Provisions Violate the APA.~~

~~134.    Several aspects of the borrower defense regulations demonstrate a lack of reasoned decision-making and thus violate the APA.~~

~~135.    The Department offers no explanation regarding its decision to remove "borrower defenses" from the realm of collection proceedings and to instead initiate a novel administrative process for affirmative debt relief. The Department contends that it needs to create a process for asserting borrower defenses because the current regulation "does not establish any process for doing so." 81 Fed. Reg. at 39,345. That is a plainly inadequate statement. There is no specific "process" for asserting borrower defenses because they are *defenses* and are asserted in *other proceedings* — for example, in proceedings to establish a tax offset. *See* 34 C.F.R. § 685.206(c) (current borrower defense regulations).~~

~~136.    The Department attempts to explain this change by claiming that it is no change at all. Even though the *current regulations themselves* state that borrower defenses are to be employed only in a "proceeding to collect on a Direct Loan," the Department claims that this is not true. Instead, the Department contends the borrowers are currently authorized~~

45

to bring affirmative "claims" based on language included in promissory notes used in the now-defunct FFEL program.  The use of those notes predated the addition of the borrower defense provision to the HEA, and those promissory notes are not and have never been used in the Direct Loan program.  It is unclear what relevance, if any, they have to the Final Rule.  But they plainly are inadequate to justify the sweeping change of the new rule.

137.   Indeed, by pretending that no change in policy has taken place, the Department engages in a textbook case of arbitrary and capricious rulemaking.  While an agency may change its mind (as long as it is acting within the bounds of the statute), it must, at a minimum, acknowledge that it is doing so.

138.   The Department also states, in an attempted justification, that the "current borrower defense regulation" has "rarely been used."  81 Fed. Reg. at 39,335.  But again, this explanation is insufficient.  The Department makes no effort to link this lack of frequent use to some specific, identified deficiency in the current regulation.

139.   The Department also fails to explain other aspects of the Final Rule, such as why it did not adopt an alternative, less disruptive proposal when determining standards for borrower defenses.  For example, the Department indicates that its current regulations, which rely on causes of action under state law to provide the foundation for a borrower "defense," are problematic because it is difficult to know which state's law should apply in light of the growth of distance learning.  *Id.* at 39,336.  But if that is the problem, the Department could simply identify a way to determine which state's law to use – for example, the law of the borrower's state of residence, the law of the state in which the school is headquartered, or both.  The Department ignores the advantages of relying on

state law causes of action, in which the applicable standards have been defined by appropriate and established limits in case law.

140. Instead, the Department proposes to create an *entirely new jurisprudence* that it terms the "Federal standard for breach of contract" and the "Federal standard" for substantial misrepresentations. *Id.* at 79,943-45. According to the Department, this new jurisprudence will not be governed by any particular body of state law or even by existing federal precedents. Rather, the Department will be making up the law "on a case-by-case basis." *Id.* The Department fails to explain how this could possibly be more clear and consistent than the current approach. Indeed, the Department expressly declined to address hypothetical situations posed by commenters seeking to clarify these new standards, because it plans to rely on its "case-by-case" approach. *Id.* This unpredictable, unbridled discretion cannot establish the consistency that the Department claims motivated the Final Rule.

141. Moreover, the Department indicates that it may be problematic to rely on state law because state laws vary, and hence some borrowers will arbitrarily receive more protection than others under the Department's regulations. *Id.* at 75,938. Of course, laws and policies will often vary from state to state. But even assuming that poses a problem, the Department has not fixed it. By relying on judgments obtained in state courts, the new regulations continue to incorporate protections that will vary by state.

142. The regulations also stretch the definition of "substantial misrepresentation" beyond the point of reasonableness. The Department expands the definition of a misrepresentation to include, for example, a statement that "omits information in such a way as to make the statement false, erroneous, or misleading." *Id.* at 79,949. By adding omissions to the

definition, without requiring any intent to deceive or indeed even any deception, the Department has transgressed the bounds set by Congress, sweeping in statements that would be both truthful and nondeceitful or merely confusing.

143.   Many of the provisions regarding an institution's right to process under these regulations are insufficiently protective, given the Department's decision to import causes of action that would ordinarily be determined in court by a jury with the full procedural protections generally afforded to federal litigants.  That is especially true given the large sums of money involved in many borrower defense claims.  For example, there is no mechanism to challenge the certification of a group of borrowers, and, by aggregating many dissimilar borrowers into one action, the group process may result in a windfall for some borrowers and a shortfall for others.  In addition, schools are not entitled to receive all the documents the Department has relied on in determining that the school might be liable when it receives notice of its potential liability.  Hearings are also discretionary.  And, while the school has a right to call witnesses, there is no mandate to ensure that borrowers will appear so that the school can confront its accusers.  Many evidentiary and procedural rules also appear to be *ad hoc* and undetermined.  *See* 82 Fed. Reg. 6256-59.

144.   To make matters worse, the Department does not explain why, in its view, the adjudication provisions already set forth in either subpart H or subpart G of 34 C.F.R. part 668 should not apply here.  The Department gives no explanation regarding why its novel procedures for recovering sums from schools under the Borrower Defense Provisions are preferable to the rules protecting institutions today, which already offer a well-understood hearing and appellate review process.  81 Fed. Reg. at 75,960.

145. Beyond that, the procedures do not provide schools with any finality. Rather, a borrower can continually return to the Department with "new" evidence, even if the borrower previously lost his or her borrower defense action. *Id.* at 79,969. This lack of finality is unreasonable and unexplained.

