## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,**

2520 Venture Oaks Way #170
Sacramento, CA 95833

**Plaintiff,**

v.

**BETSY DEVOS, in her official capacity as Secretary of the Department of Education,**

Office of the Secretary
400 Maryland Avenue, SW
Washington, D.C. 20202, and

**THE DEPARTMENT OF EDUCATION,**

400 Maryland Avenue, SW
Washington, D.C. 20202

**Defendants.**

**Civil Action No. 17-999 (RDM)**

## AMENDED COMPLAINT AND PRAYER
## FOR DECLARATORY RELIEF

Plaintiff California Association of Private Postsecondary Schools ("CAPPS"), for its amended complaint against Defendants, the Honorable Betsy DeVos, Secretary of the Department of Education ("Secretary"), and the Department of Education (the "Department") alleges, by and through its attorneys, as follows:

### INTRODUCTION

1.      This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706 ("APA") challenging regulations promulgated by the Department on November 1, 2016,

as well as supplemental regulations promulgated on January 19, 2017.  *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule" or "Borrower Defense Regulations"); 82 Fed. Reg. 6253 (Jan. 19, 2017) ("Borrower Defense Procedures").  The Department stated that the Final Rule was adopted pursuant to Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, which governs federal financial aid for postsecondary education.  The regulations exceed the Department's authority under the HEA and conflict with the Federal Arbitration Act ("FAA"), and are arbitrary and capricious under the APA.

2.  Plaintiff CAPPS is a non-profit association of California private postsecondary schools. CAPPS has a membership of around 150 institutions, including proprietary (*i.e.*, for-profit) and non-profit schools, most of whom are eligible for Title IV funding.  Nearly all CAPPS schools offer curriculum-driven educational programs designed to prepare students for occupations that are necessary to a thriving economy.  For example, CAPPS schools train future nurses, ultrasound technicians, emergency medical technicians, electricians, and individuals in numerous other occupations.  Neither the local nor the national economy would function without workers in these fields.

3.  Most CAPPS member schools are smaller institutions, averaging less than 400 students and one or two locations.  Moreover, CAPPS members serve many students who are non-traditional, including students who did not attend college immediately after graduating from high school, part-time students, students with full-time jobs, students who are financially independent, students who have dependents, and students who have earned a GED.  Students at CAPPS schools are also more likely to be low-income, older, and minorities than are students at public or non-profit colleges and universities.

4.    The Final Rule threatens the existence of many CAPPS member institutions.  The increased costs and the dramatically escalated threat of meritless claims and litigation, both before the Department and in court, will be crippling for many schools.  The lack of procedural safeguards and clear standards throughout the Final Rule severely exacerbates these problems.

5.    The Borrower Defense Regulations are likely to shutter many vocational schools without any reasonable justification and will needlessly leave many non-traditional students with few or no educational options.  A wide range of industries across America will suffer when their supply of qualified employees slows to a trickle.

6.    Many traditional liberal arts schools will suffer as well.  The Final Rule exposes all schools to massive new liability, and likely will be particularly harmful to schools serving low-income and minority students.  As a result, a wide and disparate group of citizens and institutions, including many historically black colleges and universities ("HBCUs"), have expressed concern about the unwarranted cost and burdens of the new rules.

7.    CAPPS supports thoughtful, appropriate regulation of the postsecondary education sector.  CAPPS works with its schools to foster a strong culture of compliance.  CAPPS also supports providing relief to students who have been victims of fraud, as the Final Rule purportedly aims to do.  But the Final Rule is not a lawful, common-sense, well-considered, reasoned regulatory intervention.  It goes far beyond aiding students who have been the victims of fraud and threatens massive, unnecessary, harmful, and severe consequences.  The Final Rule is a sprawling mass of thinly studied new requirements that, by the Department's own estimates, will cost schools almost one billion dollars per year.  The ten-year impact on the public fisc is estimated at $14.9 billion dollars.  It is

necessary and important that regulations with such a profound fiscal impact be justified and supported by reasoned decision-making.  This Rule was not.

8.    The Final Rule creates a seismic shift in higher education regulation without legal basis or reasonable justification.  With no statutory authorization and in conflict with the strong federal policy favoring arbitration, the Department prohibits institutions from including arbitration provisions or class action waivers in their agreements with students ("Arbitration and Class Action Provisions").  The Department prohibits these clauses in contracts despite the fact that Congress and the United States Supreme Court have repeatedly emphasized the benefits of arbitration and of class action waivers, embodied in the FAA.  In addition to banning these provisions in future agreements, the Department forbids schools from enforcing their existing contracts regarding arbitration and class actions.

