**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CALIFORNIA ASSOCIATION OF**
**PRIVATE POSTSECONDARY SCHOOLS**,

Plaintiff,

v.

**BETSY DEVOS**, in her official capacity as
Secretary, and the **DEPARTMENT OF**
**EDUCATION**, et al.

Defendants.

Civil Action No. 17-999 (RDM)

**BRIEF OF AMICI COMMONWEALTHS OF MASSACHUSETTS, PENNSYLVANIA,**
**STATES OF CALIFORNIA, IOWA, NEW YORK, OREGON, WASHINGTON,**
**PEOPLE OF ILLINOIS, ATTORNEY GENERAL OF MARYLAND,**
**AND DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF SUMMARY**
**JUDGMENT FOR THE DEFENDANTS**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 4

1.  *The Borrower Defense Rule*............................................................................................ 4

2.  *Arbitration and Class Action Waiver Provisions* .................................................... 5

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT ......................................................................................................................... 6

1.  *The Arbitration and Class Action Waiver Provisions Are within the Department's Broad Authority under the HEA to Set Conditions for Schools to Participate in the Direct Loan Program* ........................................................................................... 6

    A.  The Department Reasonably Concluded that the Arbitration and Class Action Waiver Provisions Were Necessary to Protect Student Borrowers and Federal Taxpayers from Schools' Misconduct.................................... 8

    B.  The Department's Authority to Set Conditions on Schools' Participation in the Direct Loan Program Is Broad and Fits Squarely Within Its Oversight Role in the HEA ............................................................................... 9

2.  *The Arbitration and Class Action Waiver Provisions Do Not Conflict With the FAA* ..................................................................................................................... 13

    A.  The FAA's Instruction to Courts to Enforce Arbitration Agreements on the Same Terms as Other Contracts Is Not Implicated by the Provisions ......................... 13

    B.  The Arbitration and Class Action Waiver Provisions are Reasonable Conditions on Participation in a Federal Benefit Program............................ 18

    C.  The Doctrine Prohibiting "Coercive" Spending Conditions Is Inapplicable.................. 23

3.  *The Arbitration and Class Action Waiver Provisions Are Neither Arbitrary Nor Capricious*..................................................................................................... 26

    A.  The Department Adequately Considered Comments Supporting Arbitration and Class Action Waivers .................................................................. 26

    B.  The Department Properly Relied on the CFPB Study, Along with Evidence from Its Own Experience................................................................ 29

    C.  The Department Properly Considered the Possible Effect of Its Rule on Schools' Purported Reliance Interests........................................................... 30

    D.  There Has Been No Intervening Change in Law and Remand to the Department Is Not Warranted ..................................................................... 31

Conclusion ........................................................................................................................ 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ........................................................................................... 18

*Am. Exp. Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ........................................................................................... 14

*Am. Health Care Ass'n v. Burwell*,
   217 F. Supp. 3d 921 (N.D. Miss. 2016) ........................................................ 21, 24

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) ........................................................................... 26

*Amneal Pharm. LLC v. FDA*,
   285 F. Supp. 3d 328 (D.D.C. 2018) ..................................................................... 6

*Ardmore Consulting Grp. v. Contreras-Sweet*,
   118 F. Supp. 3d 388 (D.D.C. 2015) ..................................................................... 6

*Associated Builders & Contractors of Se. Tex. v. Rung*,
   No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ................... 21, 22

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ........................................................................................... 28

*Chamber of Commerce v. Hugler*,
   231 F. Supp. 3d 152 (N.D. Tex. 2017) ............................................................... 22

*Chamber of Commerce v. U.S. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) .............................................................................. 22

*City of Arlington, Tex. v. F.C.C.*,
   569 U.S. 290 (2013) ........................................................................................... 10

*CompuCredit Corp. v. Greenwood*,
   565 U.S. 95 (2012) ............................................................................................. 13

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
   562 U.S. 277 (2011) ...................................................................................... 10, 11

*Decatur Cty. Gen. Hosp. v. Johnson*,
   602 F. Supp. 2d 176 (D.D.C. 2009) ..................................................................... 6

*DIRECTV, Inc. v. Imburgia*,
   136 S. Ct. 463 (2015) ......................................................................................... 15

*Encino Motorcars, LLC v. Navarro*,
　136 S. Ct. 2117 (2016) ......................................................................... 30, 31

*Epic Systems Corp. v. Lewis*,
　138 S. Ct. 1612 (2018) .............................................................. 15, 16, 17, 32

*F.C.C. v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) ......................................................................................... 31

*Gooch v. United States*,
　297 U.S. 124 (1936) ......................................................................................... 10

*Grove City Coll. v. Bell*,
　465 U.S. 555 (1984) ......................................................................................... 18

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
　137 S. Ct. 1421 (2017) ..................................................................................... 15

*Legal Servs. Corp. v. Velazquez*,
　531 U.S. 533 (2001) ......................................................................................... 24

*Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
　856 F.2d 1558 (D.C. Cir. 1988) ...................................................................... 10

*Massachusetts v. United States*,
　435 U.S. 444 (1978) ......................................................................................... 19

*Mingo Logan Coal Co. v. EPA*,
　829 F.3d 710 (D.C. Cir. 2016) ........................................................................ 30

*Miss. Comm'n on Envtl. Quality v. EPA*,
　790 F.3d 138 (D.C. Cir. 2015) ........................................................................ 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) .................................................................................. 6, 26, 29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
　567 U.S. 519 (2012) .................................................................................. 23, 24

*Nat'l Fuel Gas Supply Corp. v. FERC*,
　899 F.2d 1244 (D.C. Cir. 1990) ...................................................................... 32

*New York v. United States*,
　505 U.S. 144 (1992) ......................................................................................... 23

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
　499 U.S. 117 (1991) ......................................................................................... 11

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
 494 F.3d 188 (D.C. Cir. 2007) ................................................................. 27

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
 388 U.S. 395 (1967) ................................................................. 13

*Regan v. Taxation Without Representation of Wash.*,
 461 U.S. 540 (1983) ................................................................. 25

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
 547 U.S. 47 (2006) ................................................................. 24, 25

*Scherk v. Alberto–Culver Co.*,
 417 U.S. 506 (1974) ................................................................. 13

*Shearson/Am. Exp., Inc. v. McMahon*,
 482 U.S. 220 (1987) ................................................................. 15, 17

*South Dakota v. Dole*,
 483 U.S. 203 (1987) ................................................................. 19

*Transmission Access Policy Study Group v. FERC*,
 225 F.3d 667 (D.C. Cir. 2000) ................................................................. 26

*United States v. Aguilar*,
 515 U.S. 593 (1995) ................................................................. 11

*United States v. Am. Library Ass'n*,
 539 U.S. 194 (2003) ................................................................. 18

*United States v. Bean*,
 537 U.S. 71 (2002) ................................................................. 10

*Util. Solid Waste Activities Grp. v. EPA*,
 901 F.3d 414 (D.C. Cir. 2018) ................................................................. 32

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
 489 U.S. 468 (1989) ................................................................. 13, 14

*Wallaesa v. Fed. Aviation Admin.*,
 824 F.3d 1071 (D.C. Cir. 2016) ................................................................. 11

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) ................................................................. 9

*Wisc. Valley Improvement v. FERC*,
 236 F.3d 738 (D.C. Cir. 2001) ................................................................. 26

**Statutes**

10 U.S.C. § 987 ......................................................................................................... 17

12 U.S.C. § 5518 ....................................................................................................... 16

15 U.S.C. § 1226 ....................................................................................................... 20

20 U.S.C. § 1070 *et seq.* ............................................................................................ 2

20 U.S.C. § 1087b ....................................................................................................... 7

20 U.S.C. § 1087c ....................................................................................................... 7

20 U.S.C. § 1087d ............................................................................................... passim

20 U.S.C. § 1094 ......................................................................................................... 9

49 U.S.C. § 14708 ..................................................................................................... 18

5 U.S.C. § 706 ............................................................................................................. 6

7 U.S.C. § 197c ......................................................................................................... 20

7 U.S.C. § 26 ............................................................................................................. 17

9 U.S.C. § 2 .................................................................................................... 3, 11, 13

**Rules and Regulations**

24 C.F.R. § 203.204 .................................................................................................. 12

61 Fed. Reg. 36,260 .................................................................................................. 12

