## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CALIFORNIA ASSOCIATION OF
PRIVATE POSTSECONDARY SCHOOLS,

*Plaintiff*,

v.

ELISABETH DeVOS, Secretary of
Education, *et al.*

*Defendants.*

Civil Action No. 17-999 (RDM)

## <u>MEMORANDUM OPINION</u>

The California Association of Private Postsecondary Schools ("CAPPS") challenges

regulations promulgated by the Department of Education ("the Department") in November 2016

to address perceived deficiencies in the William D. Ford Federal Direct Loan ("Direct Loan")

program.  *See* Dkt. 82; Student Assistance General Provisions, Federal Perkins Loan Program,

Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and

Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg.

75,296 (Nov. 1, 2016) (codified in scattered sections of 34 C.F.R.) ("the 2016 Rule" or "the

Rule").  Although CAPPS originally sought to invalidate the 2016 Rule in its entirety, the Court

previously held that CAPPS lacked standing to pursue most of its claims.  *See Cal. Ass'n of*

*Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 183 (D.D.C. 2018) ("*CAPPS I*").

Following that decision, CAPPS amended its complaint, Dkt. 82, and it now challenges only two

(related) provisions of the 2016 Rule.  *See* Dkt. 82-1 at 20–24.

Both of the challenged provisions are found in the portion of the Rule that defines the

terms of the "program participation agreement"—or "PPA"—that all institutions of higher

education must enter into with the Secretary of Education ("the Secretary") before participating in the Direct Loan program.  The first of these terms requires participating schools to agree not to "seek to rely in any way on a predispute . . . agreement with a student who has obtained or benefited from a Direct Loan" that would preclude the student from joining a class action "that is related to" a "borrower defense claim."  34 C.F.R. § 685.300(e).  The second term requires participating schools "not to enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim."  *Id.* § 685.300(f).  A "borrower defense claim," in turn, is a claim that a student borrower has or could assert as a defense to repayment of a loan to the Secretary (or as a basis to seek recovery of an amount already paid to the Secretary) and includes claims that the participating institution of higher education breached a contractual obligation to the student or made a "substantial misrepresentation" to the student.  *Id.* § 685.300(i)(1); *id.* § 685.222.

CAPPS moves for summary judgment seeking to invalidate these provisions on three grounds.  It argues that (1) they conflict with the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*; (2) they were promulgated in excess of the Department's statutory authority; and (3) they are arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  *See* Dkt. 83-1 at 7–8.  The Department of Education opposes CAPPS's motion and cross-moves for summary judgment.  Dkt. 94.  For the reasons explained below, the Court concludes that the Department has the better of the arguments and will, according, grant summary judgment in its favor.

## I. BACKGROUND

### A.   Factual and Regulatory Background

In 1993, Congress amended Title IV of the Higher Education Act ("HEA"), 20 U.S.C.

§ 1001 *et seq*., to allow eligible students who attend "participating institutions of higher

education" to obtain loans directly from the federal government in order to finance their

postsecondary educations.  *See* Student Loan Reform Act of 1993, Pub. L. No. 103-66, 107 Stat.

341 (codified at 20 U.S.C. §§ 1087a–1087h); 20 U.S.C. § 1087a(a).  To qualify as a

"participating institution" under this program—known as the William D. Ford Federal Direct

Loan program—an "institution of higher education" must enter into an agreement with the

Secretary of Education that, among other things, "provide[s] for the establishment and

maintenance of a direct student loan program at the institution;" "provide[s] that the institution

accepts responsibility and financial liability stemming from its failure to perform its functions

pursuant to the agreement;" and "include[s] such other provisions as the Secretary determines are

necessary to protect the interests of the United States and to promote the purposes of" the Direct

Loan program.  *Id*. § 1087d; 34 C.F.R. § 685.100(a) (noting that the Direct Loan program is

known as the William D. Ford Direct Loan Program).  "No institution of higher education,"

however, has "a right to participate in the [Direct Loan] programs authorized under [part D of

Title IV of the HEA]." 20 U.S.C. § 1087b(b).  The statute further directs the Secretary to

"specify in regulations which acts or omissions of an institution of higher education a borrower

may assert as a defense to repayment of a" Direct Loan.  *Id.* § 1087e(h).

Pursuant to these authorities, the Secretary issued "standards, criteria, and procedures

governing the Federal Direct Student Loan . . . program" in January 1994.  Federal Direct

Student Loan Program, 59 Fed. Reg. 472, 472 (Jan. 4, 1994).  Those standards included the first

iteration of the "borrower defense rule," which permitted Direct Loan borrowers to "assert as a defense against repayment of the loan" to the Department "a claim based on the act or omission of the school" the borrower attended, if (1) the act or omission gave rise to a cause of action against the school under state law, (2) the borrower presented "the claim to the school and received no satisfaction," and (3) the borrower filed a timely claim with the Department. *Id.* at 481. The Secretary did not specify any other defenses to repayment, nor did he set forth any procedure by which the Department would adjudicate assertions of defenses to repayment. *See id.*

In December 1994, the Secretary issued revised regulations. *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664 (Dec. 1, 1994) (codified at 34 C.F.R. Part 685 (1995 version)). Under the new regulations, borrowers were permitted to "assert as a defense against repayment" of a Direct Loan "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1) (1995 version). "If the borrower's defense against repayment [was] successful, the Secretary [was required to] notif[y] the borrower that [she was] relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower [was] otherwise obligated to pay." *Id.* § 685.206(c)(2) (1995 version). The Secretary could also reimburse "the borrower for amounts paid toward the loan voluntarily or through enforced collection." *Id.* To recover these losses, the regulations authorized the Secretary to "initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay the Secretary the amount of the loan to which the defense applie[d]." *Id.* § 685.206(c)(3) (1995 version). These regulations remained in effect, without alteration, for more than twenty years.

The adequacy of this regulatory regime was put to the test in May 2015 by "the collapse of Corinthian Colleges," a "publicly traded company operating numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide." Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39,330, 39,335 (June 16, 2016) (to be codified in scattered sections of 34 CFR). According to the Department, "[g]overnment investigations established that Corinthian [Colleges] had for years engaged in widespread misrepresentations and other abusive conduct." *Id.* at 39,382. As the Department further explained:

> In April 2015, the Department levied a $30 million fine against Heald, a chain owned by Corinthian, for misrepresenting its placement rates, but several days later, Heald and the remaining Corinthian-owned schools closed, and Corinthian filed for bankruptcy relief. The State of California sued Corinthian in September 2013, and obtained a $1.1 billion judgment against the company only in March 2016, after the company had filed for bankruptcy relief. The [Consumer Financial Protection Board ("CFPB")] sued Corinthian in September 2014, and obtained a $531 million judgment against the company only in October 2015— well after Corinthian had become insolvent and filed in bankruptcy. None of these government actions actually achieved affirmative recovery for Corinthian Direct Loan borrowers.