146. The process regarding group borrower defenses likewise is vaguely worded and unreasoned. A group borrower defense may be initiated wherever the Department believes two or more borrowers have "common facts and claims" or where other factors, enumerated in a nonexclusive list, are present. *Id.* at 75,968. Borrowers may be included in a defense, unless they opt out, even if they have not submitted a claim form. *Id.* at 75,969. The Department does not explain what it means to have "common facts or claims." It is unclear whether the Department intends to incorporate, for example, the rigorous standard of Federal Rule of Civil Procedure 23(a)–(b). If not, the Department fails to explain why a lesser, unspecified standard is appropriate, given the severe burden imposed on institutions by class proceedings. The Department also does not explicitly allow institutions to challenge the composition and appropriateness of the class or "group." 81 Fed. Reg. at 75,968. This, too, is arbitrary and capricious.

147. Equally troubling, in a group borrower defense proceeding, the Department creates a "rebuttable presumption that each member of the group reasonably relied on the misrepresentation." *See id.* at 76,084-85. But cases *cited by the Department itself* indicate that this is often not a fair or reasonable presumption. *See, e.g.*, *id.* at 39,347; *Rodriguez v. McKinney*, 156 F.R.D. 112, 116 (E.D. Pa. 1994) (individual questions regarding reliance on misrepresentations prevented class certification). In addition, it is entirely unclear how an institution might rebut this presumption for every student

49

aggregated into the group, or how all those students might be made available for discovery or cross-examination.

148. Finally, the Department also makes several unreasoned and unexplained decisions regarding how a borrower may demonstrate breach of contract. For example, the Department concludes that a breach of contract need not be material and no injury need be shown for an institution to be held liable for the breach. 81 Fed. Reg. at 75,944. This runs counter to the Department's insistence on reasonable reliance and injury when asserting a borrower defense based on misrepresentation. *Id.* at 75,950.

149. Moreover, the Department stated that it would not impose a materiality standard because the Department "is comfortable with its ability to grant relief commensurate to the injury to a borrower alleged." *Id.* at 39,341. Failing to provide a materiality standard and instead relying on the Department's unfettered discretion in any given case is arbitrary, unjustified, and unfair to institutions trying to defend themselves or anticipate future liability.

150. In addition, the Final Rule indicates that proprietary and non-profit institutions may be treated differently in terms of their liability for similar transgressions. In Appendix A, the Department includes an example of a student at a liberal arts college who was subject to a substantial misrepresentation. *Id.* at 76,086-87. Because the Department deems her education valuable, she receives no debt forgiveness, and her school is not liable. *Id.* There is no similar example regarding a proprietary school. The Department does not explain what factors or standards it will use (or even consider) in making this extremely consequential decision about whether a particular education is "valuable" or not.

**B.     The Financial Responsibility Provisions Violate the APA.**

151.   The Financial Responsibility Provisions violate the APA's notice requirements.  *See* 5 U.S.C. § 553.  The Department provided no notice of, or opportunity to comment on, crucial substantive aspects of the Final Rule.  In particular, the Department gave no notice of the mechanisms by which the Department now proposes to estimate and incorporate the impact of various "triggering events" into the composite score framework.  The Department's failure to do so threatens the ongoing viability of the composite score methodology.

152.   The Department also has failed to provide notice of several additional "triggering events" that were presented for the first time in the Final Rule.  Two discretionary triggers related to borrower defense claims were not mentioned or addressed in negotiated rulemaking or the NPRM.  *See* C.F.R. §§ 668.171 (g)(7), (8).  Another novel trigger gives the Secretary discretion to require financial protection if he or she expects to receive a significant number of borrower defense claims.  This compounds fairness and due process concerns raised by the Final Rule.  Commenters did not have an opportunity to address these issues.

153.   The Department also failed to provide notice of its new discretionary trigger for failing an as-yet undeveloped "stress test."  *See* 81 Fed. Reg. at 76,003.  The Department does not explain what the "stress test" would consist of or when it will be revealed.  This vague placeholder on a fundamental point fails to provide any information to regulated parties.

154.   The Department additionally failed to provide notice that it would remove the dollar threshold for litigation-based triggers.  Under the Final Rule, institutions must provide the Department with a notice and submit their composite score to recalculation whenever any

judgement or settlement is reached in any court or agency that impacts the institution. This is a substantial and unwarranted burden, especially for small settlements or fines that could not possibly impact a school's composite score. Due to the lack of notice, institutions had no opportunity to raise these concerns before the Department.

155.    In addition, the Financial Responsibility Provisions are arbitrary and capricious under the APA. For example, the Department's decision to base significant regulatory consequences on the mere pending status of lawsuits brought by state or federal actors violates reasoned decision-making and due process. At a minimum, the Department has not adequately addressed these concerns. This trigger provides institutions with no opportunity to be heard regarding the merits, or lack thereof, of any underlying claims. That regulatory approach appears to be unprecedented. The regulations provide a limited opportunity for an institution to show that the government's claims, if fully proved, could not lead to the amount of damages alleged. *See id.* at 76,074-75. But the Department takes pains in the preamble to "stress that this option does not include any consideration of the merit of the government suit." *Id.* at 76,006. The Final Rule allows for 120 days to pass after a lawsuit is filed before regulatory consequences are triggered, purportedly giving institutions the opportunity to attempt to secure dismissal or summary disposition of the lawsuit. However, the Department fails to account for the possibility that dispositive motions may not be decided, or even fully briefed, within that timeframe. The regulations' extraordinary "guilty unless judged innocent within 120 days" approach fails to meet the mandates of reasoned decision-making or due process.