9.    The Final Rule harms institutions and their students, without legal authority and without a sound or adequate justification.  The Arbitration and Class Action Provisions promise to be extremely costly, especially to proprietary and career-oriented schools and other schools that serve underrepresented groups.  With the Arbitration and Class Action Provisions in effect, many schools serving non-traditional students, particularly small schools, may be forced to shut down due to the crushing burden of the regulations' cost, which are imposed without accompanying public benefit.

10.   These unfortunate outcomes are the product of a rushed and flawed rulemaking process. The Secretary gave students, lenders, schools, and others only 45 days to comment on this massive regulatory project.  Still, over 10,000 comments were filed.  The Department then purportedly read, considered, and responded to each material comment in its final

draft in less than six weeks.  After that, the Department sent the final version of its rule to

the Office of Management and Budget ("OMB") for review.  The OMB review process

generally takes 90 days.  This review was complete in a little over 30 days, despite the

regulations' $14.9 billion price tag.

11.    The Department's rush was aimed at finalizing the rule before November 1, 2016, which

was one week before the presidential election and the last possible date under the

applicable statute for promulgating rules that will go into effect the next fiscal year.  The

hurried timetable is evident in the sloppy drafting of the Final Rule.

12.    The regulatory provisions published in the Federal Register lack any statutory basis and

demonstrate an absence of reasoned decision-making.

13.    The Arbitration and Class Action Provisions are unlawful for several reasons.  First, the

Department's actions expressly conflict with Congress's pro-arbitration policy embodied

in the FAA.  The Rule exceeds the statutory authority conferred by the HEA, which does

not authorize the Department's sweeping changes to contracts between schools and

students.

14.    Second, the Department's massive rewrite of current regulations suffers from a lack of

reasoned decision-making and is arbitrary and capricious under the APA. The

Department's Arbitration and Class Action Provisions are arbitrary and capricious for

numerous reasons, including, but not limited to, a lack of reasoned discussion of the

benefits of arbitration; significant reliance on a study completed by a different agency

unrelated to the federal student loan market; and contradictions in the Department's

reasoning in the preamble itself.

15.     The Court should vacate the challenged regulations and, if necessary, remand this matter

to the agency for further, more careful consideration.

## PARTIES

16.     Plaintiff CAPPS is a voluntary, non-profit association of California private postsecondary

schools.  Its principal place of business is located in Sacramento, CA.  CAPPS has a

membership of approximately 150 institutions, including proprietary and non-profit

schools.  Most of CAPPS's member schools are smaller institutions, averaging less than

400 students.  The vast majority of CAPPS schools are accredited and participate in

financial aid programs under Title IV of the HEA.  20 U.S.C. §§ 1070-1099d.  They thus

will be subject to the Final Rule.  CAPPS schools will face additional regulatory burdens

and compliance costs as a result of the new regulations, and those costs are already

accruing.  These injuries are directly traceable to the Final Rule.  The injuries would be

remedied by a favorable judgment vacating the regulations.  The interests CAPPS seeks

to protect are germane to its purpose of promoting reasonable policy and regulation in the

postsecondary education sector, and the claims asserted and relief requested do not

require the participation of individual members.  CAPPS is also injured in its

administrative capacity because it will have to alter its own compliance and training

programs in light of these novel and unlawful regulations, which will cost the

organization substantial time and money.

17.     Defendant Betsy DeVos is the Secretary of Education.  She is sued in her official

capacity.  The Secretary's official address is 400 Maryland Avenue, SW, Washington,

D.C. 20202.  The Secretary, in her official capacity, is responsible for the Department's

promulgation of the Final Rule.

18.     Defendant Department of Education is an agency of the United States.  As such, it is

        subject to the APA.  *See* 5 U.S.C. § 551(1).  The Department is located at 400 Maryland

        Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

19.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-06.

        Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against

        officers and agencies of the United States; because Defendant Department of Education

        resides in this judicial district; because Defendant Secretary DeVos performs her official

        duties in this judicial district; and because a substantial part of the events or omissions

        giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

I.      **CAPPS AND PRIVATE SECTOR SCHOOLS**

21.     CAPPS is the only California state association that represents the full and diverse range

        of private postsecondary schools in California.  CAPPS has a membership of

        approximately 150 institutions, which includes proprietary and non-profit institutions.

        CAPPS schools offer a wide range of degrees, from certificates, to associates degrees,

        masters degrees, and professional degrees.