83 Fed. Reg. 64,269 .................................................................................................. 12

Fed. R. Civ. P. 56 ....................................................................................................... 6

**Other Authorities**

Federal Housing Finance Board, Office of Supervision, Advisory Bulletin 2005-AB-08,
     Guidance on Federal Home Loan Bank Anti-Predatory Lending Policies (2005) .................. 23

H.R. Rep. No. 102-447 (1992) ...................................................................................... 7

Office of the Comptroller of the Currency, Administrator of National Banks, Advisory
     Letter 2003-2,

Guidelines for National Banks to Guard Against Predatory and Abusive Lending
Practices (2003).................................................................................................................. 23

Pub. L. No. 115-74 (2017) ......................................................................................................... 35

**INTRODUCTION**

In response to widespread misconduct on the part of for-profit schools that has left

thousands of students across the country in dire financial straits, the Department of Education

("Department") promulgated new regulations in 2016, known collectively as the Borrower

Defense Rule. This rule was designed to protect student loan borrowers and federal taxpayers

"from misleading, deceitful, and predatory practices" of postsecondary schools and to protect

federal taxpayers from shouldering the costs of schools' misconduct, which had already caused

federal taxpayers to suffer over $150 million in losses. Among the regulatory provisions

designed to achieve these goals, and to hold schools accountable for their misconduct, the

Department established provisions conditioning schools' participation in the federal Direct Loan

Program on their agreement not to rely on predispute arbitration agreements and class action

waivers with respect to certain disputes with students (hereinafter the "Provisions" or

"Arbitration and Class Action Waiver Provisions"). Following a detailed examination of relevant

data and publicly submitted comments, the Department carefully crafted the Provisions to

prevent the misuse of federal funds and to remove obstacles preventing students from seeking

redress directly from schools engaging in misconduct.

Mere weeks before the Borrower Defense Rule was due to become effective, the

California Association of Private Postsecondary Schools ("CAPPS") filed a complaint seeking to

vacate numerous provisions of the Borrower Defense Rule, and sought a preliminary injunction

enjoining the Arbitration and Class Action Waiver Provisions. This Court subsequently stayed

the present litigation pending its resolution of related lawsuits brought by the State Amici, and

borrower plaintiffs. After this stay expired, CAPPS subsequently renewed its motion for a

preliminary injunction, expanding its scope to include multiple additional provisions. On

October 16, 2018, the Court denied CAPPS's motion for a preliminary injunction. Following this denial, CAPPS amended its complaint to challenge only the Arbitration and Class Action Waiver Provisions. CAPPS has now moved for summary judgment with respect to these Provisions.

CAPPS represents for-profit or "proprietary" schools, some–but not all–of whom participate in the William D. Ford Federal Direct Loan Program (the "Direct Loan Program") authorized by Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq*. To participate in the Direct Loan Program, schools must enter into a Program Participation Agreement ("PPA") with the Department. *See* 20 U.S.C. § 1087d. Students of participating for-profit schools may obtain student loans from the federal government to pay the cost of their attendance. In other words, when proprietary schools choose to participate in the Direct Loan Program, the federal government will finance the cost of their for-profit private business ventures.

The Department appropriately places a variety of conditions on the receipt of Title IV funds by means of the Program Participation Agreement. The Arbitration and Class Action Waiver Provisions of the Borrower Defense Rule incorporate new requirements into the PPA to address documented proprietary school misconduct and failures. These failures include the for-profit Corinthian Colleges, whose abuse and deception of its own students and subsequent bankruptcy has cost U.S. taxpayers at least $176 million in forgone repayment of federal student loans. AR-A-000060. The Department observed that Corinthian, like most for-profit schools, prohibited students from seeking redress for its misconduct in court or in class actions by imposing forced arbitration clauses and class action waivers on its students. These clauses prevented students from obtaining redress from Corinthian while the business was still solvent, and instead shifted liability for Corinthian's misconduct to the Department and federal taxpayers.

In order to prevent such misuse of federal funds, the Provisions ask schools not to rely on predispute arbitration clauses and class action waivers in existing enrollment agreements, and not to include them in new agreements, but only as to borrower defense-type claims. AR-A-000162-63 (34 C.F.R. § 685.300).

The Provisions were rational responses to the crisis in the for-profit school industry, and all were well within the Department's authority to place conditions on the disbursement of direct student loan funds under the HEA. The Provisions do not purport to regulate proprietary colleges or the services they provide, they merely set conditions for participation in a program that enables schools to obtain revenue from taxpayer funds for their private enterprises. CAPPS schools are not entitled to participate in the Direct Loan Program and, indeed, many CAPPS members do not participate. If CAPPS members wish to require their students to arbitrate borrower defense claims, they can do so by forgoing federal student loan revenue.

In seeking summary judgment, CAPPS argues that the Provisions run afoul of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, exceed the Department's authority under the Higher Education Act ("HEA"), and are otherwise arbitrary and capricious. These arguments fail. First, the Provisions do not render any predispute arbitration or class action waivers invalid, revocable, or unenforceable by a court. As such, the Provisions do not conflict with the FAA. Second, the Provisions are well within the Department's authority to establish requirements for schools' participation in the Direct Loan Program that "are necessary to protect the interests of the United States and to promote the purposes of [the Direct Loan program]." 20 U.S.C. § 1087d(a)(6). Finally, the Department's adoption of the Provisions was not arbitrary and capricious. The Department considered and addressed comments both supporting and opposing the Provisions, and appropriately explained its considerations and ultimate decision. While CAPPS may disagree

3

with the Department's policy balancing, such disagreement does not constitute a basis for challenging an agency action under the Administrative Procedure Act ("APA"). For the reasons described herein, CAPPS's motion for summary judgment should be denied in its entirety and summary judgment should be entered on behalf of Defendants.

## STATEMENT OF FACTS

### 1. The Borrower Defense Rule

In August 2015, in the wake of state and federal investigations of for-profit schools that uncovered pervasive misconduct, the Department announced a negotiated rulemaking to update its Title IV regulations concerning "acts or omissions of an institution of higher education" that could provide grounds for borrowers to seek the discharge of their federal loans. Notice of Intent to Establish Negotiated Rulemaking Committee, AR-C-000001. The rulemaking was also intended to address "the consequences of such borrower defenses for borrowers, institutions, and the Secretary." *Id.*

On June 16, 2016, the Department published a notice of proposed rulemaking in the federal register and solicited public comments. AR-B-000002. The Department ultimately received comments from more than 50,000 parties on its proposed rule. AR-A-000003.

On November 1, 2016, the Department published the final Borrower Defense Rule in the Federal Register. AR-A-000001. The Borrower Defense Rule was designed to "protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in the Department's student aid programs." *Id.* The Borrower Defense Rule was also intended to "protect taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government for discharges of and repayments for Federal student loans." *Id.* To achieve its goals, the Borrower Defense

Rule established numerous protections including the Arbitration and Class Action Waiver Provisions.

2. **Arbitration and Class Action Waiver Provisions**

The Borrower Defense Rule amended 34 C.F.R. § 685.300 to place conditions on the use of predispute arbitration agreements and class action waivers by schools electing to participate in the Direct Loan Program. Pursuant to the Provisions, participating schools may not "enter into a predispute agreement [with a student] to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim." AR-A-000163 (34 C.F.R. § 685.300(f)(1)(i)). These provisions also require participating schools to forgo reliance on any predispute agreement with a student that waives the student's right to participate in a class action against the school regarding a borrower defense claim. AR-A-000162-63 (34 C.F.R. § 685.300(e)).