*Id.* at 39,382–83. Although two groups of Corinthian students had sought to bring class action lawsuits prior to the company's collapse and although other students had attempted to bring individual suits, courts held that those actions were barred by arbitration clauses included in the Corinthian enrollment agreements. *Id.* at 39,383.

Following Corinthian's collapse, thousands of former Corinthian students applied for loan relief pursuant to the Department's borrower defense regulations. 81 Fed. Reg. at 39,335. In the Department's view, the barrier to class actions found in the Corinthian enrollment

agreements contributed to the losses the Department was left to redress with taxpayer dollars: "If the student class actions had been able to proceed," for one thing, "Heald College and the Corinthian Colleges" might have been required "to provide financial relief to the students and to change their practices while Corinthian was still a viable entity." *Id.* Instead, the only avenue of relief available to the injured students was to "obtain relief by raising the schools' misconduct as a defense to the Federal loans through the Department's [then-existing] borrower defense process." *Id.* The arbitration clauses contained in the Corinthian enrollment agreements, and in other similar agreements, moreover, allowed schools to avoid the type of publicity that can "attract the attention and risk of compensatory or prophylactic enforcement action[s] by [the] Department and other government agencies," further "frustrat[ing] the Federal and Direct Loan interests." *Id.* at 39,384. By "the close of March 2016, the Department had granted discharge relief in the amount of $42,318,574 to 2,048 Direct Loan borrowers making claims related to Heald, Everest Institute, and Wyotech"—all schools within the Corinthian network. *Id.* at 39,383.

In light of the fallout from Corinthian's collapse, the Department initiated a rulemaking to address perceived deficiencies in the borrower defense regulations. Pursuant to the HEA, the Department began by "obtain[ing] the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs under [Title IV of the HEA], such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." 20 U.S.C. § 1098a(a)(1). After doing so, the Department published a notice of intent to engage in a negotiated rulemaking, selected a negotiated rulemaking committee, and held a series of committee meetings in early

2016.  81 Fed. Reg. at 39,333–34.  The committee, however, was unable to reach consensus.  81

Fed. Reg. at 39,333–34.  The Department, as a result, issued its own notice of proposed

rulemaking on June 16, 2016, proposing a variety of revisions to the borrower defense

regulations.  *Id.* at 39,334–35.

Of particular relevance here, the Department proposed amendments to the regulation

governing the terms of the program participation agreement, which participating institutions

must agree to before their students may receive Direct Loans.  *Id.* at 39,380–86.  Most notably,

the Department proposed amending the PPA to require institutions to agree, as a condition of

participation in the Direct Loan program, to forego "the use of class action waivers" and "the use

of mandatory pre-dispute arbitration" clauses in their enrollment agreements.  *Id.* at 39,380.  The

Department reasoned that class action waivers and predispute arbitration agreements are

inconsistent with the aims of the Direct Loan program because they (1) "[a]ffect whether

institutions are held accountable for acts and omissions that give rise to borrower defense

claims;" (2) "[m]ake it more likely that the costs of losses from those actions or omissions will

be passed on to the taxpayer;" (3) "[r]educe the incentive for institutions to engage in fair and

ethical business practices;" and (4) "[f]rustrate or reduce the effectiveness of the Department's

proposed processes for submitting and determining the validity of borrower defense claims."  *Id.*

Both the public and the negotiators were invited to comment on these proposed rules before they

were made final.  *Id.* at 39,334.

After receiving over 50,000 comments, the Department published final regulations

governing the Direct Loan Program on November 1, 2016.  81 Fed. Reg. at 75,926, 75,928.

Under those regulations—which are at issue in this proceeding—Direct Loan borrowers who

take out loans after July 1, 2017, the effective date of the regulations, are relieved of their

obligations to repay Direct Loans under the following circumstances:

> (b) *Judgment against the school.* The borrower has a borrower defense if the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction. . . .

> (c) *Breach of contract by the school.* The borrower has a borrower defense if the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. . . .

> (d) *Substantial misrepresentation by the school.* (1) A borrower has a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation . . . that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan.

*Id.* at 76,083 (quoting proposed 34 C.F.R. § 685.222(b)–(d)). If relief is granted under these new

rules, "the borrower is deemed to have assigned to, and [to have] relinquished in favor of, the

Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by

contract or applicable law with respect to the loan or the contract for educational services for

which the loan was received, against the school, its principals, its affiliates, and their successors,

its sureties, and any private fund." *Id.* at 76,086 (quoting proposed 34 § C.F.R. 685.222(k)(1)).

In the final rule, the Department also adopted the proposed provisions concerning

predispute arbitration and class action waivers. Specifically, the Department added the following

two new conditions to the PPA:

> (e)   *Class action bans.*

> > (1)   The school will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action that is related to a borrower defense claim, including to seek a stay or dismissal of particular

claims or the entire action, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2)    Reliance on a predispute arbitration agreement, or on any other predispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a class action.

(ii) Seeking to exclude a person or persons from a class in a class action.

(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action.

(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action.

(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved.

(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court in that class action has granted a motion to dismiss the claim and, in doing so, the court noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed. . . .

(f)    *Predispute arbitration agreements*.

(1)    (i) The school will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim.

(ii) A student may enter into a voluntary post-dispute arbitration agreement with a school to arbitrate a borrower defense claim.

>> (2)     Reliance on a predispute arbitration agreement with a student with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:
>>
>> (i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student, including joinder with others in an action;
>>
>> (ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and
>>
>> (iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

*Id.* at 76,087–88 (quoting proposed 34 C.F.R. § 685.300(b)(11) & (e)–(f)).

"Borrower defense claims" are defined, for purposes of this section, as claims arising out of:

>> an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided, and includes one or both of the following:
>>
>> (i)     A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and
>>
>> (ii)    A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

34 C.F.R. §§ 685.222(a)(5), 685.300(i)(1); *see also* 81 Fed. Reg. at 76,081, 76,089.

Although these regulations are currently in effect, on September 23, 2019, the Department issued a final rule rescinding the predispute class action and arbitration waiver conditions, effective July 1, 2020. Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019). In explaining its rationale for rescinding these conditions, the Department reaffirmed its view that "the HEA grants the Department legal authority and wide discretion to place conditions upon receipt of title IV funds," including the authority to restrict

and prohibit the use of predispute arbitration agreements and class action waivers.  *Id.* at 49,839.
But, while affirming its authority, the Department decided to make a "policy shift" in favor of
the "liberal federal policy favoring arbitration agreements" and thus rescinded the provisions at
issue in this proceeding.  *Id.* (quotations omitted)  Because the September 2019 rule will not take
effect until July 1, 2020, however, the parties maintain—and the Court agrees—that CAPPS's
challenge to the 2016 Rule is not moot.  *See* Dkt. 107.