156.    The manner in which the regulations would account for the impact of a lawsuit that does not specify a damages figure is also arbitrarily one-sided and onerous. For a borrower-

defense-related lawsuit, the regulations employ the largest possible figure: the full amount of tuition and fees received by the institution during the relevant period for the program or location at issue. That measure is very likely to overestimate the impact of the lawsuit and does not appear to be grounded in evidence or studies.

157. The Department also does not seriously consider the likelihood that uneven enforcement based on various state laws and state agency requirements might result in unfairness for schools. In the Borrower Defense Provisions, the Department itself highlights the supposed importance of uniform rules to fairness. *See, e.g.*, *id.* at 75,939. Hence, triggers related to state or local enforcement action conflict with other aspects of the Department's reasoning.

158. The Financial Responsibility Provisions also incentivize certain litigation tactics by empowering state Attorneys General and other oversight entities—including local government entities, *id.* at 75,990—to trigger important federal regulatory consequences unilaterally, even where a lawsuit may later be found meritless. This arbitrarily increases the risks institutions face to their financial stability from the mere filing of a lawsuit.

159. The Department's decision to base significant regulatory consequences on non-governmental parties' lawsuits that endure past the still-preliminary summary judgment stage raises similar concerns. Denial of a defendant's summary judgment motion—or a defendant's decision not to pursue such a motion—does not suggest the plaintiff is likely to prevail. Survival of summary judgment indicates only that issues of fact remain to be resolved before judgment can be rendered. Claims against educational institutions often raise primarily factual, not legal, issues and are thus not amenable to summary judgment even when meritless.

53

160. The Department rejects any mechanism that would permit, much less require, it to consider the merit of a lawsuit. Its reasoning on this critical point is insufficient. The Department sees "little or no value" in considering a presentation from the institution regarding a pending lawsuit, and objects to "second-guessing" government agencies in the exercise of their litigation activities. *Id.* at 75,990. But commenters have not asked the Department to adjudicate cases, only to fairly evaluate the level of financial risk they pose. By contrast, the assumption that the plaintiff will not only prevail but obtain the maximum possible recovery is arbitrary and capricious. And it is the Department, not objecting commenters, that has chosen to use the mere filing of a lawsuit by state entities as the trigger for significant financial consequences.

161. The regulations' litigation-based "triggering events" and their failure to provide due process not only violates reasoned decision-making and deprives institutions of basic regulatory fairness, but also deprives schools of their ability to effectively manage litigation risk. The mere filing of a lawsuit with a large requested damages figure that survives for 120 days (or proceeds past summary judgment) may require a defendant institution to post a costly letter of credit. Thus, plaintiff states, private parties, and their attorneys could bring enormous settlement pressure to bear on an institution at preliminary stages of litigation. Institutions could be compelled to settle even meritless lawsuits following denial of summary judgment in order to address or ameliorate the coercive dynamic these regulations create. Placing parties on such an uneven playing field threatens not only the financial stability of higher education institutions but also the integrity of the American litigation system.

162. The regulations determine the impact of a lawsuit on an institution's composite score based on the plaintiff's demand for a certain amount of damages.  This is unjustified and unjustifiable.  The damages figure a plaintiff requests has no relationship to an institution's financial responsibility, especially since the claim may have no merit, and the damages figure has not been subjected to any sort of adversarial testing or independent evaluation.

163. Overall, the Department's use of lawsuits as triggering events is unsupported by any data or study on the record.  The Department has not offered any evidence of what percentage of lawsuits that are pending for 120 days or proceed past summary judgment result in a decision against the defendant school.  Nor has the Department studied the relationship between the amount of damages demanded and the amount, if any, recovered by plaintiffs.  By contrast, commenters offered evidence showing that judgments against schools are extremely rare.  The Department's decision thus runs counter to evidence in the record.

164. Additionally, the automatic "triggering event" based on cohort default rates effectively punishes institutions that attempt to serve underserved student populations, unnecessarily raising costs for those institutions in ways that threaten to diminish educational choice.  "Cohort Default Rates tend to be higher at institutions that serve low-income and minority students including community colleges and HBCUs."  Kamille Wolff Dean, *Student Loans, Politics, and the Occupy Movement: Financial Aid Rebellion and Reform*, 46 J. Marshall L. Rev. 105, 128 (2012).  The regulations threaten to push these institutions' costs measurably higher based on an automatic trigger, which may

unnecessarily cause some schools to shut down altogether.  That would leave taxpayers stuck with a large bill and underserved students with even fewer options.

165.   The Department has also created a trigger based on the failure of a gainful employment metric.  The use of a failure of a single programmatic gainful employment metric as a basis for a trigger requiring the recalculation of the institutional composite score inappropriately draws a conclusion of "financial risk" without supporting evidence. Harvard University recently announced the teach out of its American Repertory Theater graduate program because of a failing gainful employment rate.  It is unlikely, however, that anyone would consider Harvard at financial risk because of this single program failing the gainful employment rule.

166.   The regulations also authorize the Secretary to require an institution to provide a letter of credit or other financial protection if the Secretary finds an "event or condition that is reasonably likely to have a material adverse impact on the financial condition, business, or results of operations of the institution."  81 Fed. Reg. at 76,074.  This language neither gives regulated parties notice of what is required of them nor provides sufficient guidance to ensure reasonable, non-arbitrary decision-making.  The Department, however, has refused to define "material adverse effect" in the Final Rule.  *See id.* at 76,000.