22.     CAPPS schools prepare workers for many occupations that are necessary to a thriving

        economy.  CAPPS schools train future nurses, dialysis technicians, ultrasound

        technicians, home health aides, emergency medical technicians, information technology

        specialists, hardware and software experts, cyber-security specialists, HVAC and

        refrigeration technicians, heavy equipment specialists, electricians, paralegals, chefs, line

        cooks, cosmetologists, and even gunsmiths.  Some CAPPS members specialize in

training injured workers to reenter the workforce, and others partner with workforce training organizations to educate their participants in labor-demand occupations.

23. The economy would not function adequately without workers in these fields. Local hospitals, labs, repair companies, and restaurants depend on a reliable stream of well-trained workers. So do consumers. Many elderly patients, for example, would suffer if home health aides or dialysis technicians were in short supply. Registered nurses, whom many CAPPS schools train, are among the most in-demand workers in the national economy. Without private schools supplying much-needed workers in these trades, industry would suffer. Private sector schools supply approximately half of all technically trained workers entering the workforce each year.

24. Many CAPPS schools are also small, family-owned businesses. These small businesses offer upward mobility for their owners as well as their students. These small schools, often labeled "technical colleges," differ from traditional higher education institutions in that they do not offer broad-based liberal arts degrees. Instead, they offer degrees and certificates based on specific occupational skillsets that often require state or national licensing. These educational institutions are closely connected to employers, and their presence ensures that businesses can recruit well-trained staff and remain competitive. These occupational degrees and certificates allow consumers and companies to benefit from employees who are skilled in the latest techniques and tools of their craft.

25. CAPPS is dedicated to protecting the interests of all of its members, including smaller institutions. Proprietary institutions are among the most intensely regulated entities in California and nationally. The California legislature has imposed dozens of legal requirements that apply only to proprietary schools. The California state regulatory

agency that oversees proprietary schools has also imposed multiple onerous regulations implementing proprietary-school-only legislation.  There are also scores of statewide boards, bureaus, and commissions that oversee the licensing of practitioners and approval of programs concerning various occupations offered by CAPPS institutions.  In addition, federal oversight of these schools has been increasing rapidly.

26.   On information and belief, the fiscal burden that the Final Rule imposes will pose a serious threat to the viability of some CAPPS schools.

27.   The harm to students would be particularly acute if schools begin to close in large numbers as a result of the unlawful and detrimental new regulations.

28.   Most CAPPS members are proprietary institutions, which serve a student population that has a high percentage of low-income and minority individuals who otherwise are not well served by traditional institutions.  For example, proprietary schools' students are more likely to receive Pell grants, which provide financial aid exclusively for low-income borrowers.  *See* Comments of CAPPS, ED-2015-OPE-0103, Attach. 1, Declaration of Jonathan Guryan, Ph.D., ¶ 14 (Aug. 1, 2016).  Students at proprietary schools are also likely to be the first in their family to graduate from college.  *Id.*  In addition, in 2011-12, 26 percent of students at proprietary schools were African-American, compared to only 15 percent at public schools and 14 percent at private non-profit schools.  *Id.* ¶ 10.  "The fraction of students who were Hispanic at for-profit schools was 19 percent, similar to the 17 percent at public schools, but greater than the 10 percent at private not-for-profit schools."  *Id.*  Students at proprietary schools are also more likely to be single parents, financially independent, and over the age of 25.

29.     These students are often drawn to proprietary schools based on the schools' flexible
        schedules and focused instruction.  Many proprietary schools offer classes on evenings
        and weekends, or even online.  Those programs are also tailored toward specific, in-
        demand occupations.  Since proprietary school students are likely to be financially
        independent – and many are single parents – this flexibility and responsiveness to the
        market is important.

30.     Proprietary schools have established a record of successful efforts to help those students,
        whom other schools might label "at risk," actually graduate.  As the former president of
        Northwestern University has noted, "The graduation rates of some for-profit institutions
        are well above 50% – as high or higher than those of many four-year public colleges, let
        alone community colleges and nonselective public and private colleges (which often have
        rates below 50%)," even given their non-traditional student populations.  Henry Bienen,
        *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010),
        http://www.wsj.com/articles/SB10001424052748703724104575378933954267308.

31.     As the Department itself acknowledged, "there are many proprietary career schools and
        colleges that play a vital role in the country's higher education system."  81 Fed. Reg. at
        75,934.

32.     In light of the new regulations, many non-traditional students may be unable to access
        postsecondary education.  This will negatively affect both the diversity of schools and the
        diversity of the American workforce.

## II.     STATUTORY FRAMEWORK

33.     Title IV of the HEA was enacted "to assist in making available the benefits of
        postsecondary education to" students who otherwise could not afford the cost of a degree

or certificate.  20 U.S.C. § 1070(a).  Title IV programs are administered by the

Department.