The Department promulgated these Provisions following careful consideration of significant data, student declarations, relevant studies, government investigations and lawsuits, and its own extensive experience. The Department explained its conclusion that predispute arbitration clauses "jeopardize the taxpayer investment in Direct Loans," by allowing institutions to "insulat[e] themselves from direct and effective accountability for their misconduct, . . . deter[] publicity that would prompt government oversight agencies to react, and . . . shift[] the risk of loss for that misconduct to the taxpayer." AR-A-000097. The Department also determined that class action waivers "effectively removed any deterrent effect that the risk of . . . lawsuits would have provided," and shifted the risk to taxpayers by leaving borrowers with limited options to seek redress other than seeking loan forgiveness through the borrower defense process. *Id.* Accordingly, the Department concluded that "class action waivers for these claims

substantially harm the financial interest of the United States and thwart achievement of the purpose of the Direct Loan Program." *Id.*

## LEGAL STANDARD

Generally, a court must grant summary judgment if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). When a court is reviewing a final rule issued by an agency, however, this standard "does not apply because of the limited role of a court in reviewing the administrative record." *Decatur Cty. Gen. Hosp. v. Johnson*, 602 F. Supp. 2d 176, 182 (D.D.C. 2009). Rather, "the district court sits as an appellate tribunal, to decide as a matter of law whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Amneal Pharm. LLC v. FDA*, 285 F. Supp. 3d 328, 339 (D.D.C. 2018) (citations and alterations omitted). Under the APA standard of review, a court evaluates whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is 'narrow,' and a court applying it 'is not to substitute its judgment for that of the agency.'" *Ardmore Consulting Grp. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

1. **The Arbitration and Class Action Waiver Provisions Are Within the Department's Broad Authority under the HEA to Set Conditions for Schools to Participate in the Direct Loan Program**

Under the Higher Education Act ("HEA"), the Department of Education is directed to protect students and federal taxpayers from unscrupulous schools. In the Higher Education Amendments of 1992, the bill that began the Direct Loan Program as a demonstration project, Congress made clear its intent to give the Department the power to combat abusive tactics by schools who engage in misconduct that harms both their students and federal taxpayers:

> [The bill] makes major changes to enhance the integrity of the student financial
> aid programs. The student aid programs have been tarnished by reports detailing
> the exploitation of students by unscrupulous schools, growing default costs,
> schools offering overpriced and inferior educational programs and schools and
> lenders with unacceptable default rates. . . . [The Bill] includes nearly 100
> provisions to strengthen controls on schools and colleges to end waste and abuse
> and to minimize loan defaults.

H.R. Rep. No. 102-447, at 10 (1992). Indeed, the Direct Loan Program itself was created in

response to problems including "a high rate of student defaults . . . and fraud and abuse by

certain lenders and some trade schools." *Id.* at 59.

Access to federal funds in the Direct Loan Program is a privilege conferred by the

Department, and to which schools have no entitlement. 20 U.S.C. § 1087b(b) ("No institution of

higher education shall have a right to participate in the programs authorized by this part"). The

HEA delegates broad authority to the Department to set the requirements for schools to

participate in the Direct Loan Program, in part by specifying what schools must agree to do in

their applications to participate, and in their Program Participation Agreements. *See* 20 U.S.C. §

1087c(b)(1) ("Each institution of higher education desiring to participate in the direct student

loan program under this part shall submit an *application satisfactory to the Secretary* containing

*such information and assurances as the Secretary may require*.") (emphasis added); §

1087c(b)(2) ("The Secretary shall select institutions for participation in the direct student loan

program under this part, and shall enter into agreements …, from among those institutions that

submit [] applications … and *meet such other eligibility requirements as the Secretary shall

prescribe*.") (emphasis added); § 1087d(a)(6). Consistent with its grant of broad authority to the

Department to set conditions on access to Title IV funds, Congress explicitly entrusted to the

Department's discretion the determination of what "other provisions" should be included in the

Program Participation Agreement because they "are necessary to protect the interests of the

United States and to promote the purposes of [Part D, the Direct Loan program]." 20 U.S.C. § 1087d(a)(6). It is under this broad authority that the Department promulgated the Arbitration and Class Action Waiver Provisions. *See* AR-B-000053.

A. *The Department Reasonably Concluded that the Arbitration and Class Action Waiver Provisions Were Necessary to Protect Student Borrowers and Federal Taxpayers from Schools' Misconduct*

In issuing the 2016 Rule, the Department reasoned that, since the Direct Loan Program is a program for making loans, not grants, to students and their parents, "the overall 'purpose' of the [program] is to make loans [for education] that will then be repaid." *Id.* "Acts and omissions by schools that give a borrower grounds for avoiding repayment of a Direct Loan . . . frustrate the achievement" of that purpose. *Id.* The Department reviewed extensive evidence of the benefits and drawbacks of mandatory arbitration agreements and class action waivers, including a significant study conducted by the Consumer Financial Protection Bureau ("CFPB") of such clauses in private student loans, among other consumer contracts. *See* AR-B-000053-56. In particular, the Department noted its experience with the collapse of Corinthian Colleges, and the role that such clauses had in limiting the ability of student borrowers to obtain relief directly from abusive schools, and the ability of the Department to identify abuses before Corinthian was insolvent and unable to satisfy its massive liabilities. *See* AR-B-000054-55; AR-A-000097-98. In the end, the taxpayers were left holding the bag. *See* AR-A-000097 ("Corinthian's widespread use of these waivers and mandatory arbitration agreements resulted in grievances against Corinthian being asserted not against the now-defunct Corinthian, but as defenses to repayment of taxpayer-financed Direct Loans, with no other party from which the Federal government may recover any losses.").

On the basis of considerable evidence and its own past experience, the Department found that placing limitations on participating schools' use of predispute arbitration agreements and

class waivers in the resolution of borrower defense claims was necessary to protect the interests of the United States and the purposes of the Direct Loan Program. In particular, the Department properly concluded that by allowing students to more easily obtain relief directly from schools and by deterring unlawful conduct by schools in the first place, the Provisions would "lessen the amount of financial risk to the taxpayer." AR-B-000055.

B.   *The Department's Authority to Set Conditions on Schools' Participation in the Direct Loan Program Is Broad and Fits Squarely Within Its Oversight Role in the HEA*

The Department's authority to create conditions on participation is central to the HEA's purpose in giving the Department power to combat schools' misconduct in federal student aid programs. CAPPS implausibly suggests that the Department, in promulgating the Arbitration and Class Action Waiver Provisions, was using an ancillary authority to regulate outside its statutory mandate. *See* CAPPS Mem. in Supp. of Mot. For Summ. J. at 21, ECF No. 83-1 ("CAPPS Br.") (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). But the principle that CAPPS cites from *Whitman* addresses whether an agency may interpret a seemingly *minor* term of a statute in an expansive fashion that is *contrary* to the overall statutory scheme. *See Whitman*, 531 U.S. at 465, 468-69.

Contrary to CAPPS's suggestion, conditioning participation on schools forgoing practices the Department found were used to insulate their misconduct from governmental scrutiny is fully consistent with the statutory scheme. The preceding provisions aim at protecting students and federal taxpayers from schools' misconduct by requiring participating schools to implement a quality assurance system to detect violations, § 1087d(a)(4), and to accept financial liability for those violations, § 1087d(a)(3). The Department's § 1087d(a)(6) authority is consistent with that objective, which is addressed throughout the HEA, *see, e.g.*, 20 U.S.C. § 1094(c)(3)(A)

9

(authorizing the Department to suspend Title IV participation for any school who engages in "substantial misrepresentation" about its program).

Nor is § 1087d(a)(6) a minor term of the HEA. It requires the Department to consider whether additional provisions in the Program Participation Agreement are "necessary to protect the interests of the United States or to promote the purposes of [the Direct Loan program]," both of which are general terms that indicate a wide range of discretion. *See Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 856 F.2d 1558, 1561 (D.C. Cir. 1988) (interpreting an agency's authority to issue "such . . . rules . . . as it may prescribe for carrying out the purposes of this subchapter" as conferring a broad and "general rulemaking authority"); *cf. United States v. Bean*, 537 U.S. 71, 77 (2002) ("[T]he 'public interest' standard calls for an inherently policy-based decision best left in the hands of an agency"). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013). Congress's use of broad language here evinces the breadth of the Department's discretion to enact the Provisions.

Similarly unavailing is CAPPS's attempt to invoke the *ejusdem generis* canon to stunt Congress's broad grant of authority to the Department. That interpretive canon "limits general terms [that] follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (quoting *Gooch v. United States,* 297 U.S. 124, 128 (1936) (alteration in original). First, § 1087d(a)(6) is not the kind of residual clause that requires the canon's interpretational assistance. Notably, § 1087d(a)(6) is "*not* a general or collective term following a list of specific items to which a particular statutory command is applicable (*e.g.,* 'fishing rods, nets, hooks, bobbers, sinkers, and other equipment')" to which the *ejusdem generis* canon would apply. *Id.* (quoting *United States v. Aguilar,* 515 U.S. 593, 615

(1995) (Scalia, J., concurring in part and dissenting in part)). Instead, it is simply "one of . . .

several distinct and independent" provisions, *id.* at 295 (quoting *Aguilar*, 515 U.S. at 615), which

govern everything from actions schools must take to originate loans, 20 U.S.C. § 1087d(a)(1), to

schools' financial liability for failure to perform their responsibilities, § 1087d(a)(3), to students'

substantive rights to receive services and information free of charge, § 1087d(a)(5).