**B.    Procedural History**

CAPPS filed this lawsuit on May 24, 2017 challenging four aspects of the regulations,
including the predispute arbitration and class action waiver conditions.  *See* Dkt. 1 at 69 – 75
(Compl. ¶¶ 202–41).  CAPPS sought to enjoin the Department "from implementing, applying, or
taking any action whatsoever pursuant to the final regulations," and sought vacatur of the entire
rule.  *Id.* at 75 (Compl. ¶ 242).

A little over a week later, on June 2, 2017, CAPPS filed a motion for preliminary
injunction, seeking only to enjoin implementation of the arbitration and class action waiver
conditions.  Dkt. 6 at 1.  While that motion was pending, the Department announced that it
planned to stay the implementation of the entirety of the 2016 Rule pursuant to 5 U.S.C. § 705.
*See* Dtk. 20.  Two individuals—Megan Bauer and Stephano Del Rose—alongside eight states
and the District of Columbia moved to intervene to defend the 2016 Rule.  *See* Dkt. 16, 22.
Those intervenors also each filed separate lawsuits, also in this Court, challenging the
Department's stay order as unlawful under the APA.  *See Bauer v. DeVos*, No. 17-1330 (filed
D.D.C. July 6, 2017); *Massachusetts v. Dep't of Educ.*, No. 17-1331 (filed D.D.C. July 6. 2017).
The Court stayed the *CAPPS* litigation while the *Bauer* parties litigated the legality of the
Department's stay order.  *See* Minute Entry (March 1, 2018).

On September 12, 2018, the Court held that the stay of the 2016 Rule pursuant to § 705 was unlawful. *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018).  In light of that decision, the Court held a status conference on September 14, 2018, with the parties from both *CAPPS* and *Bauer* to discuss how the cases should proceed, including the resolution of the pending motions by the States and Bauer and Del Rose to intervene in the *CAPPS* litigation to defend the rule. *See* Minute Order (Sept. 12, 2018); *see generally* Dkt. 63 (Sept. 14, 2018 Hrg. Tr.).  The Court granted Bauer and Del Rose's motion to intervene and offered the States the opportunity to participate as amici rather than intervenors.  Dkt. 63 at 56–57 (Sept. 14, 2018 Hrg. Tr.).  The States accordingly withdrew their motion to intervene.  *See* Dkt. 61.

On September 22, 2018, CAPPS renewed its motion for preliminary injunction, this time seeking to enjoin the entirety of the 2016 rule, not merely the arbitration and class action waiver conditions.  Dkt. 65.  The Court denied the motion for a preliminary injunction, finding that CAPPS had not established irreparable injury with respect to those conditions and had shown neither irreparable injury nor the requisite likelihood of success with respect to standing for the other provisions CAPPS sought to enjoin.  *See CAPPS*, 344 F. Supp. 3d at 173, 175–83. Accordingly, CAPPS sought and was granted leave to amend its complaint to reflect that it was now challenging only the arbitration and class action waiver conditions.  Dkt. 82.

At the same time that CAPPS renewed its motion for a preliminary injunction, it also moved for reconsideration of this Court's decision to permit Bauer and Del Rose to intervene in defense of the 2016 Rule in this case.  Dkt. 64.  CAPPS alerted the Court to the fact that the educational institution against which Bauer and Del Rose sought to bring a class action—a class action that would be precluded unless the arbitration and class action waiver conditions went into effect—had filed for bankruptcy, thus barring their claims for reasons independent of the legal

effect of the 2016 Rule. *See* Dkt. 64 at 12–13. The Court held that, because Bauer and Del Rose had pending borrower defense applications before the Department, and thus would have benefited from other portions of the 2016 Rule that CAPPS had challenged, the intervenors had standing to intervene at the time the Court granted their motion for leave to intervene and, accordingly, denied the motion. *See* Dkt. 108 at 13. However, because CAPPS subsequently amended its complaint to challenge *only* the arbitration and class action waiver conditions, *id.* at 13–14, the Court ordered the intervenors to show cause why, at that juncture, their status as intervenors should not be revoked and that they be treated, like the States, as amici, *see* Dkt. 63 at 40, 53–54. In response to that order to show cause, the intervenors conceded they lacked standing. Dkt. 109. The Court accordingly ordered that Bauer and Del Rose were no longer intervenors in the case and explained that it would consider their prior submissions to be briefs by amici curiae. Minute Order (Jan. 31, 2020).

While that motion for reconsideration was pending—and thus while Bauer and Del Rose were still acting as intervenors—CAPPS moved for summary judgment on its claim that the predispute arbitration and class action waiver conditions were unlawful. Dkt. 83. The Department of Education and Bauer and Del Rose, who were still intervenors at that time, each cross-moved for summary judgment, *see* Dkt. 92; Dkt. 93, and the States and the District of Columbia filed amicus briefs in support of those cross motions, Dkt. 95; Dkt. 104.

## II. ANALYSIS

CAPPS raises three challenges to the 2016 Rule's requirement that institutions of higher education agree to eschew the predispute class action waiver and predispute arbitration clauses as a condition of participation in the Direct Loan program. First, it argues that these conditions conflict with the FAA, Dkt. 83-1 at 14–24, which favors the enforcement of arbitration

agreements.  Second, it argues that the Secretary lacked authority under the HEA to adopt the conditions, principally because, in its view, the HEA's general grant of authority to impose conditions on program participation is insufficient to overcome the specific demands of the FAA. *Id.* at 24–28.  Finally, it argues that the 2016 Rule is arbitrary and capricious because the Secretary did not consider the benefits of arbitration or the drawbacks of class actions, relied on an inapposite CFPB study, and failed to give sufficient weight to the reliance interests of the participating institutions, and argues, in the alternative, that remand is appropriate so that the Department may consider a subsequent Supreme Court decision regarding the FAA.  *Id.* at 28–33.  The Court will consider each argument in turn.

## A.    Conflict with the FAA

CAPPS devotes the lion's share of its brief to the contention that the class action waiver and predispute arbitration conditions are "flatly inconsistent with the FAA." *Id.* at 14.  In support of this theory, CAPPS presses three points:  It first argues—correctly—that the FAA embodies a policy favoring the "enforcement" of arbitration agreements and—less obviously—that the 2016 Rule is at odds with that policy. *See id.* at 15–18.  It then posits—incorrectly—that the distinction between a proscriptive rule banning the use of arbitration clauses and a condition on participation in a federal program does not bear the weight that the Department places on it. *See id.* at 18–22.  And, finally, it argues—again, incorrectly—that the condition at issue here is unduly coercive and thus unlawful. *See id.* at 22–24.  At its core, CAPPS's FAA argument turns on the premise that the FAA's "equal treatment" principle precludes federal agencies from "disfavoring" arbitration clauses in the administration of a federal program, *see* Dkt. 83-1 at 18, even when the agency bears statutory responsibility for protecting federal funds used in the program, and the agency reasonably concludes that permitting program participants to use

predispute arbitration agreements (and class action waivers) in connection with program activities will likely frustrate the goals of the program and impose substantial costs on taxpayers. Under any colorable understanding of the reach of the FAA, that contention proves too much.