167.   Compounding this problem, the discretionary triggers offered as examples of "material" events have serious legal flaws.  The discretionary trigger for fluctuations in Direct Loan or Pell Grant funds is vague, yet the Department refuses to clarify what level of fluctuation it might consider to be material.  The discretionary trigger based on an accrediting agency's decision to place an institution on probation, show-cause, or similar status for failure to meet the agency's standards also risks disproportionately punishing

56

minor infractions and infractions that have no financial impact.  The discretionary trigger for high dropout rates effectively punishes institutions that attempt to serve underserved populations because, as commenters argued and the Department does not dispute, studies show that the most common reason students drop out of school has nothing to do with institutional quality.  Instead, students who drop out commonly state that, due to financial circumstances, they needed to resume work.  *See id.* at 76,001.

168.  The Final Rule also unjustifiably singles out and targets proprietary institutions.  Several of the regulations' "triggers" – such as the 90/10 trigger, the equity-distribution trigger, and the SEC-related triggers – target *only* proprietary schools.  Others, such as the gainful employment or default rate triggers, will also have a disproportionate effect on proprietary schools.  That means the Financial Responsibility Provisions will disproportionately burden proprietary schools and their vulnerable students.  The Department fails to justify this differential, discriminatory, and arbitrary treatment.

169.  The Department's targeting of proprietary institutions is all the more troubling and inadequately justified because its own studies have consistently found that those institutions have a large percentage of low-income and minority students.  *See, e.g.*, Nat'l Ctr. for Educ. Statistics, *Students Attending For-Profit Postsecondary Institutions: Demographics, Enrollment Characteristics, and 6-Year Outcomes* Table 2 (Dec. 2011), http://nces.ed.gov/pubs2012/2012173.pdf.  Without proprietary schools, it is, at the very least, unclear whether these students would be served at all.  The Department, however, unjustifiably assumes that other institutions will accept all students who are displaced, without citing any evidence whatsoever regarding those schools' capacity or risk

tolerance.  The Department does not cite any evidence in the record to support this assumption.

170.   Despite extensive comments raising the issue of minority and underserved borrowers' access to postsecondary education, the Department says little about this critical question in the Final Rule.  *See, e.g.*, Comments of Spelman College, ED-2015-OPE-0103 (July 28, 2016); Comments of United Negro College Fund, Thurgood Marshall College Fund, National Association for Equal Opportunity in Higher Education, ED-2015-OPE-0103 (July 29, 2016).  When it does address the issue, the Department effectively concedes that its proposal to recalculate composite index scores based on triggering events will disproportionately impact institutions serving underserved borrowers.  As the Department acknowledges, those institutions will tend to have "a lower composite score than might otherwise be the case."  81 Fed. Reg. at 76,013.  The Department fails to offer a viable method of mitigating this disproportionate and harmful impact.

171.   During the comment period, numerous commenters pointed out that the Department has not been calculating the metrics under its existing regulations correctly or enforcing its rules consistently.  These commenters suggested that the Department undertake a review of its existing process before it proposes to add new financial-responsibility provisions.  *See, e.g.*, Comments of National Association of College and University Business Officers (NACUBO), ED-2015-OPE-0103 (Aug. 1, 2016); Comments of North Carolina Independent Colleges and Universities, ED-2015-OPE-0103 (Aug. 1, 2016).  The Department has arbitrarily and capriciously rejected this invitation to fix what is broken and is instead plowing ahead with new, poorly-thought-out regulations that promise to create additional problems.

172. Overall, the "triggering events" in these regulations will impose significant costs even on institutions that are financially responsible by any reasonable definition of that term. The Department's refusal to tie the impact of triggers to any actual, evidence-based study in the record is arbitrary and will have an impact on schools that is not adequately addressed in the Final Rule. As CAPPS and others explained during the comment period, each letter of credit is generally required to be backed up by cash collateral. *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103 (Aug. 1, 2016); Comments of Education Affiliates Inc., ED-2015-OPE-0103 (Aug. 1, 2016). Often, an institution will have to provide a cash deposit sufficient to cover the entire letter of credit and pay additional fees. Letters of credit also are difficult to obtain in the current credit environment. For many schools, this means that the pending status of a lawsuit against it, no matter how meritless, may cost it millions of dollars as a result of the Department's new regulations. This perverse impact will be particularly devastating for smaller schools with no endowment.

173. The Department acknowledges that letters of credit have become more onerous in recent years, *see* 81 Fed. Reg. at 76,007, but fails to provide meaningful alternatives. Despite the fact that the Department has statutory authority to accept performance bonds under Section 498(c)(3)(A) of the HEA, the Department rejects out of hand the suggestion made by several commenters that they should be accepted as an alternative to letters of credit. *See id.* The Department fails to explain why these bonds would be less effective than a letter of credit, even while acknowledging that they are generally less expensive.

174. At minimum, the tremendous costs imposed by a letter of credit will unjustifiably divert resources away from the education services a school provides in accordance with its

mission and promises to students.  At worst, if an institution is unable to obtain a letter of credit it could effectively be forced out of business for that reason alone, needlessly harming both taxpayers and current and former students.  The HEA aims to protect against the precipitous closure of institutions.  *See, e.g.*, 20 U.S.C. § 1099(c)(3)(c).  But these regulations will likely have the consequence of *causing* precipitous (and unnecessary) school closures.  That is the definition of arbitrary and capricious.