34.     The vast majority of postsecondary students – over two million each year – depend on

        Title IV funds to achieve their educational goals.  Around 83 percent of full-time, first-

        time undergraduate students rely on Title IV financial aid to help pay for their degrees.

        Nat'l Ctr. For Educ. Statistics, Digest of Education Statistics, Table 331.20 (Dec. 2016),

        https://nces.ed.gov/programs/digest/d15/tables/dt15_331.20.asp (outlining financial aid

        statistics for 2013-14 school year).  The average student receives over $7,000 in federal

        loans each year.  *Id.*  Title IV programs include many of the most familiar loan and grant

        programs: the Direct Loan Program, Federal Perkins Loans, and Pell Grants, among

        others.

35.     Congress already strictly regulates the provision and use of Title IV funds, including

        eligibility for participation in Title IV programs.  For example, to receive Title IV funds,

        a school must be "legally authorized within [a] State to provide a program of education

        beyond secondary education."  20 U.S.C. § 1001(a)(2).  Institutions must also be

        "accredited by a nationally recognized accrediting agency or association" to receive those

        funds.  *Id.* § 1001(a)(5).  Through these requirements, Congress has already ensured that

        Title IV funds will flow only to legitimate, degree- or certificate-granting institutions.

36.     Congress also provided the Department with specific, carefully cabined tools to ensure

        compliance with Title IV.

37.     For example, Section 487 of the HEA allows the Secretary to take action against an

        institution upon "determination, after reasonable notice and opportunity for a hearing,

        that an eligible institution has engaged in substantial misrepresentation of the nature of its

educational program, its financial charges, or the employability of its graduates." *Id.*
§ 1094(c)(3)(A).  When that happens, there are two specified remedies: the Secretary
may "suspend or terminate" an institution's "eligibility status" for Title IV loans or the
Secretary may "impose a civil penalty upon such institution of not to exceed $25,000 for
each violation." *Id.* § 1094(c)(3)(A)–(B).  When "determining the amount of such
penalty," the Secretary must consider "the appropriateness of the penalty to the size of
the institution of higher education subject to the determination, and the gravity of the
violation, failure, or misrepresentation." *Id.* § 1094(c)(3)(B)(ii).  Congress thus provided
specific, delineated penalties that may be imposed based on a substantial
misrepresentation.

38.     In addition, Congress provided that "the Secretary shall specify in regulations which acts
or omissions of an institution of higher education a borrower may assert *as a defense* to
repayment of a loan made under" Title IV.  *Id.* § 1087e(h) (emphasis added).  This
provides a "defense" for students who should not be liable in repayment proceedings.

39.     Prior to the promulgation of the Final Rule, the Department interpreted this language as
providing for *defenses* to be used in collection proceedings: "In any proceeding to collect
on a Direct Loan, the borrower may assert as a defense against repayment, any act or
omission of the school attended by the student that would give rise to a cause of action
against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

40.     Congress also imposed certain bookkeeping duties on institutions receiving Title IV
funds.  These duties are written into the school's Title IV program participation
agreement with the Department.  Those agreements outline the basic expectations for
Title IV participants, and they, too, are governed by statute.  For example, under the

HEA, an institution must agree to "provide a statement that certifies the eligibility of any student to receive a loan." 20 U.S.C. § 1087d(a)(1)(C).  The institution must also "set forth a schedule for disbursement of the proceeds of the loan in installments."  *Id.* § 1087d(a)(1)(D).  And the school must "provide assurances that [it] will comply with requirements established by the Secretary relating to student loan information," *id.* § 1087d(a)(2), and may "not charge any fees of any kind, however described, to student or parent borrowers for origination activities."  *Id.* § 1087d(a)(5).  As part of requiring institutions to adhere to these ministerial duties, the Secretary may "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program in program agreements. *Id.* § 1087d(a)(6).  Congress thus ensured that loan disbursement and information collection would proceed in an orderly manner.

41.   Over the years, Congress has also created several specific loan forgiveness programs for student borrowers who have provided public service.  For example, Section 455(m)(1) allows the Department to "cancel the balance of interest and principal due" for borrowers who have dedicated their lives to public service and paid their loans for ten years.  *Id.* § 1087e(m).  The Higher Education Opportunity Act added a similar provision for service in areas of national need.  *See* Pub. L. No. 110-315, § 430, 122 Stat. 3078, 3236-42 (2008).