   *Ejusdem generis* is inapplicable where, as here, using the canon is not necessary to avoid

rendering the preceding terms meaningless. *See CSX,* 562 U.S. at 295 ("We typically

use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").

The preceding provisions set out distinct, mandatory contractual provisions that must be

addressed in Program Participation Agreements, while § 1087d(a)(6) gives the Department broad

discretion to add *additional* topics as needed. This final term is distinct and reading it to give the

Department broad discretion to add topics does not deprive the preceding mandatory provisions

of their meaning. *See id.* This limited canon of statutory construction "does not control . . . when

the whole context dictates a different conclusion.'" *Wallaesa v. Fed. Aviation Admin.*, 824 F.3d

1071, 1081 (D.C. Cir. 2016), (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499

U.S. 117, 129 (1991)). "[B]road language conveys broad authority," and the expansive language

of § 1087d(a)(6) simply "will not tolerate the narrower ambit [CAPPS] seeks to impose." *Id.*

   Mischaracterizing both the function of the Provisions and the HEA's broad grant of

authority, CAPPS argues that the Department did not have the authority to promulgate the

Provisions because it lacked a "clear and manifest congressional command to displace the

[Federal Arbitration Act ("FAA")]." CAPPS Br. at 19. This argument is entirely duplicative of

its incorrect claim that the Provisions violate the FAA, which provides that arbitration

agreements shall be "valid, irrevocable, and enforceable" on the same terms as any contract. 9

U.S.C. § 2. To the contrary, as discussed at length *infra* at section 2.A, the Provisions do not "displace the FAA." These Provisions do not invalidate arbitration agreements or hinder their enforceability. Rather, the Provisions establish conditions on schools' receipt of taxpayer funds and deny future eligibility to schools that choose to enter predispute arbitration agreements that are addressed by these conditions or to rely on existing agreements. Schools may choose to continue using and enforcing such agreements, and the Department's Provisions will not affect their validity or enforceability.

Furthermore, CAPPS's citation to particular instances in which Congress has expressly authorized agencies to issue regulations invalidating arbitration clauses does not suggest that Congress must always explicitly mention arbitration in an authorizing statute to permit regulations that *do not* invalidate arbitration agreements. Nor do these citations diminish the breadth of the Department's authority under the HEA to set conditions on participation in the Direct Loan Program.[1] CAPPS's assertion that the Department's broad authority is narrow is unsupported. Congress, through the HEA, commanded the Department to safeguard the federal investment in higher education and used broad language to convey a wide range of discretion to the Department. The Arbitration and Class Action Waiver Provisions rest firmly on the Department's statutory authority.

---

[1] For example, the Department of Housing and Urban Development ("HUD") has also placed limitations on arbitration clauses as a condition of eligibility for a federal spending program, using broad statutory authority. Since the 1980s, HUD has required that prospective homeowners purchase a HUD-approved ten-year consumer warranty plan in order to qualify for certain HUD-insured mortgages. Under HUD's broad statutory mandate to approve plans "acceptable to the Secretary," since 1996 the agency has required, as a condition of eligibility, that participating plans not rely on mandatory arbitration clauses to prevent consumers from seeking "judicial resolution of disputes." 24 C.F.R. § 203.204(g); *see* 61 Fed. Reg. 36,260, 36,261 (July 9, 1996). HUD recently eliminated that warranty plan requirement for reasons unrelated to its arbitration conditions. *See* Removal of the Ten-Year Protection Plan Requirements, 83 Fed. Reg. 64,269 (Dec. 14, 2018).

2. __The Arbitration and Class Action Waiver Provisions Do Not Conflict With the FAA__

Relying on a misleading and inaccurate characterization of the Federal Arbitration Act ("FAA") and Supreme Court decisions interpreting it, CAPPS argues that the Arbitration and Class Action Waiver Provisions run afoul of the FAA. They do not. Contrary to CAPPS's characterization, the Provisions do not invalidate arbitration agreements or prohibit participating schools and their students from resolving their disputes through bilateral arbitration. Instead, the Provisions simply create reasonable and narrow conditions on participation in the Direct Loan Program.

A. *The FAA's Instruction to Courts to Enforce Arbitration Agreements on the Same Terms as Other Contracts Is Not Implicated by the Provisions*

The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable," except where justifications "exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Pursuant to the FAA, courts are required to "enforce agreements to arbitrate according to their terms," *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012), and to "place [arbitration] agreements 'upon the same footing as other contracts,'" *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511 (1974)) (internal quotation marks omitted). Critically, as the Supreme Court has explained, "the purpose of [the FAA] was to make arbitration agreements as enforceable as other contracts*, but not more so*." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) (emphasis added).

The Arbitration and Class Action Waiver Provisions do not invalidate arbitration agreements or render them unenforceable in court. *See* CAPPS Br. at 9-11. Instead, the Provisions establish a condition on participation in the Direct Loan Program, that a school seeking to participate shall not "enter into a predispute agreement to arbitrate a borrower defense

claim" and shall not rely "on a predispute arbitration agreement or on any other predispute agreement . . . with respect to any aspect of a class action that is related to a borrower defense claim." AR-A-000163, AR-A-000162. Schools remain free to continue relying on predispute arbitration and class action waiver agreements pertaining to borrower defense claims if they choose to do so; they simply cannot simultaneously receive taxpayer funds through the Direct Loan Program. Additionally, schools and students may agree to enter *post*-dispute arbitration agreements pertaining to borrower defense claims while also receiving Direct Loan funds and may employ predispute arbitration agreements and class action waivers with respect to disputes *unrelated* to borrower defense claims.

In seeking to characterize these Provisions as in conflict with the FAA, CAPPS is misconstruing the text and purpose of the FAA. The Supreme Court has explained that the FAA "reflects the overarching principle that arbitration is a matter of contract." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). As previously noted, the goal of the FAA is "to place [arbitration] agreements upon the same footing as other contracts." *Volt Info. Scis., Inc.*, 489 U.S. at 478 (internal quotation marks omitted). The FAA simply does not prevent a party from *voluntarily* agreeing to forgo reliance on an arbitration agreement—as with any other contract term—in exchange for a financial benefit. Indeed, the Department asks participating schools to forgo reliance on a variety of contractual provisions in exchange for access to federal taxpayer funding for education. *See, e.g.*, 20 U.S.C. § 1094(a)(16)(B) (requiring schools participating in any Title IV funding program to agree not to contract with individuals convicted of fraud involving Title IV funds); § 1094(a)(20) (requiring participating schools to agree not to provide certain types of incentive compensation to admissions staff). The Department's request that schools participating in the Direct Loan Program forgo reliance on predispute arbitration clauses

and class action waivers, without invalidating those contractual provisions, plainly does not implicate the FAA.[2]

None of the Supreme Court cases that CAPPS relies on have any bearing on such a voluntary agreement by a party to forgo the use of arbitration or class waiver clauses in order to access federal funds. CAPPS relies heavily on two inapposite *state preemption* cases in claiming that the "Supreme Court has frequently invalidated rules that have a disproportionate impact on arbitration clauses." CAPPS Br. at 12 (citing *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) and *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 470-71 (2015)). In those cases the Supreme Court relied on preemption principles to strike down state court decisions that invalidated arbitration agreements, *Kindred Nursing Ctrs.*, 137 S. Ct. at 1426, or refused to enforce them, *DIRECTV*, 136 S. Ct. at 466. Neither are relevant where, as here, a federal agency has neither invalidated arbitration clauses nor hampered the ability of courts to enforce them, but merely sought schools' consent to limits on certain types of clauses in exchange for funding.