CAPPS's argument that the 2016 Rule contravenes the FAA turns on whether the "equal treatment" principle contained within Section 2 of the FAA prohibits federal rules and policies that merely "disfavor" arbitration.  In answering that question, the Court starts, as it must, with the text of the FAA.  *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).  Section 2 of the FAA provides, in pertinent part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  As the Supreme Court has repeatedly explained, this language requires "courts to abandon their hostility" to arbitration and, "instead[,] [to] treat arbitration agreements"—in the words of the statute—"as 'valid, irrevocable, and enforceable.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *see also*, *e.g.*, *Kindred Nursing Ctrs., Ltd. v. Clark*, 137 S. Ct. 1421, 1426 (2017)*; AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 302 (2010); *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974).  The FAA's savings clause, in turn, "allows courts to refuse to enforce arbitration agreements" but only "'upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Epic Sys. Corp.*, 138 S. Ct. at 1622 (quoting 9 U.S.C. § 2).

CAPPS and the Department agree that the FAA would displace a federal rule that declared particular arbitration agreements invalid or unenforceable.  Dkt. 83-1 at 16; Dkt. 93-1 at 13–14; *Epic Sys. Corp.*, 138 S. Ct. at 1623–30.  But that is not what the 2016 Rule did.  To the contrary, the Department acknowledged that it lacks "the authority, and does not propose, to displace or diminish the effect of the FAA."  81 Fed. Reg. at 76,023.  Consistent with that understanding, the 2016 Rule "does not invalidate any arbitration agreement, whether already in existence or obtained in the future."  *Id.*  Institutions of higher education remain free to seek and to invoke predispute class action waivers and arbitration agreements, and, when confronted with any such agreement that is otherwise enforceable, courts must—and will—enforce the agreement.  The 2016 Rule does not provide a basis for a student to resist a motion to compel arbitration, *see* 9 U.S.C. § 4, or to stay a judicial proceeding pending arbitration, *see id.* § 3.  Instead, the regulations "impose a condition on the participation of a school in" the Direct Loan program, "a Federal program in which Congress explicitly stated that 'no institution shall have a right to participate.'"  81 Fed. Reg. at 76,023 (quoting 20 U.S.C. § 1087b(b)).  In other words, if a school wants to participate in a federal program and to benefit from the many billions of dollars that the United States distributes in Direct Loans every year, it must agree to abide by the conditions that the Secretary reasonably determines are necessary to protect the public fisc and the integrity of the program.  *See* 20 U.S.C. § 1087d(a)(6).

Because the regulations do not purport to invalidate or to render unenforceable any arbitration agreement, CAPPS offers a far more expansive interpretation of Section 2 of the FAA.  To do so, CAPPS quotes language from Supreme Court decisions that have interpreted Section 2 of the FAA to reflect an "equal treatment" principle in the *enforcement* of arbitration agreements to argue that the FAA prohibits any federal policy or rule that would "disfavor"

arbitration, including the 2016 Rule.  *See* Dkt. 83-1 at 16–18 (quoting *Epic Sys. Corp.*, 138 S. Ct.

at 1621; *Kindred Nursing Ctrs.*, 13f7 S. Ct. at 1424; *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463,

471 (2015); *Concepcion*, 563 U.S. at 341).  Neither the Supreme Court, the D.C. Circuit, nor this

Court has ever embraced such an expansive interpretation of the FAA—nor does the text of the

FAA support it.

To be sure, in enacting the FAA, Congress established "a liberal federal policy favoring

arbitration agreements."  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

24 (1983).  But courts do not apply federal policies; they apply federal statutes, and the FAA

speaks only to the validity, irrevocability and enforceability of arbitration agreements.  9 U.S.C.

§ 2.  Each of the operative terms found in § 2 of the FAA—"shall be valid, irrevocable, and

enforceable"—relates to the legal effect courts (and, as a result, parties) must accord to

contractual provisions.  Black's Law Dictionary defines the term "enforce" to mean "[t]o give

force or effect to (a law, etc.); to compel obedience to," Enforce, Black's Law Dictionary (11th

ed. 2019), and it defines the term "valid" to mean "[l]egally sufficient; binding," Valid, Black's

Law Dictionary (11th ed. 2019).  And, although the meaning of the term "irrevocable" admits of

greater ambiguity, *see* Irrevocable, Black's Law Dictionary (11th ed. 2019) ("Unalterable"),

Congress used the root term "revocation" in the savings clause to encompass all three operative

terms, 9 U.S.C. § 2.  That statutory clue, along with Justice Thomas's observation that the

Supreme "Court and others have referred to the concepts of revocability, validity, and

enforceability interchangeably," *Concepcion*, 563 U.S. at 354 (Thomas, J., concurring), leaves

the Court with little doubt that the FAA's recognition of the "irrevocability" of arbitration

agreements, like the Act's recognition of the "validity" and "enforceability" of those agreements,

relates to the legal effect—and not the general desirability—of arbitration agreements.  Because

the 2016 Rule does not alter the binding legal status of any arbitration agreement, the plain language of the FAA does little to advance CAPPS's claim.  *See Dean Witter Reynolds, Inc.*, 470 U.S. at 219 ("The Act, after all, does not mandate the arbitration of all claims, but merely the enforcement—upon the motion of one of the parties—of privately negotiated arbitration agreements.").

CAPPS's efforts to find support in the case law fares no better.  CAPPS argues, for example, that the Supreme Court's decision in *Kindred Nursing Centers Ltd.*, 137 S. Ct. at 1428, establishes that Section 2 of the FAA applies "fully to the formation of arbitration agreements." Dkt. 83-1 at 16.  That is correct.  But to the extent CAPPS suggests that *Kindred Nursing* holds—or even implies—that agencies may not dissuade program participants from entering into arbitration agreements that relate to the federal programs they administer, that contention bears no relation to what the Supreme Court considered or held.  Rather, as in every other Supreme Court decision interpreting the FAA that CAPPS cites, *Kindred Nursing* merely held—consistent with the plain text of the FAA—that state and federal courts must "give effect" to arbitration clauses on equal terms with other contractual provisions.  137 S. Ct. at 1424–29; *see also Epic Sys.*, 138 S. Ct. at 1623 (holding that a National Labor Relations Board decision barring class action waivers in employment contracts conflicts with—and thus is invalidated by—the FAA); *DIRECTV, Inc.*, 136 S. Ct. at 471 (holding that a California rule construing contract ambiguities against the drafter to be preempted by the FAA, as applied to a particular arbitration clause); *Concepcion*, 563 U.S. at 341 (holding that a California contract rule that class action waivers in contracts of adhesion were unconscionable—and thus unenforceable—was preempted by the FAA).