175.   The regulations permit institutions some limited opportunities to dispute specified triggers, but narrowly circumscribe the Secretary's hearing officers' authority to reconsider certain demands for financial protection.  The regulations allow some discretion to reduce amounts demanded above the 10 percent minimum for letters of credit.  But there is no discretion to overturn a demand for financial protection based on automatic triggers or triggers that lead to a composite score of less than 1.0 under the Department's proposed method for calculating adjustments.  Hearing officers may no longer overturn a demand under 34 C.F.R. § 668.90(a)(3)(iii) on the basis that it is unreasonable.

176.   The Department's refusal, once it has calculated an adjusted composite score based on a triggering event, to accept the institution's next audited financial statements as the basis for its financial responsibility determination is also arbitrary and capricious.  This practice contradicts the Department's basic rationale for employing "triggering events": to account for "a new financial risk that is realistically imminent" but not accounted for in the last audited financial statement.  81 Fed. Reg. at 75,987.  There is no legitimate justification for holding possible negative financial developments against an institution

for years while failing to acknowledge, for example, similarly likely positive developments.

C.     **The Repayment Rate Provisions Violate the APA.**

177.   The Repayment Rate Provisions' method for calculating loan repayment rates would effectively punish institutions that attempt to better serve borrowers by encouraging students with low incomes or high debt to pay at a rate that is proportionate to what they are earning.  These income-based plans provide valuable flexibility for borrowers.  But in many cases, borrowers who are enrolled in such plans will have, at least for some time, an outstanding loan balance that is higher than their original loan balance.  *See* Federal Student Aid, U.S. Dep't of Educ., *Income-Driven Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited May 10, 2017).  Therefore, under the regulations, institutions that have students signed up for these programs will be at greater risk of being required to distribute Department-issued warning letters.

178.   The Repayment Rate Provisions also irrationally punish institutions whose students choose to go into public service or to serve low-income communities.  A nurse or dentist that serves in a low-income clinic will likely harm the school's repayment rate relative to those who are employed in wealthier communities.

179.   Furthermore, the Repayment Rate Provisions apparently will be given retroactive effect by using data from students who graduated *years* ago, before the advent of the Final Rule.  Institutions that have already had students sign up for flexible loan repayment options offered and promoted by the government may now effectively face sanctions for doing so.  Punishing schools for actions that are now a matter of history—and which

were affirmatively encouraged by the Department when taken—is manifestly unreasonable.

180. The new loan-repayment-rate warning requirement applies only to proprietary institutions.  The Department claims that institutions in this sector are more likely to have poor repayment outcomes.  *See* 81 Fed. Reg. at 76,017.  The Department has now conceded, however, that the decision to apply this provision only to proprietary schools was made based on data that was completely inaccurate.  *See* Dep't of Educ., *Updated Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13, 2017), https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecardFinaidShop Sheet.html.

181. In any event, the Department still does not explain why a traditional institution with a loan repayment rate of zero percent or less should not also warn its students.  The Department notes that non-proprietary institutions "are not typically comprised solely of [gainful employment or vocational] programs and the repayment rate warning may not be representative of all borrowers at the school," *id.*, but fails to explain why it does not then simply limit the requirement to those institutions with a significant proportion of students in gainful employment programs rather than to proprietary institutions, *id.* at 76,018.  To the extent the Department's decision to limit the requirement to proprietary institutions is based on the "risk of excessive and unnecessary burden," *id.* at 76,017, that rationale is unfair, arbitrary, and capricious.  The solution to an overly burdensome regulatory approach is to reduce the burden it imposes on all parties, not to impose the onerous burden only on some disfavored groups.

182. ~~Singling out proprietary institutions threatens to further limit already scarce opportunities for poor, minority, and underserved populations.  Indeed, numerous education experts have raised alarms, suggesting that the Department's recent actions targeting proprietary schools will restrict access to higher education for those most in need.  That concern was also raised by numerous commenters here.  *See, e.g.*, Comments of United Negro College Fund, Thurgood Marshall College Fund, National Association for Equal Opportunity in Higher Education, ED-2015-OPE-0103 (July 29, 2016).  The Department's only response to these comments is to reiterate its position that students should be provided the information in the warnings that the regulations require, 81 Fed. Reg. at 76,020, which is no response at all.~~

183. ~~Additionally, the regulations unreasonably require loan repayment warnings if the median borrower has not at least "made loan payments sufficient to reduce by at least one dollar the outstanding balance on *each* of the borrower's FFEL or Direct Loans received for enrollment in the institution."  *Id.* at 76,071 (emphasis added).  Borrowers may prioritize paying down some loans over others, particularly if they have different interest rates.  Thus, requiring the median borrowers to have paid down each loan—rather than the total loan balance—is arbitrary and capricious and may impose loan-repayment-rate warning requirements on institutions unreasonably, with no legitimate justification.~~

   ~~**D.**~~   **The Arbitration and Class Action Provisions** ~~**Violate the APA.**~~

~~184~~70. The ~~arbitration and class waiver regulations~~ <u>Arbitration and Class Action Provisions</u> are arbitrary and capricious.  The Department failed to consider important factors raised by commenters and did not establish a reasonable connection between the facts found and the choice made.