42.   Congress also set a cap on the total amount of loans an individual student can take out. *See, e.g.*, 34 C.F.R. § 685.203.  But schools are not permitted to limit the amount students borrow from Title IV to, for example, cover only the cost of tuition.  *See* Dep't of Educ., 2016-2017 Federal Student Aid Handbook 3–90 (2016) (A "school may not have a policy

of limiting Direct Loan borrowing on an across-the-board or categorical basis.  For

example, you may not have a policy of limiting borrowing to the amount needed to cover

the school charges, or not allowing otherwise eligible students to receive the 'additional'

Direct Unsubsidized Loan amounts that are available under the annual loan limits.").

43.     Congress also included detailed provisions requiring schools receiving Title IV funds to

be financially responsible.  Section 498(c)(1) of the Act provides that "[t]he Secretary

shall determine whether an institution has the financial responsibility required," based on

whether it is able to provide the services it claims to offer, provide the administrative

resources necessary to comply with the Act, and meet all of its financial obligations.  20

U.S.C. § 1099c(c)(1).

44.     The Act further provides that "[t]he Secretary shall take into account an institution's total

financial circumstances in making a determination of its ability to meet the standards" for

financial responsibility required under the Act.  *Id.* § 1099c(c)(2).  An institution may be

required to provide "satisfactory evidence of its financial responsibility" if it "fails to

meet criteria prescribed by the Secretary regarding ratios that demonstrate financial

responsibility."  *Id.*  Such evidence may consist of, *inter alia*, a letter of credit, *id.*

§ 1099c(c)(3)(A), or a showing that it "has met standards of financial responsibility,

prescribed by the Secretary by regulation, that indicate a level of financial strength not

less than those required" by the ratio-based criteria, *id.* § 1099c(c)(3)(C).  The Act

specifically provides that the Secretary's determinations under these provisions "shall be

based on an audited and certified financial statement of the institution," and that the

criteria "shall take into account any differences in generally accepted accounting

principles, and the financial statements required thereunder, that are applicable to for-profit, public, and nonprofit institutions." *Id.* § 1099c(c)(2), (5).

45.   In other words, Congress tasked the Department with ensuring financial responsibility based on an institution's total financial circumstances, an assessment that involves audits, accounting, and ratio-based criteria.  And Congress mandated that institutions have an opportunity to demonstrate their financial responsibility based on the institution's overall financial health before a school is deemed financially deficient.  *See id.* § 1099c(c)(2)–(3).

46.   In its detailed provisions outlining the administration of federal loans, the HEA does not address arbitration agreements or class action waivers.

## III.   THE DEPARTMENT'S RUSH TO REGULATE

47.   Despite the broad scope and enormous financial impact of the Final Rule, the Department's rushed rulemaking procedure crammed multiple, unrelated provisions into a single rule and left little time for public input or departmental revisions.  The result is an understudied, overbroad rule based on very little data or concrete evidence.

48.   Section 492 of the HEA requires the Secretary to obtain public involvement in the development of proposed regulations affecting Title IV programs.  20 U.S.C. § 1098a.

49.   After obtaining public input, the Secretary must subject the proposed regulations to a negotiated rulemaking process, collaborating with stakeholders to draft consensus rules. *Id.*

50.   In accordance with the statute, the Department attempted to reach consensus with a negotiating committee representing various stakeholders as to new borrower defense, financial responsibility, anti-arbitration and class-action waiver, and loan repayment disclosure regulations.  Of the 16 groups ultimately represented on the negotiating

committee, only one group – consisting of two individuals – represented the interests of proprietary schools, large and small.

51.    Arbitration provisions and class-action waivers were not included in the original notice as topics for negotiated rulemaking.  Rather, the Department decided to jam those topics into the agenda once negotiated rulemaking had already commenced, without adding additional experts on the topic to the negotiating committee.

52.    After failing to reach consensus in March 2016, the Department set about finalizing its preferred regulations.  Less than three months after disbanding the negotiating committee, the Department released a draft of its proposed regulations.  The publicly released draft was 530 pages long.  The Notice of Proposed Rulemaking ("NPRM") consumed 93 pages of the Federal Register when it was officially published on June 16, 2016.  The Department announced that it planned to finalize the rules by November 1, 2016, slightly over four months later.

53.    Despite the broad scope of its regulatory effort and the tremendous impact it was expected to have on the public and private fisc, the Department provided commenters with a mere 45 days to respond to its proposed rules.  By contrast, Executive Order 12866 contemplates a standard 60-day period for commenting on significant rules.  *See* Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993).  This rule is classified as "significant," and has a far more expansive and costly impact than many "significant" rules.

54.    Even in the face of this tight deadline, over 10,000 schools, students, legislators, and public officials commented on the proposed rule by August 1, 2016.