CAPPS's reliance on *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), is similarly misplaced. Citing to *Epic Systems*, CAPPS claims that the Department cannot set conditions on access to federal funds without demonstrating a "clear and manifest congressional command to displace the [FAA]." CAPPS Br. at 10 (quoting *Epic Sys.*, 138 S. Ct. at 1624). This argument is a red herring. The Court in *Epic Systems* applied the principle that a party claiming that a *subsequent federal statute precludes the operation of the FAA* must show a "contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). In *Epic Systems*, the Court addressed whether the National Labor Relations Act ("NLRA") limited

---

[2] CAPPS seeks to conflate the arbitration provisions and class action waiver provisions in arguing that the class action waiver provisions violate the FAA. However, the FAA is entirely irrelevant to class waivers outside of the context of arbitration agreements.

the applicability of the FAA in the employment context, thereby invalidating arbitration

agreements in employment contracts, and ultimately held that the NLRA should not be read to

limit the FAA because there was no clear congressional intent for it to have that effect. *See* 138

S. Ct. at 1624. But the Department has never claimed that it had the authority—under the HEA

or otherwise—to displace the FAA by invalidating arbitration agreements. *See* AR-A-000098

("As we also stated in the NPRM, the Department does not have the authority, and does not

propose, to displace or diminish the effect of the FAA."). Because there is no conflict between

the Provisions and the FAA, the absence of any explicit congressional command for the HEA to

preclude the operation of the FAA is immaterial.[3] *Epic Systems* does not touch on, and is utterly

irrelevant to, the issue of an agency's authority to place conditions on participation in a federal

program.

CAPPS attempts to manufacture a conflict between the Arbitration and Class Action

Waiver Provisions and the FAA by claiming to discover in the FAA a prohibition on federal

agencies "disfavor[ing] arbitration agreements." CAPPS Br. at 8. Such a prohibition does not

exist in the FAA. After finding nothing in the text of the FAA to support its "disfavoring"

principle, CAPPS points to what the Supreme Court, when reviewing a motion to enforce an

arbitration agreement in court, has termed the FAA's "liberal federal policy favoring arbitration

agreements." CAPPS Br. at 9 (quoting *Epic Sys.*, 138 S. Ct. at 1621). But the FAA does not

create a policy requiring federal agencies to favor arbitration agreements in all contexts, nor has

---

[3] As discussed *supra* in Section 1B, CAPPS's argument that the Department lacked statutory authority to promulgate the Provisions because the HEA did not explicitly demonstrate an intent to preclude arbitration fails for the same reason. *See* CAPPS Br. at 19-20. Situations in which Congress has explicitly given other agencies the power to abrogate arbitration clauses in a particular industry, *see, e.g.,* 12 U.S.C. § 5518(b) (granting authority to the CFPB), do not suggest a limit on the statutory authority of the Department to do something that *does not violate* the FAA.

the Supreme Court held that such a policy exists. In fact, the Supreme Court has explained that "the proarbitration policy goals of the FAA do not require [an] agency to relinquish its statutory authority if it has not agreed to do so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). In *Waffle House*, the Court declined to expand the FAA's reach in a manner that interfered with an agency's exercise of its statutory authority where its exercise of such authority did not conflict with the FAA's mandate that private arbitration agreements remain legally enforceable in court. Failing to identify any case that stands for such a broad proposition, CAPPS cites once again to *Epic Systems*, erroneously claiming that the Court held that federal agencies may not "otherwise discriminate against arbitration agreements." *Id.* at 10. But, as previously discussed, *Epic Systems* dealt with the *invalidation* of arbitration agreements and did not, as CAPPS suggests, consider an agency's authority to place conditions on federal funds.

Underscoring CAPPS's misunderstanding of the Supreme Court's FAA decisions, CAPPS inappropriately attempts to place a burden of proof on the Department as if it were a litigant seeking invalidation of an arbitration agreement. It claims that "the FAA places the burden on 'the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.'" CAPPS Br. at 10 (quoting *McMahon*, 482 U.S. at 227). That burden is on a party claiming that one federal statute "displaces the other," *Epic Sys.*, 138 S. Ct. at 1624, such as a litigant arguing that an arbitration agreement to which they are a party is invalid because another statute overrides the FAA. This burden is plainly inapplicable to the Department, which explicitly disclaimed any authority to override the FAA, and is not seeking to invalidate any arbitration agreement.

The Arbitration and Class Action Waiver Provisions are consistent with Congressional policy on arbitration. Far from enacting a monolithic "national policy" to promote arbitration of

all disputes in every context, *see* CAPPS Br. at 21, Congress has frequently limited arbitration

agreements in private transactions to protect parties and the federal government from abuse. *See,*

*e.g.,* 10 U.S.C. § 987(f)(4) (prohibiting arbitration clauses in certain credit transactions with

members of the military or their families); 7 U.S.C. § 26(n) (prohibiting enforcement of pre-

dispute arbitration agreements in CFTC whistleblower suits); 49 U.S.C. § 14708(b)(6)

(prohibiting predispute arbitration agreements in certain disputes regarding interstate moving

companies). The Arbitration and Class Action Provisions are carefully considered conditions on

federal spending to protect student borrowers and federal taxpayers from demonstrated abuse,

which do not prevent courts from enforcing arbitration agreements. These conditions are fully

consistent with Congress's policy on arbitration as expressed in the FAA and other statutes.

B.   *The Arbitration and Class Action Waiver Provisions Are Reasonable Conditions on Federal*
     *Funding*

A federal agency may, operating squarely within its authority, set appropriate conditions

on the receipt of federal funds. *See, e.g.*, *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984)

(upholding regulations implementing Title IX as conditions on a school's participation in federal

student aid programs). "As a general matter, if a party objects to a condition on the receipt of

federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. [AID] v. Alliance for*

*Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *accord United States v. Am. Library Ass'n*, 539

U.S. 194, 212 (2003) (plurality opinion) ("To the extent that libraries wish to offer unfiltered

access, they are free to do so without federal assistance."); *Grove City Coll.*, 465 U.S. at 575

("Congress is free to attach reasonable and unambiguous conditions to federal financial

assistance that educational institutions are not obligated to accept."). The Arbitration and Class

Action Waiver Provisions comply with the relevant restrictions on federal spending and merely

condition the receipt of federal funds on an agreement: that recipients will not rely on predispute

arbitration agreements or class action waivers in the resolution of disputes that relate to the federal funds received.

In attempting to fight this general principle, CAPPS misconstrues a number of inapposite cases involving spending conditions that constrain recipients' *constitutional* rights. None of these cases govern the question before the Court.[4] Contrary to CAPPS's assertion, the Department never claimed that it had "*carte blanche*" authority "to impose whatever conditions it deem[ed] desirable." CAPPS Br. at 13. Rather than contend with the fact that the Provisions do not conflict with the text of the FAA, CAPPS inaccurately discusses the limits on agencies' ability to place conditions on federal funds. CAPPS ignores the fact that courts have routinely upheld a wide range of conditions on federal funds where the conditions are appropriately related "to the federal interest in particular national projects or programs." *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)). Here, the Department readily demonstrated that the Provisions are reasonable and further the federal interest in providing loans to students through the Direct Loan Program to obtain the benefits of higher education, while protecting federal taxpayers from misconduct by participating schools. *See supra* at 8-9; AR-A-000097-98 ("[W]e considered the effect of predispute arbitration agreements on the achievement of Direct Loan Program objectives and the

---

[4] In its discussion of the Borrower Defense Rule, the Department analogized the way the Arbitration and Class Action Waiver Provisions relate to the FAA to the ways in which other conditions on federal spending interact with constitutional rights, noting that even in the context of constitutional rights, in some cases, "the government may impose a restriction on the exercise of a recipient's [constitutional] rights so long as that restriction does not extend beyond the recipient's participation in the Federal program." AR-A-000098 (citing *AID*, 570 U.S. at 218-19). The Department observed that the Arbitration and Class Action Waiver Provisions fit within this model because they are conditions on federal spending and are limited to only those claims that relate directly to the Direct Loan Program. *See id.*

Federal interest"). Nonetheless, CAPPS argues that the Provisions are not "reasonable" or "legitimate" because they do not conform to CAPPS's atextual interpretation of the FAA.