CAPPS's reliance on the Supreme Court's decision in *Epic Systems* faces a similar hurdle. According to CAPPS, *Epic Systems* stands for the proposition that "federal Departments and agencies . . . may not, in the absence of explicit congressional authorization, invalidate or otherwise discriminate against arbitration agreements." Dkt. 83-1 at 16. CAPPS is right that federal agencies lack the authority, absent express congressional authorization, to invalidate arbitration agreements. The FAA, after all, declares that arbitration agreements are "valid," absent the availability of a defense applicable to "any" contractual provision. 9 U.S.C. § 2. But CAPPS identifies no support for its further contention that federal agencies lack authority to disfavor arbitration agreements in any respect. *Epic Systems* certainly does not support that sweeping proposition. Rather, all the Court held was that neither the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157, nor a National Labor Relations Board decision interpreting the NLRA overrode the FAA's direction that courts must, in general, enforce arbitration agreements as written. *Id.* at 1632.

CAPPS's contention that the Supreme Court "has frequently invalidated rules that have a disproportionate impact on arbitration clauses even when they do not impose a flat ban or are nominally neutral," Dkt. 83-1 at 18, is both an over-generalization and inapposite. True, the Supreme Court observed in *Kindred Nursing* that the FAA "displaces any rule that covertly accomplishes" what the Act expressly forbids—the invalidation of arbitration clauses on grounds not generally applicable to other contractual provisions—"by disfavoring contracts that (if so coincidentally) have the defining feature of arbitration agreements." 137 S. Ct. at 1426. But, in the very next breath, the Supreme Court explained what that means:

> In *Concepcion*, for example, we described a hypothetical state law declaring unenforceable a contract that "disallow[ed] an ultimate disposition [of a dispute] by a jury."  . . .  Such a law might avoid referring to arbitration by name; but

still, we explained, it would "rely on the uniqueness of an agreement to arbitrate
as [its] basis"—and thereby violate the FAA.

*Id.* (internal citations omitted).  Similarly, in *Kindred Nursing*, the Supreme Court held that a

state law protecting "the right of access to the courts and trial by jury" was, for all practical

purposes, the equivalent of a rule precluding the enforcement of agreements to arbitrate.  *Id.*; *see*

*also Epic Sys.*, 138 S. Ct. at 1622 (under Supreme Court "precedent . . . the saving clause [of the

FAA] does not save defenses that target arbitration either by name or by more subtle methods,

such as by 'interfer[ing] with fundamental attributes of arbitration'") (quoting *Concepcion*, 563

U.S. at 344).  Neither that holding nor the uncontroversial principle that a state (or federal

agency) may not achieve through stealth what the FAA expressly precludes bears on this case.

The regulation that CAPPS challenges does not invalidate any arbitration agreement by overt or

covert means.

Both the text of the FAA and Supreme Court precedent focus on judicial enforceability of

arbitration agreements; that is, they focus on the legal effect that courts should accord arbitration

agreements.  But, even if the FAA might go further and, at times, preempt or preclude a state law

or federal regulation that does not itself alter the legal effect of the agreement, this case does not

raise the type of extraordinary scenario CAPPS hypothesizes.  CAPPS posits, for example, that

the FAA would surely preclude a federal agency from requiring private entities to pay "a fee of

$1 million per arbitration" simply "for the privilege of" opting to arbitrate rather than litigate a

dispute.  Dkt. 99 at 10.  But that is a far cry from what the Secretary did in the 2016 Rule.  Here,

the Department is not acting as a disinterested regulator but as the administrator of a multi-

billion-dollar program and as a participant in the transaction between the student borrowers and

the schools they attend.

In that role, the Department has a direct and substantial interest in the performance of the contracts between student borrowers and schools.  It disperses over $120 billion annually under the Direct Loan program, *see* U.S. Department of Education, Federal Student Aid Office, 2018 Annual Report, https://www2.ed.gov/about/reports/annual/2018report/fsa-report.pdf (last accessed Jan. 31, 2020), and it bears the risk of non-repayment, *see* 34 C.F.R. § 685.222(a)(5), (k) (providing for Department recovery of unpaid student loans from schools, rather than students, only once a successful student borrower defense has been asserted).  When a participating school misleads a student-borrower or breaches a contractual obligation relating to a Direct Loan or "the provision of educational services for which the loan was provided," that conduct establishes a defense to repayment of the loan to the United States, 34 C.F.R. § 685.222(a)(5), and the Department's sole recourse is to seek recovery, if possible, from the school, 34 C.F.R. § 385.222(k).  Whether the Department is (1) subrogated to the rights of the student-borrower; (2) entitled to recover on the theory that the school acted as its agent in originating the loan; (3) a third-party beneficiary of the enrollment agreement; or (4) entitled to assert its own contractual rights against the school under the PPA, *see* 81 Fed. Reg. at 75,931 (citing *United States v. Kearns*, 595 F.2d 729 (D.C. Cir. 1978); *United States v. Bellard*, 674 F.2d 330 (5th Cir. 1982)), the Department is—on any plausible view—an interested party to the transaction between the student-borrower and the school that receives the loan proceeds.

The PPA conditions requiring Direct Loan program participants to eschew predispute arbitration clauses and class action waivers in their enrollment agreements, moreover, bears a reasonable nexus to the Department's statutory responsibilities to include conditions in the PPA that are "necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan program.  20 U.S.C. § 1087d(a)(6).  In the Secretary's view, those conditions

protect the public fisc by making it less "likely that the costs of losses from [the] acts or omissions [of participating institutions] will be passed on to the taxpayer;" they increase the likelihood that program participants will "engage in fair and ethical business practices" related to the Direct Loan program; and they enhance "the effectiveness of the Department's . . . processes for submitting and determining the validity of borrower defense claims." 81 Fed. Reg. 39,380. The Secretary's conclusions, moreover, were based the Department's real-world experience in dealing with the aftermath of the collapse of the Corinthian Colleges, which led to the discharge of well over $40,000,000 in Direct Loans, at the expense of the federal government. *Id*. at 39,383. One cannot plausibly assert—and CAPPS does not assert—that the new conditions included in the PPA are, in reality, regulatory prohibitions on arbitration simply masquerading as contractual terms designed to protect the interests of the United States as a party to the overall loan transaction.