~~185~~71. First, the Department failed to adequately weigh or discuss the benefits of individual arbitration. As discussed in the congressional record compiled to support the FAA and in Supreme Court case law interpreting the FAA, the benefits of arbitration can be substantial to all parties involved. *See* 9 U.S.C. § 2. Arbitration provides a prompt, fair, and efficient method of dispute resolution for private individuals as well as educational institutions.

~~186~~72. The Department itself has recognized the value and efficiency of arbitration elsewhere, requiring an institution to "agree[] to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration before initiating any other legal action." 34 C.F.R. §§ 600.4(c), 600.5(d). The Department's failure to consider the benefits of arbitration – which are demonstrated by the Department's own rules – highlights its unreasoned rush to promulgate these regulations, without consideration of all the relevant factors or costs.

~~187~~73. The Department also failed to adequately consider the serious drawbacks of class actions for students. It is well-documented that class actions are often an ineffective means of obtaining relief for consumers. Cases are often drawn-out and unsuccessful, and counsel is frequently compensated handsomely for small pay-outs to consumers. In addition, in a class action, plaintiffs must meet a high class certification burden, which often prevents plaintiffs from obtaining relief.

~~188~~74. In support of its determination, the Department relies on a CFPB study. But that study is unrelated to the federal loan market and inapplicable to the student loan context. The CFPB study on consumer financial products and arbitration agreements concerned six financial products including credit cards, checking accounts, general purpose reloadable

prepaid cards, payday loans, private student loans, and mobile wireless contracts

governing third-party billing services.  *See* 81 Fed. Reg. at 32,840.  Federal student loans

pose far different risks to borrowers in a far different context, and the Department may

not, consistent with the mandates of reasoned decision-making, simply cut and paste

findings from an entirely separate legal and factual setting, made by a separate agency

with an entirely distinct statutory charter and mission.  Accordingly, the CFPB's study is

an obviously insufficient basis to sustain the arbitration and class action waiver

provisions.  In fact, the CFPB itself acknowledges the significant distinctions between

Federal student loans, like the Direct Loan Program, and private student loans.  *See*

Consumer Financial Protection Bureau, What Are the Main Differences Between Federal

Student Loans and Private Student Loans?, http://www.consumerfinance.gov/askcfpb/

545/what-are-main-differences-between-federal-student-loans-and-private-student-

loans.html (last visited May 10, 2017).  The significant differences are not discussed in

the preamble.

~~189~~75. Even if the CFPB study of consumer financial products were an adequate basis for

determining the costs and benefits of arbitration in the federal loan context, the study

itself suggested the possibility that arbitration agreements could benefit consumers by

reducing operating costs for companies and making their products more affordable.  In

other words, arbitration was not necessarily negative for consumers or students.

~~190~~76. The lack of consideration of the difference in context also violates the mandate of

reasoned decision-making with regard to class action agreements.  For example, voidable

student loan debts may be much larger than the extra interest charged by a credit card

company, and, accordingly, the calculus of costs and benefits of individual litigation is

far different than in the contexts considered by the CFPB.  Without specific study of

federal student loans, the Department cannot meaningfully rely on the CFPB's study to

support its arbitration and class action waiver provisions.

~~191~~77. The Department's reasoning regarding class action waivers is also contradictory on its

face.  The Department claims that class action provisions are vital to ensuring that

borrowers can collectively hold institutions accountable.  But as the Department

acknowledged in the NPRM, "Federal and State rules impose requirements on class

actions that may well prevent particular borrowers from bringing and successfully

maintaining a class action."  81 Fed. Reg. at 39,383; *see also id.* at 39,384 n. 62

(discussing multiple cases involving borrowers dismissed based on the commonality

issues that often bar borrowers from bringing class actions).  If class action litigation is

not available to most borrowers because their lawsuits do not meet the prerequisites for

class certification, then it is not likely that a ban on class action waivers will increase the

availability of class actions in any meaningful way.  Moreover, the Department declines

to discuss whether the availability of group borrower defenses eliminates the need for

class actions brought in federal court.

~~192~~78. The Department also failed to adequately explain which categories of claims can no

longer be arbitrated.  The Final Rule bars arbitration of disputes "with respect to any

aspect of a borrower defense claim."  34 C.F.R. § 685.300  But the Department clearly

intends the Final Rule to cover claims that could be brought in court, not solely the

Department's borrower defense process.  For example, schools are left to wonder whether

lawsuits seeking repayment of tuition, not merely repayment of loans, are covered by this

provision.  Exactly which legal causes of action map onto the Department's borrower

defense provisions is unclear and unexplained, and it will arbitrarily and capriciously cause difficulties for schools.

~~193~~79. The Department additionally failed to properly consider the extent to which institutions have relied on the current regulatory framework.  Here, institutions have relied on arbitration provisions and class action waivers, at least in part, in determining the cost of tuition, obtaining insurance, and otherwise ordering their affairs.  Schools may also face unnecessary disputes with students who have already completed their studies, yet have gained newfound authority to bring wide-ranging claims and may create novel and unforeseen costs to their alma maters.