55.     Schools, legislators, public interest groups, and others offered a broad range of criticisms.

Historically black colleges and universities, including Spelman College, noted that the

cumulative impact of the Department's Financial Responsibility Provisions could cause

an enormous and unjustified negative financial impact on HBCUs and other under-

resourced institutions that nevertheless provide quality educational opportunities.  *See*

Comments of Spelman College, ED-2015-OPE-0103 (July 28, 2016).  Then-

Representative Tom Price and Senator Mike Enzi – chairmen of the House and Senate

Budget Committees – wrote to the Secretary to express concern over the expense of the

proposed rule.  *See* Letter from Rep. Tom Price, M.D., Chairman, House Budget Comm.,

& Sen. Mike Enzi, Chairman, Senate Budget Comm., to John B. King, Jr., Secretary,

U.S. Dep't of Educ. (July 14, 2016).  They noted that the "broad scope" of the proposed

rule "could increase tuition (by increasing schools' legal liability), bankrupt proprietary

schools, and potentially close down many nonprofit colleges, thus limiting higher

education options for students."  *Id.* at 2.  They commented that "under the proposed rule,

even an unintentional misrepresentation or omission of information in a school catalogue

could result in the Secretary certifying a claim for a group of thousands of borrowers."

*Id.*  Groups representing both non-profit and proprietary schools echoed those concerns.

*See, e.g.*, Comments of Career Education Colleges and Universities, ED-2015-OPE-0103

(Aug. 1, 2016); Comments of American Council on Education *et al.*, ED-2015-OPE-0103

(Aug. 1, 2016).  The Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and

Texas also took issue with "triggers" that would penalize schools whenever the state or

federal government brings a lawsuit or administrative action against them.  *See*

Comments of Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and Texas,

ED-2015-OPE-0103 (Aug. 1, 2016).  The Attorney General of Iowa also raised concerns about the "chilling effect" the triggers would have on potential settlements between institutions and state or federal oversight agencies.  *See* Comments of the Attorney General of Iowa, ED-2015-OPE-0103 (Aug. 1, 2016).

56. Despite these numerous comments, which the Department is obligated to review and consider when drafting its final rule, the Department sent a final draft to the OMB less than six weeks after the close of the comment period.

57. Ordinarily, a thorough review by OMB consumes 90 days.  *See* Exec. Order No. 12866, 58 Fed. Reg. 190 (Oct. 4, 1993).  Yet OMB purportedly completed its review of the regulations – which are expected to have a $14.9 *billion* dollar impact on the public fisc over the next ten years – in less than half the usual period (44 days).

58. The Final Rule was published in the Federal Register on November 1, 2016.  It did not include a description of the process to which schools were entitled before being held liable for borrower defense claims, which was only fully explained in a subsequent regulation issued on January 19, 2017.

59. Under Section 482(c) of the HEA, final regulations must be published by November 1 in order to be effective by July 1 of the following year.  *See* 20 U.S.C. § 1089.  The Department barreled through the rulemaking process to meet this deadline and to finalize the regulations before the end of the previous administration.

60. This practice, known as "midnight regulation," has been criticized by scholars and administrations alike as creating sloppy, under-analyzed, and legally problematic regulations.

61.     The rushed rulemaking process is especially troubling in light of the scope and expense

of the Final Rule, as well as the profound impact it will have on schools and students.

## IV.    CHALLENGED REGULATIONS

62.     In the Final Rule, the Department instituted major changes to its existing rules.  Under

the Final Rule, institutions that participate in the Direct Loan Program are prohibited

from entering into a predispute agreement to arbitrate claims that could form the basis of

a borrower defense.  81 Fed. Reg. at 76,066; 34 C.F.R. § 685.300(f).  Those same

institutions are prohibited from obtaining agreement that a borrower waive his or her

right to initiate or participate in a class action lawsuit regarding such claims. 81 Fed. Reg.

at 76,067; 34 C.F.R. § 685.300(e).

63.     Additionally, the Final Rule bars institutions from enforcing existing arbitration

provisions or class action waivers in their agreements with students to the extent those

agreements would govern borrower defense-type claims.  81 Fed. Reg. at 76,067; 34

C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).   Schools must either notify borrowers of

this change or amend their agreements. 81 Fed. Reg. at 76,067; 34 C.F.R.

§§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).

64.     Institutions are required to notify current students that arbitration provisions will not be

enforced no later than the date on which they provide exit counseling or the date on

which the school files its initial response to a demand for arbitration or service of a

complaint from a student who has not already been sent a notice or amendment.  81 Fed.

Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(iii), 685.300(f)(3)(iii).