CAPPS's argument that the Provisions are "unreasonable" conditions on Direct Loan Program participation is merely a rerun of its fundamental misunderstanding of the scope of the FAA and related jurisprudence. CAPPS essentially claims that *any* condition on the receipt of federal funds requiring recipients to forgo the use of certain arbitration agreements in connection with a federal program would be necessarily unreasonable because the FAA "definitively resolved the national statutory policy on arbitration." CAPPS Br. at 15. This claim once again erroneously interprets the FAA as establishing a federal policy that favors arbitration over court litigation in all contexts. As noted *supra* at 20-22, CAPPS's flawed interpretation of the FAA reaches too far beyond the FAA's text, which is limited to instructing courts to enforce arbitration agreements. Furthermore, it is inconsistent with the fact that Congress and federal agencies have long placed limitations on the use of arbitration agreements in a number of different contexts.[5] Here, the Department reasonably concluded—on the basis of considerable evidence—that predispute arbitration and class action waivers "jeopardize the taxpayer

---

[5] *See* Office of the Comptroller of the Currency, Administrator of National Banks, Advisory Letter 2003-2, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices 8 (2003) (advising banks to establish policies limiting when they will make loans that include mandatory arbitration clauses, because such clauses "have been associated with abusive lending practices"); Federal Housing Finance Board, Office of Supervision, Advisory Bulletin 2005-AB-08, Guidance on Federal Home Loan Bank Anti-Predatory Lending Policies 3 (2005) (requiring Federal Home Loan Banks to implement policies limiting when they will purchase loans that contain mandatory arbitration clauses); 15 U.S.C. § 1639c(e) (as amended by Pub. L. No. 111-203, § 1414, 124 Stat. 1376, 2151 (2010)) (prohibiting predisupte arbitration agreements in residential mortgage loans); 7 U.S.C. § 197c(a) (requiring contracts between livestock and poultry producers and their buyers to allow the producer to opt-out of any predispute arbitration agreement at the time the contract is signed); 15 U.S.C. § 1226(a)(2) (prohibiting predispute arbitration agreements between motor vehicle manufacturers and dealers).

investment in Direct Loans" by allowing schools participating in the program to "insulat[e] themselves from direct and effective accountability for their misconduct", "deter[] publicity that would prompt government oversight agencies to react", and "shift[] the risk of loss for that misconduct to the taxpayer." AR-A-000097. In response, the Department crafted narrow conditions for participation in the Direct Loan Program that only ask schools to forgo certain types of *predispute* arbitration and class action waiver agreements, and only for claims *directly related* to the federal funding program. As previously noted, participating schools and their students may agree to binding arbitration of claims related to the Direct Loan Program *after* a dispute arises, and at any time for claims that are not related to the federal funding program.

CAPPS has cited to no controlling cases that stand for the proposition that the FAA in any way curbs a federal agency's authority to place conditions on the receipt of federal funds. Instead, CAPPS relies on cases from the Fifth Circuit that are distinguishable and are of limited persuasive value.[6] *See* CAPPS Br. at 11. First, in *Am. Health Care Ass'n v. Burwell*, 217 F.Supp.3d 921 (N.D. Miss. 2016)), the court granted a preliminary injunction against a Centers for Medicare & Medicaid Services (CMS) rule barring federal funding to nursing homes that entered predispute arbitration agreements with their residents. *Burwell*, 217 F. Supp. 3d at 946. In that case, the court's decision rested in large part on its conclusion that the CMS rule was based on an inadequate administrative record. *Id.* at 933. By contrast, the administrative record in this case is indisputably robust. Next, in *Associated Builders & Contractors of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016), the court preliminarily

---

[6] In each of these three cases, the new federal administration has prevented an opportunity for full adversarial presentation on appellate review, by dismissing the government's appeals in *Rung* and *Burwell*, and reversing its position on the challenged arbitration provision in *Chamber of Commerce*.

enjoined an executive order's restriction on federal contractors' use of arbitration agreements for anti-discrimination claims by their employees. *Rung*, 2016 WL 8188655, at *1. Notably, in that case, the court observed that the rule was not limited to the scope of the federal funding, but rather applied to all of a contractor's employees, regardless of whether they worked on federal projects, with "no apparent nexus to the government's economy and efficiency." *Id.* at *13. Conversely, the Department's Provisions are limited to the scope of the federal program, affecting only claims that relate directly to the Direct Loan Program. Finally, *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018), addressed a Department of Labor rule conditioning regulatory exemptions for financial advisors on their preserving investors' rights to participate in class actions. 885 F.3d at 367. The District Court had found that the exemptions did not violate the FAA. *See Chamber of Commerce v. Hugler*, 231 F. Supp. 3d 152, 209 (N.D. Tex. 2017), *rev'd sub nom. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018). Following a change in administration, the Department of Labor ceased defending the arbitration provisions of the Rule, and without the benefit of a defense by the agency, the Fifth Circuit ultimately noted its disagreement with the District Court in one cursory paragraph lacking detailed analysis. *See Chamber of Commerce*, 885 F.3d at 385.

None of the cases cited by CAPPS seriously contended with the argument that a federal agency, acting pursuant to its statutory authority, may impose conditions on participation in a federal program that *do not invalidate* arbitration agreements without running afoul of the FAA. For this reason, among others, they are wrongly decided. The only court to have explicitly addressed and come to a conclusion about this argument decided in favor of the federal agency. *See Hugler*, 231 F. Supp. 3d at 209 (holding that the Department of Labor's regulatory exemption conditioned on investment advisors not employing class action waivers was

consistent with the FAA because it did not make arbitration agreements "invalid, revocable, or unenforceable").

C.  *The Doctrine Prohibiting "Coercive" Spending Conditions Is Inapplicable*

Finally, CAPPS wrongly relies on an inapplicable Spending Clause principle to claim that because some of its member schools have chosen to rely almost entirely on Title IV funds, the Provisions are impermissibly coercive. CAPPS Br. at 16. The prohibition against "economic dragooning" invoked by CAPPS is a principle of *federalism* that prohibits coercion of *states*. This principle, and the caselaw relied upon by CAPPS, is entirely inapplicable to *private* institutions. In *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the primary case relied upon by CAPPS, a plurality of the Court held that conditions on new Medicaid funding to the States violated a federalism principle that prevents the federal government from "requir[ing] *the States* to regulate." *Nat'l Fed'n of Indep. Bus. [NFIB] v. Sebelius*, 567 U.S. 519, 578 (2012) (plurality opinion) (emphasis added) (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)); *see id.* at 577 ("Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system."). CAPPS seeks to characterize this case as addressing a party that *incidentally* happened to be a state rather than a private litigant. To the contrary, the party's identity as a state was critical to the Court's decision, and the Court's reasoning is utterly inapplicable to private parties. Imposing conditions on federal funding to *private* entities simply does not pose the dangers to State sovereignty in the federal system identified by the Court.[7]

---

[7] As the State Amici explained in their brief opposing CAPPS's motion for a preliminary injunction, even if the "economic dragooning" principle enunciated in *NFIB* were applicable here, and it is not, the Arbitration and Class Action Waiver Provisions would not implicate this

CAPPS's contention that a high level of federal funding as a percentage of a private

entity's revenues is itself enough to convert a permissible spending condition into direct

regulation would imperil a broad range of conditions on federal funding that the Supreme Court

has explicitly upheld. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001).

Private entities would be able to effectively opt out of such conditions by choosing to structure

their businesses in order to rely entirely on the federal funding stream. This implausible result

should be rejected.[8]

Contrary to CAPPS's argument, the Supreme Court has never attributed legal

significance solely to the effect of federal spending conditions on "the affected organizations'

very existence." CAPPS Br. at 17. The cases relied upon by CAPPS do not support this claim.

First, the Court in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47

(2006), did not hold—or so much as suggest—that the amount of funding at issue was relevant to

the constitutional question in that case. *See* 547 U.S. at 51. Instead, the Court held that requiring

law schools to provide equal access to military recruiters would not violate the schools' First

---

principle. The controlling opinion on this principle is the plurality opinion of Chief Justice
Roberts in *NFIB*. *See Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 176 & n.22 (D.C.
Cir. 2015). The plurality only applied its analysis of coercion to conditions imposed on federal
funds that "threat[en] to terminate other significant *independent* grants." *NFIB*, 567 U.S. at 580
(emphasis added). The plurality contrasted the impermissible new conditions in the Medicaid
expansion with earlier permissible changes to *existing* Medicaid spending, including ones that
threatened funding for the whole Medicaid population, "both old and new." *Id.* at 583. Because
the Arbitration and Class Action Waiver Provisions are merely new conditions imposed on
future funding in an existing program, the relative share of funding provided in the program and
however undesirable it might be for an individual school to forgo that funding are irrelevant.