With that understanding of the challenged PPA conditions, this is an easy case. Federal agencies are, of course, free to contract on whatever terms they conclude are prudent and that are otherwise lawful, and the FAA does not preclude federal agencies from declining to include arbitration clauses in government contracts and grant agreements. *Cf.* Executive Order 12,778 at § 1(c)(3), 56 Fed. Reg. 55,195, 55,196 (Oct. 23, 1991) (prohibiting litigation counsel from "agree[ing] to the use of binding arbitration"). By the same logic, it proves too much to suggest that federal agencies may not contractually preclude their prime contractors from including arbitration clauses in their subcontracts, where the United States may be financially responsible for breaches of those subcontracts. As a matter of substance, however, that is analogous to what the Department has done here. The Department is a party to three-way transaction in which it lends funds to student-borrowers, which the students use to pay participating institutions, and, in

the case of a breach of the contractual relationship between the student and the school, the Department bears the risk that it will not be repaid for the loan.  Nothing in the FAA precludes the Department from contracting in a reasonable manner to protect its financial interests in that transaction—just as a private lender might do under similar circumstances.

CAPPS argues that the conditional nature of the predispute arbitration and class action waiver provisions fails to save the 2016 Rule for several reasons.  To start, it invokes *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018), in which the Fifth Circuit considered the lawfulness of a Department of Labor rule that made it a condition precedent to exemption from certain onerous regulatory requirements that the regulated party enter into a written contract with its customers and specified that the required contract could not include a class action waiver provision.  Citing *Concepcion*, the Fifth Circuit reasoned that the condition violated the FAA because courts have "consistently struck down" state laws "that have attempted to *condition* or limit the availability of an arbitral forum."  885 F.3d at 385 (emphasis added); *see id.* (analyzing the rule published at 81 Fed. Reg. 21,002 (Apr. 8, 2016)).  To reach that conclusion, the Fifth Circuit characterized the rule at issue in *Concepcion*, which refused to enforce class-action waivers in arbitration agreements on grounds of unconscionability, as a "condition" on the enforcement of an arbitration agreement.  *Id.*  In the Fifth Circuit's view, the "condition" that the Department of Labor imposed on the regulatory exemption at issue violated *Concepcion*'s direction that states (and presumably federal agencies) may not impose "conditions" on the enforcement of arbitration agreements.  But that analysis conflates two distinct meanings of the word "condition."  As applicable to the restriction at issue in *Concepcion*, the word means "a restriction or qualification," but as applicable to the Department of Labor rule at issue in *Chamber of Commerce*—and, more importantly, as applicable here—it

means "a prerequisite" to an action or event. *Condition*, Webster's Third New International Dictionary at 473 (1993). Understood in this way, *Concepcion* sheds little light on the question whether a federal agency may elicit the type of concession at issue in *Chamber of Commerce* as a prerequisite to regulatory forbearance.

Even putting that difficulty aside, *Chamber of Commerce* presented a scenario that bears little relation to the question posed here. There is, in short, a vast difference between an agency's use of its regulatory authority to impose stricter regulatory requirements on parties that opt to use arbitration in transactions not involving public funds and an agency requiring participants in a federal program to eschew predispute arbitration clauses in transactions involving the disbursement, and potential loss, of billions of dollars of taxpayer funds as a precondition to participation in that federal program. As a result, even assuming that *Chamber of Commerce* reached the correct result—and the Court expresses no view on that question—that precedent does not advance CAPPS's challenge to the PPA conditions at issue in this case.[1]

---

[1] CAPPS does cite to two district court decisions that preliminarily enjoined spending, as opposed to regulatory, conditions on use of predispute arbitration agreements. In the first case, *Associated Builders & Contractors of Southeast Texas v. Rung*, No. 16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016), the District Court for the Eastern District of Texas held that the plaintiff was likely to prevail in its challenge to an Executive Order and Federal Acquisition Regulations ("FAR") rule that required contractors for noncommercial items over valued at $1 million to agree not to enter into mandatory, predispute arbitration agreements with their employees or independent contractor on any matter arising under Title VII or arising out of a sexual assault or sexual harassment. *Id.* at *13. In the second case, *American Health Care Association v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016), the District Court for the Northern District of Mississippi held that the plaintiff was likely to prevail in its challenge to a Center for Medicare and Medicaid Service ("CMS") rule barring long-term care facilities that participate in the Medicare and Medicaid programs from entering into predispute arbitration agreements with their residents. *Id.* at 925. Neither case, however, offers any detailed analysis of how the FAA applies to conditions imposed on the use of federal funds. Indeed, of the two decisions, *American Health Care Association* is the more detailed, and the judge in that case acknowledged that he could not "say with any high degree of confidence that the Rule would fall victim to a particular legal maxim." *Id.* at 931. Ultimately, the court based its decision on a

This then leads to CAPPS's two, alternative arguments, both of which challenge the lawfulness of the conditions the 2016 Rule added to the PPA.  It first argues that the conditions are unlawful because any "spending conditions" an agency may impose in implementing a federal program "must bear a reasonable relationship to a legitimate purpose of the federal program at issue."  Dkt. 83-1 at 19.  CAPPS acknowledges, of course, that the federal agencies "may establish and impose reasonable conditions relevant to federal interest[s] in [a] project and [its] over-all objective."  *Id.* at 19–20 (quoting *South Dakota v. Dole*, 483 U.S. 203, 208 (1987)).  But when it comes to questions of arbitration, according to CAPPS, "Congress has, in the FAA, explicitly and definitively resolved the national statutory policy on arbitration," and it is illegitimate for a federal agency to impose a condition in contravention of that established, national policy.  *Id.* at 21.   That is, CAPPS continues, the "Department's justification for" the Rule—"that arbitration has harmful consequences"—flies "in the face of" the "unambiguous congressional policy" embodied in the FAA.  *Id.*

This argument misunderstands that nature of statutory preclusion.  As the Supreme Court observed in *Epic Systems Corp.*, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic," the courts are "not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'"  138 S. Ct. at 1624 (internal quotation omitted).  As a result, "[a] party seeking to suggest that two statutes cannot be

---

finding that CMS was unlikely to prevail on the merits because the agency was unable to present "sufficient justification for banning nursing homes arbitration in [that] case, even assuming (as is far from clear) that it might have demonstrated a right to take such a step under any scenario." *Id.* at 943.  The Court need not, and does not, express a view on the lawfulness of the conditions imposed in either of these cases but merely concludes that the FAA does not, as CAPPS suggests, categorically prohibit the federal government from ever disfavoring predispute arbitration agreements in the context of federal contracts, grants, and programs.

harmonized, and that one displaces the other, bears a heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Id.* (same).   Here, the HEA grants the Secretary broad authority to include those terms in the PPA that she "determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan program, 20 U.S.C. § 1087d(a)(6), and the FAA declares that arbitration clauses "shall be valid, irrevocable, and enforceable," 9 U.S.C. § 2.   Because—as explained above—the 2016 Rule does not purport to invalidate or to render unenforceable any arbitration agreement, the HEA and FAA are readily harmonized.   Nor does CAPPS cite any authority for the novel proposition that courts should circumscribe broad statutory grants of agency discretion, not based on an actual statutory restriction, but based on the court's divination of congressional policy unmoored from the statutory text.