### III. ~~The Final Rule Is Unconstitutional.~~

~~194.~~ ~~Each provision of the Final Rule creates serious constitutional problems.~~

#### A. ~~The Borrower Defense Provisions Violate the Constitution.~~

~~195.~~ ~~In addition to suffering from numerous statutory and administrative law flaws, the borrower defense regulations violate the Constitution.~~

~~196.~~ ~~First, the regulations would violate the Due Process Clause.  The regulations raise due process problems because Department officials are responsible for both prosecuting and hearing cases.  This prevents schools from being heard by a neutral and detached magistrate.~~

~~197.~~ ~~Second, the borrower defense regulations would also violate Article III and an institution's Seventh Amendment right to a civil jury trial.  They allow agency officials to adjudicate what is in essence a private right: the right of a student to recover for fraud or contract violations against his or her school.  Liability for such private rights can only be determined in court, by a jury.~~

**B.      The Financial Responsibility Provisions Violate the Constitution.**

198.   The Financial Responsibility Provisions violate the Constitution's Due Process Clause. The decision to base significant consequences on the mere pending status of a lawsuit, even when an institution has been offered no opportunity to be heard, does not comport with the requirement of procedural due process.  The same is true of the decision to base significant consequences on certain lawsuits surviving summary judgment, which provides no protection for defendants where the legal claims at issue are primarily factual in nature.  Additionally, the impermissible vagueness of the standard by which the Secretary can decide to impose a letter of credit or other financial protection based on an "event or condition" also conflicts with the requirements of due process.  And the unjustified limits placed on opportunities to contest the application of various triggers, as well as the lack of any opportunity generally for an institution to show that application of a trigger is unreasonable, also deprives institutions of the crucial opportunity to be heard.

**C.      The Repayment Rate Provisions Violate the Constitution.**

199.   The mandatory reporting provisions violate the First Amendment by compelling speech. As the result of a government fiat, they require a warning for which the Department dictates the form, place, manner, and precise language.  Institutions would be required to include this warning in all promotional materials and advertisements and to post it on the school's website.  The Department would be empowered to require changes whenever it deems the warning insufficiently prominent, clear, and conspicuous.  Broad prophylactic rules forcing speech are deeply suspect under the First Amendment.  That is especially true of regulations that are both over-inclusive and under-inclusive, like the disclosure rule – which targets innocent schools whose borrowers are using income-based

repayment plans and excuses non-profit and public institutions with similarly low repayment rates. The loan repayment rate warning requirement is precisely the type of broad prophylactic free speech restriction and forced speech of which courts are wary. It is not sufficiently tailored to warrant restricting or forcing speech, even in a commercial speech context.

**D.     The Arbitration and Class Action Provisions Violate the Constitution.**

200.    To the extent that the Arbitration and Class Action Provisions are applied to contracts already in existence, or retroactively, the regulations violate the Due Process Clause.

### IRREPARABLE HARM

201.    CAPPS schools will experience irreparable harm due to the Final Rule. The reputational harm that may stem from being subject to a borrower defense proceeding, or mandatory reporting and warnings, or a letter of credit and provisional certification will be difficult, if not impossible, to repair. Prospective students likely would be deterred from enrolling in programs that would otherwise be beneficial to them based on arbitrary and capricious repayment rate or financial responsibility warning. Current students likewise will look to transfer to programs that are not subject to or required to provide such warnings. That will irreparably harm CAPPS institutions. Some CAPPS members could be put out of business if a single letter of credit is required of them; based on the multiple mandatory triggers, CAPPS believes that a large number of members may be required to post letters of credit soon after the regulations go into effect. If a school goes out of business, or fails to enroll a student who is troubled by the Department's arbitrary and unlawful warning provisions, that harm is irreparable.

## COUNT ONE
### (Borrower Defense Provisions: No Statutory Authority)

202. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

203. The Borrower Defense Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

204. The regulations exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, GEPA, or the Organization Act. Among other things, the regulations impermissibly turn a statutory defense into a novel cause of action; authorize penalties in excess of those expressly permitted by the HEA; and create a novel adjudicatory process out of whole cloth.

205. Accordingly, the Borrower Defense Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TWO
### (Borrower Defense Provisions: Arbitrary and Capricious)

206. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

207. The Borrower Defense Provisions are arbitrary and capricious. Among other things, the regulations do not explain the need for a massive new loan forgiveness program; do not adequately explain why or how a borrower "defense" is being converted into a borrower "offense" or affirmative right; do not outline adequate adjudicatory procedures or detail an institution's right to be heard; stretch the definition of a "substantial misrepresentation" past the point of reasonableness; and apply retroactively.

208. Accordingly, the Borrower Defense Provisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT THREE
### (Borrower Defense Provisions: Violate the Constitution)

209. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

210. The Borrower Defense Provisions violate the Due Process Clause of the United States Constitution by, among other things, depriving institutions of the right to be heard and to present evidence to a neutral magistrate before being deprived of property.

211. By providing for the adjudication of contract and fraud claims in an administrative setting, the regulations violate the Seventh Amendment and Article III.

212. Accordingly, the Borrower Defense Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FOUR
### (Financial Responsibility Provisions: No Statutory Authority)

213. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

214. The Financial Responsibility Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

215. The Financial Responsibility Provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other things, the regulations fail to fulfill the statute's mandate to account for an institution's total

financial circumstances; impermissibly delegate tasks to third-party actors; and specify regulatory consequences different from those in the statute.

216. Accordingly, the Financial Responsibility Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT FIVE
### (Financial Responsibility Provisions: Arbitrary and Capricious)

217. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

218. The Financial Responsibility Provisions are arbitrary and capricious. Among other things, the regulations impose significant financial and other consequences automatically based on "triggering events" which may have little, if anything, to do with the school's financial soundness, and give the Secretary virtually unbounded discretion to impose sanctions for other reasons as well. These automatic and discretionary "triggers" raise serious problems regarding fairness, due process, and reasoned decision-making – problems which the Department fails to address adequately. Additionally, the Department failed to provide notice of, or an opportunity to comment on, the integration of these "triggers" into the composite score framework or the addition of several discretionary triggers.