## THE CHALLENGED REGULATIONS EXCEED THE DEPARTMENT'S AUTHORITY AND VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

65.     The Arbitration and Class Action Provisions suffer from fatal legal flaws.

I.     **The Arbitration and Class Action Provisions Exceed the Department's Authority Under the HEA and Violates the FAA.**

66.    The Department purports to find authority for the arbitration and class action waiver provisions in Section 454(a)(6) of the HEA, a catch-all provision codified at 20 U.S.C. § 1087d(a)(6).  This catch-all provision allows the Department to impose ministerial accounting or bookkeeping requirements similar to those found in Section 454(a) subsections (1)-(5).  It does not empower the Department to impose novel and disruptive regulations that govern the substance of contracts between schools and their students.

67.    Moreover, the arbitration and class action prohibitions conflict with Congress's pro-arbitration policy embodied in the FAA.  The FAA provides that arbitration agreements in contracts are enforceable.  However, the Final Rule seeks to retroactively invalidate arbitration clauses in thousands of contracts and prohibit mandatory arbitration clauses in thousands of prospective contracts.

68.    Congress has not explicitly afforded the Department authority to abrogate arbitration provisions.  When Congress intends to give an agency the authority to abrogate arbitration provisions, it has done so clearly and unambiguously.  For example, the Consumer Financial Protection Bureau ("CFPB") was given explicit authority by Congress to study the issue of mandatory arbitration and then to promulgate a rule regarding mandatory arbitration, if the CFPB believed such a rule to be necessary after completing the study.  Without such explicit authorization, the FAA prohibits an agency from altering arbitration agreements.

69.    The Department contends that it is not invalidating arbitration or class action provisions in existing contracts.  Rather, it is simply preventing institutions from enforcing those

provisions.  That is a distinction without a difference.  The FAA prohibits either course of action.

## II. The Arbitration and Class Action Provisions Are Arbitrary and Capricious Under the APA.

70.     The Arbitration and Class Action Provisions are arbitrary and capricious.  The Department failed to consider important factors raised by commenters and did not establish a reasonable connection between the facts found and the choice made.

71.     First, the Department failed to adequately weigh or discuss the benefits of individual arbitration.  As discussed in the congressional record compiled to support the FAA and in Supreme Court case law interpreting the FAA, the benefits of arbitration can be substantial to all parties involved.  *See* 9 U.S.C. § 2.  Arbitration provides a prompt, fair, and efficient method of dispute resolution for private individuals as well as educational institutions.

72.     The Department itself has recognized the value and efficiency of arbitration elsewhere, requiring an institution to "agree[] to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration before initiating any other legal action."  34 C.F.R. §§ 600.4(c), 600.5(d).  The Department's failure to consider the benefits of arbitration – which are demonstrated by the Department's own rules – highlights its unreasoned rush to promulgate these regulations, without consideration of all the relevant factors or costs.

73.     The Department also failed to adequately consider the serious drawbacks of class actions for students.  It is well-documented that class actions are often an ineffective means of obtaining relief for consumers.  Cases are often drawn-out and unsuccessful, and counsel is frequently compensated handsomely for small pay-outs to consumers.  In addition, in a

class action, plaintiffs must meet a high class certification burden, which often prevents plaintiffs from obtaining relief.

74.     In support of its determination, the Department relies on a CFPB study.  But that study is unrelated to the federal loan market and inapplicable to the student loan context.  The CFPB study on consumer financial products and arbitration agreements concerned six financial products including credit cards, checking accounts, general purpose reloadable prepaid cards, payday loans, private student loans, and mobile wireless contracts governing third-party billing services.  *See* 81 Fed. Reg. at 32,840.  Federal student loans pose far different risks to borrowers in a far different context, and the Department may not, consistent with the mandates of reasoned decision-making, simply cut and paste findings from an entirely separate legal and factual setting, made by a separate agency with an entirely distinct statutory charter and mission.  Accordingly, the CFPB's study is an obviously insufficient basis to sustain the arbitration and class action waiver provisions.  In fact, the CFPB itself acknowledges the significant distinctions between Federal student loans, like the Direct Loan Program, and private student loans.  *See* Consumer Financial Protection Bureau, What Are the Main Differences Between Federal Student Loans and Private Student Loans?, http://www.consumerfinance.gov/askcfpb/ 545/what-are-main-differences-between-federal-student-loans-and-private-student-loans.html (last visited May 10, 2017).  The significant differences are not discussed in the preamble.

75.     Even if the CFPB study of consumer financial products were an adequate basis for determining the costs and benefits of arbitration in the federal loan context, the study itself suggested the possibility that arbitration agreements could benefit consumers by

reducing operating costs for companies and making their products more affordable. In other words, arbitration was not necessarily negative for consumers or students.