[8] The only case cited by CAPPS for the notion that principles of economic dragooning
may apply in the context of the FAA is *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921,
929 (N.D. Miss. 2016). The district court failed to explicitly address the federalism concerns on
which this principle is grounded, and the court's preliminary injunction decision is wrongly
decided on this point.

Amendment rights, regardless of whether Congress imposed the requirement as a condition on spending or a direct regulation. *See* 547 U.S. at 70. Next, CAPPS cites *Dole*, 483 U.S. at 211, a case involving conditions on federal funding to States, which is therefore irrelevant to conditions on funds to private "organizations[]." Finally, *Regan v. Taxation Without Representation of Wash.*, 461 U.S. 540, 544 & n.6 (1983), did not "emphasize" the Court's concern with coercing private entities. Rather, the Court simply stated the general principle that conditions on federal funds that might implicate the First Amendment are generally permissible if they allow the funding recipient to engage in the First Amendment activity outside of the context of the funding program. *See* 461 U.S. at 544 (noting that the organization could still engage in prohibited activities by applying for a separate tax exemption or using an affiliate structure). While coercion may be implicated by spending conditions affecting the exercise of constitutional rights, no such coercion is at issue here, thus CAPPS's reliance on cases addressing constitutional rights is misplaced. The rights created by the FAA simply are not tantamount to constitutional rights.

In sum, the Arbitration and Class Action Waiver Provisions do not violate the FAA because they do not invalidate any arbitration agreements. Rather, they simply give schools a choice of voluntarily forgoing reliance on predispute arbitration provisions in exchange for access to federal funding. They are reasonable conditions on federal funding, adopted by the Department after careful consideration of their importance to the federal interest in protecting federal educational funding from schools' demonstrated patterns of misconduct. The choice by some of CAPPS's member schools to structure their businesses around this federal investment in education does not give them the right to keep taxpayer money while opting out of conditions on the funds.

**3.** **The Arbitration and Class Action Waiver Provisions Are Neither Arbitrary Nor Capricious**

The Arbitration and Class Action Waiver Provisions are the product of considerable analysis on the part of the Department. Prior to promulgating these provisions, the Department closely considered and responded to numerous comments, including those submitted to the Department by CAPPS, and laid out its analysis over more than 49 columns spanning 18 pages of the Federal Register. Nonetheless, CAPPS now contends that the Department acted arbitrarily and capriciously by failing to consider issues and arguments that the Department did in fact explicitly consider and explain in the administrative record. This contention is baseless. CAPPS has failed to meet its "heavy burden" for declaring an agency action to be arbitrary and capricious. *See Wisc. Valley Improvement v. FERC*, 236 F.3d 738, 745 (D.C. Cir. 2001) (quoting *Transmission Access Policy Study Group v. FERC,* 225 F.3d 667, 714 (D.C. Cir. 2000)); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008) (explaining that under the APA's deferential standard of review, courts will set aside an agency action only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). In practice, CAPPS simply prefers a different policy outcome. But an agency's mere failure to agree with a commenter does not constitute an APA violation.

A.  *The Department Adequately Considered Comments Supporting Arbitration and Class Action Waivers*

CAPPS claims that the Department failed to consider evidence in the record about the purported benefits of arbitration and drawbacks of class actions. *See* CAPPS Br. at 22-25. To the

contrary, the Department's extensive discussion of the Provisions demonstrates that the

Department both considered the purported benefits of arbitration and class action waivers and

weighed these purported benefits against the "substantial evidence" it had gathered that

supported the Provisions, including studies, data from the American Arbitration Association,

information obtained from students, and investigations and cases against for-profit colleges. *See*

AR-A-000096-106; AR-A-000100 (acknowledging a commenter's citations "to literature and

academic studies that the commenter asserts demonstrate the merits of arbitration"); AR-A-

000100 ("[W]e do not deny the merits of arbitration, and the regulations do not ban

arbitration."); AR-A-000097 n.75 (reviewing data reflecting the minimal effectiveness of student

arbitrations against Corinthian during the schools' widespread misconduct);  AR-A-000101

(acknowledging criticisms of class actions and explaining that "the criticisms of class actions in

other markets may also apply to class actions in the postsecondary education market if such suits

were available."). On the basis of this balancing, the Department determined that the harms of

abusive schools "aggressively us[ing] waivers and arbitration agreements to thwart timely efforts

by students to obtain relief from the abuse," counseled in favor of promulgating the Provisions.

AR-A-000100. With respect to class action waivers specifically, the Department explained that:

> [C]lass actions have significant effects beyond financial recovery for the
> particular class members, including deterring misconduct by the institution,
> deterring misconduct by other industry members, and publicizing claims of
> misconduct that law enforcement authorities might otherwise have never been
> aware of, or may have discovered only much later. . . . [R]ecent history shows the
> significant consequences for students and taxpayers in an industry that has
> effectively barred consumers from using the class action tool.

AR-A-000101. CAPPS "may disagree with [the Department's] policy balance, but it does not

reflect a failure to consider relevant factors." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed.*

*Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

CAPPS also faults the Department for not "even acknowledg[ing the] conflict" between the Department's conclusion that arbitration and class waivers harmed students in the context of the Direct Loan Program, and the "Supreme Court's FAA-derived emphasis on arbitration benefits." CAPPS Br. at 23. This contention is patently false. The Department explicitly considered the Supreme Court precedent cited by CAPPS and concluded that the Provisions are consistent with this precedent. *See* AR-A-000096 ("The commenters asserted that the Supreme Court has repeatedly demonstrated its support for the FAA and for arbitration as an effective method of dispute resolution.") (citing cases); AR-A-000098 ("[N]one of the case authority to which the commenters cite addresses Federal regulations that may affect arbitration, and the disputes addressed in that case authority appear to involve litigation between private parties" rather than conditions on participation in federal benefit programs). The Department reiterated that the Provisions "do not invalidate any arbitration agreement, whether already in existence or obtained in the future." *Id.* The Department further explained that "[t]he regulations do not bar the use of arbitration and therefore do not deny students the benefits that the commenters ascribe to arbitration." AR-A-000104.[9]

Following its consideration of commenters' concerns—including their citations to studies and case law—the Department properly concluded that the risks of predispute arbitration agreements jeopardized "the taxpayer investment in Direct Loans" by allowing participating schools to "insulat[e] themselves from direct and effective accountability for their misconduct,"

---

[9] CAPPS also claims that the Department violated that APA by failing to consider "the Supreme Court's analysis of the benefits of class action waivers" in *Concepcion*. CAPPS Br. at 24 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-45, 348 (2011)). But the Supreme Court in *Concepcion* never analyzed the benefits of class action waivers *per se*, it merely discussed class arbitration as compared with bilateral arbitration. *See Concepcion*, 563 U.S. at 348.

"deter[] publicity that would prompt government oversight agencies to react," and "shift[] the risk of loss for that misconduct to the taxpayer." AR-A-000097. As previously noted, while CAPPS may disagree with the outcome of the Department's balancing, such disagreement does not constitute a valid ground for challenging an agency action and CAPPS cannot ask the Court to "substitute its judgment for that of the agency." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

B.   *The Department Properly Relied on the CFPB Study, Along with Evidence from Its Own Experience*

CAPPS claims that the Department should not have relied on a study of arbitration agreements and class action waivers conducted by the CFPB because the CFPB study included private student loans, which have different protections for borrowers than federal student loans. CAPPS Br. at 25. However, contrary to CAPPS's claim that the Department "fail[ed] to even consider the[] differences" between federal and private student loans, CAPPS Br. at 26, the Department expressly noted that the CFPB's study "analyze[d] the prevalence of arbitration agreements for private student loans as well as disputes concerning those loans" and explained that the study was nonetheless relevant because "[s]chools participating in the Direct Loan Program not infrequently provide or arrange private student loans to their students." Thus, the Department appropriately concluded that "these private loan borrowers may also have Direct Loans, and . . . can be expected often to share characteristics with Direct Loan borrowers." AR-A-000100.