Finally, CAPPS argues that the conditions the Secretary imposed here are unlawful because participating schools are so dependent on Direct Loan funds that the "choice" whether to accept the conditions "is illusory."  Dkt. 83-1 at 22.   In pressing this argument, CAPPS relies principally on decisions involving the First and Tenth Amendments.   U.S. Const., Amds. I & X; Dkt. 83-1 at 22–24 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (Roberts, C.J., plurality op.); *Dole*, 483 U.S. at 211; *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 51 (2006); *Regan v. Taxation Without Representation of Wash.*, 461 U.S. 540, 545 & n.6 (1983)).   But even in cases involving the First Amendment and the special solicitude owed to the States under the Tenth Amendment, invalidation of federal spending conditions is rare—indeed, in most of the cases CAPPS cites, the rules at issue were upheld. But, more importantly, outside of those unique contexts, CAPPS fails to cite a single appellate or Supreme Court decision that holds or even suggests that the federal government may not attach

reasonable conditions on participation in a federal program, even if those who do business with the federal government or who are dependent on federal funds to conduct their businesses cannot function without the infusion of federal funds.  Nor is that dearth of authority surprising; innumerable private businesses are dependent on federal funding or federal contracting, and those businesses routinely elect—at times with little choice—to engage in that government-dependent business notwithstanding the array of conditions and restrictions that come with it.  The fact that many of those conditions and restrictions may exceed anything that the federal government could lawfully require in the absence of contractual or financial relationships is, except under the most exceptional of circumstances, of no moment.  *See, e.g.*, *Rumsfeld*, 547 U.S. at 59–60 (upholding spending condition requiring postsecondary institutions receiving federal assistance to provide equal recruiting access to the military); *Rust v. Sullivan*, 500 U.S. 173, 196–98 (1991) (upholding spending condition requiring that federally-subsidized family planning recipients not use federal funds for abortion activities).

The Court, accordingly, is unpersuaded by CAPPS's contention that the 2016 Rule is unlawful under the FAA.

## B.    The Department's Statutory Authority Under the HEA

CAPPS also argues that the arbitration and class action waiver conditions are unlawful because they "[e]xceed[] the Department's statutory authority."  Dkt. 83-1 at 24.  CAPPS makes only one argument in support of this theory: it argues that 20 U.S.C. § 1087d(a)(6) is a "general catch-all clause" and, as such, is "not sufficient to give the Department the authority to prohibit the enforcement of bilateral arbitration agreements."  Dkt. 83-1 at 25.  More is needed, CAPPS contends, because a "clear and manifest congressional command" is necessary "to displace the [FAA]."  *Id.* (quoting *Epic Sys.*, 138 S. Ct. at 1624).  But, as the Court has already explained,

there is no conflict between the 2016 Rule and the FAA and thus no need for the HEA to "displace" the FAA.

## C.   CAPPS's Challenge to the Rule as Arbitrary and Capricious

Finally, CAPPS challenges the arbitration and class action waiver conditions as "arbitrary and capricious" under the APA.  *See* 5 U.S.C. § 706(2)(A); Dkt. 83-1 at 28.  All agree that the APA requires agencies, including the Department of Education, to "examine the relevant data and [to] articulate a satisfactory explanation for [their] action[s] including a rational connection between the facts found and the choice[s] made."  *Motor Vehicle Mfrs. Assn. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations and quotations omitted).  Although the scope of judicial review of an agency's deliberations is "narrow" and deferential, if the agency "entirely fail[s] to consider an important aspect of the problem" at issue, the Court must set the agency's action aside as "arbitrary and capricious."  *Id.*  CAPPS maintains that the 2016 Rule runs afoul of this standard for five reasons.

CAPPS first argues that the Department "failed to consider adequately extensive data in the record demonstrating the benefits of arbitration."  Dkt. 83-1 at 28.  CAPPS points to its own comments, which cited both court opinions and empirical studies extolling the virtues of private arbitration.  *Id.* at 29 (citing AR-J-017077–78).  But CAPPS ignores the Department's extensive discussion of the failures of arbitration in the context of the Direct Loan program, specifically with respect to the collapse of Corinthian Colleges.  *See* 76 Fed. Reg. at 76,021–31.  The Department explained that "the widespread and aggressive use of class action waivers and predispute arbitration agreements coincided with widespread abuse by schools over recent years," resulting in injuries to "a great many students" that "cost the taxpayers many millions of dollars in losses."  81 Fed. Reg. at 76,025.  More importantly, the Department found predispute

arbitration agreements posed a special risk to the Direct Loan Program because of the way in which Corinthian had "used these waivers to avoid the publicity that might have triggered more timely enforcement agency action." *Id.* at 76,022.  Nor did the Department prohibit the use of *post*-dispute arbitration agreements.  *See* 34 C.F.R. § 685.300(f)(1)(ii).  If, after identifying a dispute, the student and their educational institution wish to take advantage of the benefits of arbitration that CAPPS identifies, they may.

In summary, the Department did not ignore—as CAPPS suggests—the prospect that students and schools may at times mutually benefit from arbitration.  CAPPS, of course, disagrees with the Department's assessment, and, the Department recently reassessed the issue in a manner more in line with CAPPS's view.  A rule is not arbitrary and capricious, however, "merely because [the agency] analyzed [and assessed] the competing interests in a way that displeased the plaintiff" or reached a conclusion on which reasonable minds might differ.  *N. Am. Catholic Educ. Programming Found., Inc. v. Womble Carlyle Sandridge & Rice, PLLC*, 800 F. Supp. 2d 239, 251 (D.D.C. 2011).