219. Accordingly, the Financial Responsibility Provisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and violate the notice and comment requirements of 5 U.S.C. § 553.

### COUNT SIX
### (Financial Responsibility Provisions: Violate the Constitution)

220.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

221.    The Financial Responsibility Provisions violate the Due Process Clause of the United States Constitution by, among other things, basing significant regulatory consequences on preliminary litigation developments, denying institutions an opportunity to be heard, and adopting an impermissibly vague standard by which the Secretary can decide to impose a letter of credit or other financial protection based on an "event or condition."

222.    Accordingly, the Financial Responsibility Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT SEVEN**
**(Repayment Rate Provisions: No Statutory Authority)**

223.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

224.    The Loan Repayment Rate Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.* Among other things, they provide for consequences not authorized under the statute, single out proprietary institutions in ways not authorized by the statute, and rely on provisions of the statute which provide no authority for these regulations.

225.    Accordingly, the Loan Repayment Rate Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT EIGHT**
**(Repayment Rate Provisions: Arbitrary and Capricious)**

226.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

73

227. ~~The Loan Repayment Rate Provisions are arbitrary and capricious. Among other things, the regulations' method for calculating loan repayment rates would effectively punish institutions that have attempted to better serve borrowers and reduce default rates by highlighting pay-as-you-earn plans and other flexible loan repayment options; the regulations would apply that method retroactively, even though the federal government itself offers and encourages such options; and the regulations target proprietary schools and do not adequately explain why other institutions with similar loan repayment rates should not be subject to the same warning requirements.~~

228. ~~Accordingly, the Loan Repayment Rate Provisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).~~

~~**COUNT NINE**~~
~~**(Repayment Rate Provisions: Violate the Constitution)**~~

229. ~~CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.~~

230. ~~The Loan Repayment Rate Provisions violate the First Amendment because the mandatory reporting provisions are broad, prophylactic rules that compel speech in the form of Department-issued warnings attached to advertising and promotional materials.~~

231. ~~Accordingly, the Loan Repayment Rate Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).~~

**~~COUNT TEN~~**
(Arbitration and Class Action Provisions: No Statutory Authority)

~~232~~80. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

74

~~233~~81. The Arbitration and Class Action Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

~~234~~82. The Arbitration and Class Action Provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other things, the regulations do ~~note~~not relate to any specific authority conferred by the HEA; conflict with the FAA; and were not otherwise authorized by Congress.

~~235~~83. Accordingly, the Arbitration and Class Action Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT ~~ELEVEN~~TWO**
**(Arbitration and Class Action Provisions: Arbitrary and Capricious)**

~~236~~84. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

~~237~~85. The Arbitration and Class Action Provisions are arbitrary and capricious.  Among other things, the regulations fail to confront or acknowledge the benefits of individual arbitration; fail to show that class actions related to borrower defenses would be permissible, even absent class waivers; and fails to consider industry reliance on the terms of private contracts.

~~238~~86. Accordingly, the Arbitration and Class Action Provisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TWELVE
### (Arbitration and Class Action Provisions: Violate the Constitution)

239. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

240. The Arbitration and Class Action Provisions violate the Due Process Clause by retroactively voiding private contracts.

241. Accordingly, the Arbitration and Class Action Provisions  are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

24287. WHEREFORE, Plaintiff prays for an order and judgment:

(i)    Declaring that the Department's Borrower Defense, Financial Responsibility, Repayment Rate, and Arbitration and Class Action Provisions were promulgated without statutory authority within the meaning of 5 U.S.C. § 706(2)(C) and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); that the entirety of the Final Rule is contrary to the Constitution within the meaning of 5 U.S.C. § 706(2)(B); and that the Final Rule is and that the Arbitration and Class Action Provisions are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

(ii)   Declaring that any action previously taken by Defendants pursuant to the final regulations Arbitration and Class Action Provisions is null and void;

(iii)   ~~Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the final regulations;~~

(~~iv~~iii)   Vacating the ~~final regulations~~Arbitration and Class Action Provisions;

(~~v~~iv)   Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

(~~vi~~v)   Granting such other and further relief as this Court deems just and proper.

Dated: ~~May 24~~December 28, ~~2017~~2018          Respectfully submitted,

|  |  |
|---|---|
|  | /s/ Clifford M. Sloan |
| BORIS BERSHTEYN | CLIFFORD M. SLOAN, DC Bar No. 417339 |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | ~~CAROLINE S. VAN ZILE~~SYLVIA O. TSAKOS, DC |
| 4 Times Square | Bar No. ~~1017942~~888273394 |
| New York, NY 10036 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| T: 212/735-3834 | 1440 New York Avenue, NW |
|  | Washington, DC 20005 |
| GREGORY BAILEY | T: 202/371-7000 |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | F: 202/661-8340 |
| 155 N Upper Wacker Dr. #2700 | Email: cliff.sloan@skadden.com |
| Chicago, IL 60606 |  |
| T: 312/407-0739 |  |
| F: 312/407-8604 |  |

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
T:  202/776-7867
F:  202/330-5290

*Attorneys for CAPPS*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Complaint was filed electronically with the Clerk of the Court on December 28, 2018 using the CM/EMF system, which will send notification of such filing to all counsel of record.

/s/ Clifford M. Sloan____
Clifford M. Sloan