76. The lack of consideration of the difference in context also violates the mandate of reasoned decision-making with regard to class action agreements. For example, voidable student loan debts may be much larger than the extra interest charged by a credit card company, and, accordingly, the calculus of costs and benefits of individual litigation is far different than in the contexts considered by the CFPB. Without specific study of federal student loans, the Department cannot meaningfully rely on the CFPB's study to support its arbitration and class action waiver provisions.

77. The Department's reasoning regarding class action waivers is also contradictory on its face. The Department claims that class action provisions are vital to ensuring that borrowers can collectively hold institutions accountable. But as the Department acknowledged in the NPRM, "Federal and State rules impose requirements on class actions that may well prevent particular borrowers from bringing and successfully maintaining a class action." 81 Fed. Reg. at 39,383; *see also id.* at 39,384 n. 62 (discussing multiple cases involving borrowers dismissed based on the commonality issues that often bar borrowers from bringing class actions). If class action litigation is not available to most borrowers because their lawsuits do not meet the prerequisites for class certification, then it is not likely that a ban on class action waivers will increase the availability of class actions in any meaningful way. Moreover, the Department declines to discuss whether the availability of group borrower defenses eliminates the need for class actions brought in federal court.

78. The Department also failed to adequately explain which categories of claims can no longer be arbitrated.  The Final Rule bars arbitration of disputes "with respect to any aspect of a borrower defense claim."  34 C.F.R. § 685.300.  But the Department clearly intends the Final Rule to cover claims that could be brought in court, not solely the Department's borrower defense process.  For example, schools are left to wonder whether lawsuits seeking repayment of tuition, not merely repayment of loans, are covered by this provision.  Exactly which legal causes of action map onto the Department's borrower defense provisions is unclear and unexplained, and it will arbitrarily and capriciously cause difficulties for schools.

79. The Department additionally failed to properly consider the extent to which institutions have relied on the current regulatory framework.  Here, institutions have relied on arbitration provisions and class action waivers, at least in part, in determining the cost of tuition, obtaining insurance, and otherwise ordering their affairs.  Schools may also face unnecessary disputes with students who have already completed their studies, yet have gained newfound authority to bring wide-ranging claims and may create novel and unforeseen costs to their alma maters.

## COUNT ONE
### (Arbitration and Class Action Provisions: No Statutory Authority)

80. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

81. The Arbitration and Class Action Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

82. The Arbitration and Class Action Provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other

things, the regulations do not relate to any specific authority conferred by the HEA;

conflict with the FAA; and were not otherwise authorized by Congress.

83.    Accordingly, the Arbitration and Class Action Provisions are in excess of statutory

authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in

accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**COUNT TWO**
**(Arbitration and Class Action Provisions: Arbitrary and Capricious)**

84.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

forth herein.

85.    The Arbitration and Class Action Provisions are arbitrary and capricious.  Among other

things, the regulations fail to confront or acknowledge the benefits of individual

arbitration; fail to show that class actions related to borrower defenses would be

permissible, even absent class waivers; and fails to consider industry reliance on the

terms of private contracts.

86.    Accordingly, the Arbitration and Class Action Provisions are arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C.

§ 706(2)(A).

**PRAYER FOR RELIEF**

87.    WHEREFORE, Plaintiff prays for an order and judgment:

(i)    Declaring that the Arbitration and Class Action Provisions were

promulgated without statutory authority within the meaning of 5 U.S.C.

§ 706(2)(C) and not in accordance with law within the meaning of 5

U.S.C. § 706(2)(A); and that the Arbitration and Class Action Provisions

are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

(ii) Declaring that any action previously taken by Defendants pursuant to the Arbitration and Class Action Provisions is null and void;

(iii) Vacating the Arbitration and Class Action Provisions;

(iv) Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

(v) Granting such other and further relief as this Court deems just and proper.

Dated: December 28, 2018

Respectfully submitted,

/s/ Clifford M. Sloan
CLIFFORD M. SLOAN, DC Bar No. 417339
SYLVIA O. TSAKOS, DC Bar No. 888273394
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
T: 212/735-3834

GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N Upper Wacker Dr. #2700
Chicago, IL 60606
T: 312/407-0739
F: 312/407-8604

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
T:  202/776-7867
F:  202/330-5290

*Attorneys for CAPPS*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Amended Complaint was filed electronically with the Clerk of the Court on December 28, 2018 using the CM/EMF system, which will send notification of such filing to all counsel of record.

/s/ Clifford M. Sloan
Clifford M. Sloan