Furthermore, the Department did not "simply cut and paste findings from" the CFPB as CAPPS contends. CAPPS Br. at 25. The Department relied on multiple sources of information regarding Direct Loans—including government investigations, lawsuits against for-profit schools, and information obtained from students—detailing how class action waivers and

mandatory predispute arbitration clauses helped to insulate rampant misconduct by for-profit

schools. Describing its own experience with Corinthian Colleges, the Department explained how

this insulation from official scrutiny contributed to significant costs to students and taxpayers.

AR-B-000054-56.[10] It was appropriate for the Department to consider the findings from the

CFPB study along with considerable additional evidence, the Department's own experience, and

public comments.

C.   *The Department Properly Considered the Possible Effect of Its Rule on Schools' Purported Reliance Interests*

Ignoring the Department's relevant analysis, CAPPS faults the Department for failing to

consider purported reliance interests that CAPPS never articulated to the Department. CAPPS's

comments to the Department included only the vague speculation that schools "have relied on

arbitration provisions and class action waivers, *at least in part*, in determining the cost of tuition,

obtaining insurance, and otherwise ordering their affairs," and that the Provisions may require

schools to "revisit" such costs. AR-J-017083 (emphasis added). Even now, CAPPS fails to

identify any comments submitted to the Department that discussed concrete reliance interests in

any greater detail. "An agency cannot be faulted for failing to discuss at length matters only

cursorily raised before it." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 722 (D.C. Cir. 2016)

(quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2128 n.2 (2016) (opinion of

Ginsburg, J., concurring). In any event, the Department adequately responded to CAPPS's

comments, acknowledging that "[i]t is possible that banning class action waivers may increase

legal expenses and could divert funds from educational services, or lead to tuition increases."

---

[10] Contrary to CAPPS's contention, CAPPS Br. at 26, Congress never rejected the CFPB's study of consumer arbitration and class action waivers. Instead, Congress "disapprove[d]" the CFPB's proposed rule and said nothing about the CFPB's study. Pub. L. No. 115-74 (2017). Notably, Congress did not take a similar action with respect to the Department's Borrower Defense Rule.

AR-A-000101. The Department noted, however, that information in the record cast doubt on the proposition that added costs from litigation would be much greater than those from arbitration and concluded "that the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place." *Id.* Once again, it appears that CAPPS simply disagrees with the Department's policy considerations.

CAPPS's citation to *Encino Motorcars* for the proposition that the Department failed to adequately consider reliance interests does not help its argument. In that case, the Court determined that an agency had violated the APA by failing to consider industry actors' reliance on an *articulated policy* that the agency had decided to eliminate. *See* 136 S. Ct. at 2123. Unlike that case, the Department had no prior policy regarding arbitration agreements and class action waivers. To the contrary, the 2016 Rule represents the first time the Department has adopted *any* policy regarding these topics. As such, there are no reliance interests comparable to those at issue in *Encino Motorcars.* Furthermore, the Court in *Encino Motorcars* did not bar agencies from changing their policies, but rather required that any such change be accompanied by "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 2126 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). Here, the Department provided a reasoned explanation responsive to the comments it received.

D. *There Has Been No Intervening Change in Law and Remand to the Department Is Not Warranted*

Finally, CAPPS requests that the Court remand the Borrower Defense Rule to the Department for reconsideration in light of *Epic Systems*, which CAPPS erroneously characterizes as an intervening change of law. As an initial matter, in each of the cases that CAPPS relies upon

to support its request for remand the *agency itself* made a motion for *voluntary* remand. *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018); *Nat'l Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244, 1249 (D.C. Cir. 1990). It is highly irregular for CAPPS to be requesting such a remand, and CAPPS has offered no basis for claiming that a remand is appropriate on its motion alone.

Furthermore, the Supreme Court's recent decision in *Epic Systems* does not constitute an intervening change in the law for the purposes of a remand to the agency. Courts have typically exercised their discretion to remand when a court decision or new legislation "appears to deprive [the agency action] of the legal effect" intended. *Nat'l Fuel Gas Supply Corp.*, 899 F.2d at 1249. The Supreme Court's decision in *Epic Systems*, however, neither deprives the Final Rule of legal effect nor alters the state of the law on which the Department relied in promulgating the rule. In *Epic Systems,* the Court held that prohibitions on class proceedings in private employment contracts did not violate the right established by the NLRA for workers to engage in "concerted activities for . . . mutual aid or protection." *Epic Sys.*, 138 S. Ct. at 1624. No part of the Court's holding in *Epic Systems* alters—or so much as addresses—the state of the law relevant to the scope of an agency's authority to place conditions on the receipt of taxpayer funds.

Unlike the employees in *Epic Systems*, the Department is not claiming that a subsequent statute creates exceptions to the FAA. In fact, the Department has repeatedly acknowledged that it "does not have the authority, and does not propose, to displace or diminish the effect of the FAA." AR-B-000057. As the Department explained, explicit Congressional authorization would have been required in cases, like that in *Epic Systems*, where agencies sought to invalidate private arbitration agreements through regulation. *See* AR-A-000098-99 ("[T]ransactions in these contexts fall squarely within the terms of the FAA . . . and arbitration clauses in these

transactions would be deemed valid and enforceable if Congress had not . . . barred . . . their use . . . or explicitly authorized a Federal agency to do so by regulation."). The Department contrasted such situations with its authority to set "the terms and conditions of participation in a Federal benefit program." AR-A-000099. As CAPPS itself notes, *Epic Systems* was squarely in line with the Supreme Court's line of FAA precedents, CAPPS Br. at 27 n.16, which the Department correctly concluded were consistent with its authority to enact the Provisions.

### Conclusion

For the foregoing reasons, the State Amici respectfully request that the Court deny CAPPS's motion for summary judgment and enter summary judgment for the Defendants.[11]

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By:   */s/ Yael Shavit*
      Yael Shavit
      Max Weinstein
      Joshua Olszewski-Jubelirer
      Assistant Attorneys General
      Office of the Massachusetts Attorney General
      One Ashburton Place
      Boston, MA 02108
      (617) 963-2197 (Shavit)
      (617) 963-2499 (Weinstein)
      (617) 963-2344 (Olszewski-Jubelirer)
      Yael.Shavit@mass.gov
      Max.Weinstein@mass.gov
      Joshua.Olszewski-Jubelirer@mass.gov

---

[11] If the Court finds that the Arbitration and Class Action Waiver Provisions are invalid, they should be severed, and the remainder of the Borrower Defense Rule should continue in effect. The Borrower Defense Rule includes a severability clause, explicitly stating the Department's intention that if any section of the Arbitration and Class Action Provisions were to be invalidated by a court, the remaining sections should continue in force. *See* AR-A-000164 (34 C.F.R. § 685.310).

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA, CALIFORNIA
ATTORNEY GENERAL
Bernard A. Eskandari
Supervising Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

PEOPLE OF THE STATE OF ILLINOIS,
by KWAME RAOUL, ATTORNEY
GENERAL OF ILLINOIS
Susan Ellis
Chief, Consumer Protection Division
Joseph Sanders
Greg Jones
Assistant Attorneys General
Illinois Attorney General's Office
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
(312) 814-6796
(312) 814-4987
jsanders@atg.state.il.us
gjones@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
Tel: (515) 281-8772
Jessica.Whitney@iowa.gov

BRIAN E. FROSH
ATTORNEY GENERAL OF MARYLAND
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585

Cmadaio@oag.state.md.us

FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
120 Broadway, 3rd floor
New York, NY 10271
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM, ATTORNEY
GENERAL
Katherine Campbell
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Tel: 971-673-1880
Katherine.campbell@doj.state.or.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL
Jesse Harvey
Deputy Attorney General
Office of the Pennsylvania Attorney General
Bureau of Consumer Protection
6th Floor Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
(412)565-2883
jharvey@attorneygeneral.gov

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
Benjamin Wiseman
Office of Consumer Protection
441 4th Street, N.W., 6th Floor
Washington, DC 20001

35

(202) 741-5226
benjamin.wiseman@dc.gov

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL
Jeffrey T. Sprung
Cynthia Alexander
Assistant Attorneys General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
jeff.sprung@atg.wa.gov
cynthiaa@atg.wa.gov

**CERTIFICATE OF SERVICE**

I certify that on March 1, 2019, I caused a copy of the foregoing to be filed electronically and that these documents are available for viewing and downloading from the ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Yael Shavit*
Yael Shavit