CAPPS's second argument—that the Department also failed to consider the "serious drawbacks of class actions for students," Dkt. 83-1 at 30—is unavailing for similar reasons. Nothing about the 2016 Rule *requires* students to bring their claims as class actions.  Indeed, nothing about the 2016 Rule *requires* students to litigate, rather than arbitrate, their claims— either on an individual or class basis.  Rather, the rule gives students the choice to bring their claims as a class action.  As the student amici point out, "[p]reserving the option for students to bring class actions where appropriate is not incompatible with the recognition that class actions can have downsides."  Dkt. 92 at 39.  Moreover, far from ignoring the comments regarding the potential downsides of class actions, the Department discussed them at length and found "little

evidence" to support the conclusion that consumer class actions "produce[] minimal or no actual

benefit" to class members, at least not in the postsecondary education context. 81 Fed. Reg. at

76,026. Indeed, the Department noted that "in one of the few class actions to proceed to trial, a

class of students obtained two million dollars in relief from a for-profit school." *Id.* at 76,026

n.85 (citing *Jamieson v. Vatterott Educ. Ctrs., Inc.*, 259 F.R.D. 530 (D. Kan. 2009)). The

Department also anticipated that the deterrent effect of class litigation—both in terms of

publicity and award amounts—would "motivate institutions to provide value and treat their

student consumers fairly in order to reduce the likelihood of suits in the first place." *Id.* at

76,026. Here, too, CAPPS's challenge amounts to nothing more than a disagreement with the

policy judgment that the Department reached after reviewing the evidence. More is required to

set aside a rule. *See N. Am Catholic Educ. Programming Found. Inc.*, 800 F. Supp. 2d at 251.

CAPPS's third argument takes issue with the Department's reliance on a CFPB study

regarding the use of arbitration agreements and class action provisions in the context of private

lending, including private student loans. Dkt. 83-1 at 31 (citing 81 Fed. Reg. at 76,025–26). In

particular, CAPPS posits that the Department erred in relying on the study because, as the CFPB

acknowledged, federal student loans differ from private loans in many key respects, including

the fact that student loan interest rates are fixed and income-based and flexible repayment

protections are often available. *Id*. (citing CFPB, *What Are the Different Ways to Pay for

College or Graduate School?*, http://www.consumerfinance.gov/askcfpb/545/what-are-main-

differences-betweenfederal-student-loans-and-private-student-loans.html). The "Department's

failure to undertake its own consideration of relevant data is," according to CAPPS, "fatal." *Id.*

But CAPPS fails to recognize that the Department considered the CFPB study only in

conjunction with its experience regarding the use of predispute arbitration and class action

waiver clauses in postsecondary education lending.  As the Department explained:

> We do not suggest that class actions are a panacea, and the criticisms of class actions in other markets may also apply to class actions in the postsecondary education market if such suits were available.  We stress that class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later.  The CFPB described these effects in its proposed rule, and as we demonstrated in the [Department's proposed rule], recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool.  As to the comment that class actions would harm private non-profit institutions, we note that these institutions are already subject to that risk, and nevertheless, only a small percentage of non-profit institutions currently use arbitration agreements with their students.  This suggests that institutions in this sector have generally felt no need for such protection, and we see no reason to expect that this regulation will change the exposure of non-profit institutions to class actions or other suits.

81 Fed. Reg. 76,026 (footnotes omitted).  Moreover, a key distinction between the public and

private student loan context—which CAPPS ignores—is that public student loans are made with

federal funds.  As a result, the Department explained, the federal government has a greater

interest in "publicizing claims of misconduct that law enforcement authorities might . . . never

been aware of" had the parties arbitrated their claims in secret.  *Id.*  The fact that the Department

considered the CFPB study—along with a host other factors and evidence—hardly gives rise to

the sort of reliance on an "improper factor[]" that would render the rule arbitrary or capricious.

*Select Specialty Hosp. of Atlanta v. Thompson*, 292 F. Supp. 2d 57, 64 (D.D.C. 2003) (citing

*State Farm*, 463 U.S. at 43).

CAPPS next argues that the rule is arbitrary and capricious because the Department failed

to give adequate consideration to the reliance interests of participating institutions.  Dkt. 83-1 at

32.  Agencies must, in crafting policy, "be cognizant that longstanding policies may have

'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2017) (internal citation and quotation omitted).  The student amici and the Department both argue that there is no such "longstanding polic[y]" on which CAPPS was entitled to rely because "[t]he Department had not previously taken a position on the legal authority to include conditions governing the use predispute arbitration agreements," Dkt. 93-1 at 17; *see also* Dkt. 91 at 44 (advancing a similar argument); *cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (distinguishing changes of policy, which implicate reliance interests, from regulations promulgated on a "blank slate").  But, even where such reliance interests are implicated, an agency may change its policy so long as it shows "awareness that it is changing position" and "that there are good reasons for the new policy."  *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television*, 556 U.S. at 515).  Here, the Department has met that burden.  The recurring theme of the Department's rulemaking was that the collapse of Corinthian Colleges demonstrated the weaknesses in the old policy.  *See* 81 Fed. Reg. at 76,025–26.  The fact that the Department expressly sought to remedy those weaknesses leaves "no doubt that the [Department] knew it was making a change."  *Fox Television*, 556 U.S. at 517.  That was the point of the rulemaking.

The Department's reasoning, moreover, was "entirely rational."  *Id.*  One reason why Corinthian's collapse had such devastating effects, the Department explained, was because the Department was unaware of the scope of the storm that was brewing.  *See* 81 Fed. Reg. at 76,026.  The Department reasoned that agreements requiring students to handle their disputes with Corinthian (and other institutions) by way of private, bilateral arbitration prevented the publicity that would have enabled the Department to engage in enforcement actions earlier.  *See id.*  And, the Department further reasoned that *ex ante* knowledge that students might bring high-

profile class actions—or even bring claims at all, as it appeared that cases were rarely arbitrated
—might deter institutions from engaging in such misconduct in the first place.  The Department
adopted the rule only after considering the potential costs to schools and finding those costs to be
outweighed by the potential benefits.  *Id.*; *see also id.* at 76,029 (noting comments about the
impact of increased legal fees due to the arbitration provision); *id.* at 76,048 (costs associated
with increased litigation); *id.* at 76,052 (compliance costs).  Again, the APA requires nothing
more.

Finally, CAPPS argues that the Court should set the 2016 Rule aside because the
Supreme Court's decision in *Epic Systems* represented a significant "change" in the "legal
landscape," which the Department did not have the opportunity to consider when it adopted the
rule.  Dkt. 83-1 at 33.  To the extent this argument merely recycles CAPPS's contention that the
rule is unlawful under the FAA, the Court has already addressed that contention at length.  And,
to the extent the argument merely asserts that the *Epic Systems* decision adds to the policy
considerations that the Department might, in its discretion, take into account, the Department is
free to do so—and, in fact, has issued a new rule, which is not yet effective, rescinding the
arbitration and class action waiver conditions.  Student Assistance General Provisions, Federal
Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed.
Reg. 49,788 (Sept. 23, 2019).  The question whether and when to reconsider a rule in light of
evolving policy considerations, however, is a question for agencies and not courts.

The Court, accordingly, is unpersuaded that the provisions of the 2016 Rule that CAPPS
challenges are arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion for summary

judgment, Dkt. 83, and will **GRANT** Defendant's cross-motion for summary judgment, Dkt. 94.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  January 31, 2020